**Case Nos. 22-15275, 22-15355, 22-15363, 22-15579**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ASHOK BABU, ET AL.,
*Plaintiffs-Appellees*,

v.

KEENAN G. WILKINS, AKA NERRAH BROWN,
*Objector–Appellant*,

TYLER ABBOTT, ET AL.,
*Objectors–Appellants*,

AMERICAN FRIENDS SERVICE COMMITTEE, ET AL.,
*Objectors–Appellants*,

REGINALD ROBERTSON,
*Objector–Appellant*,

v.

GREGORY J. AHERN, SHERIFF, ET AL.,
*Defendants-Appellees*.

Appeal From The United States District Court,
Northern District of California
Case No. 5:18-cv-07677-NC
Magistrate Judge Nathanael Cousins

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

**ROSEN BIEN GALVAN & GRUNFELD LLP**
Lisa Ells
Kara J. Janssen
Amy Xu
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
*Attorneys for Plaintiffs-Appellees*

[4279770.3]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION.............................................................2

STATEMENT OF THE CASE......................................................................2

I.     Plaintiffs' Pre-Suit Investigation of Unconstitutional Conditions at Santa Rita Jail .................................................................................2

II.    The Complaint ................................................................................4

III.   Discovery, Expert Reports, and Negotiations Before the Magistrate Judge, Including Department of Justice Involvement ...................6

IV.   Motion For Class Certification ....................................................10

V.    Preliminary Approval of the Consent Decree and Motion for Attorneys' Fees .............................................................................11

VI.   Notice Period and Objections ......................................................13

VII.  Final Approval Hearing ...............................................................15

VIII. Appeals ........................................................................................18

SUMMARY OF THE ARGUMENT ...........................................................19

ARGUMENT ..............................................................................................22

I.     THE ORGANIZATIONS LACK STANDING ............................22

II.    THE MAGISTRATE JUDGE'S JURISDICTION WAS PROPER.............22

     A.   Named Class Members Can Consent to Magistrate Jurisdiction On Behalf Of Absent Class Members ...............23

     B.   The Record Shows Absent Class Members Impliedly Consented to Magistrate Judge Jurisdiction........................25

III.   PLAINTIFFS ADEQUATELY ALLEGED AND PROVED ARTICLE III STANDING FOR ALL CLASS MEMBERS .......27

IV.   THE DISTRICT COURT PROPERLY FOUND NOTICE WAS APPROPRIATE .........................................................................30

V.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DEEMING THE SETTLEMENT FAIR, ADEQUATE, AND REASONABLE ............................................................................34

     A.   The District Court Applied the Correct Standard. ............34

i

B.     Class Counsel and the Class Representatives Adequately Represented the Class............................................................36

        1.     The Class Representatives Adequately Represented the Class ..................................................................36

        2.     The District Court Appropriately Found That Class Counsel Provided Adequate Representation. ...........................38

C.     The District Court Rightly Concluded the Consent Decree Negotiations Were Arm's-Length and Free of Collusion .................42

D.     The District Court Correctly Found the Consent Decree Provides Substantial Relief. ................................................43

        1.     The Consent Decree Provides Substantial Relief ....................45

        2.     The Settlement Was Appropriate Given the Risks, Costs, and Delay of Proceeding to Trial ..............................................52

        3.     The Terms of the Consent Decree Are Favorable to Future Litigants. ......................................................54

        4.     The Ongoing Involvement of the Department of Justice Further Demonstrates That the Consent Decree Provides Adequate Relief.........................................................56

E.     The District Court Did Not Ignore Collusion In Approving Plaintiffs' Attorneys' Fees ................................................57

F.     The Consent Decree Treats Class Members Equitably......................61

VI.     THE DISTRICT COURT ADEQUATELY RESPONDED TO ALL NON-FRIVOLOUS OBJECTIONS............................................64

CONCLUSION ...................................................................68

# TABLE OF AUTHORITIES

**Page**

## CASES

*A.B. v. Hawaii State Dep't of Educ.*,
   30 F.4th 828 (9th Cir. 2022) ..........................................................35

*Am. Council of the Blind v. Astrue*,
   No. C05-04696 WHA, 2008 WL 4279674 (N.D. Cal. Sept. 11, 2008) ........40

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) .................................................. 30, 32

*Armstrong v. Newsom*,
   58 F.4th 1283 (9th Cir. 2023) ........................................................45

*Bates v. United Parcel Serv., Inc.*,
   511 F.3d 974 (9th Cir. 2007) ........................................................30

*Briseño v. Henderson*,
   998 F.3d 1014 (9th Cir. 2021) ......................................................64

*Brown v. Plata*,
   563 U.S. 493 (2011).......................................................... 45, 58

*Campbell v. Facebook, Inc.*,
   951 F.3d 1106 (9th Cir. 2020) ........................................... passim

*Churchill Vill., L.L.C. v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004) ........................................................70

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ......................................................38

*Coleman v. Brown*,
   28 F. Supp. 3d 1068 (E.D. Cal. 2014) .........................................46

*Coleman v. Newsom*,
   No. S-90-0520-KJM-DB P,2020 WL 949935 (E.D. Cal. Feb. 27,
   2020) ......................................................................................61

*Day v. Persels & Assocs., LLC*,
   729 F.3d 1309 (11th Cir. 2013) ...................................................24

*Dewey v. Volkswagen Aktiengesellschaft*,
   681 F.3d 170 (3d Cir. 2012) .......................................................24

*East Tex. Motor Freight System, Inc. v. Rodriguez*,
   431 U.S. 395 (1977)..................................................................40

*Hall v. Cnty. of Fresno*,
    No. 1:11-cv-02047-LJO-BAM, 2015 WL 5916741 (E.D. Cal. Oct. 7, 2015) .................................................................................. 36, 59

*Handschu v. Special Servs. Div.*,
    605 F. Supp. 1384 (S.D.N.Y. 1985), *aff'd*, 787 F.2d 828 (2d Cir. 1986) .................................................................... 44, 57, 62

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ............................................... passim

*Hernandez v. Cnty. of Monterey*,
    305 F.R.D. 132 (N.D. Cal. 2015) ..................................................36

*Hesse v. Sprint Corp.*,
    598 F.3d 581 (9th Cir. 2010) .........................................................60

*Hiser v. Franklin*,
    94 F.3d 1287 (9th Cir. 1996) .........................................................60

*In re Apple Inc. Device Performance Litigation*,
    50 F.4th 769 (9th Cir. 2022) ............................................ 38, 39, 71

*In re Bluetooth Headset Products Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ........................................... 47, 64, 66

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019) .........................................................36

*In re LinkedIn User Priv. Litig.*,
    309 F.R.D. 573 (N.D. Cal. 2015) ..................................................48

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir.), *as amended* (June 19, 2000) ..................43

*In re Pac. Enterprises Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ...........................................................70

*In re Tableware Antitrust Litig.*,
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) .......................................67

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    895 F.3d 597 (9th Cir. 2018) ................................................. 71, 74

*Kim v. Allison*,
    8 F.4th 1170 (9th Cir. 2021) .........................................................37

*Koby v. ARS National Services, Inc.*,
    846 F.3d 1071 (9th Cir. 2017) ............................................... passim

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998) ............................................... 44, 71

*Littlejohn v. Copland*,
819 F. App'x 491 (9th Cir. 2020)..................................................................38

*Lusk v. Five Guys Enters. LLC*,
No. 1:17-cv-00762-AWI-EPG, 2019 WL 7048791 (E.D. Cal. Dec. 23,
2019) .............................................................................................................38

*Mays v. Cnty. Of Sacramento*,
No. 2:18-cv-02081 TLN KJN P, 2018 WL 11295524 (E.D. Cal.
Nov. 30, 2018), *report and recommendation adopted*, 2018 WL
11295523 (E.D. Cal. Dec. 28, 2018) ...........................................................36

*McAdams v. Robinson*,
26 F.4th 149 (4th Cir. 2022) ........................................................................24

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ........................................................................31

*Norbert v. City & Cnty. of San Francisco*,
10 F.4th 918 (9th Cir. 2021) ........................................................................58

*Officers for Justice v. Civil Serv. Comm'n of S.F.*,
688 F.2d 615 (9th Cir. 1982) ........................................................................49

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022), *cert. denied sub nom. StarKist Co. v.
Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424 (2022).....................31

*Pigford v. Glickman*,
185 F.R.D. 82 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000),
*and enforcement denied sub nom. Pigford v. Schafer*, 536 F. Supp. 2d
1 (D.D.C. 2008) ............................................................................................50

*Radcliffe v. Hernandez*,
794 F. App'x 605 (9th Cir. 2019) .................................................................67

*Rodriguez v. West Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ........................................................................47

*Roell v. Withrow*,
538 U.S. 580 (2003)....................................................................... 25, 26, 28

*Saucillo v. Peck*,
25 F.4th 1118 (9th Cir. 2022) ................................................................ 28, 39

*Sec. Life Ins. Co. of Am. v. Meyling*,
146 F.3d 1184 (9th Cir. 1998) ......................................................................68

*Stathakos v. Columbia Sportswear Co.*,
No. 4:15-CV-04543-YGR, 2018 WL 582564 (N.D. Cal. Jan. 25,
2018) .............................................................................................................33

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ........................................................................56

*Sully v. Ayers*,
    725 F.3d 1057 (9th Cir. 2013) ........................................39

*Toussaint v. McCarthy*,
    926 F.2d 800 (9th Cir. 1990) ........................................58

*TransUnion LLC. v. Ramirez*,
    141 S. Ct. 2190 (2021).......................................... passim

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)........................................33

*Williams v. Gen. Elec. Cap. Auto Lease, Inc.*,
    159 F.3d 266 (7th Cir. 1998) .............................. 24, 25

## STATUTES

28 U.S.C. § 1291 ........................................................2

28 U.S.C. § 1331 ........................................................2

28 U.S.C. § 1343 ........................................................2

28 U.S.C. § 1367 ........................................................2

28 U.S.C. § 636........................................ 22, 23, 24, 25

42 U.S.C. § 1997e ....................................................53

## OTHER AUTHORITIES

1 Newberg and Rubenstein on Class Actions § 2:4 (6th ed.) ................................27

Fed. R. Civ. P. 23(e)(2) Advisory Committee Note to 2018 Amendment ....... 35, 36

## RULES

Fed. R. App. P. 4 ........................................................2

Fed. R. Civ. P. 23 .................................................... passim

Fed. R. Civ. P. 24 ....................................................24

## REGULATIONS

Cal. Code. Regs. Tit. 15, § 1065 ................................................48

# INTRODUCTION

In these four consolidated appeals, Appellants-Objectors (collectively, "Objectors") raise a litany of baseless arguments urging reversal of the district court's well-reasoned order granting final approval to the Consent Decree because, at bottom, they disagree with the exact form of injunctive relief that the parties have agreed on to remedy the unquestionably unconstitutional conditions at Santa Rita Jail in Alameda County, California. But that is not a legitimate reason to reject the settlement, and none of Objectors' arguments seriously challenge the district court's findings that the Consent Decree is fair, adequate, and reasonable—though they do, as the trial court found, "highlight the pressing need to reform the Jail's policies and procedures." Objectors' claims that the magistrate lacked jurisdiction to approve the settlement and challenging class member standing are not supported by the record or precedent in this, nor any other, circuit. Nor can Objectors identify any abuse of discretion in the trial court's order. As the district court recognized, the Consent Decree requires Defendants to implement "substantial changes to the policies, procedures, and facilities at the Jail" that benefit all incarcerated people, and exceed both state law requirements and relief obtained in other comparable settlements. Furthermore, the record fully supports the district court's finding that the settlement was negotiated at arm's length and contains no signs of collusion. This Court should affirm the district court's final

approval of the Consent Decree, which was the culmination of more than three years of factual investigation and over a dozen settlement conferences overseen by a federal magistrate judge. It is undisputed that the Jail's conditions prior to the Consent Decree are inhumane and unconstitutional; this Court should not slow the progress to remedy those conditions by requiring further unnecessary determinations by the district court or unwarranted renegotiations.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. The February 7, 2022 order is appealable pursuant to 28 U.S.C. § 1291, although Organization-Objectors lack standing to appeal. *See* Argument Section I; 22-15363, Dkt. 27, 36. Organization-Objectors (22-15363) and Inmate-Objectors (22-15355) timely appealed on March 7, 2022, and Objector Wilkins (22-15275) timely appealed on February 15, 2022. Objector Robertson's appeal (22-15579) was timely filed on March 24, 2022 pursuant to an extension granted under Federal Rule of Appellate Procedure 4(a)(1)(A).

## STATEMENT OF THE CASE

### I. Plaintiffs' Pre-Suit Investigation of Unconstitutional Conditions at Santa Rita Jail

Plaintiffs began investigating this case after community members' longstanding concerns about unconstitutional and dangerous conditions at Santa Rita Jail ("the Jail") in Dublin, California, which is run by the County of Alameda

("the County"), came to a head. 9-ER-2110-2111. Starting in September 2017, Plaintiffs began receiving a steady stream of complaints from incarcerated people, family members, and community groups about dire conditions at the Jail, including reports that prisoners with psychiatric disabilities rarely left their cells and received negligible access to programming and no meaningful mental health treatment, which led them to suffer in isolation for extended periods. 9-ER-2110-2111. Further, in the five years prior to this lawsuit, at least 33 people had died at the Jail—13 of them by suicide. 12-ER-3040.

Prior to bringing suit, Class Counsel spent hundreds of hours investigating the Jail, corresponding with incarcerated people, reviewing publicly available information, including Board of Supervisors' meeting minutes and grand jury reports, and collaborating with community groups. 1-ER-5; 9-ER-2110. The investigation made clear the Jail's poor conditions and shockingly high death rates were inextricably related to the Jail's overreliance on isolation and failure to provide adequate mental health treatment. The Jail incarcerated many patients with serious mental illnesses, but forced them to remain isolated in their cells rather than providing any meaningful treatment in its mental health units. *See* 12-ER-3073-3090. When patients expressed suicidality, the County placed them in "safety cells"—inhumane single-person cells without furniture or running water where people must sleep, eat, and use the restroom on the floor. 12-ER-3041.

Despite policies limiting the use of safety cells to 72 hours, the Jail often left suicidal patients in these appalling settings for a week or more at a time. 12-ER-3041. The County also placed people in isolation as punishment, including for behaviors that were related to an individual's psychiatric disabilities. 12-ER-3061. The County lacked effective, accurate policies and systems to appropriately determine placement in the Jail's various isolation settings, leading to overreliance on their use. 12-ER-3060-3073. As a result, the County's practices in the Jail exacerbated symptoms of existing psychiatric disabilities and caused people without pre-existing psychiatric disabilities to develop them. *See* 12-ER-3060-3073.

## II.    The Complaint

After extensive investigation, class counsel initiated this case on behalf of named plaintiffs Ashok Babu, Robert Bell, Ibrahim Keegan-Hornesby, Demarea Johnson, Brandon Jones, Stephanie Navarro, Roberto Serrano, and Alexander Washington ("Plaintiffs"), who represent all adults who are currently or will in the future be incarcerated at the Jail. 12-ER-3043-3051. Each named plaintiff who is no longer at the Jail is subject to return for further court proceedings or potential violation of their supervision terms. *See* 12-ER-3043-3051. Plaintiffs Babu, Bell, Keegan-Hornesby, Johnson, Navarro, and Washington are also people with psychiatric disabilities who have been subject to the Jail's centralized policies regarding mental health care, use of safety cells, medication management, and

access to programs, services, and activities including disability-related accommodations. 12-ER-3073-3090. They also represent the disability subclass, which is defined as all qualified individuals incarcerated in the Jail with a psychiatric disability. 12-ER-3093-3095.

On December 21, 2018, Plaintiffs sued Alameda County, which operates and manages the County Jails, and its representatives (collectively, "Defendants"), alleging that "[d]ue to understaffing, poor management, and lack of treatment space, Alameda County relies almost entirely on the unconstitutional use of isolation to manage prisoners, including prisoners with significant disabilities and mental health needs, resulting in horrific suffering." 19-ER-4642; *see also* 12-ER-3040 (First Amended Complaint). Plaintiffs' complaint did not seek damages. Instead, Plaintiffs sought declaratory and injunctive relief to remedy the unlawful conditions at the Jail, including (1) ending the unconstitutional use of isolation; (2) provision of due process to people regarding their placement in isolation cells; (3) ensuring patients with psychiatric disabilities meaningful access to the Jail's programs, including by housing them in the least restrictive setting appropriate to their needs; (4) provision of constitutionally adequate mental health care; and (5) the reduction or end of the Jail's use of safety cells, which place patients with psychiatric disabilities at an increased risk of harm. 12-ER-3042. In February 2019, the parties consented to magistrate judge jurisdiction, 19-ER-4639-4640, and

Defendants answered in March 2019 denying the allegations. 18-ER-4581-4618.

## III. Discovery, Expert Reports, and Negotiations Before the Magistrate Judge, Including Department of Justice Involvement

Plaintiffs conducted an extensive investigation as to the factual and legal issues raised in this case. This matter was subject to the Northern District of California's General Order 56 process, which governs cases involving claims under the ADA and requires the parties to engage in early settlement negotiations and conduct site visits, while also automatically staying discovery. *See* 9-ER-2111-2112. Through this process, Defendants produced over 57,000 pages of documents, including mental health and correctional files of individuals incarcerated at the jail, as well as current policies, procedures, forms and materials regarding operation of the Jail, out-of-cell time, classification, restrictive housing, mental health care, disability-related accommodations, and general correctional practices. 5-ER-996, 9-ER-2112.

The parties retained a panel of four experienced joint neutral experts in the areas of corrections, classification, ADA, and mental health to assess the Jail's policies and practices. 18-ER-4563-4564. Terri McDonald, the corrections expert, and Dr. James Austin, the classification expert, have decades of executive-level experience overseeing and reforming prison and jail custody systems. *See, e.g.*, 5-ER-1000-1006. Sabot Consulting and Mike Brady are experienced neutral experts who evaluated the Jail's ADA, COVID-19, and staffing policies. 16-ER-3809-34;

16-ER-3889-3972. Dr. Kerry Hughes, a psychiatrist and experienced court-appointed expert in *Coleman v. Newsom* responsible for monitoring mental health care in California's prison system, issued a report evaluating the Jail's mental health system. 16-ER-3974-4000.

The experts spent eight days on-site conducting interviews with staff and class members and reviewing over 53,000 pages of documents that Defendants produced through informal discovery, several data sets, and video recordings of use-of-force incidents. 16-ER-3806; 17-ER-4331. Based on this extensive evaluation, the joint experts filed public reports substantiating the severity of Plaintiffs' allegations. *See* 16-ER-3805-4041. The experts concluded, *inter alia*, that "[p]ersons held in the Jail do not receive enough out-of-cell time, and do not receive enough access to rehabilitative programming." 16-ER-3806. The reports illustrated the limitations of the Jail's critically understaffed mental health system, which did not have the appropriate physical space for confidential clinical interviews and failed to provide adequate treatment for patients in crisis. 16-ER-3806. Further, the expert reports found the Jail lacked a system for tracking and identifying patients with cognitive disabilities to permit them access to rehabilitative programming. 16-ER-3806-3807. The joint experts also found the County lacked sufficient custody staff to operate the Jail safely and their classification system, which relied heavily on the use of restrictive housing, needed

to be overhauled.  16-ER 3806.

The parties engaged in extensive negotiations following the completion of the joint expert reports substantiating Plaintiffs' claims.  From December 2019 to August 2021, the parties participated in fourteen mediation sessions with Magistrate Judge Beeler, as well as in countless meet and confer discussions, to negotiate the substantive contents of the Consent Decree.  *See* 5-ER-866.  The joint experts also aided in the negotiations by providing guidance on disputed issues.  5-ER-996-997.  Throughout this period, Plaintiffs continued to meet with the named plaintiffs and putative class members to learn and advocate about their concerns.  9-ER-2112-2113.

The onset of the COVID-19 pandemic in March 2020 had a catastrophic impact on incarcerated people living in congregate settings, and therefore significantly altered the trajectory of this case.  The parties appeared before the court on numerous occasions to discuss efforts to address the pandemic in the Jail.  4-ER-622-623, 9-ER-2114.  The parties' joint expert completed six mostly unannounced Jail inspections to evaluate its COVID-19 policies.  9-ER-2114.  Plaintiffs amended their complaint to include allegations concerning Defendants' failure to properly implement sufficient COVID-19 policies and procedures.  12-ER-3039-3108.  During the pandemic, Plaintiffs in *Gonzalez et al. v. Ahern*, Case 5:18-cv-07677 (N.D. Cal.) ("the *Gonzalez* matter"), a putative class action

involving different challenges to conditions at the Jail, filed motions in this case seeking to intervene and relate the cases to address COVID-19 issues, *see* 13-ER-3264 – 14-ER-3432, SER-146-170, 140-141, which the court denied. SER-133, 142-145. Counsel for the *Gonzalez* plaintiffs—who also acted as counsel for certain inmate objectors in the trial court and is now counsel for Inmate-Objectors on appeal—did not object to the jurisdiction of the magistrate judge when trying to formally join the case. *See* 13-ER-3264 – 14-ER-3432; SER-146-170, 140-141.

Concurrent with Plaintiffs' investigation and lawsuit, the United States Department of Justice (DOJ) began investigating the County, including its Jail and psychiatric hospital, in 2017. *See* 9-ER-2115-2116. The DOJ's resulting April 22, 2021 investigative report overlapped substantively with Plaintiffs' complaint. It described the inadequate mental health care provided at the Jail, including a lack of individualized treatment and discharge planning, *see* SER-114-124, and the Jail's unconstitutional use of prolonged restrictive housing, *see* SER-124-128. Consequently, the DOJ requested to participate in the parties' settlement discussions before Magistrate Judge Beeler, to attend negotiations between the parties, and to review and comment on documents, including drafts of the Consent Decree. *See* SER-59-60. Plaintiffs worked diligently during the settlement negotiations to ensure that the DOJ's concerns were adequately and appropriately addressed. Ultimately, numerous revisions to Consent Decree terms were made to

bring the language into conformity with terms from DOJ conditions-of-confinement cases in other jurisdictions.  5-ER-997, 9-ER-2116.

## IV.    Motion For Class Certification

Through the course of informal discovery, it became clear to the parties that Defendants did not have a realistic basis for opposing the motion for class certification, and that doing so would unnecessarily drive up litigation costs and cause further delays.  Accordingly, Plaintiffs' counsel drafted a motion for class certification, which the parties filed jointly.  17-ER-4245-4267.  The motion described how all members of the proposed class and subclass are "exposed to a substantial risk of serious harm due to Defendants' policies and practices related to conditions of confinement, classification, housing and mental health care," and moved to certify the proposed class and disability subclass pursuant to Rule 23(b)(2) for the purposes of seeking declaratory and injunctive relief.  17-ER-4251, 4266.  The parties identified numerous common questions of law affecting all people in the Jail, including whether its use of isolation violates the Constitution; whether the Jail improperly houses people in restrictive housing units and violates their due process rights; and whether the Jail's policies and practices subject inmates to a substantial risk of serious harm, including as to COVID-19.  17-ER-4259-4260.  The court granted the parties' joint motion for class certification on January 21, 2020, finding the "numerosity, commonality, typicality, and adequacy

requirements of Rule 23(a) are satisfied." 17-ER-4238. The court therefore certified a class consisting of "[a]ll adults who are now, or in the future will be, incarcerated in the Alameda County Jail" and a subclass defined as "[a]ll qualified individuals with a psychiatric disability … and who are now, or will be in the future, incarcerated in the Alameda County Jail." 17-ER-4238. The court also appointed the class and subclass representatives, and appointed Class Counsel to represent the class's interests. 17-ER-4238-4239.

## V. Preliminary Approval of the Consent Decree and Motion for Attorneys' Fees

On June 24, 2021, the parties notified the court that they had reached agreement on all of the substantive corrective actions necessary to address Plaintiffs' injunctive claims. SER-57-58. Up to that point, Class Counsel refused to engage in any negotiations or discussion about payment of their reasonable attorneys' fees and costs. SER-57-58; 4-ER-628; 5-ER-997. After the parties reached agreement on the substantive remedial terms of the proposed Consent Decree, they participated in two settlement conferences before Magistrate Judge Beeler focused solely on attempting to resolve Plaintiffs' fees claim. SER-55-56; 4-ER-628-629. Thereafter, Plaintiffs filed for preliminary approval of the Consent Decree, which Defendants did not oppose. 12-ER-2816-2835.

The Consent Decree provides comprehensive injunctive relief to the certified class and subclass by requiring the County to substantially change policies,

procedures, and facilities pertaining to many major aspects of the Jail's operations. The changes include improving mental health care and treatment services; increasing programming and discharge planning for people with mental health disabilities; revamping suicide prevention protocols including by limiting the use of dangerous safety cells; increasing out-of-cell time; and reducing the use of restrictive housing. 12-ER-2836-2945; *see also* 12-ER-2821. The Consent Decree also includes robust mechanisms for reporting, monitoring, and dispute resolution. 12-ER-2904-2912. For at least six years, neutral experts and Class Counsel will have extensive access to tour the Jail; provide feedback on draft policies, procedures, and trainings; and monitor the County's compliance with the relief ordered by the Consent Decree. 12-ER-2904-2912; 12-ER-2914-2916. Class Counsel can enforce the Consent Decree by bringing those issues before the court, which retained jurisdiction to address future disputes. 12-ER-2911-2912. Additionally, the DOJ is entitled to biannual tours of the Jail with their mental health expert and access to all policies, procedures, forms, and trainings covered by the Consent Decree. 12-ER-2904-2910. The Consent Decree—which, like Plaintiffs' complaint, is limited to injunctive relief—acknowledges that the County may attempt to assert claim or issue preclusion in other litigation, but does not release or otherwise address in any way class members' potential claims for damages. 12-ER-2914.

The court granted the unopposed motion for preliminary approval on September 24, 2021, finding the Consent Decree was "the product of arms'-length, serious, informed, and non-collusive negotiations between experienced and knowledgeable counsel who have actively prosecuted and defended this litigation." 11-ER-2773-2776. The court also determined that the settlement notice and proposed notice process "constitutes valid, due, and sufficient notice to the class, constitutes the best notice practicable under the circumstances, and complies fully with the requirements of Rule 23 of the Federal Rules of Civil Procedure." 11-ER-2774.

Thereafter, Class Counsel asked the court to push back the objections deadline and the final approval hearing date in response to class member requests for additional time. SER-044-45. The court acquiesced, extending the deadline for written objections to December 31, 2021 and delaying the final approval hearing, setting it for January 19, 2022. 11-ER-2775.

## VI. Notice Period and Objections

The parties distributed the settlement notice according to the court-approved plan. *See* 4-ER-563-567. By October 14, 2021, the notice was posted in all intake and housing units and on the tablet and television notification system at the Jail. 4-ER-564. Class Counsel also posted the notice on its public website in English, Spanish, Traditional Chinese, Simplified Chinese, Vietnamese, Tagalog, and

Korean.  4-ER-564.  Class Counsel  made considerable efforts to communicate

with class members and the public during the notice period beyond what was

required by the court's notice plan.  For example, Class Counsel filmed an video

about the Consent Decree and how to submit objections that was lodged on the

Jail's tablets and on Class Counsel's public website.  4-ER-563-625.  Between

September 24 and December 31, 2021, Class Counsel communicated with 333

class members through calls, letters, and/or in person meetings, including during

two all-day visits to Jail housing units where they provided information to class

members about the Consent Decree and how to file objections or comments.  4-

ER-564-565.  Additionally, Class Counsel appeared on television and radio

programs and met with numerous community-based groups to discuss the

implications of the Consent Decree.  4-ER-566.

In total, class members and community members filed 131 responses to the

Consent Decree in advance of the final approval hearing.  1-ER-7.  Of the total 131

filings, 110 were on behalf of incarcerated individuals, representing approximately

5% of the Jail's population at that time.  1-ER-7; 4-ER-579, 812-815; *see also* 4-

ER-806-810 (explaining analysis).  Community members and organizations who

do not fall within the class definition filed at least 22 objections, including

Organization-Objectors' submission, which was filed three days after the

December 31 deadline.  1-ER-7; *see also* 5-ER-1228-1269 (objections filed by

Organization-Objectors on January 3, 2022). Nearly half of the objections (62 out of 131) were just responses to standardized surveys. 4-ER-579, 812-815. Some of the responses were neutral or supportive of the Consent Decree. 4-ER-579-580, 812-815.

Other objections, including some survey responses, expressed broader frustrations about incarceration and the need to reform the criminal justice system. 4-ER-580, 812-815; *see also* 1-ER-9. At least 23 objections stated that people who have severe mental health conditions should never be incarcerated. 4-ER-580, 812-815; *see also* 1-ER-9. Nearly two-thirds of the objections (100 out of 131) raised concerns about out-of-cell time, including some who objected because they were not currently receiving enough out-of-cell time. 4-ER-580-581, 812-815; *see also* 1-ER-7. Still other class members focused their objections on discrete issues outside of the Complaint, including inflated commissary prices or poor food quality, and which indeed are covered by the *Gonzalez* matter in which counsel for Inmate-Objectors is lead counsel. *See* 1-ER-7; 4-ER-812-815. Finally, some objections discussed sex, gender, or race-based discrimination occurring at the Jail. 4-ER-581-582, 812-815. No objection raised concerns about the magistrate judge's jurisdiction or challenged Plaintiffs' standing.

## VII. Final Approval Hearing

The district court heard extensive testimony about the Consent Decree

during two multi-hour hearings on the motion for final approval. On January 19, 2022, the court permitted over two hours of testimony from community members, none of whom were class members. 3-ER-257-342. After the first hearing, the court requested supplemental briefing to address numerous issues raised by objectors, including, for example, substantive legal and factual questions about the sufficiency of the Consent Decree, allegations of collusion, the adequacy of Class Counsel's representation in other prison class actions, and clarifications about the claimed fees. 3-ER-540-542. Plaintiffs provided answers to the court's inquiries. 3-ER-354-429. The court then held a second hearing on January 27, 2022, in which it heard telephonically from 36 class members over the course of five hours. 2-ER-18-255. Again, no one at either hearing objected to the magistrate judge's jurisdiction or challenged Plaintiffs' standing.

Thereafter, the court approved the settlement, finding the terms of the Consent Decree fair, adequate, and reasonable. 1-ER-3-13. The court found that the parties "extensively evaluated the merits of the case" and determined that "settlement at this time will avoid … the delays and risks presented by further litigation." 1-ER-4. The court also concluded that the parties reached a settlement after "intensive and prolonged arm's length negotiations by capable counsel," and cited to the DOJ's participation in the extensive settlement negotiations overseen by a magistrate judge. 1-ER-4-5, 8. The court noted Class Counsel's significant

work prior to reaching settlement, highlighting, among other things, four years of factual investigation, a thorough discovery process, and "hundreds of hours communicating with incarcerated individuals by phone and in writing to understand the Jail's inhumane conditions." 1-ER-5, 9.

The court also substantively evaluated the Consent Decree, finding it provides "substantial changes to the policies, procedures, and facilities at the Jail" for all class and subclass members. 1-ER-5-6. The court rejected as unfounded Inmate-Objectors' unsubstantiated assertion that the Consent Decree offers no benefits for 96% of incarcerated people. 1-ER-7-8. Addressing the objections by category, the court found they "do not dissuade the Court from approval because they highlight the pressing need to reform the Jail's policies and procedures," and granted final approval of the Consent Decree. 1-ER-9. Additionally, the court found that notice distribution was appropriate because individuals who may later become incarcerated would receive notice of the Consent Decree at that time, while also determining that the extensive public participation in the objection process and fairness hearing demonstrated as a de facto matter that notice had been provided. 1-ER-10.

The court awarded $2.15 million in attorneys' fees and costs to Class Counsel for work performed through the effective date of the Consent Decree. 1-ER-12. The court found that Plaintiffs were the prevailing parties and therefore

entitled to attorneys' fees. 1-ER-10. Noting Class Counsel's substantial billing judgment reductions, the court determined that the time spent on this litigation, as well as the rates, were reasonable. 1-ER-11. The court also approved annual caps for attorneys' fees for Class Counsel's ongoing work to monitor implementation, and authorized fees should Plaintiffs prevail on enforcing or defending the Consent Decree during its anticipated six-year duration. 1-ER-12.

## VIII. Appeals

Four appeals[1] of the final approval order were filed by, *inter alia*, a group of people incarcerated at the Jail at the time of the appealed order (22-15355, the "Inmate-Objectors"); a set of non-party community organizations[2] (22-15363, the "Organization-Objectors"); and two *pro se* individuals, Reginald Robertson (22-15579, "Robertson"), who is a pretrial detainee at the Jail, and Keenan Wilkins (22-15275, "Wilkins"), who was last in the Jail in 2012 and is currently incarcerated in the California Department of Corrections and Rehabilitation. Defendants moved to dismiss the Organization-Objectors and Wilkins appeals for lack of standing, which Plaintiffs did not oppose. *See* 22-15363, Dkts. 27, 34; 22-15275, Dkts. 20, 28. The Court denied Defendants' motions without prejudice.

---

[1] Two additional appeals were dismissed. *See* 22-15353, 22-15886.

[2] The National Lawyers Guild voluntarily dismissed their appeal. *See* 22-15363, Dkt. 38.

*See* 22-15363, Dkt. 37; 22-15275, Dkt. 33-1.

The Court consolidated the appeals, *see* 22-15355, Dkt. 31, and Objectors thereafter each filed a separate opening brief along with a single excerpt of record. *See* 22-15355, Dkt. 36 ("ER"); Dkt. 37 ("Inmate-AOB"); Dkt. 38 ("Robertson-AOB"); Dkt. 39 ("Org-AOB"); Dkt. 41 ("Wilkins-AOB").[3]

## SUMMARY OF THE ARGUMENT

As an initial matter, this Court should dismiss Organization-Objectors' appeal for lack of standing, as they are non-parties not entitled to appeal. On the other hand, this Court should reject both jurisdictional arguments proffered by Organization-Objectors. The law is clear not only in this Circuit, but in every Circuit to address the issue, that named class members can consent to magistrate judge jurisdiction on behalf of absent class members, and there is no dispute the named plaintiffs did so here. Moreover, the record clearly reflects that, by voluntarily participating in the proceedings without raising this objection, absent class members impliedly consented to the magistrate judge's jurisdiction to decide the case. Finally, Organization-Objectors' assertion that this Court should reverse because the district court allegedly failed to sufficiently consider standing under *TransUnion LLC. v. Ramirez*, 141 S. Ct. 2190 (2021), must be rejected. *TransUnion* has no application to this injunctive-only case, and there is no question

---

[3] All opening brief page citations are to the ECF pagination.

that Plaintiffs meet this Court's standing requirements given the clear risk of future harm posed by the County's existing jail conditions, which the district court deemed unconstitutional.

Objectors' merits arguments fare no better. Their claim that every member of the public was entitled to notice is predicated on a nonsensical misreading of the class definition never adopted by the district court that, if correct, would have precluded class certification in the first place. Moreover, Objectors identify no abuse of discretion in the district court's determination that the settlement is fair, reasonable, and adequate under Federal Rule of Civil Procedure 23(e). While Objectors claim the district court applied the wrong legal standard, the 2018 revisions to Rule 23(e) did not supplant the *Hanlon* factors, and in any event the statutory requirements are clearly met. The district court repeatedly found the class representatives adequate, and their interests remained aligned through final approval because all members of the injunctive-only class and subclass seek to compel the County to change the Jail's unconstitutional policies and practices. Objectors identify no clear error in the trial court's determination that class counsel – highly experienced prison litigators – adequately represented the class. It is uncontested that class counsel carefully investigated their claims for years prior to settlement, including through hundreds of hours of communications with incarcerated people, several onsite inspections, review of 57,000 pages of

documents, and retention of highly qualified joint experts who issued detailed reports substantiating Plaintiffs' claims. Similarly, Objectors identify no clear error in the court's finding that the negotiations leading to settlement were arm's length and free of collusion, nor could they given a federal magistrate judge conducted the parties' seventeen settlement conferences and both sides swore under oath that fees were discussed only after all substantive injunctive terms were resolved.

Moreover, the district court did not abuse its discretion in concluding the Consent Decree provides substantial relief to all class and subclass members. The reforms required by the Consent Decree – including, for example, increased out-of-cell time for everyone, improved mental health treatment and suicide prevention measures, changes to use-of-force, COVID-19 and grievances policies – are robust, far-reaching, and tangible. They were carefully negotiated with the involvement of joint experts and the Department of Justice, and compare favorably to other jail injunctive settlements, particularly given the significant risk and delay Plaintiffs faced in proceeding to trial. Nor does the Consent Decree trade away the rights of class members, who retain their rights to pursue damages claims and further injunctive relief addressing different aspects of the Jail's conditions.

Additionally, the district court did not abuse its discretion in awarding Plaintiffs their attorneys' fees and costs for work performed in the litigation and

future monitoring. The court found Plaintiffs' below-lodestar claimed fees and costs reasonable, warranted, and fully supported with billing records reflecting substantial billing judgments. Nor can Objectors identify any clear error in the court's finding that this settlement is not the product of collusion, given the absence of any evidence even hinting at an inappropriate compromise. Similarly, the Consent Decree properly treats class members equitably, as no similarly situated class members is treated more or less favorably than other similarly situated class members. Finally, the district court did not commit reversible error by addressing all of the non-frivolous objections categorically in its thorough findings. Particularly given this Court's precedents favoring class action settlements and requiring deferential review, this Court must affirm.

## ARGUMENT

### I.  THE ORGANIZATIONS LACK STANDING

Plaintiffs join Defendants' argument that Organization-Objectors lack standing. *See* 22-15363, Dkt. 27, 36.

### II.  THE MAGISTRATE JUDGE'S JURISDICTION WAS PROPER

Organization-Objectors assert that the magistrate judge did not have authority under Article III to approve the Consent Decree because "absent" class members did not consent to jurisdiction under 28 U.S.C. section 636(c)(1). Org-AOB 13-29. This argument is both legally and factually erroneous.

**A.**     **Named Class Members Can Consent to Magistrate Jurisdiction On Behalf Of Absent Class Members**

Section 636(c)(1) provides that "[u]pon the consent of the parties," a federal magistrate judge "may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case."  There is no dispute that the named Plaintiffs and Defendants consented to the magistrate judge's exercise of jurisdiction.  *See* ER 4639, 4640.  The only question is whether the named Plaintiffs had the authority to consent on behalf of the rest of the class, and that question has been squarely resolved.

*Koby v. ARS National Services, Inc.*, 846 F.3d 1071 (9th Cir. 2017), definitively forecloses Objectors' jurisdictional challenge:  Section 636(c) requires the consent of the named plaintiffs alone.  *Id*. at 1076-79.  Every single Circuit to address the issue has reached the same conclusion based on very similar reasoning. *See McAdams v. Robinson*, 26 F.4th 149, 155 (4th Cir. 2022); *Day v. Persels & Assocs.*, *LLC*, 729 F.3d 1309, 1316-17 (11th Cir. 2013); *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012); *Williams v. Gen. Elec. Cap. Auto Lease, Inc.*, 159 F.3d 266, 269-70 (7th Cir. 1998).

Even if this Court had the authority to overrule *Koby*, which it does not, Objectors provide no valid reason to do so.  Objectors simply ignore the well-reasoned opinions of all five Circuit Courts to have addressed this issue, while criticizing *Koby* for utilizing "a questionable method of first determining the intent

of the statute and then resolving its ambiguities in the direction of constitutional doubts." Org-AOB 18. But there is no constitutional doubt. The Supreme Court has ruled that the personal right to an Article III adjudicator can be waived, *Roell v. Withrow*, 538 U.S. 580, 590 (2003), and Rule 23 ensures that the named plaintiffs "protect the absent class members' interests in the exercise of the right conferred by Article III." *Koby*, 846 F.3d at 1078. To the extent that absent class members disagreed, they could have sought to intervene under Federal Rule of Civil Procedure 24(a) to exercise their right to withhold consent, or they could have raised a post-judgement collateral attack based on due process against the named representative's decision to consent to the magistrate judge's exercise of jurisdiction. *See Williams*, 159 F.3d at 269-70. No one did so here.

Objectors assert that *Koby* created an unusual circumstances carveout, but no court has endorsed such an exception, much less applied it to reverse a final approval order. Org-AOB 24-28. Even if such an exception exists, there is no evidence to support Objectors' contention that the named plaintiffs' and the absent class members' interests are not in alignment for purposes of consenting to magistrate judge jurisdiction. Objectors have not identified a single objection on this grounds filed with the district court—nor can they, as none exist. The trial court properly determined the named plaintiffs fairly and adequately protected the interests of the entire class under Federal Rule of Civil Procedure 23(a)(4), and

Objectors neither collaterally attacked that finding after judgement or appealed the class certification order. *See* 17-ER-4238; 11-ER-2773 (confirming class certification factors met at preliminary approval stage); *see also* 1-ER-2-13 (appealing only final approval order and judgment); Fed. R. Civ. P. 23(f). In these circumstances, the interests of the named plaintiffs and absent class members presumably align for purposes of Section 636(c)(3) consent. *Koby*, 846 F.3d at 1078.

### B. The Record Shows Absent Class Members Impliedly Consented to Magistrate Judge Jurisdiction

To the extent absent class members needed to consent to magistrate judge jurisdiction despite *Koby*'s contrary holding, all evidence points to the conclusion that they did so impliedly. *See Roell*, 538 U.S. at 582, 590 (implied consent under § 636(c)(1) is sufficient where "the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the Magistrate Judge").

No one here ever objected to the case proceeding in front of the magistrate judge. While Objectors assert *Roell* does not apply in class actions because absent class members "by definition" do not participate in the proceedings, Org-AOB 27-28 n.9, the record demonstrates the opposite. Objectors and absent class members filed numerous objections and, after the court made substantial efforts to include absent class members, appeared before the magistrate judge at the two-day final

fairness hearing to object to the terms of the Consent Decree.  *See* 2-ER-18-255 (Jan. 27, 2022 hearing transcript); 3-ER-257-342 (Jan. 19, 2022 hearing transcript); 5-ER-1040 – 9-ER-2043 (objections); *see also* 3-ER-430 (order addressing class member participation in final approval hearing).  This includes incarcerated class members represented during the final approval process by counsel for Inmate-Objectors here.  6-ER-1343-1367.

But no one challenged the magistrate judge's authority to approve the Consent Decree in the first instance, much less sought to intervene to raise this concern or brought a collateral attack.  In fact, counsel for Inmate-Objectors fought to convince Magistrate Judge Cousins to permit intervention and/or relate a different class case about Jail conditions brought on behalf of other Jail inmates to this case—without ever suggesting he lacked jurisdiction.  13-ER-3264 – 14-ER-3432 (*Gonzalez* Plaintiffs' motion to intervene and declarations in support); SER-140-141, 146-170.

Ultimately, the record is replete with evidence that Objectors and many absent class members knowingly appeared before Magistrate Judge Cousins[4]

---

[4] While Objectors claim the lack of an explicit reference to Magistrate Judge Cousin's title in the class notice presents a "procedural due process reason for invalidating the settlement approval," Org-AOB 21-22, they cite no authority for such a proposition, which in any event does not affect this Court's jurisdiction. *See Koby*, 846 F.3d at 1078-79.  The use of the word "Judge" without the prefix "Magistrate" does not imply appointment under Article III, and the docket is filled with explicit references to Judge Cousins's full title, including both in his orders,

without ever questioning his jurisdiction. That is sufficient to establish consent "through actions rather than words." *Roell*, 538 U.S. at 589.

## III. PLAINTIFFS ADEQUATELY ALLEGED AND PROVED ARTICLE III STANDING FOR ALL CLASS MEMBERS

Organization-Objectors' second jurisdictional challenge—questioning the sufficiency of the findings regarding Article III standing for both classes under *TransUnion*—is no more successful. Org-AOB 29-34. *TransUnion* is a red herring, and there is no doubt Plaintiffs sufficiently established Article III standing to pursue injunctive relief on behalf of the classes.

As an initial matter, *TransUnion*'s Article III analysis is only relevant when it comes to the "injury-in-fact" requirement in damages cases. *See* 141 S. Ct. at 2211 (finding that the "mere risk of future harm, without more" is not enough to "demonstrate Article III standing in a suit for damages"). The *TransUnion* Court made clear that its case law on standing in injunctive relief cases has not changed. *See id.* at 2210; *see also* 1 Newberg and Rubenstein on Class Actions § 2:4 (6th ed.) ("The Supreme Court's 2021 decision in *TransUnion v. Ramirez* casts significant doubt on the argument that a risk of future harm, standing alone, is sufficient to meet Article III's concrete harm requirement in a money damage, *as*

---

*see, e.g.*, 11-ER-2776, and in Plaintiffs' filings and communications to the class, *see, e.g.*, 18-ER-4577; 4-ER-577; 3-ER-447. Moreover, given no objector raised this issue or claimed any confusion in the lower court, it is waived. *Saucillo v. Peck*, 25 F.4th 1118, 1129 (9th Cir. 2022).

*opposed to injunctive relief*, case." (emphasis added)). This case has never involved damages, only injunctive relief. *See* 12-ER-2836-2945 (Consent Decree); 12-ER-3039-3108 (First Amended Complaint). Thus, *TransUnion* is not relevant to the standing analysis here.

Moreover, Organization-Objectors are wrong to assert that *TransUnion* "stands for the principle" that a class may not be defined or narrowly drawn in a way to support Article III standing for all of its class members. Org-AOB 32. *TransUnion* was not about the class being defined in such a way that did not support Article III standing for all of its class members, and indeed that Court never analyzed or discussed class definitions under Rule 23 in any depth. Rather, the Court's differentiation between class members as to the existence of a concrete harm was predicated on a factual stipulation that some class members' credit files were disseminated to third-parties, while others were not. 141 S. Ct. at 2202, 2212-13. *TransUnion* simply does not support Objectors' arguments.

Organization-Objectors are also wrong to assert there is a "logical gap between the class definition and the claims of the class representatives," and that Plaintiffs lack standing unless they establish that "'all' incarcerated persons or 'all' incarcerated persons with disabilities will be subjected to isolation or discriminated against," rather than just "*some* segment or segments of the classes." Org-AOB at 34. The law is well established that "[i]n a class action, standing is satisfied if at

least one named plaintiff meets the requirements" for class certification. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (citing *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001), *abrogated on other grounds by Johnson v. Cal.*, 543 U.S. 499, 504–05 (2005)). Indeed, this Court, sitting en banc, just affirmed this very point in the wake of *TransUnion*. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022) (en banc) (holding Article III standing for all class members is not required when court is certifying class seeking injunctive or declaratory relief only), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Coop., Inc*., 143 S. Ct. 424 (2022).

There is no question Plaintiffs met the requirements of Article III here—nor do Organization-Objectors really contest the point. *See* Org-AOB at 32 (objectors "do not claim that the plaintiff class does not have standing to sue"). In general, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 141 S. Ct. at 2210. "To have standing to assert a claim for prospective injunctive relief, a plaintiff must demonstrate that he is realistically threatened by a repetition of the violation," including by establishing the existence of a policy, pattern, or practice violative of their federal rights. *Melendres v. Arpaio*, 695 F.3d 990, 997-98 (9th Cir. 2012) (internal quotation marks and modifications omitted). When it comes to named

plaintiffs demonstrating a material risk of future harm in order to satisfy Article III standing on behalf of the class, if the court, "through its specific factual findings, documents the threat of future harm to the plaintiff class and establishes that the named plaintiffs … are personally subject to that harm, the 'possibility of recurring injury ceases to be speculative,' and standing is appropriate." *Armstrong*, 275 F.3d at 861.

Here, the court clearly found that the Jail's conditions are "unconstitutional" and "demonstrate the need for reforms mandated in the Consent Decree;" that there is a "pressing need to reform the Jail's policies and procedures;" and that the Consent Decree does in fact provide redress to "*all* Class and Subclass members." 1-ER-5-7, 9 (emphasis added). This is sufficient to establish that the existing conditions would result in the threat of future harm to the class and subclass without future action. That is all Article III requires.

## IV.   THE DISTRICT COURT PROPERLY FOUND NOTICE WAS APPROPRIATE

Inmate-Objectors claim  the Consent Decree is invalid because the parties did not provide notice to community members who are not incarcerated in the Jail. Inmate-AOB 31-35.  They assert that these "future" class members will be unfairly precluded from initiating future litigation despite not having an opportunity to object to the Consent Decree.  *Id.*

This argument is based on a misunderstanding of who must receive notice of

the settlement and the definition of the certified class. The due process protections afforded under Rule 23 are lessened where, as here, the relief at issue is injunctive only pursuant to Rule 23(b)(2) and thus mandatory. *See* 17-ER-4238 (order granting motion for class certification). In these cases, in contrast to non-mandatory classes certified under Rule 23(b)(3), Rule 23 "provides no opportunity for … (b)(2) class members to opt out, and does not even oblige the District Court to afford them notice of the action." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011). As such, the district court here was merely required to "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Indeed, given that class members retain their right to sue for damages and cannot opt out of the class, "federal courts across the country have uniformly held that notice is not required" for prospective, injunctive-only class actions certified under Rule 23(b)(2). *See, e.g., Stathakos v. Columbia Sportswear Co.*, No. 4:15-CV-04543-YGR, 2018 WL 582564, at *3 (N.D. Cal. Jan. 25, 2018) (collecting cases).

Nonetheless, the district court approved, and the parties complied with, an extensive plan to provide notice of the Consent Decree, including dissemination of the settlement notice through many distribution channels and in many languages throughout the Jail and on Class Counsel's website, as well as in-person interviews, calls, and letters. 4-ER-563-567. Inmate-Objectors do not claim that

notice was insufficient as to the incarcerated class members; rather they argue that notice was insufficient because of a faulty, nonsensical interpretation of the scope of the certified class. The class, defined as "all adults who are now, or in the future will be, incarcerated in the Alameda County Jail," is based on the carceral status of the individual. 12-ER-2844; *see* 1-ER-10 ("[T]he Class here is limited to individuals currently incarcerated at the Jail …."). Throughout the litigation, the parties and the district court have always defined the class as people who are *currently* incarcerated at the Jail and therefore subject to Defendants' system-wide policies and procedures. *See, e.g.*, 17-ER-4257 (numerosity is satisfied based on "thousands of individuals held at Santa Rita on a daily basis"); 17-ER-4261 (typicality satisfied because all named plaintiffs are "have been or are currently incarcerated in Santa Rita" or "have been or are currently subject to" the Jail's policies). The phrase "or in the future will be" captures people who will be incarcerated at the Jail in the future, and who will at that point be subject to the protections of the Consent Decree. It was never meant to state that the class currently is comprised of all people in society who could, in theory, be incarcerated in the Jail at some point in their lives.

"The inclusion of future class members in a class is not itself unusual or objectionable … when, as here, a class's membership changes continually over time …." *A.B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022)

(internal quotation marks and citation omitted). Objectors' understanding of the class "is defined so broadly as to include a great number of members who … could not have been harmed by the defendant's allegedly unlawful conduct" and therefore could never have been certified. *See Olean*, 31 F.4th at 669 (citation omitted). The district court's interpretation of the class definition is consistent with these logical conclusions. 1-ER-10.

Even if it could somehow be required that every member of the public be notified of a consent decree specific to the Jail, which is preposterous, the district court correctly found there "was ample notice outside of the Jail." 1-ER-10. Plaintiffs posted the notice and Consent Decree on their public website in multiple languages, garnered extensive press coverage, and engaged with community organizations repeatedly. 4-ER-566; 4-ER-623-624, 628 . These outreach efforts resulted in the "participation of hundreds of interested community members at both hearings." 1-ER-10. As such, even if the public writ large was somehow entitled to notice, the district court's finding that the "reasonable" efforts required by Rule 23(e)(1) for injunctive-only classes was met here is more than supported.[5]

---

[5] Numerous other jail consent decrees have adopted similar class definitions, but none have been interpreted to include every single member of the public, nor have courts ever required notice to the community at large. *See, e.g.*, *Mays v. Cnty. of Sacramento*, No. 2:18-cv-02081 TLN KJN P, 2018 WL 11295524, at *1 (E.D. Cal. Nov. 30, 2018), *report and recommendation adopted*, 2018 WL 11295523 (E.D. Cal. Dec. 28, 2018); *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 164 (N.D. Cal. 2015); *Hall v. Cnty. of Fresno*, No. 1:11-cv-02047-LJO-BAM, 2015 WL

**V.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
        DEEMING THE SETTLEMENT FAIR, ADEQUATE, AND
        REASONABLE**

The district court correctly found the Consent Decree to be "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2).  Particularly given the heightened judicial policy favoring settlement of complex class action suits, this Court's review of the court's order is "extremely limited" and reversal is only warranted upon a "strong showing that the district court clearly abused its discretion." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (en banc) (internal quotation marks and citation omitted).  Appellants do not come anywhere near to making that showing.

**A.     The District Court Applied the Correct Standard.**

The district court followed long-standing precedent in utilizing the factors from *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), to analyze whether the proposed settlement met the requirements of Rule 23(e)(2).  1-ER-4. Objectors assert that the court's alleged failure to separately consider Rule 23(e)(2)'s subfactors, as revised in 2018, constitutes reversable error.  Org-AOB 40; Inmate-AOB 29-30; Robertson-AOB 16-18.  But this argument runs counter to the purpose of the 2018 amendments, which was to focus courts on the key issues and not to "displace any [circuit] factor."  Fed. R. Civ. P. 23(e)(2) Advisory

---

5916741, at *1 (E.D. Cal. Oct. 7, 2015).

Committee Note to 2018 Amendment. Objectors identify no case finding

application of the factors as articulated in *Hanlon* to be reversible error. Indeed,

this Court has continued to analyze the same factors applied by the district court

here years after the revisions to Rule 23(e)(2). *See, e.g.*, *Kim v. Allison*, 8 F.4th

1170, 1178-79 (9th Cir. 2021); *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121

(9th Cir. 2020); *Littlejohn v. Copland*, 819 F. App'x 491, 493 (9th Cir. 2020). And

Organization-Objectors themselves rely extensively on a case that not only applies

a number of criteria beyond the bounds of Rule 23(e)(2)'s text, but expressly cites

*Hanlon* and other pre-2018 cases in identifying the "relevant" factors. *See* Org-

AOB 42-47 (applying factors from *Lusk v. Five Guys Enters. LLC*, No. 1:17-cv-

00762-AWI-EPG, 2019 WL 7048791 (E.D. Cal. Dec. 23, 2019), taken from

*Hanlon* and *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992)).

Even if there were such a requirement, this Court must still affirm as the

Consent Decree satisfies all of the requirements of Rule 23(e).[6] *See infra* Section

---

[6] Objectors argue this Court's precedents require reversal even if the record supports a finding that the Rule 23(e)(2) standards are met, relying on *In re Apple Inc. Device Performance Litigation*, 50 F.4th 769 (9th Cir. 2022), and *Saucillo*, 25 F.4th at 1129. *See* Org-AOB 40-41; Inmate-AOB at 21. But this Court reversed in those cases because the district court wrongly applied a presumption of reasonableness for settlements reached prior to class certification, which is substantively wrong and potentially outcome-dispositive. *See In re Apple,* 50 F.4th 769 at 782-83; *Saucillo*, 25 F.4th at 1129. The court here applied no such presumption, and Objectors make no claim the standard employed by the trial court was substantively wrong, only that it did not separately articulate the subfactors in Rule 23(e)(2) in addition to the flexible *Hanlon* factors before concluding the

V(B)-(F); *see also Sully v. Ayers*, 725 F.3d 1057, 1067 (9th Cir. 2013) (court may affirm "on any grounds supported by the record").

**B.   Class Counsel and the Class Representatives Adequately Represented the Class.**

Objectors identify no reversible error with respect to the adequacy of the class representatives or class counsel.

**1.   The Class Representatives Adequately Represented the Class**

Objectors assert the district court abused its discretion by failing to restate in its final approval order that the class representatives adequately represented the class.  *See* Inmate-AOB 35-36; Robertson-AOB 19.  But they identify no case deeming this reversable error where, as here, the court made such findings when it certified the class and no evidence contravenes those findings.  *See* 17-ER-4237-4239; 11-ER-2773 (confirming class certification factors met at preliminary approval stage); *see also* Fed. R. Civ. P. 23(e)(2) Advisory Committee Note to 2018 Amendment (subfactor (e)(2)(A) "look[s] to the conduct of the litigation and of the negotiations leading up to the proposed settlement").  Nor did Objectors appeal the class certification order deeming the named plaintiffs adequate representatives of the class.  *See* 1-ER-2-13 (appealing only final approval order and judgment); *see also* Fed. R. Civ. P. 23(f).

settlement was "fair, adequate, and reasonable."

As at the time of class certification, the named plaintiffs' interests remain aligned with the interests of the class and subclass because they all seek to compel the County to change the Jail's unconstitutional policies and practices. *See* 17-ER-4237-4239; *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) ("[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." (citation omitted)); *see also* 1-ER-7. Moreover, because the named plaintiffs do not seek monetary damages or even incentive payments, "[t]he potential for any conflict or collusion is … minimal." *Am. Council of the Blind v. Astrue*, No. C05-04696 WHA, 2008 WL 4279674, at *6 (N.D. Cal. Sept. 11, 2008).

Inmate-Objectors' claim that the class representatives do not adequately represent "future" class members is without merit, as it is predicated on an incorrect understanding of the class definition. Inmate-AOB 36; *see supra* Section IV. Further, Inmate-Objectors fail to explain why there would be different considerations for representing current and future incarcerated people at the Jail, and why the named Plaintiffs could not adequately represent both.

Incarcerated-Objectors also argue that the named plaintiffs overrepresent the portion of the Jail population that is housed in Restricted Housing and/or has psychiatric disabilities, which they claim presents a conflict of interest for representing the Jail's general population. Inmate-AOB 37-41. But Objectors do

not explain what kind of conflict of interest exists between the disability subclass and the class at large, given that both receive relief and that peoples' needs change throughout their incarceration. *See infra* Sections V.D.1, F (addressing substantial relief, equity considerations). The court recognized—and Inmate-Objectors do not dispute—that the Consent Decree provides benefits for members of the disability subclass by mandating the development of an adequate mental healthcare system, including increasing services for individuals with psychiatry disabilities and establishing intensive treatment units called the Therapeutic Housing Units. 2-ER-6; Inmate-AOB 40. The Consent Decree also reforms systems, policies, and procedures that affect all people incarcerated in the Jail, such as COVID-19 precautions, custody staffing, classification and use of restrictive housing, out-of-cell time, use of force and disciplinary measures, and discharge planning. 2-ER-5. The district court found that "[t]his comprehensive injunctive relief will benefit *all* Class and Subclass members." 2-ER-6 (emphasis added). Objectors provide no reason why the injunctive relief provided by the Consent Decree accrues disproportionate benefits for any population at the expense of others, such that the named plaintiffs no longer adequately represented the class.

### 2. The District Court Appropriately Found That Class Counsel Provided Adequate Representation.

Objectors disagree with the district court's repeated finding that Class Counsel adequately represent the class, but they identify no clear error. It cannot

be contested that Class Counsel are "experienced prison class action litigators" who represent incarcerated plaintiffs in numerous cases fighting unconstitutional and discriminatory conditions in prisons and jails. 1-ER-6, 10-11 (collecting cases); *see also* 9-ER-2098-2103.

Class Counsel vigorously investigated the claims before settling, contrary to Objectors' claims. Org-AOB 43-46. As the district court recognized, Class Counsel "extensively evaluated the merits of the case and their positions" for four years before agreeing to the Consent Decree. 1-ER 4-5. That process included hundreds of hours communicating with incarcerated individuals, conducting several joint onsite inspections or tours, reviewing over 57,000 pages of informal discovery, and retaining a panel of highly qualified joint experts to evaluate and report on the Jail's policies, procedures, practices, and conditions. 1-ER 4-5. Organization-Objectors criticize these findings as "imprecise" but fail to identify any missing information the parties needed to evaluate the merits of the case. *See* Org-AOB 44-46; *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir.), *as amended* (June 19, 2000) ("[I]n the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement." (internal quotation marks and citation omitted)).

Similarly, the district court recognized that the joint experts' participation,

including their extensive reports documenting conditions at Santa Rita Jail, demonstrated the parties engaged in thorough fact-gathering before reaching a settlement and weighed in favor of approving the Consent Decree. *See* 1-ER-5-6. Objectors nitpick two joint expert reports and criticize them for lacking detail and data, but fail to explain the significance of those supposed shortcomings. *See* Org-AOB 66-67. Assuming *arguendo* these criticisms have merit, the court did not commit reversible error by relying on them. The joint expert findings, which the DOJ reiterated in their report, demonstrated that "the parties [had] sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998); *see also Handschu v. Special Servs. Div.*, 605 F. Supp. 1384, 1394 (S.D.N.Y. 1985), *aff'd*, 787 F.2d 828 (2d Cir. 1986) ("The trial judge's evaluation of a proposed settlement must be an informed one. … [But] '[t]he Supreme Court could not have intended that, in order to avoid a trial, the judge must in effect conduct one." (citation omitted)).

Robertson argues that Class Counsel is inadequate because they "directed him to find other counsel" when the Jail used excessive force against him. Robertson-AOB 19-20. That is not a basis for reversal. Class Counsel declined to represent Robertson in an individual damages suit against the Jail, but has repeatedly elevated his concerns and advocated for his interests in implementing the Consent Decree, including negotiating new training and reforms to the Jail's

use of force policies, procedures, and review processes. This is consistent with

Class Counsel's demonstrated pattern of frequent advocacy for class members

throughout this litigation. *See* 9-ER-2113; 4-ER-627.

Wilkins asserts that Class Counsel provided inadequate representation in

other correctional class action cases and is therefore not qualified to serve here.

Wilkins-AOB 1-14. The district court closely considered similar arguments in

advance of final approval (*see* 3-ER-541), but ultimately found Class Counsel

adequate, 1-ER-6, 10-11. Wilkins identifies no clear error in that finding. Class

Counsel have, for instance, been diligent and effective in enforcing the remedy in

*Coleman v. Newsom*, No. S-90-0520-KJM-DB P (E.D. Cal.), by pushing for

increased mental health staffing, challenging the defendants' manipulation of

compliance data, litigating access to inpatient psychiatric care, and enforcing

deadlines for the defendants to implement suicide prevention measures, among

many other issues. 3-ER-418-429. And the key cases for which Wilkins

complains about Class Counsel's performance have resulted in tremendous

positive change for incarcerated people in California prisons. *See, e.g.*, *Brown v.

Plata*, 563 U.S. 493 (2011) (affirming order requiring reduction in prison crowding

so that prisoners can obtain life-saving medical and psychiatric care); *Armstrong v.

Newsom*, 58 F.4th 1283 (9th Cir. 2023) (affirming orders requiring fixed-

surveillance and body-worn cameras and reforms for investigating and disciplining

staff); *Coleman v. Brown*, 28 F. Supp. 3d 1068 (E.D. Cal. 2014) (ordering use of force and segregation reforms). The district court did not clearly err in concluding that Class Counsel adequately serves the class, particularly in light of the lack of any hint of collusion beyond Objectors' insinuation. *See infra* Sections V.C, E.

## C. The District Court Rightly Concluded the Consent Decree Negotiations Were Arm's-Length and Free of Collusion

Objectors next assert the trial court erred in finding the Consent Decree was the product of arm's-length negotiations under Rule 23(e)(2)(B), and instead claim collusion. *See* Org-AOB 46-49; Inmate-AOB 10, 25, 42-45; Robertson-AOB 21. But they identify no clear error in the district court's findings that the Consent Decree followed "intensive and prolonged arm's length negotiations by capable counsel, with input from the United States Department of Justice and under the supervision of Magistrate Judge Laurel Beeler," and was "not a product of fraud, overreaching, or collusion among the parties." 1-ER-4-5.

The parties held seventeen settlement conferences before Magistrate Judge Beeler over two years to negotiate the Consent Decree. 4-ER-622. All but the final two were devoted solely to negotiating the substantive remedial terms of the settlement. 4-ER-628-629. They were informed by neutral experts—who submitted thorough public reports assessing Jail conditions and provided guidance on disputed issues—and by the extensive independent participation of the DOJ – which provided detailed comments on draft versions of the consent decree after

conducting its own extensive investigation and found the final Consent Decree

unobjectionable. 5-ER-996-97; 9-ER-2116; SER-47-53. Objectors do not

seriously contest these facts, which support a finding of fairness. *See Rodriguez v.*

*West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of

stock in the product of an arms-length, non-collusive, negotiated resolution ….").

Counsel for both parties swore under oath that no aspect of Plaintiffs' fee

demand was discussed until after the substantive injunctive terms were final and

approved by the County's Board of Supervisors. *Compare* 4-ER-628, *and* 5-ER-

997, *with In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 948 (9th

Cir. 2011) (finding possible collusion where district court did not require parties to

substantiate claim to have negotiated substantive settlement before fees); *see infra*

Section V.E (addressing collusive fees arguments). Only thereafter did the parties

engage in two additional mediations before Magistrate Judge Beeler, which

included extensive briefing and exchange of Plaintiffs' billing records, to address

Plaintiffs' claim for fees through final approval and for monitoring. 4-ER-628-

629. These uncontested facts amply support the court's finding that the "extensive

and prolonged" negotiations were appropriately "arm's-length" with no hint of

collusion. 1-ER-4-5.

### D. The District Court Correctly Found the Consent Decree Provides Substantial Relief.

Objectors challenge the adequacy of the relief provided to the class. They

variably assert that that the district court abused its discretion in approving the Consent Decree because it purportedly "fails to benefit the majority of the class" (Inmate-AOB 46-52), because they dislike particular substantive provisions (Org-AOB 50-54; Robertson-AOB 21-25, 33-35), because it is allegedly not favorable to future litigants (Inmate-AOB 31-32, 45; Org-AOB 48, 55-57; Robertson-AOB 35), and because they wish the DOJ monitoring provisions were stronger (Org-AOB 63-65). But they identify no abuse of discretion.

"[T]he proper standard for approval of the proposed settlement is whether it is fair, reasonable, adequate, and free from collusion—not whether the class members could have received a better deal in exchange for the release of their claims." *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 583 (N.D. Cal. 2015) (citing *Hanlon*, 150 F.3d at 1027). "Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027. As such, when evaluating whether the district court abused its discretion in approving the Consent Decree, this Court may not substitute its notion of fairness for that of the district court. *Officers for Justice v. Civil Serv. Comm'n of S.F.,* 688 F.2d 615, 626 (9th Cir. 1982). It is the settlement taken as a whole, "rather than the individual component parts, that must be examined for overall fairness." *Id.* at 628. Neither the district court nor this Court have the ability to

"delete, modify or substitute certain provisions;" the settlement must stand or fall

in its entirety.  *Id.* at 630.

### 1. The Consent Decree Provides Substantial Relief

Objectors misrepresent (or perhaps misunderstand) the nature of the relief

obtained in the Consent Decree, and disapprove of the extent and nature of the

compromise, which they assert will not result in tangible benefits to the class.  The

district court considered these arguments and rejected them, and Objectors identify

no clear error.  1-ER-7-9; *see Pigford v. Glickman*, 185 F.R.D. 82, 103 (D.D.C.

1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000), *and enforcement denied sub nom.*

*Pigford v. Schafer*, 536 F. Supp. 2d 1 (D.D.C. 2008) (district courts "should not

reject a settlement merely because individual class members claim that they would

have received more at trial").

This is not a case about "worthless" injunctive relief.  *See Koby*, 846 F.3d at

1079-80 (reversing settlement where class gave up damages claims in exchange for

injunction that did not obligate defendant to do anything it was not already doing).

The district court found the Consent Decree requires Defendants to make

"substantial changes to the policies, procedures, and facilities at the Jail" that will

provide "comprehensive injunctive relief" while avoiding the cost, risks, and delay

of trial and appeal.  *See* 1-ER-5-6.  As the district court found—contrary to

Objectors' claims—many of these changes will provide concrete, much-needed

relief for the entire Jail, not just a subset of incarcerated people.  *See* Inmate-AOB 46-49; 1-ER-7-8 (rejecting argument "that the Consent Decree offered no benefits for 96% of incarcerated individuals"); *see also infra* Section V.F (equitability). For example, the Complaint described Defendants' routine practice of putting incarcerated people with psychiatric disabilities in solitary confinement for prolonged periods of time.  12-ER-3060-3073.  Prior to the Consent Decree, Defendants did not have an effective classification system and often placed people with severe mental illnesses in restrictive settings while their mental health continued to deteriorate.  12-ER-3060-3073.  The Consent Decree now compels Defendants to adopt a comprehensive new classification system for all people at the Jail, including formal processes for admitting, reviewing, and releasing people into restrictive settings, which are being developed in conjunction with and monitored by a joint expert and Plaintiffs.  12-ER-2856-2820.  The Consent Decree also requires robust measures to, among other things, combat the spread of COVID-19 throughout the entire Jail, reconfigure outdoor recreation spaces to maximize programming for everyone, reform of the Jail's generally applicable use of force and restraints policies, and improve grievance procedures.  12-ER-2849-2853 (COVID); 12-ER-2866-2867 (outdoor recreation space); 12-ER-2868-2870 (use of force policies); 12-ER-2871-2872 (grievances).

Objectors make various assertions about what the Consent Decree does or

does not provide, picking and choosing individual provisions they dislike. *See, e.g.*, Inmate-AOB 46-52; Org-AOB 51-54. Most of their claims are fundamentally inaccurate; none establish abuse of discretion. Indeed, the Consent Decree provides for substantial injunctive relief when compared with similar class action settlements seeking to remedy unconstitutional jail conditions, which is a clear sign that it provides adequate relief to the class.

Objectors continue to provide zero support for their assertion that the out-of-cell minimums in the Consent Decree only benefit prisoners with mental illness, Inmate-AOB at 47-49, or are "actually less than what has been available in the past for general population [individuals]," Inmate-AOB 50-51. *See also* Robertson-AOB 32. The district court's finding that class members will benefit from "a new (over four times higher) minimum-out-of-cell time requirement" is not clearly erroneous. 1-ER-5; *see also* 1-ER-7-8 (declaring "current minimal out-of-cell time" to be "unconstitutional" and finding increased out-of-cell time provided by the Consent Decree, "while perhaps not Ms. Huang's ideal, is markedly better than the current situation").

The Consent Decree's out-of-cell time minimums—between 14 and 21 hours weekly for people in Restrictive Housing and 28 hours weekly for people in General Population celled housing—are not only dramatically better than state law minimums, they compare favorably to the minimums in comparable jail conditions

consent decree cases. *Compare* 12-ER 2860-2863, *with* Cal. Code. Regs. Tit. 15, § 1065 (requiring three hours of weekly out-of-cell time for general population inmates), *and* Pls' Request for Judicial Notice ("RJN") Ex. 1 at 67, 73 (Sacramento County Jail consent decree providing weekly out-of-cell time minimums of 17 hours for General Population individuals and between 7 and 17 hours for Administrative Segregation individuals). Likewise, the Consent Decree guarantees patients with serious mental illnesses in the newly created Therapeutic Housing Units will receive between 28 to 56 hours of weekly out-of-cell time at a minimum, depending on their phase of treatment, which is well above the minimum secured by the DOJ for comparable patient populations at the Los Angeles County Jail. *Compare* 12-ER-2889-90, *with* Pls' RJN Ex. 2 (Los Angeles County Jail consent decree providing patients with serious mental illness in High Observation Housing 20 hours out-of-cell time per week). While Objectors complain the electronic tracking system the Consent Decree requires provides no benefit, Inmate-AOB 51-52, it is this system that will allow for oversight and monitoring of Defendants' compliance with the expanded out-of-cell-time requirements. 12-ER-2865.

Nor are Objectors' other complaints about the Consent Decree's purported deficiencies more availing. Their assertion that the Consent Decree reduces mental health treatment for most patients is baseless. Inmate-AOB 48-49; Robertson-

AOB 32.  The Consent Decree requires Defendants to develop a comprehensive

mental health system to replace the current unconstitutional system, many features

of which are more protective than settlements reached in comparable cases.  12-

ER-2872-2894; 1-ER-6-7.  For example, the Consent Decree requires the Jail to

screen all people for mental health treatment within four hours of admission.

*Compare* 12-ER-2875, *with* Pls' RJN Ex. 2 at 18 (Los Angeles County Jail consent

decree requiring initial screening by medical or trained custody within 12 hours of

arrival, and then by qualified mental health professional within 24-72 hours).  And

the Jail must implement a suicide prevention policy incorporating graduated

suicide precautions and limiting the use of inhumane safety cells.  *Compare* 12-

ER-2884-2888 (individuals discharged from suicide precaution remain on mental

health caseload and receive follow up assessments within 24 hours, 72 hours and 1

week of discharge), *with* Pls' RJN Ex. 2 at 23 (Los Angeles County Jail consent

decree requiring a step-down system for persons placed on suicide watch to

provide intermediate levels of precaution, and follow-up by qualified mental health

professional within 72 hours).

Objectors' claims that the use-of-force reforms require nothing beyond the

status quo and only benefit people with mental illness are obviously inaccurate

from the face of the Consent Decree.  Org-AOB 52-53; Inmate-AOB 49.  The

relevant provisions, *inter alia*, require development and implementation of an

updated use-of-force policy for all planned and unplanned force in the Jail subject

to carefully delineated limitations, ensure oversight and monitoring, including

supervisory review of all use-of-force incidents, and mandate installation of fixed

cameras. 12-ER-2868-2870. Objectors' complaints about grievance timeline

disparities (Inmate-AOB 46-47) are similarly unfounded, as they fail to note the

48-hour response time is for emergencies only. 12-ER-2094.

Objectors also dislike the provisions of the Consent Decree that increase

mental health and custody staff at the Jail, which they claim will harm class

members. Org-AOB 51-53. But "the Consent Decree does not fund new

positions; instead it sets requirements about how existing positions must be

staffed." 1-ER-9. The Consent Decree requires Defendants "to maintain sufficient

mental health and custody staff to meet the requirements of the Consent Decree."

12-ER-2853; 1-ER-9. Without adequate staff, the Jail cannot implement the

reforms necessary to address inadequate out-of-cell time, ensure timely processing

of grievances, and lack of mental health treatment—all areas the district court

found to be "unconstitutional." 1-ER-7; *see also* Pls' RJN, Ex. 2 at 25-26

(requiring additional custodial and health care staff to fulfill the terms of the Los

Angeles Jail Consent Decree); Pls' RJN, Ex. 1 at 19 (same as to Sacramento Jail).

While some Objectors argue that the Consent Decree is inadequate because

the conditions at the Jail have not improved (Robertson-AOB 23, 34-35), the

district court correctly rejected this objection because "the Consent Decree has not been implemented yet, so its effectiveness is to be seen." 1-ER-8. Immediately after final approval, Plaintiffs began working with the neutral experts, the County, and the DOJ to implement changes, which are now underway and will effectuate the "comprehensive injunctive relief" required by the Consent Decree. *See* 1-ER-6.

Objectors further claim the Consent Decree affords Defendants too much discretion. Robertson-AOB 33-34. But this does not provide a basis for reversal, as settlement necessarily requires compromise. *See Hanlon*, 150 F.3d at 1027. And the Consent Decree does not grant Defendants unbridled discretion. The required policies, procedures, and trainings must be developed with the joint experts, Class Counsel, and the Department of Justice, which will be informed by their extensive access to the Jail, the joint experts' monitoring reports, and other relevant documents. *See* 12-ER-2904-11. Further, Plaintiffs can enforce the terms of the Consent Decree before the district court for at least six years if Defendants fail to take their remedial obligations seriously. *See* 12-ER-2911-12, 12-ER-2916; *see also supra* Section V.B.2 (discussing Class Counsel's record of aggressive enforcement in other conditions-of-confinement class cases). The robust remedial scheme in the Consent Decree stands in stark contrast to other settlements providing limited injunctive relief that this Court has been reluctant to overturn. *See, e.g.*, *Campbell*, 951 F.3d at 1122-24 (affirming settlement even where

injunction provided only "modest value" and contained "somewhat broad" release

of injunctive claims); *Staton v. Boeing Co.*, 327 F.3d 938, 961-63 (9th Cir. 2003)

(stating concerns about settlement, including "limited scope of many of the

injunctive provisions of the decree," broad liability release, and lack of

enforcement mechanism did not, by themselves, warrant overturning approval of

settlement, but reversing on other grounds).

### 2. The Settlement Was Appropriate Given the Risks, Costs, and Delay of Proceeding to Trial

For all Objectors' complaints about what they would prefer in a Consent

Decree, they make no attempt to establish that their desired relief could have been

obtained had the parties not settled, much less do they account for the costs and

delay of proceeding in the face of such risk. *See* FRCP 23(e)(2)(C)(i). The district

court recognized that approving the Consent Decree would "avoid substantial costs

to all parties and avoid the delay and risks presented by further litigation." 1-ER-4.

That finding is owed great deference given the district court's exposure "to the

litigants, and their strategies, positions and proof," *Hanlon*, 150 F.3d at 1026, and

Objectors identify nothing to suggest it is clearly erroneous beyond their desire for

a different outcome.

Not only is it far from clear that Plaintiffs could have secured a stronger

injunction by trying the case, that course of action presented serious risk. *See*

*Handschu*, 605 F. Supp. at 1394 (in injunctive cases, "the relief achieved by the

proposed settlement is measured against the Court's likely decree after trial").

Even where civil rights plaintiffs are successful at trial in securing systemic prison

reform, the ordered relief often merely requires the defendant to develop remedial

plans to address the identified areas of deficiency rather than telling the defendants

precisely what they must do. *See, e.g.*, *Brown v. Plata*, 563 U.S. at 509-10, 541-43

(affirming order, after three-week trial, requiring defendants to submit plan to

reduce prison crowding within two years, and noting such deferential approach

pays "[p]roper respect" to state sovereignty); Pls' RJN, Ex. 3 at 76-82 (ordering,

after 39-day trial, development of remedial plans to address numerous

constitutional deficiencies, with assistance from court-appointed monitor and

experts); *see also* 3-ER-419-20. The Consent Decree requires far more specific

and detailed relief that is subject to the district court's ongoing jurisdiction for any

necessary enforcement.

Nor was success at trial on all of the issues covered by the Consent Decree

guaranteed, particularly given the serious hurdles imposed by the Prison Litigation

Reform Act, 42 U.S.C. § 1997e. For example, a few weeks before settlement of

this case, this Court rejected an attempt to establish a constitutional right to

outdoor exercise in the San Francisco County Jail. *See, e.g.*, *Norbert v. City &*

*Cnty. of San Francisco*, 10 F.4th 918, 922 (9th Cir. 2021) (affirming order denying

injunction to require outdoor exercise in jail). In addition, gains achieved in the

district court can be reversed on appeal. *See Toussaint v. McCarthy*, 926 F.2d 800, 801-04 (9th Cir. 1990) (reversing various aspects of permanent injunction requiring reforms to prison administrative segregation practices). Moreover, even if ultimately successful, proceeding to trial would have further delayed remediation for the "inhumane" and "unconstitutional" conditions many objectors identified, which the district court found ultimately "highlight[ed] the pressing need to reform the Jail's policies and procedures." 1-ER-7-9.

### 3. The Terms of the Consent Decree Are Favorable to Future Litigants.

To determine whether the Consent Decree provides adequate relief, "the settlement's benefits must be considered by comparison to what the class actually gave up by settling." *Campbell*, 951 F.3d at 1123. Objectors make several arguments that the Consent Decree includes provisions that are unfavorable to class members or future litigations. These arguments, which were expressly rejected by the district court, do not provide a basis for reversal. *See* 1-ER-8. First, Objectors protest that the Consent Decree does not provide money damages to the class. *See* Inmate-AOB 45; Org-AOB 48. Complaints like this "do not negate the fairness of the settlement" because this is a Rule 23(b)(2) class action seeking only injunctive relief. *See Hall*, 2015 WL 5916741, at *6 (approving injunctive-only consent decree over similar objections). Because the settlement is only for injunctive relief, the court correctly found that class members remain free

to pursue individual damage claims. 1-ER-8 (quoting *Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996)).

The district court also correctly rejected Objectors' assertion that the Consent Decree releases the County of liability. *See* 1-ER-8; *see also* Inmate-AOB 31-32; Org-AOB 49 at 55-57; Robertson-AOB 22, 35. The Consent Decree states that "Defendants and their employees and agents may use this Consent Decree and any statement contained herein to assert issue preclusion or *res judicata*," which would have been true even if this statement was not included. 12-ER-2914. The court correctly understood that this language "does not preclude future litigation based on future conduct or for injunctive relief on subjects not covered by the Consent Decree." 1-ER-8. "Even apart from due process concerns, a settlement agreement's bare assertion that a party will not be liable for a broad swath of potential claims does not necessarily make it so." *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010). And "the only claims that would be barred in a future case are those that share an identical factual predicate with the claims advanced in this case." *See Campbell*, 951 F.3d at 1124 (internal quotation marks omitted). Whether issue or claim preclusion applies to future litigation would be up to the facts of the second case and a future court—and the district court's interpretation of the Consent Decree to bar neither damages claim nor different injunctive claims will ensure any purported preclusion defense the County may offer will be

narrowly construed. Even future injunctive litigation that substantively overlaps with the Consent Decree would likely not be barred to the extent it is based on future conduct, and indeed could be coordinated to avoid duplication. *See, e.g.*, *Coleman v. Newsom*, No. S-90-0520-KJM-DB P, 2020 WL 949935, at *2 (E.D. Cal. Feb. 27, 2020) (permitting intervention in class action where injunctive claim directly relates to remedial plan implementation).

### 4. The Ongoing Involvement of the Department of Justice Further Demonstrates That the Consent Decree Provides Adequate Relief.

The district court found that the continued involvement of the DOJ and the joint experts weighed in favor of approving the Consent Decree. 1-ER-6. Organization-Objectors' claim of error is unsubstantiated. Org-AOB 63-67.

The DOJ conducted an independent investigation at the Jail that remains open and overlaps significantly with this case and the resulting Consent Decree. *Compare* 12-ER-3039-3108, *with* SER-87-132. The DOJ report required a litany of remedial measures that corresponded to the corrective actions that the parties eventually negotiated. *See* SER-129-32. With its understanding of the Jail's constitutional shortcomings, the DOJ would not have endorsed the Consent Decree without confidence it would provide adequate relief, and its continued involvement in monitoring is further evidence of that relief. *See* SER-47-53; *see also* 12-ER-2904-5 (policies, procedures, and training materials shared with the DOJ); 12-ER-

2908 (DOJ receives confidential joint expert reports); 12-ER-2910 (DOJ and expert entitled to two annual tours with "the same access to jail facilities, personnel, contractors, third parties, and inmates as described herein with respect to Class Counsel").

Objectors complain the monitoring provisions are not strong enough. Org-AOB 63-65. The DOJ directly negotiated aspects of the Consent Decree, which addresses deficiencies the DOJ separately identified in its report. To suggest the DOJ did so with no intention of continuing involvement in remediation is begs credulity. Nor is there any possibility that Plaintiffs could have secured a permanent injunction requiring mandatory DOJ monitoring had they pressed the case to trial, given the DOJ is not even a party to the case. *See Handschu*, 605 F. Supp. at 1394 (injunctive relief "measured against the Court's likely decree after trial"). Even without the DOJ's involvement, the Consent Decree authorizes robust monitoring, providing for biannual joint expert tours with concomitant reports and recommendations, as well as between two and three annual tours by Plaintiffs' counsel. 12-ER-2904-2911. Finding the monitoring provisions supported the adequacy of the Consent Decree was not clear error.

### E. The District Court Did Not Ignore Collusion In Approving Plaintiffs' Attorneys' Fees

Objectors argue that Class Counsel's attorneys' fees are evidence of collusion or a conflict of interest. Inmate-AOB 42-45; Wilkins-AOB 2;

Robertson-AOB 23-24, 36; Org-AOB 46-49.  The district court, however, found

Plaintiffs' fees fully substantiated, reasonable, and warranted, and Objectors

identify no clear error in that ruling.  1-ER-10-12.  Nor can Objectors identify any

basis to disturb the district court's express finding that the settlement was free from

collusion.  1-ER-4-5.

The parties did not negotiate Class Counsel's attorneys' fees until they

reached agreement on the substance of the Consent Decree.  *See supra* Section

V.C; *see also* SER-57-58; 4-ER-628; 5-ER-997.  And when Plaintiffs did seek

fees, they did not simply rely on the Consent Decree; they submitted a motion that

was fully supported by multiple declarations, including an expert declaration, and

time records reflecting substantial billing judgments.  *See* 9-ER-2067 – 11-ER-

2747.  They also provided additional clarifying information at the request of the

court.  3-ER-366-369; *see* 3-ER-540-542.

The district court thoroughly analyzed Plaintiffs' fees motion before

granting the fee request.  After determining Plaintiffs were entitled to fees, it found

Class Counsel's claimed rates were reasonable given their "experience[] in

litigating disability access, prisoner's rights, and other class actions," as well as the

skilled and diligent work performed.  1-ER-10-11; *see also* 11-ER-2671-2747.

Finally, the court found that the hours that Class Counsel expended were

reasonable, particularly given their "reasonable and appropriate" billing judgments

reducing the claimed lodestar by over 20%. 1-ER-11; *see also* 9-ER-2108. Based on those findings, the court concluded that Plaintiffs were entitled to $2,946,642.89 in attorneys' fees and costs accrued between September 1, 2017 through December 31, 2021, as well as additional unclaimed fees for ongoing work. 1-ER-11. But subject to the parties' agreement, the court only ordered payment of $2,150,000. 1-ER-11.

Objectors' claim that the district court ignored subtle signs of collusion has no basis, as none of the potential "red flags" identified by this Court are present here. Org-AOB 37-39, 46-48; Inmate-AOB 42-45; *see also Briseño v. Henderson*, 998 F.3d 1014, 1023-24 (9th Cir. 2021) (identifying potential signs of collusion); *In re Bluetooth*, 654 F.3d at 947 (same). Objectors do not assert that the third possible "red flag"—reverter—exists, nor could they in this injunctive-only case involving no common fund.[7] *Campbell*, 951 F.3d at 1127.

Objectors' assertion that the first *Bluetooth* red flag applies—where counsel received a "disproportionate" portion of the settlement—is baseless. This is not a case where the lawyers receive millions while the class receives nothing of value. *See Briseño*, 998 F.3d at 1026. The district court found the Consent Decree's 110-

---

[7] Objectors' assertion that this Court should reverse for failure to follow Northern District guidance concerning settlement administrators is similarly inapplicable and should be rejected out of hand. *See* Org-AOB at 67-68.

pages of detailed injunctive terms required substantial changes that were urgently needed to cure ongoing constitutional violations at the Jail, and that Class Counsel fully substantiated their fee claim for well below their lodestar. 1-ER-5-7, 9, 11; *see supra* Section V.E. Not only is the value of the injunction significant, class members give up little in exchange. *Campbell*, 951 F.3d at 1123 ("[T]he class did not need to receive much for the settlement to be fair because the class gave up very little."). Like in *Campbell*, this case involves no possibility of damages, the Consent Decree does not release such claims, and the district court was intimately familiar with "the value of the injunctive relief that was made available to the class through the settlement" based on its "years-long oversight of this litigation." *See id.* at 1126-27. Indeed, the *Campbell* settlement contained a far broader release than anything in the Consent Decree, but was still deemed sufficiently fair. *See id.* at 1124. Any claim of collusion is baseless.

Nor is the inclusion of the attorneys' fee provision in the Consent Decree the type of clear sailing provision this Court has signaled may be problematic in an injunctive-only case of this type. *See Campbell,* 951 F.3d at 1127. Class Counsel did not obtain Defendants' consent to their requested fee award by giving up injunctive relief—indeed both parties swore under oath that fees were not discussed until after resolution of the substantive terms. *See* SER-57-58; 4-ER-628; 5-ER-997. Nor does the Consent Decree "[enable] a defendant to pay

Plaintiffs excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class." *In re Bluetooth*, 654 F.3d at 947. To the contrary, Class Counsel's fee application clearly demonstrates they were entitled to more payment than what they agreed to accept. *See* 1-ER-11; *see also* 9-ER-2080 (describing billing judgments reducing lodestar by approximately 21%); 11-ER-2671-2747 (expert attesting to reasonableness of fee claim). There is no basis to conclude the injunctive terms would have been meaningfully stronger had the fees been opposed, and thus no red flag. *See Campbell*, 951 F.3d at 1127.

The district court carefully scrutinized the extensive record supporting Plaintiffs' claimed fee award and found the Consent Decree was reasonable and non-collusive, including its fees provisions. 1-ER-10-12. Objectors identify no basis to challenge that holding beyond insinuation and abject conjecture, which cannot form the basis of reversal particularly under the abuse of discretion standard.

### F. The Consent Decree Treats Class Members Equitably.

This Court should similarly reject Objectors' claims the district court committed reversible error because the Consent Decree allegedly fails to treat class members equitably. Robertson-AOB 25; Org-AOB 54-57; *see* Fed. R. Civ. P. 23(e)(2)(D).

The Rule 23(e)(2)(D) inquiry turns on whether the proposal "improperly

grant[s] preferential treatment to class representatives or segments of the class." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (citation omitted). Concerns about equitability generally arise in settlements involving unequal distribution of settlement funds, such as, for example, when named plaintiffs receive an incentive payment. *See, e.g.*, *Radcliffe v. Hernandez*, 794 F. App'x 605, 607-8 (9th Cir. 2019) (settlement that tied distribution of settlement funds to actual harm did not treat class members inequitably).

Here, the settlement requires that the Jail reform its policies and procedures regarding mental health treatment, out-of-cell time, restrictive housing, COVID-19, and numerous other topics. *See* 12-ER-2904-05. The Consent Decree applies to the entire Jail and therefore treats class members equitably; no similarly situated class members are treated more or less favorably than other similarly situated class members. *See Sec. Life Ins. Co. of Am. v. Meyling*, 146 F.3d 1184, 1190 (9th Cir. 1998) (per curiam). The named plaintiffs received no incentive payments or other special treatment.

Organization-Objectors argue that "overly-broad releases of liability" may also demonstrate inequity. Org-AOB 55-57. But the Consent Decree does not release any liability and merely acknowledges Defendants "may … assert issue preclusion or *res judicata*" as a defense, which would still be true even if the Consent Decree were silent on this matter. 12-ER-2914; *see supra* § V.D.3.

Relatedly, Inmate-Objectors assert that the Consent Decree contains an "inherent conflict of interest between the Disability Subclass represented by the named plaintiffs and the majority of the class members," whom they assert "[do not] have mental illness, who were not disabled and who were not incarcerated in restricted, isolated housing," and therefore allegedly will not benefit from the Consent Decree. Inmate-AOB 40. The fact that a consent decree resolving legal claims related to inadequate mental health care, disability discrimination, and overuse of segregation contains numerous terms targeted at those issues is to be expected, and does not make the decree inequitable. *See* Fed. R. Civ. P. 23(e)(2) Advisory Committee Note to 2018 Amendment (subfactor (e)(2)(D) concerns "whether the apportionment of relief among class members takes appropriate account of differences among their claims").

Moreover, the district court expressly rejected this argument, finding the Consent Decree's "comprehensive injunctive relief will benefit *all* Class and Subclass members." 1-ER-6 (emphasis added). Inmate-Objectors identify no clear error in this finding, nor could they given the Consent Decree contains multiple terms benefiting all incarcerated people. 1-ER-5; *see* 7-ER-2849-2872; *see also supra* Section V.D.1. Furthermore, even those provisions that appear to benefit only those with mental illness or in restricted housing ultimately benefit everyone, as a person's condition and needs may change throughout their incarceration. For

example, a person who does not require mental health treatment when initially committed may well need it after weeks or months of incarceration. Similarly, a person may be subjected to restricted housing at any point in their incarceration. Because the Consent Decree treats similarly situated class members similarly, and does not unfairly single out any class members for preferential treatment, it is equitable and must be affirmed.

## VI. THE DISTRICT COURT ADEQUATELY RESPONDED TO ALL NON-FRIVOLOUS OBJECTIONS

Objectors also argue that the district court failed to respond sufficiently to each of the objections. Inmate-AOB 54-59; Org-AOB 58-62; Robertson-AOB 27-30. The court here closely considered all objections, including requesting supplemental briefing on points of concern, which Plaintiffs provided. *See* 3-ER-540-542; 3-ER-354-429. It then thoroughly addressed the objections in the final approval order by summarizing common themes and responding to them in turn. 1-ER-6-9. That is sufficient. *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995) (Rule 23(e) requires reasoned response to objections).

Objectors argue the district court's response was insufficient because it did not provide "192 reasoned responses or a total of reasoned responses + findings of frivolousness equal to that figure." Org-AOB 58. But there is no legal precedent requiring district courts to address each objection individually to provide a reasoned response. *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577

(9th Cir. 2004) (affirming where district court "weighed the reactions of members of the proposed settlement class" and "provided a reasoned response to settlement objections"); *Linney*, 151 F.3d at 1243 (affirming where district court made findings at fairness hearing and provided reasons why settlement is fair, reasonable, and adequate in order); *see also In re Apple*, 50 F.4th at 782 (finding district court order addressing "'the more serious, common, and representatives objections'" demonstrated its "careful consideration of the settlement's fairness," and reversing on other grounds).

The district court provided a reasoned response to the objections by grouping them into themes because many of the 192 objections were duplicative and some even frivolous. *See* 1-ER-6-9; *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 895 F.3d 597, 612 (9th Cir. 2018) (courts need not respond to objections "entirely lack[ing] merit"). Plaintiffs and the County each conducted a detailed analysis of the objections prior to the final fairness hearing and identified key themes. 4-ER-579-87; 5-ER-875-87. Roughly half of the objections were standardized surveys employing boilerplate language that do not comply with Rule 23(e)(5)(A)'s requirements including by failing to "specifically state the grounds for objection" to any Consent Decree term. 4-ER-579. Some of the objections actually supported the Consent Decree. 2-ER-80. At least 22 were submitted by non-parties who are not entitled to object under Rule

23. *See* 1-ER-7. A significant portion of the responses expressed broader frustrations about the criminal justice system or issues outside the Complaint. 1-ER-7, 9; 4-ER-580-81. More than a hundred objections raised issues about the quality of mental health care provided at the Jail, which the district court correctly found only served to "highlight the pressing need to reform the Jail's policies and procedures." 1-ER-9.

Inmate-Objectors identify examples of objections they claim the court ignored, but nothing remotely approaching reversible error. Inmate-AOB 54-56. Inmate-Objectors' counsel's repeated claim that the Consent Decree benefits only 4% of inmates was and remains substantiated by nothing, and the district court did not clearly err in rejecting it and concluding the Consent Decree will make the Jail "markedly better than the current situation." *See* 1-ER-7-8. Inmate-Objectors further assert the court ignored claims that class members would receive less mental health care under the Consent Decree. *See* Inmate-AOB 54-55. But only one cited objection makes such a comment—and it is predicated on a hypothetical concern about how the objector might be classified under the Consent Decree's expanded mental health model. 7-ER-1498. That concern cannot override the court's ultimate finding that mental health care in the Jail will substantially improve under the Consent Decree. 1-ER-5-6; *see also* 16-ER-3978 (expert report finding existing care inadequate).

Similarly, for most of the remaining nine examples of types of objections the court purportedly failed to address, Inmate-Objectors mischaracterize the cited comments, which often have nothing to do with Inmate-Objectors' assertions. *See* Inmate-AOB 55-56. None provide a basis for reversal. Any concern the 110-page Consent Decree is not sufficiently concrete will necessarily be addressed via the "comprehensive injunctive relief" afforded by the policies that the Jail must develop in conjunction with Plaintiffs and the joint experts as part of the court-ordered remediation. *See* 12-ER-2904-05; *see also* 1-ER-6. Other objections identified by Inmate-Objectors demonstrate a lack of understanding of the Consent Decree, including false assertions that there are no consequences if Defendants fail to comply with the Consent Decree and that incarcerated people will not be assessed for mental health treatment. *See* 12-ER-2911-12 (dispute resolution and enforcement); 12-ER-2873-77 (mental health screening). The remaining objections, such as complaints about outdoor yard time, psychiatric medication, or the cultural competency of mental health staff, do not demonstrate that the relief is inadequate and are being addressed as the Jail develops policies and trainings as required by the Consent Decree.

Organization-Objectors' claim that district court order gave "short-shrift" to the objections is similarly misplaced. Org-AOB 61-62. While Organization-Objectors claim the number of objections raises "red flags," they fail to identify

even a single instance of alleged clear error. *Id.* The record makes plain the district court took seriously all submitted comments—including those from non-parties not entitled to object, those having nothing to do with the Consent Decree itself, and form survey responses far below Rule 23(e)(5(A)'s minimum requirements—and thoroughly addressed the objections, after consideration of testimony and responses to supplemental briefing directed at points of concern.

Objectors nitpick the order below, but their primary objection to the Consent Decree is that it was not the settlement they would have preferred. That is not a reason to reverse. *See Hanlon*, 150 F.3d at 1027. The district court gave reasoned responses to objections, except for ones entirely lacking merit. *See In re Volkswagen*, 895 F.3d at 613. Its order must be upheld.

## CONCLUSION

For the foregoing reasons, the district court's order should be affirmed.

DATED: April 27, 2023      Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Amy Xu*

Amy Xu

*Attorneys for Plaintiffs-Appellees*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the undersigned counsel for Plaintiff-Appellee states the following:

The following appeals currently pending before this Court are related to this appeal, as they have been consolidated and "raise the same or closely related issues." Ninth Cir. R. 28-2.6(b):

- *Tyler Abbott et al v. Babu et al.*, No. 22-15355;

- *American Friends Service Committee, et al. v. Babu et al.*, No. 22-15363;

- *Keenan G. Wilkins v. Babu et al.*, No. 22-15275;

- *Reginald Robertson v. Babu et al.*, No. 22-15579.


DATED: April 27, 2023          Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP


By: */s/ Amy Xu*
    Amy Xu

*Attorneys for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15275, 22-15355, 22-15363, 22-15579

I am the attorney or self-represented party.

**This brief contains** | 15,329 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

   ☐ it is a joint brief submitted by separately represented parties.

   ☒ a party or parties are filing a single brief in response to multiple briefs.

   ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Amy Xu | **Date** | April 27, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**     *Rev. 12/01/22*