**Case Nos. 22-15275, 22-15355, 22-15363, 22-15579**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ASHOK BABU, ET AL.,
*Plaintiffs-Appellees*,

v.

KEENAN G. WILKINS, AKA NERRAH BROWN,
*Objector–Appellant*,

TYLER ABBOTT, ET AL.,
*Objectors–Appellants*,

AMERICAN FRIENDS SERVICE COMMITTEE,
ET AL.,
*Objectors–Appellants*,

REGINALD ROBERTSON,
*Objector–Appellant*,

v.

GREGORY J. AHERN, SHERIFF, ET AL.,
*Defendants-Appellees*.

Appeal From The United States District Court,
Northern District of California
Case No. 5:18-cv-07677-NC
Magistrate Judge Nathanael Cousins

**PLAINTIFFS-APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 1 OF 1**

**ROSEN BIEN GALVAN & GRUNFELD LLP**
Lisa Ells
Kara J. Janssen
Amy Xu
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
*Attorneys for Plaintiffs-Appellees*

[4268924.3]

## INDEX TO PLAINTIFFS-APPELLEES'
## SUPPLEMENTAL EXCERPTS OF RECORD

| Description | Date | ECF No. | SER Pages |
|---|---|---|---|
| Declaration of Appellant R. Robertson in Support of Appeal of Consent Decree, Dkt #266-1 Friday, October 28th, 2022 | 11-02-2022 | 490 * | 005-013 |
| Envelope for Declaration of Appellant R. Robertson in Support of Appeal of Consent Decree, Dkt #266-1 Friday, October 28th, 2022 | 11-02-2022 | 490-1* | 014-017 |
| R. Robertson-Class member's Appeal to Order Granting Dkt #266-1, FRCP, Rules 23(d)(B)(III), 23(F); FRE; Rule 401(a) and 401(b) | 03-24-2022 | 457 * | 018-043 |
| Plaintiffs' Response to Recently Filed Objections and Revised [Proposed] Order Extending Deadlines for Objections and Final Approval | 09-21-2021 | 276 | 044-046 |
| Defendants' Errata to Declaration of Samantha Wolff in Support of Defendants' Statement of Non-Opposition to Plaintiffs' Motion for Preliminary Approval of Consent Decree | 08-26-2021 | 268 | 047-048 |
| Exhibit 1 to Declaration of Samantha Wolff in Support of Defendants' Statement of Non-Opposition to Plaintiffs' Motion for Preliminary Approval of Consent Decree | 08-26-2021 | 268-1 | 049-053 |
| Minute Entry for proceedings held before Magistrate Judge Laurel Beeler: Settlement Conference held | 08-11-2021 | 265 | 054 |

---

\* Plaintiffs provide ECF Nos. 457, 490, and 490-1 pursuant to Circuit Rule 30-1.3 because Appellant-Objector Robertson cites to these documents in his pro se opening brief.

| Description | Date | ECF No. | SER Pages |
|---|---|---|---|
| via Zoom on 8/10/2021. | | | |
| Minute Entry for proceedings held before Magistrate Judge Laurel Beeler: Settlement Conference held via Zoom on 8/4/2021. | 08-05-2021 | 264 | 055-056 |
| Joint Status Update | 06-24-2021 | 257 | 057-058 |
| Stipulation and Order re Department of Justice Participation in Ongoing Settlement Discussions | 05-05-2021 | 247 | 059-076 |
| Joint Response to April 9, 2021 Order re Santa Rita Jail COVID-19 Response | 04-28-2021 | 245 | 077-132 |
| U.S. District Court Northern District of California Related Case Order | 09-17-2020 | 201 | 133 |
| *Babu* Plaintiffs' Response to *Gonzalez* Plaintiffs' Administrative Motion to Consider Whether the *Gonzalez v. Alameda County Sheriff's Office*, 3:19-CV-07423 Should be Related | 09-04-2020 | 197 | 134-139 |
| Administrative Motion to Consider Whether the Gonzalez v. Alameda County Sheriff's Office, 3:19-CV-07423 Should be Related in Light of the First Amended Complaint Herein, and the Second Amended Complaint in Gonzalez | 09-01-2020 | 195 | 140-141 |
| Order Denying Motion to Intervene; Granting Motion for Leave to Amend | 08-13-2020 | 184 | 142-145 |
| Alameda County Male Prisoners and Former Prisoners, Daniel Gonzalez, Rocci Garrett, Lawrence Gerrans and Michael Lucas, Martin Gallardo, and Sergio Morales-Servin Reply in Support of Their Motion to Intervene as Plaintiffs' Intervenors | 08-03-2020 | 180 | 146-154 |

[4268924.3]

**SER-003**

| Description | Date | ECF No. | SER Pages |
|---|---|---|---|
| Declaration of Adrian Contreras in Support of Alameda County Male Prisoners and Former Prisoners, Danial Gonzalez, et al's Motion to Intervene | 08-03-2020 | 180-1 | 155-158 |
| Declaration of Gilbert Martinez in Support of Alameda County Male Prisoners and Former Prisoners, Daniel Gonzalez, et al's Motion to Intervene | 08-03-2020 | 180-2 | 159-163 |
| Declaration of Troy Powell in Support of Alameda County Male Prisoners and Former Prisoners, Daniel Gonzalez, et al's Motion to Intervene | 08-03-2020 | 180-3 | 164-166 |
| Declaration of Eric Wayne in Support of Alameda County Male Prisoners and Former Prisoners, Daniel Gonzalez, et al's Motion to Intervene | 08-03-2020 | 180-4 | 167-168 |
| [Proposed] Order Granting Gonzalez Plaintiffs' Request to Intervene as Plaintiff-Intervenor | 07-13-2020 | 149-1 | 169-170 |

1   Your name: Robertson, R. APM873

2   Address: 5325 Broder Blvd.

3   _____ Dublin, CA   94568-3309

4   Phone Number: (775)-335-7773 (Mess.)

5   Objector/Appellant, R. Robertson, _____ Pro Per

6

**FILED**

NOV 02 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

7           **UNITED STATES DISTRICT COURT**
8           **NORTHERN DISTRICT OF CALIFORNIA**

9   ASHOK BABU, et. al.,                    )   Case Number: 18-CV-07677 NC
10  _____                )
11                                          )   **DECLARATION OF**
                                            )
12          Plaintiff(s),                   )   APPELLANT, R. ROBERTSON
                                            )
13      vs.                                 )   **IN SUPPORT OF** APPEAL OF CONSENT
                                            )
14  GREGORY AHERN, et. al.,                 )   DECREE, DKT. #266-1
                                            )
15  _____                )   Friday, October 28th, 2022
                                            )
16  _____                )
                                            )
17  _____                )
                                            )
18  _____                )
                                            )
19          Defendant(s).                   )
20  _____                )

21

22      I, ___R. Robertson,_____

23  declare as follows:

24      1.   I am a classmember for the above-captioned action and belong to the

25  sub-class of inmates with mental-health diagnoses.

26      2.   I have personal knowledge of all facts stated in this declaration, and if called to

27  testify, I could and would testify competently thereto.

28

DECLARATION OF APPELLANT, R. ROBERTSON _____ IN SUPPORT OF
APPEAL OF CONSENT DECREE, DKT. #266-1
_____ CASE NO. 18-CV-07677 NC ; PAGE 1 OF 5

**SER-005**

3. I make this declaration to document a perceived pattern of harrassment by Alameda County Sheriff's Office (here-in, "ACSO")- Deputy, Marco Negrete.

4. I also make this declaration as evidence of continued bad acts of Defendants, County of Alameda and ACSO-Sheriff, Ahern's subor- dinates, staffing Santa Rita Jail/Dublin, CA.

5. Prior to the Consent Decree's approval by the Court, on 12-30-21 I was: forcibly removed from my assigned cell, seperated from personal property access to courts was interfered with, while no due process protections were afforded.

6. ACSO-Dep. Negrete was an active participant of this incident, which has been documented in Inmate Grievance and Response- #22-0470 (see: as attached to this declaration).

7. After implementation of the Consent Decree-DKt. #266-1, on 2-18-22, Negrete allowed an inmate to assault my person - while he stood by idly.

8. While I was defending myself from the inmate's attack, without any verbal warning, Negrete then tasered me-twice-and while I was the victim.

9. After I was down -prone-Negrete next kicked me in my right- foot with sufficient force to break bone. Subsequently, charging me with "battery" for defending myself, during the incident.

10. The inmate assault, excessive use of force incident of 2-18-22 has been documented as may be located - DKt. #457, with supporting documentary evidence attached.

11. Over the next period of March, 2022 thru May, 2022, there were minor incidental deprivations, initiated by Negrete... (continued, page 3)

DECLARATION OF __APPELLANT, R. ROBERTSON__ IN SUPPORT OF
__APPEAL OF CONSENT DECREE, DKt. #266-1__
CASE NO. 18-CV-07677 NC ; PAGE 2 OF 5

**SER-006**

1    .... which I occassionally reported to jailstaff.

2

3

4    12. However, on 6-13-22 Negrete arrived at my assigned cell with

5    three-additionally-deputies implying that I had disrespected "his

6    technicians". There was an interference not physical assault by Negrete.
     [threat]

7    13. After the three-additional-deputies departed, I remained

8    locked in my cell for our tier's scheduled recreation-time. A punish-

9    ment imposed by Negrete, in violation of my right to due process.

10   14. I reported this incident to jailstaff, afterwhich the Grievance

11   Unit of Santa Rita Jail found Negrete had-in fact-violated my con-

12   stitutional-right to due process (see: Inmate Grievance Response-Tracking

13   #22-3170, as attached to this declaration).

14

15

16

17   15. In an attempt to protect myself, on 7-26-22, I filed a request

18   for a Temporary Restraining Order (here-in, "TRO"), against Negrete in CA

19   Superior Ct.-Robertson v. Negrete, Case No. 22-CV-014958, Hayward Hall

20   of Justice. Which was denied, pending a hearing.

21

22

23   16. The TRO hearing was scheduled for 8-17-22 and I was un-

24   able to appear, due to jailstaff failure to transport me to court or

25   allow a remote appearance. Negrete-on information-appeared pro se.

26   17. Subsequentially, I was advised the TRO was dismissed by the

27   Hon. Bentrish Satarzadeh, for ...          (continued, page 4)

28

DECLARATION OF  APPELLANT, R. ROBERTSON  IN SUPPORT OF
APPEAL OF CONSENT DECREE, DKT. #266-1

CASE NO.  18-CV-07677  ; PAGE 3 OF 5        **SER-007**

1  .... "improper service of process". On information and belief,
2  the minutes from the TRO hearing provide — Negrete and an attorney
3  from Alameda County Counsel's Office, present on the date/time scheduled!
4  18. Based on the preceding facts, there is a reasonable likely-hood
5  Negrete's constitutional violations, harrassment, excessive use of force, and
6  assaults on me—are capable of repitition.
7  19. I personally observed a deputy assault an inmate belonging to
8  the subclass of inmates with mental-health diagnoses on 10-22-22.
9
10  20. I observed, prior to the deputy placing a wrist-lock on this
11  inmate, executing a "body-slam"/take-down manuever. That the inmate
12  was simply eating a sandwhich, walking around, and posed no threat of harm.
13  21. In my understanding, he appeared detached—mentally—from
14  the moment, as it was happening and may have suffered a mental-
15  health episode. He appeared focused on eating and walking, only.
16  22. Since this incident, I learned an account was provided
17  to jailstaff, in the form of an Inmate Grievance, Tracking #22-5546.
18  I do not have access to these records.
19  23. Based on eye-witness observation, the culture of jailstaff
20  routinely violating the rights of inmates and subclass with mental-
21  health diagnoses has not been affected in any overt way.
22  24. Eight-months after its implementation, we are still being
23  injured, the Consent Decree—in its present form—has no power to
24  effect significant improvement/relief, to our subclass—or me, personally.
25  25. I have encountered ACSO deputies that provided, they weren't
26  exactly sure what the Consent Decree was... (continued, page 5)
27
28

DECLARATION OF  APPELLANT, R. ROBERTSON  IN SUPPORT OF
APPEAL OF CONSENT DECREE

CASE NO. 18-CV-07677NC ; PAGE 4 OF 5

SER-008

DECLARATION OF APPELLANT, R. ROBERTSON _____ IN SUPPORT OF

APPEAL OF CONSENT DECREE, DKt.#966-1

No, I do not believe its possible to adhere to a document
that several jailstaff are unable to define-based on prior exper-
ience. Therefore, I object to DKt#966-1 and provide this dec-
laration in support of appeal.

cc: Amer. Friends Service Committee
    Law Offices of Yolanda Huang, Esq.,
    Civil L.R., Rule 5-1(h)

Attachments: Inmate Grievance #33-0470 (Part I & II)
    Inmate Grievance Response #33-0470 and
    Inmate Grievance Response #33-3170
    & Postage-paid Envelopes.

cc: Class Counsel for Plaintiffs
    Counsel for Defendants, Civil L.R., 5-1(h)
    Appellant R. Robertson has attached a pre-paid
    envelopes to cover cost of notifying Appellants;
    Kevin Lee McCullom, Case No. 33-15353 and
    Keenan G. Wilkins, Case No 33-15375, 9th Cir., ct. of App.,
    San Francisco, CA.

I declare under penalty of perjury under the laws of the United States that the foregoing is
true and correct and that this declaration was executed on [date] Friday, October 28th, 2022.

Signature: R. Robertson - In pro per

Printed name: R. Robertson - APM8 73

Address: 5335 Broder Blvd./Dublin, CA. 94568-3309

SER-009

Part I, of II.

## ALAMEDA COUNTY SHERIFF'S OFFICE
## INMATE GRIEVANCE FORM
[✓] Santa Rita Jail  [ ] Glenn E. Dyer Detention Facility

[X] ADA RELATED

NAME: R. Robertson   DEP S  PFN: Apm873   DATE: 1-21-22   HU/FLOOR #8E/C-6

*Only one grievance issue per form ---- (Subject to refusal if failure to comply)* DATE GRIEVANCE OCCURRED 12-30-21 thru 1-4-22

**Grievance Details:**

On 12-30-21 at approximately 4:40pm and after multiple appearances at my assigned cell-stated above, Alameda County Sheriff's Office (here-in, "ACSO")-Sgt. Francis returned stating, "Someone from Behavioral Health, heard you threatening to harm your-self... on the tablet. You're being placed on I.O.L." I stated to Sgt. Francis and Dep. Negrete #2546 (who had arrived to assist), that this allegation was false. On this date, I placed three-calls, All were to my representative (Article 1, Sect. 3(a), CA Const.) and were primarily to obtain records from ACSO-Internal Affairs (1401 Lakeside Drive /Oakland, CA) - under the CA Public Records Act, CA Govt C., 6253 et. seq. Sgt. Francis then stated, "You have no choice!" Based on his demeanor and tone, there was an implied threat. Following his instructions, I walked to the door way of cell 6, Where Dep. Negrete took my eye-glasses, stating "You can't have these." Then both deputies placed me in Unit #8/F-2, where I remained for four-days. On 1-3-22 at approximately 8:30pm, two representatives from AFBH came and spoke with me. After I relayed Sgt. Francis' allegation-line 3, above-one of the repre-sentatives stated, "Behavioral Health is not in the business of eaves-dropping on inmate calls. We were informed you threatened to go on a hunger-strike." The issue I am grieving is by threat, intimidation, and coercion and with reck-less disregard of my right to due process, I was placed in I.O.L. for four-days, based on false-unsubstantiated-allegations. (continue, part II...)

**INMATE SIGNATURE:** R. Robertson

*By signing this form, you are consenting to a search of your medical, dental, or mental health records for the purpose of this investigation only. This acts as a waiver to your HIPAA rights. If you disagree with this, you must indicate so in your grievance.*

***DO NOT WRITE ON BACK OF THIS FORM. USE ADDITIONAL GRIEVANCE FORMS IF NECESSARY***
***DO NOT WRITE BELOW THIS LINE***

Received by Deputy: S. OSMANI   Badge# 2532   Date: 01/21/2022

[ ] Resolved at Deputy Level   Inmate Acceptance (*Signature*) _____

[X] Cannot be resolved at Deputy Level   Grievance Tracking Number: 22 - 0470

PREA Tracking Number: _____

*The Deputy who received the inmate's grievance shall attach an Inmate Grievance Response Supplemental Form (ML-53) detailing how they resolved or attempted to resolve the inmate's grievance.*

Copies: White-Staff
Pink-Inmate

ML-51 (rev 03/19)

**SER-010**

Part II, of II

## ALAMEDA COUNTY SHERIFF'S OFFICE
## INMATE GRIEVANCE FORM
[✓] Santa Rita Jail  [ ] Glenn E. Dyer Detention Facility



| X | **ADA RELATED** |

NAME: R. Robertson    PFN: Apm 873    DATE: 1-21-22    HU/FLOOR #8E/C-6

*Only one grievance issue per form ---- (Subject to refusal if failure to comply)* DATE GRIEVANCE OCCURRED 12-30-21 thru 1-4-22

**Grievance Details:**

In resolving this matter, it is requested the incident be investigated; false allegation(s) of my being suicidal, be expunged from my Santa Rita Jail records; that my HIPAA/Mental Health records be noted to reflect the circumstances of the false allegation,

Please Note; ① Prior to being placed on I.O.L., no evaluation was performed by AFBH; ② No procedural process was implemented by ACSO; ③ Rights under the Tom Bane Act were violated; ④ In violation of the ADA and without providing "reasonable accommodations", my eye-glasses were taken; ⑤ I was denied the benefit of the ACSO/SRJ book-cart; ⑥ my right of "access to courts" was interfered with for four-days; ⑦ As a pre-cursor to this incident, a permenant record of the allegation, "suicidal" has been placed in my HIPAA/Mental Health records. Two-(2)- County of Alameda, Government Claim-forms are requested with your response.
— I DO NOT WISH TO WAIVE MY HIPAA RIGHTS—

                              Thank-you for your time and attention.

INMATE SIGNATURE: R. Robertson
*By signing this form, you are consenting to a search of your medical, dental, or mental health records for the purpose of this investigation only. This acts as a waiver to your HIPAA rights. If you disagree with this, you must indicate so in your grievance.*

***DO NOT WRITE ON BACK OF THIS FORM. USE ADDITIONAL GRIEVANCE FORMS IF NECESSARY***
***DO NOT WRITE BELOW THIS LINE***

Received by Deputy: S. OSMANI          Badge# 2532    Date: 01/21/2022

[ ] Resolved at Deputy Level              Inmate Acceptance (*Signature*) _

[✓] Cannot be resolved at Deputy Level    Grievance Tracking Number: 22-0470

                                          PREA Tracking Number: _____ -0470

*The Deputy who received the inmate's grievance shall attach an Inmate Grievance Response Supplemental Form (ML-53) detailing how they resolved or attempted to resolve the inmate's grievance.*

**SER-011**

## INMATE GRIEVANCE RESPONSE

*Inmate Copy*

GRIEVANCE TRACKING NUMBER: **22-0470**

INMATE: **ROBERTSON, REGINALD**   PFN: **APM873**   HOUSING UNIT LOCATION: **08-C-06**

GRIEVANCE IS   AFFIRMED: _____   DENIED: **X**   WITHDRAWN: _____   RESOLVED: _____   REFERRED: _____

**If grievance is denied, give reason for denial. If affirmed, state what corrective action will be taken (if applicable):**

These findings are based on a review of your grievance received on **January 21, 2022**. In your grievance, you made the following claim:

- You were wrongfully placed on an Intense Observation Log (IOL), violating your rights.

**Response:** The Grievance Unit has reviewed and investigated your claim thoroughly and provided an explanation of its findings below.

The Body Worn Camera (BWC) footage regarding this incident was reviewed. Your rights were not violated. At no point did the sergeant tell you Adult Forensics Behavioral Health (AFBH) heard you threaten to harm yourself on the tablet. You were told the sergeant's supervisor received a call from someone concerned about your wellbeing and when that information was relayed to AFBH, they initiated an IOL. The sergeant was also not threatening in any way as you claim in your grievance. The sergeant and deputy were both polite and patient as you asked multiple questions and complained the entire time.

A review of the process showed the correct procedures were followed regarding your placement on an IOL. Due to you not waving your HIPAA rights, the Grievance Unit is unable to contact AFBH to further investigate your claim.

Your grievance is **DENIED**.

*Your information is false, my due process rights were violated, no one from AFBH evaluated me until 1-3-22. Reasonable accommodations were not provided-while my glasses were taken.*

| | | | |
|---|---|---|---|
| Investigating Deputy: | **D. Kyes, Deputy** | Date: | 02/16/22 |
| Investigating Supervisor: | **M. Carausu, Sergeant** | Date: | 02/13/22 |
| Inmate's Signature: | | | |
| Do you wish to appeal this ruling? Yes ✓ | No _____ | Refused to Answer | Date: 2-24-22 |
| Appeal Officer: LT. D. TAYLOR #1509 | Recommendation: DENIED | Date: 2/28/22 |
| Reason for affirmation or denial: (If different from above) | | | |

Commanding Officer: **Lt. G. Mora #1642**   Recommendation: DENIED   Date: 03/02/22

ML52 (Rev.06/18)

# *INMATE GRIEVANCE RESPONSE*

**Inmate Copy**

GRIEVANCE TRACKING NUMBER: __22-3170__

INMATE: **ROBERTSON, REGINALD**   PFN: __APM873__   HOUSING UNIT LOCATION: __21-E-07__

GRIEVANCE IS   AFFIRMED: __X__   DENIED: _____   WITHDRAWN: _____   RESOLVED: _____   REFERRED: _____

**If grievance is denied, give reason for denial. If affirmed, state what corrective action will be taken (if applicable):**

These findings are based on a review of your grievance received on **June 13, 2022**. In your grievance, you made the following claim:

- You were locked in your cell without due process.

**Response:** The Grievance Unit has reviewed and investigated your claim thoroughly and provided an explanation of its findings below**.**

You were locked in your cell without due process.

A copy of this grievance was forwarded to the ADA Coordinator.

Your grievance is **AFFIRMED.**

**Note: A copy of your grievance will be forwarded to the appropriate supervisors for review.**

Investigating Deputy: __**D. Kyes, Deputy**__   Date: __09/13/22__

Investigating Supervisor: __**M. Carausu, Sergeant**__   Date: __091472__

Inmate's Signature: __R. Robertson__   Date: __9-16-22__

Do you wish to appeal this ruling?   Yes   (No) ✓   Refused to Answer

Reason for appeal: _____

Appeal Officer: _____   Recommendation: _____   Date: _____

Reason for affirmation or denial: (If different from above)

Commanding Officer: __Lt. G. Moore #1797C__   Recommendation: __AFFIRMED__   Date: __9-22-22__

ML52 (Rev.02/2022)

**SER-013**

R. Kobe

5325 Broder Blvd.

Dublin, CA 94568-3309

RE: Case No. 18-CV-07677NC

Confidential

-LEGAL MAIL-



Office of the Clerk
— N.D. Ct. of CA —
280 South 1st Street
San Jose, California
95113

SER-015



SER-016



A. PROL #2696

- LEGAL MAIL -

Confidential

SER-017

1   Your name: Robertson, R., classmember

2   Address: 5325 Broder Blvd.

3   _____ Dublin CA  94568-3309

4   Phone Number: (775)-335-7743 (mess.)

5   Fax Number: _____

6   _____ Classmember _____, Pro Se

7

8                   UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10          [Select one location: San Francisco / Oakland / San Jose / Eureka]

11

12   BABU, A., et al.,                    )   Case Number: 5: 18-CV- 07677 NC
                                          )
13   _____                 )
                                          )   R. ROBERTSON- CLASSMEMBER'S APPEAL
14          Plaintiff(s),                 )   TO ORDER GRANTING DKT. #266-1,
                                          )
15          vs.                           )   FRCP, RULES 23(d)(B)(III), 23(F); FRE,
                                          )
16   AHERN, et al.,                       )   RULE 401(a) and 401(b)
                                          )
17   _____                 )   _____
                                          )
18   _____                 )   _____
                                          )
19   _____                 )
                                          )
20   _____                 )
                                          )
21          Defendant(s).                 )
                                          )
22

23          Comes now Classmember-R. Robertson in pro se to present claims of

24   Defendants' bad acts, committed contrary to and postdating the court's Order-

25   granting the Consent Decree-Docket #266-1 (Fed. R. Civ. P., Rule 23(d)(B)(III)).

26   Classmember-R. Robertson (here-in, "Robertson" or "Plaintiff"), submits documents as

27   evidence of an active dispute and in support of appeal to the Consent Decree-

28   Fed. R. Ev., RULES, 401(a) and (b).               (continue, page 2)

TITLE OF DOCUMENT: R. ROBERTSON'S APPEAL TO DKT. #266-1 "CONSENT DECREE"
CASE NO.: 18-CV-07677 NC
PAGE NO. 1 OF 4

**SER-018**

1  Defendants' concur that Plaintiff's "Notice of Motion and Motion to Change
2 Time," "... was timely filed" - Defendants Opposition..., Dkt. #454, 2, at #17.
3 Yet misapprehend Plaintiff's presentation that there is an active dispute, which
4 the district-court has jurisdiction to resolve. "An appeal does not stay
5 proceedings in district court unless the district judge or the court of appeals
6 so orders," Federal Rules of Civil Proc., Rule 23(f). On personal know-
7 ledge, Robertson provides no such order has been received - either from
8 the Northern Dist. Ct. or 9th Circuit, by Classmembers.

9

10 Documentary Evidence

11

12  Plaintiff additionally provides the facts set-forth in this document
13 and attachments (i.e. Inmate Grievances - #22-1041, #22-1439; Declarations
14 of Witness/Classmembers: M. Scott, Z. Rideaux, D. Godwin, and Plaintiff - outweigh
15 the evidentiary-value of a lone deputy). While - concurrently - supporting the
16 fact Defendants' and Class Counsels', Consent Decree is inadequate in
17 ebbing jail-staff's bad acts against Class/Sub-Classmembers, it was
18 approved to aid/protect. Submission of these facts are of consequence to
19 the district and appellate courts - Fed. R. Ev., Rules 401(a) and (b).

20

21 Dispute Resolution

22

23  In accordance with the Consent Decree's Dispute Resolution Clause -
24 Dkt. #266-1, 76-77, at (V.), Plaintiff: Filed an Inmate Grievance to
25 utilize Defendants' process in place; Submitted a hand-written complaint against
26 jail-staff that used lethal-force (use of a taser can cause loss of life -
27 Sanders v. City of Fresno, 551 F. Supp. 2d 1149 (E.D. Cal. 2008)); Called
28 Class Counsel ...     (continue, page 3)

TITLE OF DOCUMENT: R. ROBERTSON's APPEAL TO DKT. #266-1 "CONSENT DECREE"
CASE NO.: 18-cv-07677NC
PAGE NO. 2 OF 4

SER-019

1   ... Provided Class Counsel with documentary-evidence in the form of a
2   copy of Inmate Grievance #22-1041 and contact information for two-witnesses
3   present-during this use of force/assault by jail staff. Although Class
4   Counsel-according to their agreement with Defendants'-were authorized to
5   "review relevant documentation and/or otherwise interview classmembers" (Dkt, #
6   266-1, 77, at #2-#3). Class Counsel offered no assistance, directing
7   Plaintiff to seek, "other counsel". In Plaintiff's understanding, this
8   denial of performing duties of Class Counsel, as described in the Dispute
9   Resolution Clause, id., evidences violation of Fed. R. Civ P., Rule 23(g)(B).
10  While leaving active the dispute of: whether use of force was appropriate
11  on 2-18-22, regarding regarding Deputy-Negrete #2546-use of a taser; invest-
12  igation of Plaintiff and the Classmember/Witnesses' conflicting version of events
13  on 2-18-22; review of all evidence available, which would tend to support
14  or refute claims presented by Plaintiff and multiple eye-witnesses. Any
15  less actions by Defendants' and Class Counsel, would be contrary to the
16  duties they agreed to comply with-over classmembers clear objections.
17
18  Plaintiff Supports Appeal
19
20      To be clear, in its present form the Consent Decree provides no
21  apparent motivation for Class Counsel, Defendants', their representatives,
22  concerns, or jail-staff to that treat Classmembers/Sub-Classmembers any
23  differently-then prior to its implementation. Therefore, Classmember
24  supports appeal of Dkt. #266-1, in its present form and addresses-
25  specifically - The Use of Force and Dispute Resolution Clauses, Dkt. #266-1,
26  33-35, at E. (1) "Use of Force", 76-77, at V. "Dispute Resolution",
27  with this document and supporting evidence/papers, as attached.

(continued, page 4)

28
TITLE OF DOCUMENT: R. ROBERTSON'S APPEAL TO DKT. #266-1 "CONSENT DECREE"
CASE NO.: 18-CV-07674 NC
PAGE NO. 3 OF 4

SER-020

1  Plaintiff's Efforts to Resolve

2

3  Per Class Counsel, only Dep. Negrete's version is available for review; no

4  other deputies were present-during the 2-18-22 incident; no video-footage from onset

5  to conclusion, reviewed by Class Counsel; no statements of witnesses provided or

6  reviewed; no statements obtained or requested of the alleged victim or aggressor;

7  and nearing four-weeks, Plaintiff has yet to recieve an examination from any

8  Wellpath staff, above CNA-level-although my right-foot remains swollen. Under

9  the terms of the Consent Decree, which presently is in effect-per the Court's

10  Order-Dkt.#436, II, at #34. Classmember, R.Robertson, requests the wisdom,

11  aid of the Court to resolve this dispute (Dkt.#266-1, at 81, X.). Under penalty of

12  perjury, in accordance with U.S. laws, I declare the fore going is true and correct.

13

14  Respectfully Submitted,          Dated; March 21st, 2022

15

16  R. Robertson - in Pro Per

17

18  R. Robertson ▓▓▓▓▓          cc: Class Counsel for Plaintiffs,

19  5325 Broder Blvd,          et Counselors for Defendants-

20  Dublin, CA 94568-3309          USDC-Civil L.R., Rule 5-1(h)(1)

21

22  Attachments: Inmate Grievances #22-0470, #22-1041, #22-1439;

23          Letter/Complaint to Capt. Brodie, ACSO-Internal Affairs;

24          Email to Class Counsel-Regarding 2-18-22 incident;

25          Supporting Declarations by Classmember/Witnesses:

26          D. Scott, Z. Rideaux, D. Godwin, R. Robertson

27

28  PS: Attacha is INVIEW IMAGING REPORT-DOS 3/14/2022

TITLE OF DOCUMENT: R. ROBERTSON's APPEAL TO DKT.#266-1 "CONSENT DECREE"
CASE NO.: 18-CV-07677NC
PAGE NO. 4 OF 4

**SER-021**

1   Your name: Robertson, R., classmember

2   Address: 5325 Broder Blvd.

3   Dublin, CA 94568-3309

4   Phone Number: (775)-335-7473 (mess.)

5   Classmember _____ Pro Per

6

7   **UNITED STATES DISTRICT COURT**
    **NORTHERN DISTRICT OF CALIFORNIA**

8

9   BABU, A., et al.,                          ) Case Number: 5:18-CV-07677 NC
                                               )
10                                             ) **DECLARATION OF**
                                               )
11                                             ) R. ROBERTSON, CLASSMEMBER
                                               )
12          Plaintiff(s),                      ) **IN SUPPORT OF** APPEAL TO COURT'S
                                               )
13      vs.                                    ) ORDER, GRANTING CONSENT DECREE,
                                               )
14   AHERN, G., et al.                         ) FRCP, RULE 23(d)(B)(III)
                                               )
15                                             )
                                               )
16                                             )
                                               )
17                                             )
                                               )
18                                             )
                                               )
19          Defendant(s).                      )
                                               )
20

21      I, R. Robertson, declare:

22   declare as follows:

23      1.    I am a classmember for the above-captioned civil matter, and

24                belong to the sub-class of inmates with mental health impairments.

25      2.    I have personal knowledge of all facts stated in this declaration, and if called to

26   testify, I could and would testify competently thereto.

27

28

DECLARATION OF R. ROBERTSON, CLASSMEMBER _____ IN SUPPORT OF
APPEAL TO COURT'S ORDER, GRANTING CONSENT DECREE,
FRCP, RULE 23(d)(B)(III) _____ CASE NO. 18-CV-07677 NC ; PAGE 1 OF 4

**SER-022**

1. I make this declaration in support of a request, for the Court's aid in resolving an active dispute and in supplement of Plaintiffs' Appeal of the Consent Decree - Dkt. #266-1.

2. On Friday, 2-18-22 (approximately, 10:45am), myself and several inmates housed in Unit #8/lower-tier (Santa Rita jail/Dublin, CA), were on scheduled recreation-time.

3. When I was assaulted by an inmate housed on the upper-tier, while Deputy-Negrete #9546 stood idly by; then while defending myself, Negrete tasered me, twice.

4. After I was down on the ground, Negrete kicked me in my right-foot; hand-cuffed me and falsely alleged that I was the aggressor.

5. The following week, I documented this incident in Inmate Grievance #22-1041; mailed a handwritten complaint to Capt. Brodie, ACSO-Internal Affairs - against Negrete; and contacted Class Counsel.

6. Subsequently, Ms. Xu, Esq. informed me only Negrete's version of the event was "available"; Based on this information, I provided Class Counsel a copy of the grievance.

7. Then the following day, provided contact information for two-witnesses present during the 2-18-22 incident - and informed Class Counsel of their willingness to convey what they witnessed.

8. Class Counsel declined to render aid or otherwise become involved, contrary to the prescriptions outlined in the Consent Decree - under the Dispute Resolution Clause (Dkt. #266-1, 76-77, at V.).

9. On personal knowledge, Defendants' prior history involving similar incidents of bad acts by jail-staff, have resulted in only cursory-investigation... (cont.)

DECLARATION OF R. ROBERTSON, CLASSMEMBER_____ IN SUPPORT OF
APPEAL TO COURT's ORDER, GRANTING CONSENT DECREE,
FRCP RULE 23(d)(B)(III)      CASE NO. 18-cv-07677 NC    ; PAGE 2 OF 4    **SER-023**

10. Combined with the fact, the only version available, is the version presented by the deputy-which utilized excessive force and likely, broke bone in my right-foot, without being afforded a medical examination, in nearly 30-days. There is the appearance of a cover-up. Normally, inmates request to be seen in sick-call, meet with a physician's assistant or M.D. - within three to five-days.

11. In regards to this Classmember, Implementation of the Consent Decree has only resulted in an increased amount of adversity being faced. While Defendants' bad acts increase in severity.

12. Respectfully, it is requested the Court would weigh the value of evidence submitted: In my limited understanding of justice, as long Defendants' continue to have no compulsion to cease their bad acts - the Consent Decree, for all intent is just paper. It's effect rendering justice to no one...

13. In resolution of this dispute and should the issues presented here-in so move the Court. It is requested access to view footage, of the video-footage recorded, during the date/times of the incident of 2-18-22 be made available to the Court and/or the interested parties (redacting/editing any footage which may tend to prove irrelevant by the Court or tending to compromise the safety/security of Santa Rita Jail, its staff, or inmates).

14. In accordance with the Court's ability to corroborate the claims put-forth in this document, Defendants' investigative efforts, findings shall be made available to this Court.

DECLARATION OF R. ROBERTSON, CLASSMEMBER _____ IN SUPPORT OF
APPEAL TO COURT'S ORDER, GRANTING CONSENT DECREE,
FRCP, RULE 23(d)(B)(III) ____ CASE NO. 18-CV-07677NC ; PAGE 3 OF 4

**SER-024**

1  Defendants' shall be compelled to perform the duties, consented to
2  performing in the Consent Decree, likewise - Class Counsel.

3
4  Such other acts, conditions, duties as the Court deems appropriate,
5
6
7  Pursuant to 28 U.S.C., Section 1746 (1746), under penalty of
8  perjury, I attest that to the best of my knowledge, the foregoing is true
9  and correct, Executed this 21st day of March, 2022, at Dublin, CA.
10
11
12  R. Robertson - in Pro Per
13  R. Robertson - Apm873
14  5325 Broder Blvd.
15  Dublin, CA  94568-3309
16
17
18  cc: Counsel for Defendants,
19  Counsel for Plaintiffs -
20  USDC Civil L.R., Rule 5-1(h)(1)
21
22
23  I declare under penalty of perjury under the laws of the United States that the foregoing is
24  true and correct and that this declaration was executed on [date]
25    Signature:
26    Printed name:
27    Address:
28

DECLARATION OF R. ROBERTSON, CLASSMEMBER _____ IN SUPPORT OF
APPEAL TO COURT'S ORDER, GRANTING CONSENT DECREE,
FRCP, RULE 23(d)(B)(III) ____ CASE NO. 18-CV-07677NC ; PAGE 4 OF 4

**SER-025**

Part I, of II

## ALAMEDA COUNTY SHERIFF'S OFFICE
## INMATE GRIEVANCE FORM
[ ] Santa Rita Jail [ ] Glenn E. Dyer Detention Facility

☒ **ADA RELATED**

NAME: R. Robertson  DEP S  PFN: Apm873  DATE: 1-21-22  HU/FLOOR #8E/C-6

*Only one grievance issue per form ---- (Subject to refusal if failure to comply)* DATE GRIEVANCE OCCURRED 12-30-21 thru 1-4-22

**Grievance Details:**

On 12-30-21 at approximately 4:40pm and after multiple appearances at my assigned cell-stated above, Alameda County Sheriff's Office (here-in, "ACSO")- Sgt. Francis returned stating, "Someone from Behavioral Health, heard you threatening to harm your-self... on the tablet. You're being placed on I.D.L." I stated to Sgt. Francis and Dep. Negrete #2546 (who had arrived to assist), that this allegation was false. On this date, I placed three calls, All were to my representative (Article 1, Sect. 3(a), CA Const.) and were primarily to obtain records from ACSO-Internal Affairs (1401 Lakeside Drive/Oakland, CA)- under the CA Public Records Act, CA Gov't C., 6253 et. seq. Sgt. Francis then stated, "You have no choice!" Based on his demeanor and tone, there was an implied threat. Following his instructions, I walked to the door way of cell 6, where Dep. Negrete took my eye-glasses, stating "You can't have these." Then both deputies placed me in Unit #8/F-2, where I remained for four-days. On 1-3-22 at approximately 8:30pm, two representatives from AFBH came and spoke with me. After I relayed Sgt. Francis' allegation- line 3, above- one of the repre-sentatives stated, "Behavioral Health is not in the business of eaves-dropping on inmate calls. We were informed you threatened to go on a hunger-strike." The issue I am grieving is by threat, intimidation, and coercion and with reck-less disregard of my right to due process, I was placed in I.D.L. for four-days, based on false-unsubstantiated-allegations. (continue, part II...)

INMATE SIGNATURE: R. Robertson

*By signing this form, you are consenting to a search of your medical, dental, or mental health records for the purpose of this investigation only. This acts as a waiver to your HIPAA rights. If you disagree with this, you must indicate so in your grievance.*

**‡***DO NOT WRITE ON BACK OF THIS FORM. USE ADDITIONAL GRIEVANCE FORMS IF NECESSARY***
***DO NOT WRITE BELOW THIS LINE***

Received by Deputy: S. OSMANI  Badge# 2532  Date: 01/21/2022

[ ] Resolved at Deputy Level

[☒] Cannot be resolved at Deputy Level

Inmate Acceptance (*Signature*) _____

Grievance Tracking Number: 22-0470

PREA Tracking Number: _____

*The Deputy who received the inmate's grievance shall attach an Inmate Grievance Response Supplemental Form (ML-53) detailing how they resolved or attempted to resolve the inmate's grievance.*

Copies: White-Staff
Pink-Inmate

ML-51 (rev 03/19)

**SER-026**

## ALAMEDA COUNTY SHERIFF'S OFFICE
## INMATE GRIEVANCE FORM
[√] Santa Rita Jail  [ ] Glenn E. Dyer Detention Facility

ADA
RELATED

NAME: _Robertson D._   PFN: _SPM57 5_   DATE: _3-11-20_   HU/FLOOR _SE/A 4_

Only one grievance issue per form ---- (Subject to refusal if failure to comply) **DATE GRIEVANCE OCCURRED** _2-15-20 thru ONGOING_

**Grievance Details:**

On Friday, February 15th I was assaulted by an inmate housed on the tier. I chose SP so I could respond only to the immediate (my cellmate) call in (the tank then). With the assault from this assault. I was forced into a fight (which I was already tired and exhausted), on my right side by Dep. Martin #13996. This thrust I hit the right side. Nearly blacked out, I vomited I was hospitalized (See: Inmate Grievance #13-1091). Since the incident I believe I have severe internal/abdominal pain and my right rib is still swollen (overly) and abnormal(s). I placed two requests up and failed to See Physician's Asst-Cooper. Then also submitted a third medical request (in hopes too?) to date now three weeks past I have yet to be provided a follow-up visit to see Dr. Cooper or any related staff about "sick call." Then the only treatment being given tylenol and one cold pack.

The inmate I am accusing in both Wellpath and Alameda County Sheriff's office staff have been "willfully indifferent" to my medical needs and delayed examination of my injuries for more than three-weeks.

To remedy this issue (in part) it is requested I be allowed to see a medical provider qualified to review my complaints and perform a medical examination within 72 hours of receipt of that I be allowed to visit Hospital. — I CONSENT TO REVIEW OF MY MEDICAL RECORDS ONLY —

**INMATE SIGNATURE:** _R Robertson_

*By signing this form, you are consenting to a search of your medical, dental, or mental health records for the purpose of this investigation only. This acts as a waiver to your HIPAA rights. If you disagree with this, you must indicate so in your grievance.*

### ***DO NOT WRITE ON BACK OF THIS FORM. USE ADDITIONAL GRIEVANCE FORMS IF NECESSARY***
### ***DO NOT WRITE BELOW THIS LINE***

**Received by Deputy:** _L. Amezaga_   **Badge#** _2940_   **Date:** _03/11/2020_

[ ] Resolved at Deputy Level

[√] Cannot be resolved at Deputy Level

**Inmate Acceptance (Signature)** _____

**Grievance Tracking Number:** _20-1459_

**PREA Tracking Number:** _____

*The Deputy who received the inmate's grievance shall attach an Inmate Grievance Response Supplemental Form (ML-53) detailing how they resolved or attempted to resolve the inmate's grievance.*

Copies: White-Staff
Pink-Inmate

ML-51 (rev 03/19)

**SER-027**

Tuesday, February 22nd, 2022

Captain - Dan Brodie
1401 Lakeside Dr, 7th Flr.
Oakland, CA    94612

RE: Formal Complaint - ACSO,
    Deputy - Negrete' #2546

Dear, Sir:

In a voice-mail left with Ms Sanders, of the prisoners'
rights organization - Destination Freedom (Jan, 2022), you provided
that complaints, "should come in from Mr. Robertson."
This is such a complaint.
Proceeding in pro per, I am the Plaintiff for Case No.: 5:20-
cv-02523 BLF, N.D. Ct. of CA - San Jose Division (Robertson
v. Kaiser-Nevel, et al.). On Monday, December 27th, 2022, Defen-
dants' "Motion for Summary Judgement" was delivered - here at
Santa Rita Jail. Based on the need to obtain Alameda County
Sheriff's Office - here in, "ACSO" - policies/procedure, for use
in opposition of Defendants' previously stated motion - I contacted
Ms Sanders. Subsequently, on December 30th, 2021, at
approximately 7pm - we called your office to request this
information. Resulting in the email exchanges between
Ms Sanders and Ms Wilson, of which I have been...

(Continued, page 2)

pg: 1

SER-028

... advised, you are aware of. Within three-hours of the call and initial email exchange - approximately, 4:30pm - and without a "write-up", disciplinary-charge/report, or evaluation performed by a member of Adult Forensic Behavioral Health, I was removed from my assigned cell and placed on I.O.L. As you may be aware I.O.L. (Intensive Observation Log(s)), is the mental-health component of seg-regated housing/disciplinary isolation. This incident has been documented in Inmate Grievance - Tracking #22-0470, its investigation by the Grievance Response Unit-has yet to be completed.

   In short, today's grievance/formal complaint involves ACSO-Deputy, Negrete' #2546 and occurred on 2-18-22, at approximately, 10:30am. On this date, our tier (Unit #8/ C-pod) were having scheduled "recreation/pod-time". When Dep. Negrete' took an inmate from 8E/C-11, brought him down-stairs passing within several feet of my position (approximately, 4 to 6 feet from the primary pod-door). While passing and exiting the pod-door, the inmate from C-11, made several threats and derogatory comments on, "beating yo old _ ss"! This conduct continued upon their return a few moments later (I observed the inmate being administered a COVID test), Passing me again, then - both individuals stopping before they reached the stairs leading to the upper tier. I heard both individuals speaking in hushed tones...

(continued, page 3)

pg 2

**SER-029**

... in what I recognized as Spanish. Then the inmate re-stated he was going to "beat yo' old-ss!"; took off his shirt while standing adjacent to Negrete'; Negrete' appeared to take a half-step back, providing a clear path; the inmate then ran up to attack me; while warding off this attack, Dep. Negrete' "tased" me, twice. The following day, both the inmate and Negrete' were present in Unit 8/C-pod, like nothing ever happened. As similar or more adverse circumstances can occur, re-occur, based on these individuals' suffering no consequences for their bad acts, I am compelled to file this complaint.

Based on the fact I had been tased and handcuffed, responding deputies assumed I was the aggressor, it's also possible Dep. Negrete' may have mis-informed these deputies. There are several cameras in our Unit, Dep. Negrete' was wearing a body-cam, and their were several witnesses. I am suffering adverse physical conditions—as a result of this incident—and have only been given 4 tylenol and Mobit, which I was already receiving.

Formally, my complaint is against SCSO-Deputy Negrete' #2546-for alleged conspiracy, breach of duty, negligence, excessive use of force, on my person and as a member of multiple-protected-classes. As provided in the CA Disabled Persons' Act, Americans with ...

(continued, page 4)

pg. 3

**SER-030**

... Disabilities Act, ACSO Policy/Procedure 1.14 (with elements of race/age discrimination, i.e. a hate crime).

I invite a review of my jail-records. Over the course of more than 35 years, in/out of Alameda County's jails (to include, Glen Dyer), to my knowledge - I have a total for the entire period, of two "write-ups" (disciplinary-charges). One for having a piece of cardboard on my cell-door window, and the second - for taking food I had purchased, to court. This record speaks for itself... Consistently for more than three-decades, I have respected the jails, its staff, independant/private contractors, and inmates.

If there is a seperate form, policy, procedure - which must be utilized in submission of this complaint. It is respectfully requested that a member of your staff, would forward said documentation - via email - to: R. Robertson-APM 873 C/o Destination-Freedom, www.destination-freedom.org; or, via the U.S. Postal Service, at my address-as listed below.

Thank-you for your time in review of this correspondence and for any assistance which may be provided - in regards to the requests it contains and as may be deemed appropriate.

Sincerely,

R. Robertson-in Pro Per

pg. 4

SER-031

R. Robertson – Apm 873
5325 Broder Blvd.
Dublin, CA   94568-3309

"Formal Complaint – ACSO, Deputy-
Negrete #2546" (Note: This incident
has been summarized in Grievance #22-1041,
dated: 2-22-22)

cc: Destination-Freedom, my records, RBGG-
    Class Counsel (Babu, et. al. v. Ahern, et. al.)

( pg. 5 of 5 )

SER-032

# ALAMEDA COUNTY SHERIFF'S OFFICE
# INMATE GRIEVANCE FORM
[✓] Santa Rita Jail   [ ] Glenn E. Dyer Detention Facility



**ADA RELATED** [X]

NAME: R. Robertson   PFN: AON 573   DATE: 2-21-22   HU/FLOOR: 5E/6-6

*Only one grievance issue per form ---- (Subject to refusal if failure to comply)* **DATE GRIEVANCE OCCURRED** 2-15-22

**Grievance Details:**

At approximately 10:30am while the lower tier was being scheduled and our
Deputy Negrete # 1540 had an inmate from 5E/6-11 brought downstairs
[illegible handwritten text spanning multiple lines]
... I DO NOT WAIVE ANY HIPAA items - R. Robertson

**INMATE SIGNATURE:** _I DO NOT WAIVE ANY HIPAA items - R. Robertson_
*By signing this form, you are consenting to a search of your medical, dental, or mental health records for the purpose of this investigation only. This acts as a waiver to your HIPAA rights. If you disagree with this, you must indicate so in your grievance.*

***DO NOT WRITE ON BACK OF THIS FORM. USE ADDITIONAL GRIEVANCE FORMS IF NECESSARY***
***DO NOT WRITE BELOW THIS LINE***

**Received by Deputy:** _S. Cortand_   **Badge#** _1417_   **Date:** _2-22-22_

[ ] Resolved at Deputy Level

[✓] Cannot be resolved at Deputy Level

**Inmate Acceptance (Signature)** _____

**Grievance Tracking Number:** _22-1341_

**PREA Tracking Number:** _____

*The Deputy who received the inmate's grievance shall attach an Inmate Grievance Response Supplemental Form (ML-53) detailing how they resolved or attempted to resolve the inmate's grievance.*

Copies: White-Staff
Pink-Inmate

ML-51 (rev 03/19)

**SER-033**


inview Imaging

| | | | |
|---|---|---|---|
| **PATIENT:** | ROBERTSON, REGINALD | **REFERRING:** | |
| **MRN:** | APM873 | **DOS:** | 3/14/2022 |
| **DOB:** | 8/1/1966 AGE 55 YEARS | **EXAM:** | RT. FOOT - 3 VIEWS |

## INVIEW IMAGING REPORT

EXAM: RIGHT FOOT X-RAYS

HISTORY: Rule out fracture.

TECHNIQUE: AP, lateral and oblique views.

FINDINGS: Multifocal cortical thickening noted of the distal fibula. Sclerosis of the the subtalar joint, the talar dome, the tarsal bones noted. The IP joint spaces appear narrowed. A nondisplaced fracture of the fifth proximal phalanx noted that extends to the articular surface. Bohler's angle of the calcaneus is 36° which is within normal limits. No subluxation is evident. Soft tissues appear swollen laterally.

IMPRESSION:
1. Non-displaced fracture of the fifth proximal phalanx involving the PIP joint space. Coexisting soft tissue swelling laterally.
2. Old fracture of the distal fibula.
3. Multifocal arthritic changes.

Electronically signed by: KIREN JAIN MD  3.14/2022

LAFAYETTE OFFICE
970 Dewing Ave #100
Lafayette, CA 94549
P: (925) 297-6460
F: (925) 297-6459

FREMONT OFFICE
39465 Paseo Padre Pkwy #1000
Fremont, CA 94538
P: (510) 490-0961
F: (510) 490-0971

OAKLAND OFFICE
3300 Webster St#109
Oakland, CA 94609
P: (510) 451-0780
F: (510) 451-2352

SER-034

1   Your name: Robertson, R., classmember
2   Address: 5325 Broder Blvd.
3            Dublin, CA  94568-3309
4   Phone Number: (775)-335-7473 (messi)
5   Fax Number:
6            Classmember                    , Pro Se
7
8                    **UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**
10          [Select one location: San Francisco / Oakland / <u>San Jose</u> / Eureka]
11
12   BABU, A., et al.,                    )   Case Number: 5:18-CV-07677 NC
                                          )
13   _____            )   DECLARATION OF MAURICE D.
14          Plaintiff(s),                 )   SCOTT - CLASSMEMBER
                                          )
15          vs.                           )
                                          )
16   AHERN, G., et al.,                   )
                                          )
17   _____            )
                                          )
18   _____            )
                                          )
19   _____            )
                                          )
20                                        )
21          Defendant(s).                 )
22
23      I, Maurice D. Scott declare:
24
25   1. I am over the age of 18 and know the following based on my experience.
26
27   2. I have personal knowledge of facts contained here-in, and if called to testify,
28      I could and would testify competently thereto.          (continued, page 2)

TITLE OF DOCUMENT: DECLARATION OF MAURICE D. SCOTT - CLASSMEMBER
CASE NO.: 18-CV-07677 NC
PAGE NO. 1 OF 3                                                  **SER-035**

3. On Friday, February 18th, 2022 - at approximately 10:45am - myself and several inmates lodged in Lower/C-pod (Unit #8, Santa Rita Jail) were in the day-room for scheduled recreation-time.

4. When I observed Deputy-Negrete (#2546) retrieve an inmate from the upper-tier; passing thru the day-room; toward the primary-entrance of C-pod. This inmate was housed in Cell-#11 (slim build, long hair).

5. A few feet prior to exiting the primary-entrance of C-pod, I over-heard the inmate direct several threats to an inmate housed on the lower-tier/cell-#6, Mr. Robertson.

6. It appeared the inmate from cell-#11 received a COVID-19 test, as I saw a nurse use a long ten Q-tip - just outside the primary-entrance. Then Negrete and the inmate re-entered the day-room.

7. Walking-together-several meters, both stopped and spoke-indiscernibly-in hushed tones. From my vantage - approximately 15 to 20ft. away - it sounded as if they were conversing in what could have been Spanish.

8. Next, I heard the inmate from cell-#11 - again - threaten Robertson; remove his shirt; stating, "I'm gone beat your old _ ass!"; and run towards Robertson-fists balled-in an aggressive manner.

9. While Robertson was defending himself from the inmate's attack, I observed Negrete taser Robertson, twice. I did not observe Negrete attempt to utilize any other tactics.

10. At no time, did I see or hear Negrete attempt to prevent this inmate from assaulting Robertson. Although Robertson was not the aggressor, Negrete tasered-then handcuffed Robertson.

11. Additionally, I asked Negrete, "Why are you tasering him (Robertson) you should be doing that to the other guy..." (continued, page 3)

DECLARATION OF MAURICE D. SCOTT-CLASSMEMBER _____ IN SUPPORT OF

12. Negrete provided no response. Prior to hand-cuffing Robertson, I saw Negrete kicking Robertson on his right foot, while Negrete was stating, "turn on your stomach" and "turn on your back."

13. Although Robertson was following Negrete's directions, Negrete continued to treat Robertson roughly - as if Robertson had been the aggressor.

14. This is a true statement.

In accordance with the laws of the United States, State of California, I declare under penalty of perjury, that the foregoing is true and correct. Executed this 11th day of March, 2022, at Dublin, CA.

Signature: Maurice Duvell Scott
Printed Name: Maurice Duvell Scott
Address : 5325 Broder Blvd.
          Dublin, CA 94568-3309

TITLE OF DOCUMENT: DECLARATION OF MAURICE D. SCOTT - CLASSMEMBER
CASE NO.: 18-CV-07676 NC
PAGE NO.: 3 OF 3

**SER-037**

1   Your name: Robertson, R, classmember

2   Address: 5325 Broder Blvd,

3   Dublin, CA 94568-3309

4   Phone Number: (775)-335-7773 (mess.)

5   Classmember, in Pro Per

6

7                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
8

9   BABU, A, et. al.,                    )  Case Number: 5:18-CV-07677 NC
                                         )
10                                       )  DECLARATION OF
11  _____          )  ZACHERY RIDEAUX-CLASSMEMBER
                                         )
12          Plaintiff(s),                )  IN SUPPORT OF _____
                                         )
13      vs.                              )  _____
14  AHERN, G, et. al.,                   )  _____
                                         )
15                                       )
                                         )
16  _____          )
                                         )
17  _____          )
                                         )
18  _____          )
19          Defendant(s).                )

20

21      I, Zachery Rideaux

22  declare as follows:

23      1.    I am over the age of 18 and know the following based on my

24  experience, while housed at Santa Rita Jail-Dublin, CA.

25      2.    I have personal knowledge of all facts stated in this declaration, and if called to

26  testify, I could and would testify competently thereto.

27

28

DECLARATION OF ZACHERY RIDEAUX-CLASSMEMBER IN SUPPORT OF

_____  CASE NO. 18-CV-07677 NC; PAGE 1 OF 3    **SER-038**

3. On Friday, February 18th, 2022 - at approximately 10:45am - myself and several inmates lodged in Lower/C-pod (Unit #8, Santa Rita Jail) were in the day-room for scheduled recreation-time.

4. When I observed Deputy-Negrete (#2546) retrieve an inmate from the upper-tier; bringing him downstairs; passing through the day-room. This in-mate was housed in cell #11.

5. A few feet from exiting the primary-entrance of C-pod, I could hear the inmate from cell #11 begin to direct threats to an inmate housed in cell #6, Mr. Robertson.

6. The inmate from cell #11 was administered a COVID-19 test, just outside the primary-entrance to C-pod. Then Negrete and this in-mate re-entered the day-room.

7. Continued walking until reaching a few feet shy of stairs which lead to the upper-tier. Both spoke in hushed tones - indiscernible from where I was situated, approximately, 15 to 20 feet away from them.

8. Next, I heard the inmate from cell #11 - again - threaten Robertson; re-move his shirt (while standing adjacent to Negrete); stating, "I'm gone beat your old -ss!"; then run towards Robertson in an aggressive manner.

9. While Robertson was defending himself from the inmate's assault, I observed Negrete taser Robertson, twice.

10. At no time, did I see or hear Negrete attempt to prevent this inmate from attacking Robertson. Although Robertson was not the aggressor, Negrete tasered - then handcuffed Robertson.

11. This is a true statement.

DECLARATION OF _ZACHERY RIDEAUX - CLASSMEMBER_   IN SUPPORT OF

CASE NO. _18-CV-07677 NC_ ; PAGE _2_ OF _3_          **SER-039**



I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct and that this declaration was executed on [date] 3-11-22

Signature: _Zacceel_

Printed name: ZACHERY RIDEAUX

Address: 5325 BRODER BLVD DUBLIN, CA 94568

DECLARATION OF ZACHERY RIDEAUX-CLASSMEMBER IN SUPPORT OF

CASE NO. 18-CV-07677 NC ; PAGE 3 OF 3

SER-040

1   Your name: Robertson, R., classmember

2   Address: 5325 Broder Blvd.

3   _____ Dublin, CA 94568-3309

4   Phone Number: (775)-335-7773 (mess.)

5   Fax Number:_____

6   _____ Classmember _____, Pro Se

7

8         **UNITED STATES DISTRICT COURT**

9         **NORTHERN DISTRICT OF CALIFORNIA**

10   *[Select one location: San Francisco / Oakland / San Jose / Eureka]*

11

12   BABU, A., et. al.,  )  Case Number: 5:18-CV-07677 NC

13   _____  )  DECLARATION OF DAVID E.

14     Plaintiff(s),  )  GODWIN

15     vs.  )  _____

16   AHERN, G., et. al.,  )  _____

17   _____  )  _____

18   _____  )  _____

19   _____  )

20   _____  )

21     Defendant(s).  )

22

23     I, David E. Godwin declare:

24

25   1. I am over 18 and know the following facts based on experience.

26

27   2. I have personal knowledge of facts here-in, and if called to testify,

28     I could and would testify competently thereto.

TITLE OF DOCUMENT: DECLARATION OF DAVID E. GODWIN-CLASSMEMBER
CASE NO.: 18-CV-07677 NC
PAGE NO. 1 OF 3

**SER-041**

3. On Friday, February 18th, 2022 at approximately 10:45 am - myself and several inmates housed in C-pod/lower-tier (Unit #8, Santa Rita Jail), were in the day-room for scheduled recreation.

4. I recall that while watching television, I was distracted by an inmate housed on the upper-tier, making threats to Mr. Robertson. I know of Robertson-casually-as he occupies the cell next to mine.

5. The inmate making the threats was being escorted by Deputy-Negrete (#2546). Together, Negrete and the inmate from the upper-tier (cell-#11, here-in, "inmate"), exited the primary-entrance of C-pod.

6. I do not recall seeing Negrete and the inmate re-enter C-pod. I do recall looking to my rear and seeing-both-standing-side-by-side, a few feet from the stairs, which lead to the upper-tier.

7. Next, the inmate removed his shirt and ran towards Robertson, in an aggressive manner. Robertson and the inmate moved near the table where I was seated, which motivated me to stand and relocate.

8. While relocating to an area closer to the television, I observed Negrete readying a taser. Not wanting to be tasered-myself-I moved further away.

9. Negrete then tasered Robertson, twice. At no point, did I see or hear Negrete attempt to prevent the inmate from attacking Robertson. Although Robertson was not the aggressor, Negrete seemed only to focus on Robertson.    (continued, page 3)

TITLE OF DOCUMENT: DECLARATION OF DAVID E. GODWIN-CLASSMEMBER
CASE NO.: 18-CV-07677 NC
PAGE NO. 2 OF 3

**SER-042**

10. Next while standing over Robertson, I observed Negrete kick Robertson (on his right-foot), while yelling at Robertson to, "turn on your stomach" and "turn on your back".

11. Lastly, Although Robertson was the victim, I observed Negrete hand-cuff Robertson and continually treat Robertson as if he were the aggressor. This is a true statement.

In accordance with the laws of the United States and State of California. I declare under penalty of perjury, that the foregoing is true and correct. Executed this 11th day of March, 2022, at Dublin, CA.

Signature: _____

Printed Name: DAVID E. GODWIN

Address: 5325 Broder Blvd.
               Dublin, CA  94568-3309

TITLE OF DOCUMENT: DECLARATION OF DAVID E. GODWIN-CLASSMEMBER
CASE NO.: 18-CV-07677 NC
PAGE NO. 3 OF 3

1   JEFFREY L. BORNSTEIN – 099358
    ERNEST GALVAN – 196065
2   KARA J. JANSSEN – 274762
    ROSEN BIEN GALVAN & GRUNFELD LLP
3   101 Mission Street, Sixth Floor
    San Francisco, California 94105-1738
4   Telephone:  (415) 433-6830
    Facsimile:  (415) 433-7104
5   Email:      jbornstein@rbgg.com
                egalvan@rbgg.com
6               kjanssen@rbgg.com

7   Attorneys for Plaintiffs

8

9                   UNITED STATES DISTRICT COURT

10       NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

11

12  ASHOK BABU, ROBERT BELL,              Case No. 5:18-CV-07677
    IBRAHIM KEEGAN-HORNESBY,
13  DEMAREA JOHNSON, BRANDON              **PLAINTIFFS' RESPONSE TO**
    JONES, STEPHANIE NAVARRO,             **RECENTLY FILED OBJECTIONS**
14  ROBERTO SERRANO, and                  **AND REVISED [PROPOSED] ORDER**
    ALEXANDER WASHINGTON on behalf        **EXTENDING DEADLINES FOR**
15  of themselves and all others similarly **OBJECTIONS AND FINAL**
    situated,                             **APPROVAL**
16
                 Plaintiffs,             Date:    September 22, 2021
17                                        Time:    11:00 am
             v.
18                                        Judge:   Hon. Nathanael Cousins
    COUNTY OF ALAMEDA; GREGORY J.
19  AHERN in his official capacity as Sheriff
    of the Alameda County Sheriff's Office;
20  KARYN TRIBBLE in her official capacity
    as Director of the Alameda County
21  Behavioral Health Care Services Agency;
    and DOES 1 to 20, inclusive,,
22
                 Defendants.
23

24

25

26

27

28

[3797449.2]                                              Case No. 5:18-CV-07677
PLAINTIFFS' RESPONSE TO RECENTLY FILED OBJECTIONS AND REVISED [PROPOSED] ORDER
        EXTENDING DEADLINES FOR OBJECTIONS AND FINAL APPROVAL

SER-044

1      Multiple, largely identical, objections were filed on September 13, 2021 and signed

2  by class members in Housing Units 4A, 4D, 4E, 4F, and 21A.  (Dkt. Nos. 270, 271, 272,

3  273, and 274).  In their objections, the class members request (1) complete copies of the

4  motion and settlement agreement; (2) a continuance of the hearing for preliminary

5  approval; (3) an opportunity to be heard at the hearing for preliminary approval; (4) the

6  opportunity to seek legal representation; and (5) that the hearing for final approval be

7  vacated and not be set for at least 180 days after the hearing on preliminary approval.

8      The Parties have put forth a notice plan in the pending motion for preliminary

9  approval that will provide class members with the Notice as approved by the Court, the

10  complete Consent Decree in both hard copy and on the electronic tablets that incarcerated

11  people have access to in the Jail, and will provide them with time to object and to seek

12  assistance from counsel if they desire.

13      Given the continued difficulties in accessing class members due to COVID-19 and

14  the complexity of the settlement, Plaintiffs agree that some additional time to review the

15  Consent Decree may be warranted and be able to speak with Counsel regarding any

16  questions or concerns as well as to file any objections.  Therefore, Plaintiffs submit the

17  attached revised Proposed Order Granting Preliminary Approval with a revised schedule

18  that extends the deadline for class member objections to **December 31, 2021** and

19  correspondingly extends the deadlines for filing of responses to objections and Plaintiffs'

20  motion for final approval to **January 12, 2022** with the hearing on final approval and

21  Plaintiffs' unopposed motion for attorneys' fees and costs moving to **January 19, 2022**.

22  Plaintiffs have also requested that Defendants assist Class Counsel with accessing class

23  members given the current contact visiting restrictions in place at the Jail due to COVID-

24  19.

25  / / /

26  / / /

27  / / /

28  / / /

[3797449.2]        1        Case No. 5:18-CV-07677
PLAINTIFFS' RESPONSE TO RECENTLY FILED OBJECTIONS AND REVISED [PROPOSED] ORDER
EXTENDING DEADLINES FOR OBJECTIONS AND FINAL APPROVAL    SER-045

Plaintiffs' have no objection to class members being heard at the hearing for final approval and are willing to discuss how to best arrange that with the Court and Defendants assuming that the Court will allow such testimony, either by video or telephone from the Jail.

DATED:  September 21, 2021     Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Kara Janssen*

Kara J. Janssen

Attorneys for Plaintiffs

[3797449.2]

2

Case No. 5:18-CV-07677

PLAINTIFFS' RESPONSE TO RECENTLY FILED OBJECTIONS AND REVISED [PROPOSED] ORDER
EXTENDING DEADLINES FOR OBJECTIONS AND FINAL APPROVAL

SER-046

1   HANSON BRIDGETT LLP                    Gregory B. Thomas (SBN 239870)
    PAUL B. MELLO, SBN 179755              E-mail: gthomas@bwslaw.com
2   pmello@hansonbridgett.com              Temitayo O. Peters (SBN 309913)
    SAMANTHA D. WOLFF, SBN 240280          E-mail: tpeters@bwslaw.com
3   swolff@hansonbridgett.com              BURKE, WILLIAMS & SORENSEN, LLP
    425 Market Street, 26th Floor          1901 Harrison Street, Suite 900
4   San Francisco, California 94105        Oakland, CA 94612-3501
    Telephone:   (415) 777-3200            Tel: 510.273.8780  Fax: 510.839.9104
5   Facsimile:   (415) 541-9366

6   Attorneys for Defendants

7

8                    UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

10

11  ASHOK BABU, ROBERT BELL, IBRAHIM        Case No. 5:18-cv-07677-NC
    KEEGAN-HORNSBY, DEMAREA
12  JOHNSON, BRANDON JONES,                 **DEFENDANTS' ERRATA TO**
    STEPHANIE NAVARRO, ROBERTO              **DECLARATION OF SAMANTHA**
13  SERRANO, and ALEXANDER                  **WOLFF IN SUPPORT OF DEFENDANTS'**
    WASHINGTON on behalf of themselves and  **STATEMENT OF NON-OPPOSITION TO**
14  all others similarly situated,          **PLAINTIFFS' MOTION FOR**
                                            **PRELIMINARY APPROVAL OF**
15              Plaintiffs,                 **CONSENT DECREE**

16       v.                                 Date:    September 22, 2021
                                            Time:    1:00 P.M.
17  COUNTY OF ALAMEDA; GREGORY J.
    AHERN in his official capacity as Sheriff of  Judge:   Honorable Nathanael Cousins
18  the Alameda County Sheriff's Office;
    KARYN TRIBBLE in her official capacity as
19  Director of Alameda County Behavioral
    Health Department,
20
                Defendants.
21

22       **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

23       It has come to the attention of counsel for Defendants that Exhibit A to the Declaration of

24  Samantha Wolff in Support of Defendants' Statement of Non-Opposition to Plaintiffs' Motion for

25  Preliminary Approval of Consent Decree was inadvertently omitted from the filing. *See* ECF No.

26  267-1.

27  / / /

28  / / /

                                        -1-                    Case No. 5:18-cv-07677-NC
    17819019.1
    DEFS.' ERRATA TO DECL. WOLFF ISO NON-OPP'N                  **SER-047**

1    Defendants respectfully submit this errata to correct this error. A corrected version of Ms.

2  Wolff's Declaration, and the corresponding exhibit, are attached hereto as **Exhibit 1**.

3

4  DATED:  August 26, 2021                    HANSON BRIDGETT LLP

5

6                                    By:    _/s/ Samantha D. Wolff_
                                           
7                                           PAUL B. MELLO
                                           SAMANTHA D. WOLFF
8                                           Attorneys for Defendants

9  DATED:  August 26, 2021                    BURKE, WILLIAMS & SORENSEN, LLP

10

11                                  By:  _/s/ Gregory Thomas_
                                        Gregory B. Thomas
12                                      Temitayo O. Peters
                                        Attorneys for Defendants
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

SER-049

| | | |
|---|---|---|
| 1 | HANSON BRIDGETT LLP | Gregory B. Thomas (SBN 239870) |
| | PAUL B. MELLO, SBN 179755 | E-mail: gthomas@bwslaw.com |
| 2 | pmello@hansonbridgett.com | Temitayo O. Peters (SBN 309913) |
| | SAMANTHA D. WOLFF, SBN 240280 | E-mail: tpeters@bwslaw.com |
| 3 | swolff@hansonbridgett.com | BURKE, WILLIAMS & SORENSEN, LLP |
| | 425 Market Street, 26th Floor | 1901 Harrison Street, Suite 900 |
| 4 | San Francisco, California 94105 | Oakland, CA 94612-3501 |
| | Telephone:    (415) 777-3200 | Tel: 510.273.8780  Fax: 510.839.9104 |
| 5 | Facsimile:    (415) 541-9366 | |

6    Attorneys for Defendants

7

8                        **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

10

| | | |
|---|---|---|
| 11 | ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNSBY, DEMAREA | Case No. 5:18-cv-07677-NC |
| 12 | JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO | **DECLARATION OF SAMANTHA D.** |
| 13 | SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and | **WOLFF IN SUPPORT OF DEFENDANTS'** **STATEMENT OF NON-OPPOSITION TO** |
| 14 | all others similarly situated, | **PLAINTIFFS' MOTION FOR** **PRELIMINARY APPROVAL OF** |
| 15 | Plaintiffs, | **CONSENT DECREE** |
| 16 | v. | Date:       September 22, 2021 Time:      1:00 P.M. |
| 17 | COUNTY OF ALAMEDA; GREGORY J. | . |
| 18 | AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office; | Judge:    Honorable Nathanael Cousins |
| 19 | KARYN TRIBBLE in her official capacity as Director of Alameda County Behavioral | |
| 20 | Health Department, | |
| 21 | Defendants. | |

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

17816741.1

SER-050

1    I, Samantha D. Wolff, declare as follows:

2    1.    I am an attorney duly admitted to practice before this Court.  I am a partner with

3    Hanson Bridgett LLP, attorneys of record for Defendants County of Alameda, Sheriff Gregory

4    Ahern, and Karyn Tribble ("Defendants").  I have personal knowledge of the facts set forth herein,

5    except as to those stated on information and belief and, as to those, I am informed and believe

6    them to be true.  If called as a witness, I could and would competently testify to the matters stated

7    herein.

8    2.    Counsel for Plaintiffs and Defendants have been in communication with attorneys

9    for the Civil Rights Division of the U.S. Department of Justice ("Department") following the

10   Department's issuance of its April 22, 2021 Notice Regarding Investigation of Alameda County,

11   John George Psychiatric Hospital, and Santa Rita Jail.  Attorneys for the Department have been

12   involved in good faith meet-and-confer discussions pertaining to the terms of the proposed

13   Consent Decree with counsel for Plaintiffs and Defendants.  The Department has reviewed the

14   proposed Consent Decree closely and does not object to Plaintiffs' Motion.  Attached as **Exhibit**

15   **A** is a true and correct copy of a letter from U.S. Department of Justice Acting Special Counsel

16   Maura Klugman to myself, dated August 18, 2021, in which Ms. Klugman indicates the

17   Department's position with respect to the pending motion.

18   I declare under penalty of perjury under the laws of the United States of America that the

19   foregoing is true and correct.

20   Executed on this 26th day of August, 2021, at Lafayette, California.

21

22   */s/ Samantha Wolff*

23   Samantha D. Wolff

24

25

26

27

28

# Exhibit A



**U.S. Department of Justice**

Civil Rights Division

*950 Pennsylvania Ave, NW*
*Washington DC 20530*

August 18, 2021

Samantha Wolff
Hanson Bridgett LLP
425 Market Street, 26th Floor
San Francisco, CA 94105

Dear Ms. Wolff:

Thank you for providing the United States Department of Justice (DOJ) with the opportunity to review drafts of the consent decree in *Babu et al. v. Ahern, et al.*, Case No. 5:18-cv-7677. This letter confirms that DOJ has no objections to the parties' joint motion for approval of the consent decree.

Sincerely,

/s/ Maura M. Klugman

Maura M. Klugman
Acting Special Counsel

cc:

Jeffrey L. Bornstein
Kara Jane Janssen
101 Mission Street, Sixth Floor
San Francisco, CA 94105

*Counsel for Plaintiffs*

**SER-053**

**Gail LaPurja**

| | |
|---|---|
| **From:** | ECF-CAND@cand.uscourts.gov |
| **Sent:** | Wednesday, August 11, 2021 8:25 AM |
| **To:** | efiling@cand.uscourts.gov |
| **Subject:** | Activity in Case 5:18-cv-07677-NC Babu et al v. Ahern et al Settlement Conference |

[EXTERNAL] Notice: This message comes from an external sender.

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**California Northern District**

## Notice of Electronic Filing

The following transaction was entered on 8/11/2021 at 8:25 AM and filed on 8/10/2021

| | |
|---|---|
| **Case Name:** | Babu et al v. Ahern et al |
| **Case Number:** | 5:18-cv-07677-NC |
| **Filer:** | |
| **Document Number:** | 265(No document attached) |

**Docket Text:**
**Minute Entry for proceedings held before Magistrate Judge Laurel Beeler: Settlement Conference held via Zoom on 8/10/2021. The parties reached agreement on all material terms of their settlement and will file their motion for preliminary approval by the court-ordered date of August 26, 2021. (Not Reported).**

**Total Time in Court: 3 hours, 30 minutes.**
**Plaintiffs' Attorneys: Jeff Bornstein and Kara Janssen.**
**Defendants' Attorneys: Greg Thomas, Temitayo Peters and Paul Mello.**
**Also appearing: Robert Chalfant.**
***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ejkS, COURT STAFF) (Date Filed: 8/10/2021)**

5:18-cv-07677-NC Notice has been electronically mailed to:

Andrew Paul Lee     alee@gbdhlegal.com, dvaldez@gbdhlegal.com, efile@gbdhlegal.com

Ernest James Galvan     egalvan@rbgg.com, glapurja@rbgg.com

**Gail LaPurja**

| | |
|---|---|
| **From:** | ECF-CAND@cand.uscourts.gov |
| **Sent:** | Thursday, August 5, 2021 8:30 AM |
| **To:** | efiling@cand.uscourts.gov |
| **Subject:** | Activity in Case 5:18-cv-07677-NC Babu et al v. Ahern et al Settlement Conference |

[EXTERNAL] Notice: This message comes from an external sender.

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

U.S. District Court

California Northern District

## Notice of Electronic Filing

The following transaction was entered on 8/5/2021 at 8:29 AM and filed on 8/4/2021

| | |
|---|---|
| **Case Name:** | Babu et al v. Ahern et al |
| **Case Number:** | 5:18-cv-07677-NC |
| **Filer:** | |
| **Document Number:** | 264(No document attached) |

**Docket Text:**
**Minute Entry for proceedings held before Magistrate Judge Laurel Beeler: Settlement Conference held via Zoom on 8/4/2021. The parties settled the issue about monitoring fees. The court sets a further settlement conference for Tuesday, August 10 at 2 p.m. (Not Reported).**

**Total Time in Court: 3 hours.**
**Plaintiffs' Attorneys: Jeff Bornstein and Kara Janssen.**
**Defendants' Attorneys: Greg Thomas, Temitayo Peters and Paul Mello.**
**Also appearing: Robert Chalfant.**

**Settlement Conference set for 8/10/2021 at 2:00 PM in San Francisco - Videoconference Only. This proceeding will be held via a Zoom meeting.**

**Meeting Access: All counsel, members of the public, and media may access the meeting information at https://www.cand.uscourts.gov/lb. Please DO NOT join the Zoom webinar (for public hearings). Go to the section labeled: Joining Non-Public Hearings (Settlement Conferences, etc.) below the public webinar information and click on the box to the left to expand text and obtain information for the non-public Zoom meeting. You will be placed in a**

1

**waiting room and admitted once the settlement conference begins. (Meeting ID: 160 464 1326 Passcode: 106809)**

**General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.**

**Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/.**

***(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ejkS, COURT STAFF) (Date Filed: 8/4/2021)**

5:18-cv-07677-NC Notice has been electronically mailed to:

Andrew Paul Lee     alee@gbdhlegal.com, dvaldez@gbdhlegal.com, efile@gbdhlegal.com

Ernest James Galvan     egalvan@rbgg.com, glapurja@rbgg.com

Gregory B. Thomas     gthomas@bwslaw.com, tlee@bwslaw.com

Jeffrey L. Bornstein     JBornstein@rbgg.com, GLaPurja@rbgg.com, LWoo@rbgg.com

Jonathan Unruh Lee     jonathan.lee@usdoj.gov, CaseView.ECF@usdoj.gov, karina.ruiz@usdoj.gov, kathleen.turner@usdoj.gov, kay.konopaske@usdoj.gov, leeya.kekona@usdoj.gov

Kara Jane Janssen     KJanssen@rbgg.com, ecook@rbgg.com, glapurja@rbgg.com

Kurt A. Franklin     kfranklin@hansonbridgett.com, _calendarclerk@hansonbridgett.com, aghiorso@hansonbridgett.com

Paul Brian Mello     pmello@hansonbridgett.com, ajackson@hansonbridgett.com, CalendarClerk@hansonbridgett.com

Samantha D. Wolff     swolff@hansonbridgett.com, ajackson@hansonbridgett.com, calendarclerk@hansonbridgett.com, shubley@hansonbridgett.com

Temitayo O. Peters     tpeters@bwslaw.com, tlee@bwslaw.com

Yolanda Huang     yhuang.law@gmail.com

5:18-cv-07677-NC Please see Local Rule 5-5; Notice has NOT been electronically mailed to:

**SER-056**

PAUL B. MELLO – 179755
SAMANTHA D. WOLFF – 240280
HANSON BRIDGETT LLP
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
Email:    pmello@hansonbridgett.com
          swolff@hansonbridgett.com

GREGORY B. THOMAS – 239870
TEMITAYO O. PETERS – 309913
BURKE, WILLIAMS & SORENSEN, LLP
1901 Harrison Street, Suite 900
Oakland, California 94612-3501
Telephone:    (510) 273-8780
Facsimile:    (510) 839-9104
Email        gthomas@bwslaw.com
             tpeters@bwslaw.com

Attorneys for Defendants

JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
KARA J. JANSSEN – 274762
REKHA ARULANANTHAM - 317995
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:    jbornstein@rbgg.com
          egalvan@rbgg.com
          kjanssen@rbgg.com
          rarulanantham@rbgg.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNESBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

COUNTY OF ALAMEDA; GREGORY J. AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office; KARYN TRIBBLE in her official capacity as Director of the Alameda County Behavioral Health Care Services Agency; and DOES 1 to 20, inclusive,,

Defendants.

Case No. 5:18-CV-07677

**CLASS ACTION**

**JOINT STATUS UPDATE**

Judge:   Hon. Nathanael Cousins

Trial Date: December 6, 2021

The parties jointly submit this Joint Status Update in accordance with the Court's June 9, 2021 Order requiring the parties to file a joint status update detailing: (1) whether all remaining disputes, with the exception of attorneys' fees and costs, have been resolved and (2) the parties' proposed process for resolving attorneys' fees and costs including whether the parties intend to attempt mediation or to resolve by motion to the Court. Dkt. No. 254.

At this time the parties have reached agreement in principle on all items with the exception of attorneys' fees and costs. The parties are finalizing the non-monetary components of the Consent Decree and expect to have the documents finalized in principle by Wednesday, June 30, 2021.

At this time the parties intend to attempt to mediate the issue of fees and costs prior to bringing any motion to the Court. The parties intend to update the Court as to the status of these efforts and, whether a motion will be needed, as part of the Case Management Statement to be filed in anticipation of the July 9, 2021 Case Management Conference.

DATED: June 24, 2021      Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: _/s/ Kara Janssen_
        Kara Janssen

Attorneys for Plaintiffs

DATED: June 24, 2021      BURKE, WILLAMS & SORENSEN LLP

By: _/s/ Gregory B. Thomas_
        Gregory B. Thomas
        Temitayo O. Peters

DATED: June 24, 2021      HANSON BRIDGETT LLP

By: _/s/ Samantha D. Wolff_
        Paul B. Mello
        Samantha D. Wolff

Case No. 5:18-CV-07677

SER-058

17644353.1 [3753609.2]

JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
KARA J. JANSSEN – 274762
ROSEN BIEN GALVAN &
GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:        jbornstein@rbgg.com
              egalvan@rbgg.com
              kjanssen@rbgg.com

Attorneys for Plaintiffs

GREGORY B. THOMAS – 239870
TEMITAYO O. PETERS – 309913
BURKE, WILLIAMS & SORENSEN, LLP
1901 Harrison Street, Suite 900
Oakland, CA  94612-3501
Telephone:    (510) 273-8780
Facsimile:    (510) 839-9104
Email:        gthomas@bwslaw.com
              tpeters@bwslaw.com

PAUL B. MELLO – 179755
SAMANTHA D. WOLFF – 240280
HANSON BRIDGETT LLP
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
Email:        pmello@hansonbridgett.com
              swolff@hansonbridgett.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNESBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF ALAMEDA; GREGORY J. AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office; CAROL BURTON in her official capacity as Interim Director of the Alameda County Behavioral Health Care Services Agency; and DOES 1 to 20, inclusive,,<br><br>Defendants. | Case No. 5:18-CV-07677<br><br>**STIPULATION AND [PROPOSED] ORDER RE DEPARTMENT OF JUSTICE PARTICIPATION IN ONGOING SETTLEMENT DISCUSSIONS**<br><br>Judge:  Hon. Laurel Beeler<br><br>Trial Date: August 30, 2021 |

1    IT IS HEREBY STIPULATED BY AND BETWEEN THE PARTIES THAT:

2    Based on the "Investigation of Alameda County, John George Psychiatric Hospital,

3 and Santa Rita Jail" issued by the Department of Justice ("DOJ") on April 22, 2021, the

4 DOJ may participate in meet and confers between the Parties, review documents including

5 drafts of the Consent Decree, and observe and/or participate in settlement conferences

6 before the Honorable Laurel Beeler regarding this case.

7    The DOJ understands it will be bound by the Protective Order, Dkt. 30 in this case,

8 attached hereto as **Exhibit A**.   The DOJ further understands its review of written

9 materials, including drafts of the Consent Decree, and any observation of or participation

10 in settlement discussions are bound by the settlement privilege.

11

12                              Respectfully submitted,

13 DATED:  May 4, 2021          ROSEN BIEN GALVAN & GRUNFELD LLP

14                              By:  _/s/ Rekha Arulanantham_

15                                   Rekha Arulanantham

16                              Attorneys for Plaintiffs

17 DATED:  May 4, 2021          BURKE, WILLAMS & SORENSEN LLP

18                              By:  _/s/ Gregory B. Thomas_

19                                   Gregory B. Thomas

20                                   Temitayo O. Peters

21 DATED:  May 4, 2021          HANSON BRIDGETT LLP

22                              By:  _/s/ Paul B. Mello_

23                                   Paul B. Mello

24                                   Samantha D. Wolff

25                              Attorneys for Defendants

26

27

28

[3730031.2]                          1                    Case No. 5:18-CV-07677

STIPULATION AND [PROPOSED] ORDER RE DOJ PARTICIPATION
IN ONGOING SETTLEMENT DISCUSSIONS

**SER-060**

DATED: May 4, 2021

UNITED STATES DEPARTMENT OF JUSTICE
Civil Rights Division

By: */s/ Maura Klugman*
Maura Klugman
Jessica Polansky

Attorneys for Interested Party the United States

# [~~PROPOSED~~] ORDER

IT IS SO ORDERED.

DATED: ___May 5, 2021___

_____
Honorable Laurel Beeler
United States Magistrate Judge

EXHIBIT A

JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
KARA J. JANSSEN – 274762
HUGO CABRERA – 309289
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:     (415) 433-6830
Facsimile:     (415) 433-7104
Email:         jbornstein@rbgg.com
               egalvan@rbgg.com
               kjanssen@rbgg.com
               hcabrera@rbgg.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNSBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF ALAMEDA; GREGORY J. AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office; CAROL BURTON in her official capacity as Interim Director of the Alameda County Behavioral Health Care Services Agency; and DOES 1 to 20, inclusive,,<br><br>Defendants. | Case No. 4:18-CV-07677<br><br>**STIPULATED PROTECTIVE ORDER**<br><br>Judge:   Hon. Nathanael Cousins |

[3391435.1]

**SER-063**

1.     <u>PURPOSES AND LIMITATIONS</u>

    Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

2.     <u>DEFINITIONS</u>

    2.1     <u>Challenging Party</u>:  a Party or Non-Party that challenges the designation of information or items under this Order.

    2.2     "<u>CONFIDENTIAL</u>" Information or Items:  information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c), including, but not limited to, information protected from disclosure by the Health Insurance Portability and Accountability Act of 1996, 45 C.F.R. §§ 160, *et. seq.* ("HIPAA").

    2.3     <u>Counsel (without qualifier)</u>:  Outside Counsel of Record and House Counsel (as well as their support staff).

    2.4     <u>Designating Party</u>:  a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL."

    2.5     <u>Disclosure or Discovery Material</u>:  all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in

[3391435.1]

**SER-064**

1  disclosures or responses to discovery in this matter.

2      2.6      <u>Expert</u>:  a person with specialized knowledge or experience in a matter

3  pertinent to the litigation who has been retained by a Party or its counsel to serve as an

4  expert witness or as a consultant in this action.

5      2.7      <u>House Counsel</u>:  attorneys who are employees of a party to this action.

6  House Counsel does not include Outside Counsel of Record or any other outside counsel.

7      2.8      <u>Non-Party</u>:  any natural person, partnership, corporation, association, or

8  other legal entity not named as a Party to this action.

9      2.9      <u>Outside Counsel of Record</u>:  attorneys who are not employees of a party to

10  this action but are retained to represent or advise a party to this action and have appeared

11  in this action on behalf of that party or are affiliated with a law firm which has appeared on

12  behalf of that party.

13      2.10      <u>Party</u>:  any party to this action, including all of its officers, directors,

14  employees, consultants, retained experts, and Outside Counsel of Record (and their support

15  staffs).

16      2.11      <u>Producing Party</u>:  a Party or Non-Party that produces Disclosure or

17  Discovery Material in this action.

18      2.12      <u>Professional Vendors</u>:  persons or entities that provide litigation support

19  services (e.g., photocopying, videotaping, translating, preparing exhibits or

20  demonstrations, and organizing, storing, or retrieving data in any form or medium) and

21  their employees and subcontractors.

22      2.13      <u>Protected Material</u>:  any Disclosure or Discovery Material that is designated

23  as "CONFIDENTIAL."

24      2.14      <u>Receiving Party</u>:  a Party that receives Disclosure or Discovery Material

25  from a Producing Party.

26  3.      <u>SCOPE</u>

27      The protections conferred by this Stipulation and Order cover not only Protected

28  Material (as defined above), but also (1) any information copied or extracted from

[3391435.1]

SER-065

1 Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected

2 Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel

3 that might reveal Protected Material. However, the protections conferred by this

4 Stipulation and Order do not cover the following information:  (a) any information that is

5 in the public domain at the time of disclosure to a Receiving Party or becomes part of the

6 public domain after its disclosure to a Receiving Party as a result of publication not

7 involving a violation of this Order, including becoming part of the public record through

8 trial or otherwise; and (b) any information known to the Receiving Party prior to the

9 disclosure or obtained by the Receiving Party after the disclosure from a source who

10 obtained the information lawfully and under no obligation of confidentiality to the

11 Designating Party. Any use of Protected Material at trial shall be governed by a separate

12 agreement or order.

13 4.     <u>DURATION</u>

14        Even after final disposition of this litigation, the confidentiality obligations imposed

15 by this Order shall remain in effect until a Designating Party agrees otherwise in writing or

16 a court order otherwise directs.  Final disposition shall be deemed to be the later of

17 (1) dismissal of all claims and defenses in this action, with or without prejudice; and

18 (2) final judgment herein after the completion and exhaustion of all appeals, rehearings,

19 remands, trials, or reviews of this action, including the time limits for filing any motions or

20 applications for extension of time pursuant to applicable law.

21 5.     <u>DESIGNATING PROTECTED MATERIAL</u>

22        5.1     <u>Exercise of Restraint and Care in Designating Material for Protection</u>. Each

23 Party or Non-Party that designates information or items for protection under this Order

24 must take care to limit any such designation to specific material that qualifies under the

25 appropriate standards. The Designating Party must designate for protection only those

26 parts of material, documents, items, or oral or written communications that qualify—so

27 that other portions of the material, documents, items, or communications for which

28 protection is not warranted are not swept unjustifiably within the ambit of this Order.

[3391435.1]

SER-066

1       Mass, indiscriminate, or routinized designations are prohibited. Designations that

2 are shown to be clearly unjustified or that have been made for an improper purpose (e.g.,

3 to unnecessarily encumber or retard the case development process or to impose

4 unnecessary expenses and burdens on other parties) expose the Designating Party to

5 sanctions.

6       If it comes to a Designating Party's attention that information or items that it

7 designated for protection do not qualify for protection, that Designating Party must

8 promptly notify all other Parties that it is withdrawing the mistaken designation.

9       5.2   <u>Manner and Timing of Designations</u>. Except as otherwise provided in this

10 Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or

11 ordered, Disclosure or Discovery Material that qualifies for protection under this Order

12 must be clearly so designated before the material is disclosed or produced.

13       Designation in conformity with this Order requires:

14       (a)   for information in documentary form (e.g., paper or electronic

15 documents, but excluding transcripts of depositions or other pretrial or trial proceedings),

16 that the Producing Party affix the legend "CONFIDENTIAL" to each page that contains

17 protected material. If only a portion or portions of the material on a page qualifies for

18 protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by

19 making appropriate markings in the margins).

20       A Party or Non-Party that makes original documents or materials available

21 for inspection need not designate them for protection until after the inspecting Party has

22 indicated which material it would like copied and produced. During the inspection and

23 before the designation, all of the material made available for inspection shall be deemed

24 "CONFIDENTIAL." After the inspecting Party has identified the documents it wants

25 copied and produced, the Producing Party must determine which documents, or portions

26 thereof, qualify for protection under this Order. Then, before producing the specified

27 documents, the Producing Party must affix the "CONFIDENTIAL" legend to each page

28 that contains Protected Material. If only a portion or portions of the material on a page

[3391435.1]

qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b)    for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony.

(c)    for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.3    <u>Inadvertent Failures to Designate</u>.  If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1    <u>Timing of Challenges</u>.  Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2    <u>Meet and Confer</u>.  The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve

each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3     Judicial Intervention.  If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the

confidentiality designation by failing to file a motion to retain confidentiality as described

above, all parties shall continue to afford the material in question the level of protection to

which it is entitled under the Producing Party's designation until the court rules on the

challenge.

7.    ACCESS TO AND USE OF PROTECTED MATERIAL

    7.1    Basic Principles. A Receiving Party may use Protected Material that is

disclosed or produced by another Party or by a Non-Party in connection with this case only

for prosecuting, defending, or attempting to settle this litigation. Such Protected Material

may be disclosed only to the categories of persons and under the conditions described in

this Order. When the litigation has been terminated, a Receiving Party must comply with

the provisions of section 13 below (FINAL DISPOSITION).

    Protected Material must be stored and maintained by a Receiving Party at a location

and in a secure manner that ensures that access is limited to the persons authorized under

this Order.

    7.2    Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise

ordered by the court or permitted in writing by the Designating Party, a Receiving Party

may disclose any information or item designated "CONFIDENTIAL" only to:

    (a)    the Receiving Party's Outside Counsel of Record in this action, as

well as employees of said Outside Counsel of Record to whom it is reasonably necessary

to disclose the information for this litigation and who have signed the "Acknowledgment

and Agreement to Be Bound" that is attached hereto as **Exhibit A**;

    (b)    the officers, directors, and employees (including House Counsel) of

the Receiving Party to whom disclosure is reasonably necessary for this litigation and who

have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

    (c)    Experts (as defined in this Order) of the Receiving Party to whom

disclosure is reasonably necessary for this litigation and who have signed the

"Acknowledgment and Agreement to Be Bound" (Exhibit A);

    (d)    the court and its personnel;

[3391435.1]

1    (e)    court reporters and their staff, professional jury or trial consultants,

2 mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this

3 litigation and who have signed the "Acknowledgment and Agreement to Be Bound"

4 (Exhibit A);

5    (f)    during their depositions, witnesses in the action to whom disclosure is

6 reasonably necessary and who have signed the "Acknowledgment and Agreement to Be

7 Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the

8 court. Pages of transcribed deposition testimony or exhibits to depositions that reveal

9 Protected Material must be separately bound by the court reporter and may not be

10 disclosed to anyone except as permitted under this Stipulated Protective Order.

11    (g)    the author or recipient of a document containing the information or a

12 custodian or other person who otherwise possessed or knew the information.

13 8.    <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN

14 OTHER LITIGATION</u>

15    If a Party is served with a subpoena or a court order issued in other litigation that

16 compels disclosure of any information or items designated in this action as

17 "CONFIDENTIAL," that Party must:

18    (a)    promptly notify in writing the Designating Party. Such notification

19 shall include a copy of the subpoena or court order;

20    (b)    promptly notify in writing the party who caused the subpoena or order

21 to issue in the other litigation that some or all of the material covered by the subpoena or

22 order is subject to this Protective Order. Such notification shall include a copy of this

23 Stipulated Protective Order; and

24    (c)    cooperate with respect to all reasonable procedures sought to be

25 pursued by the Designating Party whose Protected Material may be affected.

26    If the Designating Party timely seeks a protective order, the Party served

27 with the subpoena or court order shall not produce any information designated in this

28 action as "CONFIDENTIAL" before a determination by the court from which the

[3391435.1]

SER-071

subpoena or order issued, unless the Party has obtained the Designating Party's

permission. The Designating Party shall bear the burden and expense of seeking protection

in that court of its confidential material – and nothing in these provisions should be

construed as authorizing or encouraging a Receiving Party in this action to disobey a

lawful directive from another court.

9.      A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a)      The terms of this Order are applicable to information produced by a

Non-Party in this action and designated as "CONFIDENTIAL." Such information

produced by Non-Parties in connection with this litigation is protected by the remedies and

relief provided by this Order. Nothing in these provisions should be construed as

prohibiting a Non-Party from seeking additional protections.

(b)      In the event that a Party is required, by a valid discovery request, to

produce a Non-Party's confidential information in its possession, and the Party is subject

to an agreement with the Non-Party not to produce the Non-Party's confidential

information, then the Party shall:

(1)      promptly notify in writing the Requesting Party and the Non-

Party that some or all of the information requested is subject to a confidentiality agreement

with a Non-Party;

(2)      promptly provide the Non-Party with a copy of the Stipulated

Protective Order in this litigation, the relevant discovery request(s), and a reasonably

specific description of the information requested; and

(3)      make the information requested available for inspection by the

Non-Party.

(c)      If the Non-Party fails to object or seek a protective order from this

court within 14 days of receiving the notice and accompanying information, the Receiving

Party may produce the Non-Party's confidential information responsive to the discovery

request. If the Non-Party timely seeks a protective order, the Receiving Party shall not

STIPULATED PROTECTIVE ORDER
[3391435.1]

1    produce any information in its possession or control that is subject to the confidentiality

2    agreement with the Non-Party before a determination by the court. Absent a court order to

3    the contrary, the Non-Party shall bear the burden and expense of seeking protection in this

4    court of its Protected Material.

5    10.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

6          If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed

7    Protected Material to any person or in any circumstance not authorized under this

8    Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the

9    Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all

10   unauthorized copies of the Protected Material, (c) inform the person or persons to whom

11   unauthorized disclosures were made of all the terms of this Order, and (d) request such

12   person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is

13   attached hereto as Exhibit A.

14   11.    INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE
            PROTECTED MATERIAL
15

16         When a Producing Party gives notice to Receiving Parties that certain inadvertently

17   produced material is subject to a claim of privilege or other protection, the obligations of

18   the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B).

19   This provision is not intended to modify whatever procedure may be established in an e-

20   discovery order that provides for production without prior privilege review. Pursuant to

21   Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the

22   effect of disclosure of a communication or information covered by the attorney-client

23   privilege or work product protection, the parties may incorporate their agreement in the

24   stipulated protective order submitted to the court.

25   12.    MISCELLANEOUS

26         12.1   Right to Further Relief. Nothing in this Order abridges the right of any

27   person to seek its modification by the court in the future.

28         12.2   Right to Assert Other Objections. By stipulating to the entry of this

[3391435.1]
STIPULATED PROTECTIVE ORDER

Case No. 4:18-CV-07677

**SER-073**

1    Protective Order no Party waives any right it otherwise would have to object to disclosing

2    or producing any information or item on any ground not addressed in this Stipulated

3    Protective Order. Similarly, no Party waives any right to object on any ground to use in

4    evidence of any of the material covered by this Protective Order.

5        12.3    Filing Protected Material. Without written permission from the Designating

6    Party or a court order secured after appropriate notice to all interested persons, a Party may

7    not file in the public record in this action any Protected Material. A Party that seeks to file

8    under seal any Protected Material must comply with Civil Local Rule 79-5. Protected

9    Material may only be filed under seal pursuant to a court order authorizing the sealing of

10   the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order

11   will issue only upon a request establishing that the Protected Material at issue is privileged,

12   protectable as a trade secret, or otherwise entitled to protection under the law. If a

13   Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule

14   79-5(d) is denied by the court, then the Receiving Party may file the information in the

15   public record pursuant to Civil Local Rule 79-5(e) unless otherwise instructed by the court.

16       12.4    Order to Disclose. The parties agree that this court order authorizes the

17   disclosure of documents containing information protected by HIPAA, which shall be

18   subject to this protective order.

19       13. FINAL DISPOSITION

20       Within 60 days after the final disposition of this action, as defined in paragraph 4,

21   each Receiving Party must return all Protected Material to the Producing Party or destroy

22   such material. As used in this subdivision, "all Protected Material" includes all copies,

23   abstracts, compilations, summaries, and any other format reproducing or capturing any of

24   the Protected Material.

25       **IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.**

26

27

28

[3391435.1]

SER-074

DATED: May 22, 2019

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: /s/ Ernest Galvan
    Ernest Galvan

Attorneys for Plaintiffs

DATED: May 22, 2019

Respectfully submitted,
BURKE, WILLIAMS & SORENSEN, LLP

By: /s/ Gregory B. Thomas
    Gregory B. Thomas. Esq.

DATED: May 22, 2019

Respectfully submitted,
HANSON BRIDGETT LLP

By: /s/ Samantha D. Wolff
    Paul B. Mello, Esq.
    Samantha D. Wolff, Esq.
Attorneys for Defendants

**PURSUANT TO STIPULATION; IT IS SO ORDERED**

DATED: May _29_, 2019

Nathanael Cousins
United States Magistrate Judge

GRANTED
Judge Nathanael M. Cousins

[3391435.1]

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____

[print or type full address], declare under penalty of perjury that I have read in its entirety and

understand the Stipulated Protective Order that was issued by the United States District Court for

the Northern District of California on _____ in the case of ASHOK BABU, ROBERT BELL,

IBRAHIM KEEGAN-HORNSBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE

NAVARRO, ROBERTO SERRANO, AND ALEXANDER WASHINGTON on behalf of

themselves and all others similarly situated v. COUNTY OF ALAMEDA, et. al. Case No. 4:18-

CV-07677-NC. I agree to comply with and to be bound by all the terms of this Stipulated

Protective Order and I understand and acknowledge that failure to so comply could expose me to

sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in

any manner any information or item that is subject to this Stipulated Protective Order to any

person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the

Northern District of California for the purpose of enforcing the terms of this Stipulated Protective

Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of

_____ [print or type full address and telephone number]

as my California agent for service of process in connection with this action or any proceedings

related to enforcement of this Stipulated Protective Order.


Date: _____

City and State where sworn and signed: _____


Printed name: _____


Signature: _____

[3391435.1]

**SER-076**

Gregory B. Thomas (SBN 239870)
E-mail: gthomas@bwslaw.com
Temitayo O. Peters (SBN 309913)
E-mail: tpeters@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
1901 Harrison Street, Suite 900
Oakland, CA 94612-3501
Tel: 510.273-8780 Fax: 510.839.9104

HANSON BRIDGETT LLP
Paul B. Mello (SBN 179755)
Samantha D. Wolff (SBN 240280)
Laurel E. O'Connor (SBN 305478)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
E-mail: pmello@hansonbridgett.com
        swolff@hansonbridgett.com

Attorneys for Defendants

Jeffrey L. Bornstein (SBN 099358)
Ernest Galvan (SBN 196065)
Kara J. Janssen (SBN 274762)
Rekha Arulanantham (SBN 317995)
ROSEN BIEN GALVAN &
GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email:    jbornstein@rbgg.com
          egalvan@rbgg.com
          kjanssen@rbgg.com
          rarulanantham@rbgg.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNESBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>COUNTY OF ALAMEDA; GREGORY J. AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office; KARYN TRIBBLE in her official capacity as Director of the Alameda County Behavioral Health Care Services Agency; and DOES 1 to 20, inclusive,<br><br>        Defendants. | Case No. 5:18-CV-07677<br><br>**JOINT RESPONSE TO APRIL 9, 2021 ORDER RE SANTA RITA JAIL COVID-19 RESPONSE**<br><br>Date:    April 30, 2021<br>Time:   9:00 a.m.<br>Judge:  Hon. Nathanael M. Cousins |

The Parties jointly submit the following status report in response to the Court's April 9, 2021 Order entered at Docket 240, setting a further case management conference for April 30, 2021.

## I. Department of Justice Notice Regarding Investigation of Alameda County, John George Psychiatric Hospital, and Santa Rita Jail

Plaintiffs' Statement

On April 22, 2021, the United States Department of Justice ("DOJ") issued a Notice Regarding Investigation of Alameda County, John George Psychiatric Hospital, and Santa Rita Jail regarding conditions the DOJ believes violate the Constitution and federal law, including the 8th, 14th amendments and the Americans with Disabilities Act (ADA). A copy of the Notice and underlying report is attached hereto as **Exhibit A**. The full report can be found at https://www.justice.gov/crt/case-document/file/1388891/download.

The report sets forth minimum corrective actions that the DOJ recommends Alameda County implement. *See* Exhibit A at 36-39.

The DOJ's findings encompass many of the same issues in this case, including the unconstitutional conditions at the Santa Rita Jail with respect to:

- the placement of individuals with serious mental illness in restrictive housing and for prolong periods;
- the need for periodic review of individuals' placement in restrictive housing;
- timely mental health treatment in confidential settings;
- development of and regular review of individualized treatment plans;
- regular, consistent therapy and counseling, in group and individual settings;
- individual assessments of prisoners to determine whether and when they should be placed on some form of suicide watch, the individualized conditions of that watch, and whether and when they should be removed from that watch;
- conditions in suicide watch placements that are therapeutic, rather than punitive.
- discharge planning to prisoners with serious mental illness to ensure continuity of care;

17484055.1[3728239.2]                                           2                                    Case No. 5:18-CV-07677
JOINT RESPONSE TO APRIL 9, 2021 ORDER RE SANTA RITA JAIL COVID-19 RESPONSE

SER-078

1   • community-based services and supports for individuals with mental health disabilities; and

2

3   • access to the Jail's programs, services, and activities for individuals with mental health disabilities.

4   These remedial measures are consistent with the spirit of the corrective actions

5   being negotiated by the Parties.

6   The Parties are scheduled to meet and confer on May 4, 2021 to further discuss the

7   Consent Decree and all of the remedial actions needed to address the current on-going

8   issues at the Jail.  Plaintiffs believe that almost all of the issues raised by the DOJ that are

9   focused on the Jail are being or can be addressed as part of the Consent Decree.  Plaintiffs

10   welcome any productive involvement from the DOJ that could assist the parties in

11   expediting a fair, durable and comprehensive Consent Decree.

12   Defendants' Statement

13   Defendants received the Department of Justice's ("DOJ") Notice Regarding

14   Investigation of Alameda County, John George Psychiatric Hospital, and Santa Rita Jail on

15   April 22, 2021 (the "Report").  The County and Alameda County Sheriff's Office

16   ("ACSO") continue to evaluate the Report but offer the following initial observations.

17   First, Defendants note that the DOJ was last at Santa Rita Jail ("SRJ") in the summer of

18   2019.  As a result, the Report is based largely upon stale information (save for several

19   references to information culled from public filings in this case).  Moreover, neither the

20   County nor ACSO were contacted by the DOJ to discuss the matter or obtain more current

21   and complete information before the DOJ issued its Report.  As a result, the basis for the

22   DOJ's purported findings and recommendations predates the COVID-19 pandemic and

23   many changes that have already been made at SRJ or are being made as part of this

24   litigation.  By way of example, though not an exhaustive list, the Report fails to recognize

25   the following:

26   • In March 2020, ACSO created a step-down "Administrative Separation Rec-Together" classification to increase out-of-cell time for incarcerated persons housed in restrictive housing.

27

28

- The Board of Supervisors authorized the hiring of significant numbers of Adult Forensic Behavioral Health ("AFBH") and ACSO staff in order to improve access to and the quality of mental health care delivered to those incarcerated in SRJ. AFBH and ACSO are in the process of hiring to fill these newly authorized positions. To date, AFBH has hired approximately 15 new personnel to work at SRJ. ACSO has created a Recruiting Unit and added a night academy (in addition to regular daytime academies) to expedite hiring. As of May 16, ACSO will have hired 43 new Sheriff's Technicians to work at the jail. As of May 2, ACSO will have internally promoted 27 new jail supervisors. Further, since July 2020, ACSO has hired a total of 53 deputy sheriff recruits and 32 laterals to fill existing vacancies and newly authorized positions.

- In the interim, ACSO has instituted a mandatory overtime policy to ensure that the jail is appropriately staffed.

- ACSO has increased the number of supervisors assigned to SRJ.

- ACSO has established a Compliance Unit created in part to ensure compliance with minimum out-of-cell time.

- ACSO now provides incarcerated persons with tablets which include, among other things, therapeutic and educational materials developed in consultation with AFBH, as well as various other applications (including music, movies, and the ability to make phone calls).

- ACSO has increased the number of free telephone and video visits for incarcerated persons while in-person visitation is suspended during the global pandemic.

- ACSO, in consultation with AFBH, created a Behavioral Healthcare Access Team ("BHAT") to facilitate clinical encounters. The BHAT consists of dedicated deputies who are assigned to fulfill this important function.

- ACSO has begun to roll-out a new classification system. This new classification system has already significantly reduced the number of inmates classified as Administrative Separation (isolation). This has already resulted in the number of persons classified as Administrative Separation decreasing from about 240 to approximately 40 persons. It is anticipated that the number of individuals classified as Administrative Separation will continue to decline.

- AFBH, in coordination with ACSO, has already has begun to offer regular group therapy in Housing Unit 9 through its contracted provider and is the process of providing additional group therapy to Behavioral Health patients housed in other housing units at SRJ.

- AFBH contracted to ensure the provision of 24/7 mental health care coverage at SRJ.

SER-080

- AFBH and ACSO have collaborated to ensure that returning citizens exiting SRJ have direct access to community resources through the onsite ROOTS trailer.

- Physical plant and other changes were made to improve the confidentiality of the intake process at SRJ by creating or expanding private interview, clinical and office space.

- AFBH and ACSO have begun implementation of more robust suicide review processes, including monthly review of inmates with a propensity for self-harm.

- AFBH is now consulted before pre-planned use-of-force incidents involving Behavioral Health clients to assist with de-escalation.

Each of these items, and others not listed above, were in the process of being implemented or were already implemented as part of the County's significant efforts to improve care and services at SRJ. Moreover, many of these items, and many others, are subjects of this litigation. Areas of reform that are already subsumed within the *Babu* litigation include, but are not limited to, the following: intake and screening processes, reduced use of restrictive housing, out-of-cell time and outdoor recreation, pre-release and discharge planning, coordination between SRJ and John George, establishment of therapeutic housing units, increased access to programming and group therapy, improvements in the delivery of mental health care, continued and increased focus on suicide prevention, and confidential treatment space, among others.

The Defendants in this case remain committed to the continued efforts to improve the delivery of care and services to the incarcerated population at SRJ. They have also invested significant time and resources in pursuing these important goals in this case and believe that the DOJ's recommendations relating to SRJ have been and are being addressed in this matter.

## II. Updates Regarding Vaccine Distribution and COVID Response

Plaintiffs' Statement:

Plaintiffs are extremely concerned by the low vaccination rate at the Jail. As of April 23, 2021, there are 362 individuals who are fully vaccinated, and 58 individuals partially vaccinated at SRJ. With a population of 2,141 individuals, under 20 percent of

the Jail's population is partially or fully vaccinated.

Plaintiffs have continuously asked Defendants to consider providing incentives to individuals to encourage vaccination. *See* Dkt. 239. Joint neutral expert Mike Brady also suggested incentivizing vaccinations in his April 14, 2021 Report on his February 18, 2021 COVID Follow-Up Spot Check.[1] Although Defendants have asserted that the Jail has considered this option, they have not communicated to Plaintiffs that any incentives have been offered at SRJ. Plaintiffs requested that Defendants report on what incentives have been considered by the Jail and provide more information on why it has not yet implemented incentives for vaccination.

The Alameda County Sheriff's Office webpage on COVID-19 does not provide sufficient information for Plaintiffs or the public to understand vaccine distribution at the Jail. In an April 16, 2021 email to Diana Weiss, the CJA Supervising Attorney for the Northern District of California, Defendants explained that Wellpath is focused on providing the vaccine to higher risk groups and had put on hold the vaccination of individuals in administrative separation units. Plaintiffs encourage Defendants to post the vaccination prioritization scale on the webpage, as well as the remaining units that have not yet been offered the vaccine.

Plaintiffs also requested that Defendants provide an update on whether concerns regarding the safety of the Johnson & Johnson vaccine have affected vaccination administration at the Jail and whether alternative vaccines are now being offered.

Defendants' Response:

While Defendants share Plaintiffs' concerns regarding vaccine hesitancy, the statistics regarding the number of inmates who are either partially or fully vaccinated are not as dire as Plaintiffs suggest. Since Wellpath first began offering COVID-19 vaccines to incarcerated persons at SRJ, 439 incarcerated persons have been fully vaccinated and 89

---

[1] https://alamedacountysheriff.org/files/Sixth-SRJ-Covid-19-Spot-Check-Report-by-Mike-Brady-02-18-21-FINAL.pdf.

have been partially vaccinated.  This number includes persons who have since been released from custody.  Moreover, not all incarcerated persons are eligible to receive the vaccine.  As Defendants reported at the last case management conference, newly incarcerated persons must first clear the Public Health-mandated 14-day intake quarantine before they may be eligible to receive a COVID-19 vaccine.  As of April 27, 2021, 210 persons are housed in the intake quarantine housing units.  Thus, a total of 1,935 incarcerated persons are eligible to receive the vaccine (using the total in-custody population of 2,145 from April 27, 2021, less the number of inmates housed in the intake quarantine units).  Of those, 420 currently incarcerated persons were fully or partially vaccinated as of April 23, 2021.

As of April 27, 2021, Wellpath has offered COVID-19 vaccines to all housing units within SRJ.  It is possible that inmates who were housed in intake quarantine units while the vaccine was offered to certain housing units have not yet been offered the vaccine, although they now reside within a housing unit that was previously offered the vaccine.  Such inmates may submit a sick-call slip requesting the vaccine and Wellpath is currently working to respond to all such requests.  Additionally, Wellpath has assigned a team to revisit each housing unit to ensure that all inmates who may not have been present during the initial pass are given an opportunity to receive the vaccine without having to submit a specific request.  This team will also attempt to meet with inmates who previously declined to accept the vaccine.

In addition, Wellpath and ACSO are working together to address vaccine hesitancy in a number of ways.  First, inmates who have already been vaccinated will be receiving a $5 credit (which they can use for phone calls, tablet charges, video calls, etc.) as well as two canteen food items.  Wellpath and ACSO began distributing these items to inmates who have already been vaccinated on April 28 2021.  Also as of April 28 2021, this incentive is being offered to inmates as they accept the vaccine (for inmates who are given the Moderna vaccine, the $5 credit will be offered at the first dose and the canteen items will be given at the second dose; all items will be given to inmates when and if they

1  receive a one-dose vaccine).  Second, additional educational materials, including

2  information at intake, have been produced.  These materials include an ACPHD flyer

3  regarding how to obtain a vaccine in the community. Third, a survey regarding testing and

4  vaccine hesitancy, that was developed in conjunction with Wellpath and Alameda County

5  Public Health Department, was recently completed and the results are being analyzed.

6  Defendants are hopeful that the information obtained from the inmate population as a

7  result of the survey will be helpful in addressing the incarcerated population's concerns

8  relating to testing and vaccination.

9       Further, Defendants do not believe Plaintiffs' request to add additional vaccination

10  information to ACSO's webpage is merited.  The webpage contains extensive and up-to-

11  date information relating to COVID-19.  Specifically with respect to vaccination

12  distribution, the website indicates the number of persons who have been fully vaccinated at

13  SRJ, the number of persons who were partially vaccinated at SRJ, the number of fully

14  vaccinated persons in custody, the number of partially vaccinated persons in custody,

15  which housing units have been offered the vaccine to date, and the number of staff tests

16  administered from April 11 through April 24, 2021.  ACSO will continue to be transparent

17  and post current COVID-19 statistics on its website throughout the pandemic, but has no

18  current plans to augment any vaccination information that is presently available.

19       Finally, with regard to Johnson & Johnson vaccine, the hold on administering the

20  vaccine has been lifted.  An educational fact sheet regarding the benefits and risks of the

21  Johnson & Johnson vaccine is being posted in each housing unit and Wellpath plans to

22  resume administering the Johnson & Johnson vaccine next week.  At that time, both the

23  Moderna and Johnson & Johnson vaccines will be available to the patient population.

24  **III.    Update on Settlement Negotiations**

25  Joint Statement:

26       The Parties continue to engage in productive settlement discussions and are close to

27  tentative agreement on the following sections: Recitals; COVID-19 Measures; Custody

28  and Mental Health Staffing; Classification and Use of Restrictive Housing; Grievances;

JOINT RESPONSE TO APRIL 9, 2021 ORDER RE SANTA RITA JAIL COVID-19 RESPONSE

1   Inmate Council/Ombudsperson Program, Settlement Approval Process, Effect of Consent

2   Decree In Other Actions, and Reservation of Jurisdiction and Enforcement, subject to final

3   review by the Parties and approval by the County.

4           While the parties continue to work cooperatively to resolve all issues in the case

5   through the settlement process, it is possible that the parties will not be able to reach

6   agreement on all issues.  Should the parties be unable to reach agreement on all issues, the

7   parties may need a judicial determination of discrete issues and will continue to keep the

8   court apprised of settlement efforts. As discussed at the previous status hearing, while the

9   parties continue to work cooperatively to resolve all issues in the case through the

10  settlement process, the parties will likely need a judicial determination of some

11  fundamental issues, if the parties cannot reach agreement.  From the Plaintiffs'

12  perspective, the following are critical issues need to be addressed: out-of-cell time,

13  including the time it will take to improve access to outdoor space, limitation on the number

14  of days individuals with serious mental illness may be housed in restrictive housing, pre-

15  release planning, continuity of care for individuals sent to John George from the Jail, and

16  vice versa, the confidentiality of monitoring reports, and the duration of the consent

17  decree.

18          The next settlement conference is scheduled for May 6, 2021.

19  **IV.    Trial and Preparation Dates**

20  Joint Statement:

21          As the Parties continue to engage in settlement conversations, the Parties will meet

22  and confer regarding on an appropriate pre-trial schedule, with adjusted dates for discovery

23  cutoffs and motion practice, for issues that must be litigated.

24  **V.     Joint Neutral Mental Health Expert**

25  Joint Statement:

26          The Parties have agreed to further meet and confer about the person to become the

27  joint neutral mental health expert to replace Dr. Kerry Hughes, who recently advised the

28  parties that he is unavailable to fulfill that role.

---

17484055.1[3728239.2]                           9                    Case No. 5:18-CV-07677

JOINT RESPONSE TO APRIL 9, 2021 ORDER RE SANTA RITA JAIL COVID-19 RESPONSE

SER-085

## VI.   Further Status Conference

Joint Statement:

Plaintiffs respectfully request that the Court set this matter for a status conference on May 21, 2021 or other date convenient to the Court, to allow the Parties to make progress on the issues describe above.

Dated:  April 28, 2021

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Rekha Arulanantham*
    Jeffrey L. Bornstein
    Ernest Galvan
    Kara J. Janssen
    Rekha Arulanantham
    Attorneys for Plaintiffs

Dated:  April 28, 2021

BURKE, WILLIAMS & SORENSEN, LLP

By:  */s/ Gregory B. Thomas*
    Gregory B. Thomas
    Temitayo O. Peters
    Attorneys for Defendants

Dated:  April 28, 2021

HANSON BRIDGETT LLP

By:  */s/ Paul B. Mello*
    Paul B. Mello
    Samantha D. Wolff
    Attorneys for Defendants

17484055.1[3728239.2]                          10                          Case No. 5:18-CV-07677
JOINT RESPONSE TO APRIL 9, 2021 ORDER RE SANTA RITA JAIL COVID-19 RESPONSE

SER-086

EXHIBIT A

SER-087

**U.S. Department of Justice**

Civil Rights Division

_____

Assistant Attorney General
950 Pennsylvania Ave, NW - RFK
Washington, DC 20530

April 22, 2021

Keith Carson
President
Alameda County Board of Supervisors
1221 Oak Street, #536
Oakland, CA 94612

Gregory J. Ahern
Alameda County Sheriff/Coroner
Santa Rita Jail
5325 Broder Blvd.
Dublin, CA 94568

Mark Fratzke
Alameda Health System
Interim Chief Operating Officer
1411 E. 31st St.
Oakland, CA 94602

      Re:    <u>Notice Regarding Investigation of Alameda County, John George Psychiatric
Hospital, and Santa Rita Jail</u>

Dear President Carson, Sheriff Ahern, and Interim Chief Operating Officer Fratzke:

The Civil Rights Division has completed the investigation into the conditions and
practices at Santa Rita Jail and John George Psychiatric Hospital, and into whether Alameda
County's reliance on John George Psychiatric Hospital and sub-acute psychiatric facilities to
provide mental health services to adults with mental health disabilities violates those individuals'
right to receive services in the most integrated setting appropriate to their needs. The
investigation was conducted under the Civil Rights of Institutionalized Persons Act (CRIPA), 42
U.S.C. § 1997, and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§
12131−12134, and the ADA's implementing regulation, 28 C.F.R Part 35.

Consistent with the statutory requirements of CRIPA, we provide this Notice of the
alleged conditions that we have reasonable cause to believe violate the Constitution and federal
law and the supporting facts giving rise to those violations. 42 U.S.C. § 1997b(a)(1); 42 U.S.C.
§ 1997c(b)(1). This Notice also sets forth the Department's findings of fact and conclusions of
law under the ADA. 42 U.S.C. §§ 12131−12134; 28 C.F.R. § 35.172(c). We also notify you of
the minimum remedial measures that we believe may remedy the alleged violations.

After carefully reviewing the evidence, we conclude that there is reasonable cause to believe that Alameda County and the Alameda County Sheriff's Office violate the ADA and engage in a pattern or practice of constitutional violations in the conditions at the Santa Rita Jail, and that Alameda County violates the ADA as interpreted by *Olmstead v. L.C.*, 527 U.S. 581, 607 (1999). Specifically, we have reasonable cause to believe that: (1) Alameda County violates the ADA by failing to provide services to qualified individuals with mental health disabilities in the most integrated setting appropriate to their needs by unnecessarily institutionalizing them at John George Psychiatric Hospital and sub-acute facilities; (2) Santa Rita Jail fails to provide constitutionally adequate mental health care to prisoners with serious mental health needs, including those at risk of suicide; (3) Santa Rita Jail's use of prolonged restrictive housing under current conditions violates the Eighth and Fourteenth Amendment rights of prisoners with serious mental illness; and (4) Santa Rita Jail violates the ADA by denying prisoners with mental health disabilities access to services, programs, and activities because of their disabilities.[1]

We thank Alameda County, Alameda Health System, and the Alameda County Sheriff's Office for accommodating our investigation and providing access to facilities, staff, documents, and data. We are obligated to advise you that 49 days after issuance of this Notice, the Attorney General may initiate a lawsuit under CRIPA to correct the alleged conditions we have identified if Alameda County officials have not satisfactorily addressed them. 42 U.S.C. § 1997b(a)(1). CRIPA also authorizes the Department to move to intervene in a related private suit 15 days after issuing the Notice. 42 U.S.C. § 1997c(b)(1).

We hope, however, to resolve this matter through a cooperative approach and look forward to working with Alameda County leadership and staff to address the violations of law we have identified. The lawyers assigned to this investigation will, therefore, contact Alameda County to discuss options for resolving this matter amicably. Please also note that this Notice is a public document. It will be posted on the Civil Rights Division's website.

---

[1] The Department of Justice (Department) opened this investigation to examine five issues: (1) whether the County's reliance on psychiatric institutions to provide mental health services to adults with mental health disabilities violates the ADA; (2) whether the conditions of confinement and practices at Santa Rita Jail deprive persons with serious mental illness of their constitutional rights; (3) whether the conditions at Santa Rita Jail violate the rights of persons with mental health disabilities under the ADA; (4) whether the practices at John George Psychiatric Hospital violate the rights of persons with mental health disabilities under the ADA to receive services in the most integrated setting appropriate to their needs; and (5) whether the conditions at John George Psychiatric Hospital deprive persons with serious mental illness of their constitutional rights. This Notice Letter applies to the first four issues. With regard to the remaining issue, the Department did not reach a conclusion as to whether there are systemic unconstitutional conditions at John George Psychiatric hospital and is closing its investigation.

SER-089

If you have any questions regarding this correspondence, please call Steven H. Rosenbaum, Chief of the Special Litigation Section, at (202) 616-3244.

Sincerely,

Pamela S. Karlan
Principal Deputy Assistant Attorney General
Civil Rights Division


cc:    Donna Ziegler
County Counsel for Alameda County
1221 Oak Street, Suite 450
Oakland, CA 94612

Dr. Taft Bhuket, President
Alameda Health System Board of Trustees
1411 E. 31st. St.
Oakland, CA 94602

James Jackson, Interim CEO
Alameda Health System
1411 E. 31st St.
Oakland, CA 94602

Mike Moye, General Counsel
Alameda Health System
1411 E. 31st St.
Oakland, CA 94602

Stephanie Hinds
Acting United States Attorney
Northern District of California
Federal Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102


Attachment: Investigation of Alameda County, John George Psychiatric Hospital, and Santa Rita Jail

SER-090

# INVESTIGATION OF ALAMEDA COUNTY, JOHN GEORGE PSYCHIATRIC HOSPITAL, AND SANTA RITA JAIL



United States Department of Justice
Civil Rights Division

April 22, 2021

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................ 1

II.    INVESTIGATION................................................................ 3

III.   SYSTEM OVERVIEW .......................................................... 4

IV.   ALAMEDA COUNTY VIOLATES INDIVIDUALS' RIGHT TO RECEIVE SERVICES IN THE MOST INTEGRATED SETTING UNDER TITLE II OF THE ADA ............... 6

    A. Alameda County Subjects Adults with Mental Health Disabilities to Unnecessary Psychiatric Institutionalization and the Serious Risk of Psychiatric Institutionalization ... 7

    B. People with Mental Health Disabilities in Alameda County Can Be Appropriately and Effectively Served in the Community................................................................ 11

       1.     People Cycling Through Psychiatric Institutions Are Appropriate for Community-Based Services…………………………………………………………………………..11

       2.     Alameda County Fails to Provide Adequate Community-Based Services that Could Prevent Needless Psychiatric Institutionalization ...................................... 12

       3.     Alameda County Fails to Identify and Connect People with the Community-Based Services Necessary to Avoid Needless Institutionalization................................. 16

    C. Most People with Mental Health Disabilities in the Psychiatric Facilities in Alameda County Do Not Oppose Community-Based Services ........................................ 17

    D. Alameda County Can Make Reasonable Modifications to Prevent Unnecessary Psychiatric Institutionalization........................................................................ 18

V.     MENTAL HEALTH CARE AT SANTA RITA JAIL IS INADEQUATE IN VIOLATION OF THE CONSTITUTIONAL RIGHTS OF PRISONERS WITH SERIOUS MENTAL HEALTH NEEDS ............................................................ 21

    A. Many Prisoners at the Jail Have Serious Mental Health Needs, Requiring Treatment .... 23

    B. Prisoners with Serious Mental Health Needs Are Subject to a Substantial Risk of Serious Harm as a Result of Inadequate Mental Health Care........................................ 24

       1.     Prisoners with Serious Mental Health Needs Are Subject to Harm Because of a Lack of Individualized Treatment, Including Inadequate Psychotherapy and Programming................................................................................. 24

       2.     Prisoners with Serious Mental Health Needs Are Subject to Harm Because of Inadequate Treatment Planning, Including Discharge Planning.......................... 28

    C. Officials at the Jail Have Known of the Risk to Prisoner Health and Safety Posed by Inadequate Mental Health Care and Disregarded It........................................ 29

VI.   THE JAIL'S USE OF PROLONGED RESTRICTIVE HOUSING UNDER CURRENT CONDITIONS, INCLUDING THE FAILURE TO PROVIDE ADEQUATE MENTAL HEALTH CARE, VIOLATES THE CONSTITUTIONAL RIGHTS OF PRISONERS WITH SERIOUS MENTAL ILLNESS .......................................................... 31

SER-092

A. Prisoners with Serious Mental Illness Are Subject to a Substantial Risk of Serious Harm as a Result of the Jail's Use of Restrictive Housing ........................................................ 33

B. Officials at the Jail Have Known of, and Disregarded, the Substantial Risk of Serious Harm of Placing Individuals with Serious Mental Illness in Restrictive Housing ........... 34

VII.   THE JAIL'S TREATMENT OF PRISONERS WITH MENTAL HEALTH DISABILITIES VIOLATES THE AMERICANS WITH DISABILITIES ACT ............ 35

VIII.   MINIMUM REMEDIAL MEASURES .......................................................... 36

IX.   CONCLUSION ............................................................................................. 39

SER-093

## I.     INTRODUCTION

After an extensive investigation, the United States provides notice, pursuant to Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12131−12134, and the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997, that there is reasonable cause to believe that Alameda County and the Alameda County Sheriff's Office violate the ADA and engage in a pattern or practice of constitutional violations in the conditions at the Santa Rita Jail and that Alameda County violates the ADA in its provision of public mental health services. Specifically, we have reasonable cause to believe that: (1) Alameda County fails to provide services to qualified individuals with mental health disabilities in the most integrated setting appropriate to their needs, instead relying on John George Psychiatric Hospital and sub-acute psychiatric facilities (collectively, "psychiatric institutions")[1] to provide such services; (2) Santa Rita Jail fails to provide constitutionally adequate mental health care to prisoners with serious mental health needs, including those at risk of suicide; (3) Santa Rita Jail's use of prolonged restrictive housing under current conditions violates the constitutional rights of prisoners with serious mental illness; and (4) Santa Rita Jail denies prisoners with mental health disabilities access to services, programs, and activities because of their disabilities.[2]

Specifically, the United States provides notice of the following findings:

- **Alameda County relies on psychiatric institutions to serve adults with mental health disabilities who are eligible for public mental health services, rather than providing services in the most integrated setting appropriate to their needs.** On any given day in Alameda County, hundreds of people are institutionalized for lengthy stays at one of several large, locked, sub-acute psychiatric facilities or are hospitalized at John George Psychiatric Hospital (John George). Depending on the facility, people live at the sub-acute facilities for an average of anywhere from six months to two years. Of those hospitalized at John George, a significant subset will spend weeks or even months there; many, lacking any alternatives, are funneled to other segregated facilities on discharge. Even more adults with mental health disabilities are at serious risk of admission to these psychiatric institutions.

---

[1] For purposes of our findings related to the integration mandate of the ADA, we considered only *psychiatric* institutional settings. *See* 28 C.F.R. pt. 35, App. B, at 708 (2018); 28 C.F.R. § 35.130(d) (2019); *see also* 42 U.S.C. § 12101(a)(2), (b)(1). We did not consider Santa Rita Jail to be an institutional or segregated setting in those findings. At the same time, for the CRIPA portion of our investigation, the Santa Rita Jail is an "institution" as defined by CRIPA. *See* 42 U.S.C. § 1997.

[2] The Department of Justice (Department) opened this investigation to examine five issues: (1) whether the County's reliance on psychiatric institutions to provide mental health services to adults with mental health disabilities violates the ADA; (2) whether the conditions of confinement and practices at Santa Rita Jail deprive persons with serious mental illness of their constitutional rights; (3) whether the conditions at Santa Rita Jail violate the rights of persons with mental health disabilities under the ADA; (4) whether the practices at John George Psychiatric Hospital violate the rights of persons with mental health disabilities under the ADA to receive services in the most integrated setting appropriate to their needs; and (5) whether the conditions at John George Psychiatric Hospital deprive persons with serious mental illness of their constitutional rights. This Notice Letter applies to the first four issues. With regard to the remaining issue, the Department did not reach a conclusion as to whether there are systemic unconstitutional conditions at John George Psychiatric hospital and is closing its investigation.

- **With appropriate community-based services, supports, and coordination, people with mental health disabilities could live at home and be integrated in their communities.** Evidence-based services, such as Assertive Community Treatment and Permanent Supported Housing, are proven effective in enabling people to live in their own homes in the community, even for people with the highest level of need for mental health services. Community-based crisis response services are also critical to avoid unnecessary hospitalizations and maintain people successfully in the community. A strong crisis system, along with other comprehensive community-based services, can ensure that the majority of adults with mental health disabilities in Alameda County avoid psychiatric institutionalization. Alameda County fails to make these needed community-based services available in adequate capacity or intensity. Alameda County also fails to ensure that people who are in institutions receive professionally-adequate discharge planning and a connection upon discharge to needed services. Without connection to adequate community-based services, people return to John George in crisis again and again. Deficiencies in the community-based service system, including crisis services, at times also contribute to the incarceration of people with mental health disabilities in Santa Rita Jail (Jail). This incarceration further increases a person's risk of institutionalization in John George and the sub-acute psychiatric facilities after release, due in part to the unconstitutional conditions described below.

- **For those who are incarcerated at Santa Rita Jail, the Jail fails to provide constitutionally adequate mental health treatment.** The Jail's mental health program lacks many of the hallmarks of a constitutionally adequate system. Specifically, the Jail's current program fails to: provide adequate psychotherapy; provide adequate treatment planning, discharge planning, and programming; and properly treat and supervise suicidal prisoners. As a result, prisoners with serious mental health needs can experience worsening mental health conditions, repeated cycling for acute care at John George, prolonged restrictive housing, and, at times, serious physical harm or death. From 2015 to 2019, at least 14 prisoners died by suicide in the Jail. Two other prisoners have died by suicide at the Jail within the last two months.

- **The Jail's use of prolonged restrictive housing under current conditions, which include the failure to provide adequate mental health care, violates the constitutional rights of prisoners with serious mental illness.** The Jail subjects prisoners with serious mental illness to prolonged periods of restrictive housing under conditions that place them at a substantial risk of serious harm. Half of the people in "administrative segregation" at any given time in the Jail are estimated to have serious mental illness. On the date of our last visit to the Jail, there were 75 prisoners in administrative segregation who had been there for over 90 days. Eleven of the 14 people who died by suicide between 2015 and 2019 were held in restrictive housing at some point, and half of the other instances of self-harm that we reviewed occurred while prisoners were in restrictive housing.

2

SER-095

- **The Jail denies prisoners with mental health disabilities equal access to needed programming and services.** The Jail offers an array of programming and transition services to prisoners in the general population, but prisoners with mental health disabilities who are held in the Jail's segregated "mental health unit" or in administrative segregation are denied access to these programs.

Together, these alleged violations result in a system where people with mental health disabilities in Alameda County find themselves unnecessarily cycling in and out of psychiatric institutions, lacking access to proven, evidence-based practices that would allow them to recover and participate in community life. Many also have encounters with the criminal justice system driven in part by unmet mental health needs. Those who are incarcerated at Santa Rita Jail experience severely deficient mental health treatment, lengthy stays in restrictive housing, and discrimination on the basis of their disabilities, all of which can result in serious harm or even death while incarcerated, and place them at serious risk of repeated or unnecessarily lengthy psychiatric institutional stays after release.

The Department has received multiple complaints from and on behalf of prisoners with serious mental illness at Santa Rita Jail and people who rely on Alameda County for mental health services and experience unnecessary psychiatric institutionalization. Alameda County has long been on notice of the deficiencies in its mental health service system and the harmful conditions at Santa Rita Jail, but these problems continue. Reports by County bodies, including the Board of Supervisors' own committees, and outside consultants have identified many of these and other concerns as far back as at least 2015. News articles repeatedly highlight deaths at Santa Rita Jail, the allegedly dangerous conditions that exist there, and the overcrowding in John George's emergency room, among other issues. Several lawsuits have been filed in recent years alleging a litany of serious problems in the Jail, and California's federally-designated protection and advocacy organization, Disability Rights California, in 2019 sent the County a "probable cause" findings letter regarding many of the same ADA violations we identify. Advocates and family members of those who have died in the Jail have called for an audit of the Alameda County Sheriff's Office for years. In 2018, midway through our investigation, we shared many of our concerns and observations with the County and Jail leadership.

The County is well-positioned to make crucial changes, with many of the needed services already available in limited amounts in the community and with leadership that recognizes the need for change. But today, people with mental health disabilities continue to experience needless psychiatric institutionalization and unconstitutional, discriminatory, and harmful treatment at Santa Rita Jail as they wait for change that still has not come.

## II.  INVESTIGATION

In January 2017, the Department of Justice notified the County of Alameda, the Alameda County Sheriff's Office, and Alameda Health System that it was opening an ADA and CRIPA investigation into whether the County of Alameda unnecessarily uses psychiatric institutional settings to provide services to adults with mental health disabilities and whether the conditions of confinement in John George Psychiatric Hospital and Santa Rita Jail subject individuals to

3

unlawful harm.  Our ADA investigation focused on whether the County provides meaningful community-based services as alternatives to, and effective discharge planning to help people with mental health disabilities transition out of and avoid re-entering, psychiatric institutional care.

Two nationally recognized expert consultants assisted with our investigation: a forensic psychiatrist with over 20 years of clinical and forensic experience in a variety of academic and correctional settings, and a community psychiatrist with experience as a medical director of a statewide community services provider and as a bureau chief for a state mental health authority. These experts accompanied us on site visits, participated in interviews with County and facility staff and community members, reviewed documents, and provided their expert opinions and insight to help inform our investigation and its conclusions.

During our investigation, we visited Santa Rita Jail, John George Psychiatric Hospital, sub-acute psychiatric facilities, and board and care homes.  During our site visits, we interviewed staff at these facilities, as well as people who were receiving services in the facilities.  We also met with providers of community mental health services, individuals with mental health disabilities who receive community-based services from the County, and mental health and criminal justice advocates and other stakeholders in the County.  Finally, we met with officials from Alameda County Behavioral Health Care Services and the Alameda County Sheriff's Office.  In addition to these visits and interviews, we reviewed the documents and information provided by the County, reviewed publicly available data and reports, and considered the opinions of a wide range of individuals knowledgeable about the County's mental health system.

Following several visits, Department attorneys and experts provided briefings to County and Sheriff's Office staff and leadership about preliminary concerns identified by our experts.  It is evident that County and Sheriff's Office leadership and staff took these briefings seriously. By the time of our last visit in August 2019, the County had taken some positive steps, described further in Sections IV.B.2 and IV.D, and leadership elaborated on its vision of and plans for further progress.  We appreciate the commitment to making these urgently needed changes, but remain concerned that there has been little actual progress to resolve the discrimination that is occurring in the County's mental health system and the unconstitutional conditions and discrimination in the Santa Rita Jail.

We thank the County for the assistance and cooperation extended to the Department of Justice thus far and acknowledge the courtesy and professionalism of all of the County officials and counsel involved in this matter to date.  We also thank the people we met who are affected by the violations we were investigating, especially for their willingness to share their often-difficult experiences with us and take time away from their jobs and lives to do so.

### III.    SYSTEM OVERVIEW

Alameda County administers, funds, and controls its public mental health system.  Within Alameda County, responsibility for administering public mental health and substance use services falls primarily on Alameda County Behavioral Health Care Services (BHCS).  BHCS is

4

responsible for providing mental health services for people with moderate to severe mental health needs as well as for substance use disorder services. Alameda County residents are generally eligible for services from BHCS if they have a mental health disability that impairs their daily functioning.[3] California delegates responsibility to and authorizes counties to provide an array of mental health services under Medicaid (referred to in California as Medi-Cal) and state-only funds, including the Mental Health Services Act (MHSA).[4] In delegating responsibility for behavioral health services to counties, California affords counties significant flexibility in administering both Medicaid and state-only-funded programs; however, California expects the emphasis of MHSA programs to be on evidence-based, recovery-oriented community services, including crisis services, employment services, preventative services, supported housing, and intensive support services.[5] Counties also fund additional mental health services, such as long-term psychiatric institutional programs, that are not reimbursed by Medicaid or state programs.

Alameda County provides acute inpatient hospitalization and crisis stabilization services at John George Psychiatric Hospital, a County-owned, dedicated psychiatric emergency and inpatient facility in San Leandro, California. BHCS contracts with Alameda Health System for operation of and provision of services at John George. John George has three inpatient units with a total of 69 beds, as well as an emergency room, called Psychiatric Emergency Services (PES). PES is intended to provide crisis stabilization services. Utilization of these crisis services routinely exceeds capacity. Alameda County also funds and provides long-term, sub-acute inpatient and residential services for about 200 people at a time in several "sub-acute facilities" that range in size from 39 to 78 beds, where people regularly stay for months or years.[6] Services provided in these locked facilities include medication management, psychosocial rehabilitation, support groups, and assistance with some activities of daily living, like grooming. Many more people in Alameda County are placed in "board and care" facilities which provide residential services as well as minimal daily supports.

Many of the same or equivalent supports provided in these inpatient and segregated settings in Alameda County are also available—but in extremely limited supply—through various

---

[3] *See* CAL. WELF. & INST. CODE § 5600.3(b) (West 2019); CAL. CODE REGS. tit. 9, § 1830.205 (2020). A mental health disability is a qualifying disability under the ADA. 42 U.S.C § 12102 (2012) (defining "disability" as a "physical or mental impairment that substantially limits one or more major life activities"). Mental health disabilities include serious mental illness, or SMI, which is defined as "a diagnosable mental, behavior, or emotional disorder that causes serious functional impairment" of an individual over the age of 18 that "substantially interferes with or limits one or more major life activities" within the last year. *Mental Health and Substance Use Disorders*, SUBSTANCE ABUSE AND MENTAL HEALTH ADMIN., https://www.samhsa.gov/find-help/disorders (last visited Apr. 6, 2020).

[4] Under the MHSA, California requires counties to provide safety net mental health services for people without insurance. Cal. Welf. & Inst. Code §§ 5801–5809; Cal. Prop. 63, Mental Health Services Act, § 3 (2005, 2020 supp.).

[5] CAL. WELF. & INST. CODE §§ 5801(b)(9), 5802, 5848.5; Cal. Prop. 63, Mental Health Services Act, § 3 (2005, 2020 supp.).

[6] These facilities are considered Institutes for Mental Disease under Medicaid, and must be paid solely with County, not Medicaid, funds; equivalent services provided in community-settings would instead be eligible for Federal Medicaid funds.

SER-098

outpatient programs.  Full Service Partnerships and less intensive Service Teams use multidisciplinary team models to provide high-intensity outpatient support services to people in the places where they live.  Alameda County also funds and operates limited integrated residential services for people with mental health disabilities, such as permanent supported housing.  Alameda County also makes some limited crisis services available through crisis stabilization units, crisis residential facilities, and mobile crisis services.

Alameda County also funds the Santa Rita Jail, which is administered and controlled by the Alameda County Sheriff's Office.  Santa Rita Jail, opened in 1989, has the capacity to hold approximately 4000 prisoners.  During most of the time of our investigation, however, the actual prisoner count has been closer to 2400.  Until recently, Alameda County Sheriff's Office also operated the Glenn Dyer Jail in Oakland, but in mid-2019, it closed that jail and transferred its population to Santa Rita Jail.  The Jail holds both pre-trial detainees and convicted prisoners (collectively referred to throughout this Notice as "prisoners").

Jail officials have stated that approximately 40% of Santa Rita Jail's population is on the mental health caseload, and have estimated that approximately 20–25% of the population has a serious mental illness.  Mental health services at the Jail are provided by BHCS, through its Criminal Justice Mental Health arm.

## IV.    ALAMEDA COUNTY VIOLATES INDIVIDUALS' RIGHT TO RECEIVE SERVICES IN THE MOST INTEGRATED SETTING UNDER TITLE II OF THE ADA

Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1) (2012).  Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2) (2012).  For these reasons, Congress prohibited discrimination against individuals with disabilities by public entities when it provided that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132 (2012).  Accordingly, the "ADA is intended to insure that qualified individuals receive services in a manner consistent with basic human dignity rather than a manner which shunts them aside, hides, and ignores them."  *Helen L. v. DiDario*, 46 F.3d 325, 335 (3d Cir. 1995).

One form of discrimination prohibited by Title II of the ADA is violation of the "integration mandate."  *See* 28 C.F.R. § 35.130(d) (2019); *see also* 42 U.S.C. § 12101(a)(2), (b)(1).  That is, under the ADA, public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  An integrated setting is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. pt. 35, App. B, at 708 (2018).

6

SER-099

In *Olmstead v. L.C.*, the Supreme Court held that public entities are required to provide community-based services to persons with disabilities when (a) such services are appropriate; (b) the affected persons do not oppose community-based treatment; and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. 527 U.S. 581, 607 (1999). In so holding, the Court explained that unnecessary institutional placement "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* at 600.

The ADA's integration mandate applies both to people who are currently institutionalized and to people who are at serious risk of institutionalization. *Steimel v. Wernert*, 823 F.3d 902, 913 (7th Cir. 2016); *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 321–22 (4th Cir. 2013); *M.R. v. Dreyfus*, 663 F.3d 1100, 1115–18 (9th Cir. 2011), *opinion amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012); *United States v. Mississippi*, 400 F. Supp. 3d 546, 553–55 (S.D. Miss. 2019). As the Tenth Circuit reasoned, the integration mandate "would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003); *see also Pitts v. Greenstein*, No. 10-635-JJB-SR, 2011 WL 1897552, *3 (M.D. La. May 18, 2011) ("A State's program violates the ADA's integration mandate if it creates the *risk* of segregation; neither present nor inevitable segregation is required.") (emphasis in original). A State's failure to provide community services may create a serious risk of institutionalization. *Pashby*, 709 F.3d at 322; *see also Mississippi*, 400 F. Supp. 3d at 553–55 (upholding plaintiff's *Olmstead* claim that when people with serious mental illness are discharged from state psychiatric hospitals, the state's "ongoing lack of community-based services means they are at serious risk of re-institutionalization").

### A. Alameda County Subjects Adults with Mental Health Disabilities to Unnecessary Psychiatric Institutionalization and the Serious Risk of Psychiatric Institutionalization

Alameda County relies unnecessarily on segregated psychiatric institutions to serve its residents with mental health disabilities who need intensive treatment and long-term services and supports and who are eligible for public mental health services. Institutions such as John George and the sub-acute facilities in Alameda County isolate and segregate people with mental health disabilities from those without disabilities. *Cf., e.g.*, *Benjamin v. Dep't of Pub. Welfare*, 768 F. Supp. 2d 747, 750 (M.D. Pa. 2011) (individuals in facilities were segregated where they lived in units ranging from 16 to 20 people, primarily received services on the grounds of the facilities and had limited opportunities to interact with non-disabled peers); *Disability Advocates, Inc. v. Paterson*, 653 F. Supp. 2d 184, 224 (E.D.N.Y. 2009) (finding that "many people with mental illness living together in [an adult home] setting with few or no nondisabled persons contributes to the segregation of [a]dult [h]ome residents from the community"), *judgment vacated on other grounds*, 675 F.3d 149 (2d Cir. 2012); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 285 (E.D.N.Y. 2008) (denying motion to dismiss in case involving plaintiffs with mental illness who were institutionalized in nursing facilities). Residents of these facilities are exclusively people with

7

SER-100

disabilities, and the facilities provide services nearly entirely within their walls. These institutions' doors are locked from the outside, and the facilities place restrictions on residents' ability to leave. Even short stays in these facilities isolate people from their friends and families and interrupt participation in community life.

Alameda County is distinct in California in that it has more beds per capita in long-term sub-acute psychiatric facilities than any other similarly sized California county, and these beds are nearly always full. The primary sub-acute facilities the County relies on to serve people with mental health disabilities are Villa Fairmont, Gladman Mental Health Rehabilitation Center, and Morton Bakar Center, a nursing facility, which have a combined 187 beds. Depending on the facility, people may stay for months or live in these facilities for years. At Villa Fairmont, the average length of stay in 2017 was 156 days. Most people stay at Morton Bakar for nearly two years and the average length of stay at Gladman is between two-and-a-half and three years.

Outside of these sub-acute facilities, people with mental health disabilities in Alameda County experience shorter, but often repeated, stays at John George Psychiatric Hospital in order to get needed services. Based on the data provided by the County, an average of 1111 people in need of crisis stabilization are evaluated at John George PES each month and remain there for up to 72 hours. Of these, almost 240 people each month are then admitted into John George's acute inpatient units. The average length of stay is nine days in these units, and increasing, but many stays last weeks or even months. Between August 2017 and July 2019, 844 admissions lasted two weeks or more in John George's inpatient unit, and 236 were for 30 days or more. Alameda County's utilization of John George's inpatient unit is 6.3 times the statewide average in California for utilization of state and county psychiatric hospitals. One complainant wrote to us about her experiences at John George and told us that County authorities "concentrate [M]edicaid crazies like myself there, as opposed to using clinics in the community." She was taken there involuntarily by law enforcement from her home after she called them to report domestic abuse and then spent two weeks in "the closest thing to Hell I've encountered." She felt that, while there, she had no clear treatment or release plan; when she eventually was released, she did not receive medications or other assistance, except for a bus pass with a single fare.

A high number of people cycle through John George again and again. Nearly 1600 people experienced four or more crisis stabilization admissions to John George's PES during the two-year period from August 2017 to July 2019.[7] During the same period, over 1000 people experienced at least two admissions to the inpatient units. In fiscal year 2019, nearly 11% of individuals discharged from John George's inpatient unit were readmitted within just 14 days. This rate, which already far exceeds both national averages for state hospitals and statewide averages, appears to be increasing.

A history of admissions to John George—which alone is disruptive to people's lives and can put people at risk of losing jobs and housing—in turn often becomes the gateway to

---

[7] The County similarly reported in 2016 that roughly 17.5% of all emergency room admissions to John George came from "high utilizers": people with more than four emergency admissions in the previous 12 months.

8

SER-101

segregating people for longer periods in the sub-acute facilities.  John George directly refers people needing longer-term services to the sub-acute facilities.  Between 2012 and 2017, more than 10% of admissions to John George's inpatient units resulted in a placement in a sub-acute facility within 14 days of discharge.  The County itself plays a direct role in institutional placements through its monthly Acute Care Coordination Committee meeting.  In this meeting, representatives from John George, the sub-acute facilities, and community providers discuss individuals who have cycled through hospitals, and sometimes also jail, in an attempt to place these individuals in the sub-acute facilities or, for those who have been lingering at the sub-acute facilities, into a board and care home.  However, few are connected with intensive community services through this process.

     As discussed in Section IV.B–D, our investigation determined that nearly all of the people who are placed in the sub-acute facilities or in John George's inpatient units could have avoided or spent less time in these psychiatric institutions with appropriate community-based services, and few would oppose such services, rendering Alameda County's reliance upon psychiatric institutions unnecessary.  But because Alameda County does not make appropriate community-based services available in sufficient capacity, people have little choice but to enter these psychiatric institutions to get the help they need.

     People with mental health disabilities incarcerated at the Santa Rita Jail face further serious risk of institutionalization in a psychiatric facility upon their release from the Jail.  Some people are sent directly to John George upon release from the Jail, and others make their way to the hospital soon after, because of a lack of community-based mental health services or because the County fails to connect them to those services that do exist.  Between 2012 and 2017, there were more than 4200 instances when a person released from Santa Rita Jail was seen at John George PES within just 30 days.  Of the people who spent time in John George's inpatient unit between 2012 and 2017, 41% had previously been incarcerated in Santa Rita Jail.  Of those with four or more inpatient stays at John George, 53% had spent time in the Jail.

     As discussed further in Sections V–VII, Santa Rita Jail denies prisoners adequate mental health treatment, isolates people with serious mental illness for prolonged periods in restrictive housing, and severely limits access to pre-release programming and transition services for this population.  These conditions contribute to people with serious mental illness being sent repeatedly for brief stints to John George while incarcerated and often leads to institutionalization upon release.  The inadequate discharge planning the County provides to prisoners with mental health disabilities at the Jail compounds this problem.  The County's discharge and treatment planning often fails to anticipate a person's needs in advance of release and almost never includes goals for community stabilization.  According to Jail mental health staff and our expert's review, prisoners commonly receive, at most, bridge medications and a list of resources.  Although Alameda County BHCS is responsible for mental health treatment at the Jail, the County does not ensure that community providers meet with prisoners before their release to coordinate treatment.  Because of these practices, people being released from jail, a time when they are particularly vulnerable, often do not successfully connect with community services.  A lack of successful connection to community services leads to housing instability and

9

SER-102

a lack of effective mental health treatment. This results in an increased risk of additional mental health crisis and eventual placement at John George and the sub-acute facilities.

Alameda County further places people at serious risk of psychiatric institutionalization due to its lack of community-based behavioral health crisis services. Instead of providing community crisis services by trained mental health clinicians, such as mobile crisis services and crisis residential services, that are effective in preventing unnecessary hospitalizations, the County relies heavily on law enforcement to respond to crises. The Alameda County Board of Supervisors' Mental Health Board observed in 2015 that "Police officers in the field responding to individuals with mental illness have few options other than bringing them to Santa Rita or John George. Although they may have received Crisis Intervention Training, without adequate diversion resources, police officers must frequently use John George and/or Santa Rita Jail as their only option."[8] We heard from multiple stakeholders, including those who had themselves experienced a mental health crisis, that it is typically law enforcement who respond to psychiatric emergencies and that there is a degree of chance with respect to whether one is taken to jail or the hospital. Multiple reports have found that the lack of access to community-based mental health services—including crisis services, diversion mechanisms, long-term community supports, and re-entry discharge planning—may all contribute to people with mental health disabilities encountering law enforcement and ultimately becoming hospitalized or incarcerated in Santa Rita Jail. Our experts' findings and national studies also support this conclusion.[9]

The death of A.A.[10] illustrates the problems that can occur due to the lack of community-based mental health services, including crisis services. A.A. was experiencing a mental health crisis in early June 2019. After a brief psychiatric hospitalization, nurses told his parents on discharge to call 911 and ask for police if he needed further help, and that he would be brought back in for mental health treatment. Days later, A.A. was still in crisis, and his parents called 911, asking for help. A.A.'s father told the police who responded that A.A. was not a danger and that he needed to be taken for mental health treatment. This would have been an appropriate situation in which to bring in community-based crisis services or call a mobile crisis team, but it appears that this did not occur. Instead, police arrested A.A., and, as described in more detail below, he was taken to Santa Rita Jail, where he sustained severe injuries and later died. A.A.'s parents have publicly expressed deep regrets that they ever sought assistance from police for their son.[11]

Another person's experience similarly illustrates how the lack of effective community-based services and a history of repeated institutionalization can also result in engagement with the criminal justice system. B.B. was well known to BHCS—she had more than 100 "episodes"

---

[8] ALAMEDA CNTY. MENTAL HEALTH BD., ANNUAL REPORT TO THE ALAMEDA COUNTY BOARD OF SUPERVISORS, FISCAL YEAR 2014–2015 at 7 (2015), http://www.acbhcs.org/mhb/Resources/MHB_Annual_Report_2015.pdf.
[9] In fact, California law specifically permits pre-trial diversion to mental health treatment for individuals with mental illness where the mental illness played a significant factor in the commission of the charged offense, excluding certain violent and serious charges, CAL. PENAL CODE § 1001.36 (West 2020), but without community-based treatment options, this law may have little impact on diversion.
[10] To protect the identity of people, we use coded initials.
[11] Despite multiple requests, Alameda County did not provide records related to A.A.'s death.

10

SER-103

dating back to 2002. In 2016, without access to intensive community-based services, B.B. experienced a mental health crisis, attempted to admit herself to John George, and was ultimately arrested for trespassing after John George denied her admission without contacting a mobile crisis team or otherwise connecting her to services. B.B. was rearrested a few months later, but her mental health deteriorated and she was forensically admitted to a state psychiatric hospital for nearly two years before being released back to Santa Rita Jail in July 2019.

### B. People with Mental Health Disabilities in Alameda County Can Be Appropriately and Effectively Served in the Community

People with mental health disabilities who are institutionalized or at serious risk of institutionalization at John George or a sub-acute facility in Alameda County could avoid placement in psychiatric institutions with appropriate integrated, community-based services, if such services were available. Many established, evidence-based practices exist that are proven to support people with serious mental illness or other mental health disabilities in their own homes and community-based settings, and to reduce needless psychiatric institutionalization. However, Alameda County has not appropriately implemented these practices, and services are in too short supply. It is the County's failure to provide evidence-based, community-based treatment, including crisis services and processes to divert people from psychiatric institutionalization, that results in and perpetuates the cycle of needless institutionalization described above.

### 1. People Cycling Through Psychiatric Institutions Are Appropriate for Community-Based Services

Most of the people who cycle in and out of John George and the sub-acute facilities in Alameda County could be provided appropriate mental health treatment in the community. At two points during the Department's investigation, our consultant, a national expert in the provision of community-based treatment to people with serious mental illness, conducted a review of people in John George's inpatient unit. Both times, our expert found that nearly all of the individuals there would have avoided hospitalization altogether or spent less time in the hospital had they been provided appropriate community-based treatment and received professionally adequate discharge planning to connect with those services.

People regularly stay longer than is needed at John George. On any given day at John George, a significant portion of the residents have been determined by John George professionals to be appropriate to leave but remain in the hospital because they are awaiting a placement elsewhere. On July 31, 2019, 24 of the 69 inpatient beds—or 35%—were occupied by individuals whom John George had determined no longer met criteria for an inpatient stay. In the year between August 2018 and July 2019, 123 people spent two weeks or more institutionalized at John George after they were cleared for discharge, simply because there was nowhere for them to go. Instead, they were held at John George, waiting for an opening in an intensive community-based mental health program, or for space at one of the sub-acute facilities—discussed below. John George staff estimated that in a given week, about 10 of their inpatient residents who are ready for discharge are of enough concern to be discussed at the

11

weekly Acute Care Coordination Committee meeting in order to locate a community placement; each week, the resources are found to support only about half of them. Staff reported that in some cases, people have waited in the inpatient unit for months for a placement, simply because there were no community resources available to support them outside of the hospital. Similarly, the County has estimated that 75% of people placed on involuntary holds at John George do not even meet medical necessity to be there. This is likely because, as one John George administrator put it, the "dearth of resources" in the community lands far too many people in their institution, again and again.

People living in the sub-acute facilities could also largely live in their own homes and communities with appropriate services. Facility staff themselves stated that many of the people living at these facilities could live in the community with appropriate services, and this opinion was echoed by stakeholders in various roles in the County. Our expert agreed that Alameda County overly relies on the sub-acute facilities instead of community-based treatment. Our expert reviewed a sample of people at one sub-acute facility, Villa Fairmont, and concluded that, like those at John George, nearly all would have avoided admission or could have spent less time in the facility, had they been provided appropriate community-based treatment. Yet many are stuck, waiting for slots in community service programs that simply do not exist or that are inadequate to meet their needs.

Our expert found that people served by BHCS are often at serious risk of psychiatric institutionalization because of a lack of available community supports. Having interviewed individuals in and at risk of entry to many of the psychiatric institutions in Alameda County, our expert confirmed that the people he met in Alameda County's institutions were no different from people he had served or observed receiving services successfully in their own homes around the country.

2.  <u>Alameda County Fails to Provide Adequate Community-Based Services that Could Prevent Needless Psychiatric Institutionalization</u>

It is well-established that an appropriate array of evidence-based services can enable people with serious mental illness or other mental health disabilities to avoid psychiatric institutionalization and live safely in integrated, community-based settings. The County has implemented some critical community-based services, but it has not fully funded them to ensure they are available in sufficient capacity, adequate intensity, and with fidelity to evidence-based practices so as to prevent individuals from cycling through psychiatric institutional stays.

Community-based mental health services and practices are necessary to enable individuals with mental health disabilities to live in the community. These are critical, evidence-based practices that can be individually tailored to the needs of each person and minimize costly, unnecessary, and repeated psychiatric institutionalization. These services are appropriate for Alameda County residents who have serious mental illness and are currently in or at serious risk of entering psychiatric institutions and, if fully developed in Alameda County, would prevent unnecessary institutionalization. These services are also proven to reduce arrests and incarceration and could thus further help to break the cycle of unnecessary psychiatric

12

SER-105

institutionalization and incarceration. These services or their equivalents are provided in John George and the sub-acute facilities, but do not currently exist in sufficient supply or intensity in the community. These services include the following:

- **Crisis Services:** Community-based crisis supports are a crucial component of a system that prevents needless psychiatric institutionalization. These services include crisis hotlines, mobile crisis teams, crisis apartments, and walk-in crisis centers. For example, mobile crisis is an evidence-based intervention that is available 24 hours a day to respond rapidly to people experiencing a mental health crisis at their homes or at whatever location they may be experiencing the crisis. These services are proven to decrease psychiatric hospitalizations, arrest rates, and incarceration. However, as of our last visit to Alameda County, there were just two mobile crisis programs, which do not operate at all times. Instead, law enforcement officers alone typically handle mental health crisis calls.[12] In our expert's review of individuals at John George and Villa Fairmont, he found that none had had access to the kind of mobile crisis services that could have diverted them from admission. County leadership has recognized the important role of mobile crisis and the gaps in this service in Alameda County and is in the process of expanding mobile crisis response. At the time of our last visit, the County described plans to add six new mobile crisis teams, one of which would include an EMT to conduct medical clearance so that individuals in crisis could be taken to a location other than John George or Santa Rita Jail, expanding the options that currently are used by existing mobile crisis teams. This is among the most promising plans for improvement in the County. However, even if the County creates all of the crisis teams as planned, it will not have mobile crisis services available 24 hours a day, mobile crisis response will not be available in all areas of the County, and only one team will be able to conduct medical clearances.

    Similarly, crisis services should also include alternatives to hospitalization such as crisis residential programs or crisis apartments, which typically contain a few beds in a home-like environment with full-time staff. These programs are intended to allow people to stabilize in these settings and avoid going to the hospital. The County has a few crisis residential programs, but people typically come to those settings from an acute setting, typically John George, instead of using them to avoid hospitalization in the first place. This is counter to the purpose of having a crisis residential program and uses up beds that could otherwise be used as a diversion or alternative to hospitalization.[13]

---

[12] In 74% of the involuntary holds (also known as 5150 holds) conducted by Alameda County Sheriff's Office that we reviewed, the individual was neither threatening nor violent. In 88% of these incidents, no restraints were used. And this does not include mental health crisis calls that did not rise to the level of severity that resulted in an involuntary hold.

[13] In fact, the entire behavioral health system seems to be permeated by a step-down philosophy, requiring individuals to graduate out of more restrictive care to gradually less restrictive settings, which does not comport with the ADA's requirement that people receive community-based services when they are appropriate. Standards in the field today, which align with the requirements of the ADA, reject the step-down philosophy. Professional standards instead dictate that individuals are best supported in their own homes with intensive, appropriate community-based services.

13

SER-106

To be effective, community-based crisis services must also include and be paired with mechanisms specifically designed to divert people with mental health disabilities from psychiatric institutions and the criminal justice system, which are notably absent in Alameda County. For example, the County has acknowledged that law enforcement overutilizes involuntary holds at John George due to the lack of alternative crisis resources or a formal mechanism at initial detention to connect people with mental health disabilities to community-based services, which would reduce the serious risk of subsequent psychiatric institutionalization.

- **Full Service Partnerships:** Assertive Community Treatment, or California's model, called Full Service Partnerships, is designed to support service recipients with the highest mental health needs and most frequent hospitalizations to transition from institutions and live in the community. Full Service Partnerships provide a multidisciplinary team that is intended to help people stay in treatment, manage medication, address crises, secure and maintain housing and employment, and engage in their communities. Teams should be available 24 hours a day and be able to respond to crises and other needs on a flexible basis, including assisting in the coordination of services if a client enters or is at risk of entering an institutional setting. Both California and Alameda County have recognized that Full Service Partnerships reduce institutionalization, criminal justice involvement, and emergency room use, and community members in Alameda County have identified Full Service Partnerships as the most effective mental health service in the County. Alameda County administrators have acknowledged that the capacity is far from sufficient, although the County has not conducted an analysis of the actual need. One County administrator estimated the need to serve 4000 to 6000 people with the Full Service Partnership program. At the same time, Alameda County had funded capacity to serve only 850 adults with Full Service Partnerships and in practice serves fewer than 725 adults in a given month.[14] Alameda County also operates a forensic Full Service Partnership that is designed to engage people with a history of significant criminal justice involvement. Yet, based on documents provided by the County, of the 290 people whom the County has identified to be eligible for this program, just 17 appear to have been connected with that service. Evidence we reviewed indicates that the County fails to effectively connect people with needed Full Service Partnership services and that, once connected, such services are often not provided in an intensity or with the flexibility needed to address crises and provide appropriate supports.

- **Permanent Supported Housing:** Permanent supported housing is an evidence-based mental health service that serves individuals with disabilities and provides flexible supports including medical, behavioral health, and services to support sobriety. Permanent supported housing promotes mental health recovery by enabling individuals to maintain housing and avoid the inherent stress of housing instability; by helping service recipients achieve maximum independence, positive health benefits, and overall higher

---

[14] The County also offers another multidisciplinary team-based service, called Service Teams, which offers a lower-intensity of service and a higher client-to-staff ratio than Full Service Partnership teams.

14

quality of life; and by providing a stable place from which a person can engage with other services. It is a cost-effective service that is proven to reduce psychiatric institutionalization, as well as precursors to institutionalization including expensive hospitalizations, emergency room visits, incarceration, and, of course, homelessness. Alameda County BHCS acknowledges that there "is a direct link between housing and behavioral health."[15] However, Alameda County lacks sufficient supported housing capacity to meet the needs of individuals with mental health disabilities. In fiscal year 2017–2018, 10% of the people entering County programs for people with mental health disabilities—a total of 2702 unique individuals—were homeless.[16] This number has steadily increased in recent years. Similarly, approximately 39% of all homeless individuals in the County self-reported a mental health condition that year.[17] The County's contractor to coordinate homelessness issues explained that these and other data points show "the considerable overlap between chronic homelessness and serious mental illness." In 2018, Alameda County's contractor estimated that the County needed to create an additional 2800 "permanent supportive housing" units to meet the need for this service. In 2019, there was an 8000-person waitlist for the County's system to access housing services or subsidies, and only about a quarter of people with serious mental illness who attempt to join the waitlist are successful in even getting their names on the list. Unable to access this evidence-based service, many individuals go to board and care homes instead. Board and care homes provide some minimal care and supervision, but residents frequently lack access to needed services and meaningful community life; further, these facilities tend to be overcrowded and highly variable in quality.

- **Peer Support Services:** Peer support services are an evidence-based practice where trained and certified individuals or family members of individuals who have lived experience with mental health disabilities and receipt of mental health services provide supports. Peer supports are proven to help individuals with serious mental illness engage in treatment and to prevent or reduce hospitalization and incarceration. California's Council on Mentally Ill Offenders has explained that peer support services "clearly stood out . . . as one of the most impactful and desired resources to reduce incarceration among those with mental illness and substance use disorders."[18] Multiple groups in Alameda County have recommended expanding peer support services throughout the service system. Nevertheless, we heard from several stakeholders that peer support services remain in too short supply in Alameda County.

- **Supported Employment Services:** Supported employment is an evidence-based service that assists people with serious mental illness to obtain and maintain competitive employment. Supported employment supports people with disabilities to live integrated lives in their communities. Alameda County has recognized the importance of supported

---

[15] *Housing Service Office*, ALAMEDA CNTY. BEHAVIORAL HEALTH CARE SERV., http://www.acbhcs.org/housing-services (last visited Apr. 6, 2020).
[16] EVERYONEHOME, PLAN TO END HOMELESSNESS: ALAMEDA COUNTY, CA: 2018 STRATEGIC UPDATE at 31 (2018), https://everyonehome.org/wp-content/uploads/2018/12/EveryOne-Home-Strategic-Update-Report-Final.pdf.
[17] *Id.*
[18] COUNCIL ON MENTALLY ILL OFFENDERS, 15TH ANNUAL REPORT at 17 (2016).

15

employment to support recovery for people with serious mental illness, but fewer than 530 people with serious mental illness received the County's supported employment services in fiscal year 2019.

- **Services for People with Co-occurring Diagnoses:** Community-based services to support people with serious mental illness who also have co-occurring diagnoses, such as intellectual disability, substance use disorder, or chronic illnesses, are important to help such individuals avoid placement in long-term institutional settings. John George staff explained that in recent years they have seen an increase in people with co-occurring intellectual and developmental disabilities, people with co-occurring substance use disorders, and older adults who may have age-related disabilities—all of whom have begun utilizing John George's acute services more because of a lack of services in the community to support their needs. Although there are evidence-based approaches that have proven to decrease hospital use for most people—for example, integrated dual diagnosis treatment—these services are largely unavailable in Alameda County.

    3. <u>Alameda County Fails to Identify and Connect People with the Community-Based Services Necessary to Avoid Needless Institutionalization</u>

In order to avoid needless cycling through institutions, it is crucial that individuals with mental health disabilities have a way to access community-based mental health services. However, Alameda County does not utilize available opportunities to identify people—whether in the community or in institutional settings—who need to be connected to community-based services and to connect them to those services. In particular, Alameda County does not provide adequate discharge planning and transition services to individuals who are institutionalized in John George and the sub-acute facilities in order to connect them to community-based services.[19] In a recent review of treatment plans at John George, our expert found that not one reflected professionally adequate discharge planning. Discharge planning at John George is often not informed by important clinical and practical considerations for the person, and there is inadequate communication between treatment providers. Treatment plans also fail to promote transition to the most integrated setting for the person or to anticipate key goals, opportunities, and important factors for transition.

In addition, the County fails to adequately connect people to the community-based services that could help them avoid institutionalization. For example, as noted above, while the County operates a forensic Full Service Partnership designed to engage people with intensive needs who have a history of significant criminal justice involvement, and has identified 290 people eligible for the program, as of September 2019, fewer than 20 of those individuals had been connected with that service. Similarly, the County has identified the individuals who utilize the most mental health services, as measured by the top 3% of its mental health spending. However, fewer than one-third of those individuals were connected to Full Service Partnerships

---

[19] And, as discussed above, Alameda County does not adequately provide for the discharge and transition planning of prisoners who will be released from Santa Rita Jail. This further places people with mental health disabilities at serious risk of psychiatric institutionalization upon release.

16

SER-109

as of September 2019, and as of that time, the County did not track people who were eligible for those services other than those eligible for forensic Full Service Partnerships, in order to facilitate these linkages. Furthermore, of the top ten mental health service utilizers, all ten were hospitalized during the year, and nine of the ten were in sub-acute facilities. Yet, only three of those ten individuals received Full Service Partnership services during that 12-month period, and only one was placed on a service team, all for seemingly brief periods. While the County has started the process to identify people who need more intensive services, it has failed to take the necessary steps to actually connect them.

The County's failure to successfully connect people to services is hampered by lack of community-based options. This is particularly true for people with co-occurring diagnoses, such as intellectual and developmental disabilities, substance use disorders, and physical health needs. Many people are discharged without adequate supports and services, resulting in frequent readmissions to John George or sub-acute facilities or contacts with the criminal justice system. One person who had received treatment several times at John George described discharge planning there as: "Here's a bus pass, now get the hell out." Others described similar experiences with discharge from John George.

John George staff confirmed many of these issues. Staff report that there are few good options when they discharge patients to the community. They told us that at times, people are discharged to shelters or other forms of homelessness. Without housing, people rapidly lose connection with providers or with transition staff, so that the only way to get services is to return again to John George. Additionally, staff reported challenges with informing County behavioral health services when their clients were at the hospital and a regular failure of service providers to meet with their clients when at John George. John George leadership admitted that being linked to community services upon discharge is the single highest correlate with success in the community.

### C. Most People with Mental Health Disabilities in Psychiatric Facilities in Alameda County Do Not Oppose Community-Based Services

Most people with mental health disabilities in Alameda County psychiatric institutions do not oppose receiving community-based services. The majority of people who find themselves at John George or the sub-acute facilities are there involuntarily, or because they had no other way to get services they needed. In fact, Alameda County has the highest rate of involuntary holds of adults in the state—a rate that is three-and-a-half times the statewide average. In his assessment of individuals at John George and Villa Fairmont, our expert found that nearly all individuals reviewed or their guardians would very likely choose to live in the community if they were fully informed of and had access to appropriate community-based services. He found in his most recent review that there was no recorded evidence, for any individual reviewed, that the person or their guardian would oppose receiving services in the community. For many individuals and their guardians, emergency room or inpatient hospitalization, or in some cases incarceration, appeared to be the only option to get help. But, in our expert's view, when there are viable options for receiving treatment at home and in integrated settings, very few people or their guardians would choose options that restrict their freedom and segregate them.

17

Our interviews with individuals at John George and the sub-acute facilities confirmed this conclusion. Many told us of their desire to leave, or expressed interest in receiving services in the community. One man we met at John George, who had also been to Santa Rita Jail four or five times and was otherwise homeless as of the time of our interview, explained that he would like a program that would help him transition out of John George and find a place to live, and not just be discharged to the street. Another man at John George told us he "wanted to be anywhere else," but that after he left John George the last time, he relapsed and needed help, and so he returned. A woman we met who was living at a sub-acute facility told us she wanted to go home, and maybe go to college, but knew she would need support to do so. "Who is going to support me and be with me?" she questioned. Another man at a sub-acute facility told us that he wanted to leave as soon as possible, but felt that nobody was helping him with this. Others echoed these sentiments. A staff member at one of the sub-acute facilities told us that residents who want to leave the sub-acute facility sometimes "act up" in order to be sent to John George or to jail, because they mistakenly believe that they would subsequently be released into the community after their stay in the hospital or jail.

### D. Alameda County Can Make Reasonable Modifications to Prevent Unnecessary Psychiatric Institutionalization

Alameda County can reasonably modify its mental health service system to provide home- and community-based services to prevent unnecessary psychiatric institutionalization. The County already makes available a range of services that can support people with mental health disabilities in their own homes. As discussed above, community-based services, diversion programs, and professionally-adequate discharge planning are proven to be effective in preventing unnecessary psychiatric institutionalization. The County has taken some positive steps to address unnecessary psychiatric institutionalization, including, as of our last visit, the recent funding of 100 Full Service Partnership slots for people with a history of forensic involvement (although providers have had difficulty staffing these slots); the proposal to pilot 100 additional Full Service Partnership slots, combined with housing subsidies, for individuals who are homeless and have co-occurring physical health or substance use disorders; and the plan to significantly expand mobile crisis services. The County also conducts some limited in-reach to John George and Santa Rita Jail with the goal of helping people to connect with services upon discharge. While the supply of these services and scope of existing programs remain insufficient to meet the need, the County can modify and expand these services to serve all individuals who are, or are at serious risk of becoming, unnecessarily institutionalized; ensure that each person receives an appropriate intensity and frequency of services to meet their needs; and eliminate barriers that lead to unnecessary psychiatric institutionalization.

In addition, the County already conducted a Sequential Intercept Mapping process in 2017 and 2019 in which it identified the potential "intercepts," such as arrest, where individuals with mental health disabilities come into contact with the criminal justice system, but can instead be identified and connected to community-based services. Alameda County has identified the resources and gaps that exist at these intercepts and is well-positioned to develop the needed mechanisms to use these intercepts to connect people who are at serious risk of psychiatric institutionalization with services, but has not done so yet.

18

SER-111

Further, County leadership has acknowledged, and studies have repeatedly shown, that providing community-based services for people with serious mental illness is cost effective. Alameda County currently spends disproportionately on institutional services as compared to community-based services. For example, based on information provided by the County, annually each individual in the County's top 3% of mental health spending utilizers uses services costing an average of $120,410 as of 2019. This group is largely made up of people who spend the majority of their time in a sub-acute facility or have four or more hospitalizations and accounts for 32% of all system costs. However, few of the people in this group received intensive community services, which are known to cost significantly less.[20] Even including costs for housing supports, serving these individuals in the community could dramatically reduce the costs for the County.

Alameda County can also maximize federal and state funding opportunities to develop community-based services. For example, most hospital and sub-acute stays are funded solely by County funds, while community-based services are typically eligible for federal Medicaid match dollars. Moreover, California provides a significant amount of funding through the Mental Health Services Act funds, which can be used for critical services such as Full Service Partnerships, permanent supported housing, and diversion programs. Yet Alameda County in recent years has left a significant amount of its MHSA funds unspent, and these are at risk of reverting to the state.

The lack of community-based services drives individuals with serious mental illness into costly psychiatric facilities, but it also can lead to costly incarceration. Alameda County spent $177.2 million in fiscal year 2016–2017 on Santa Rita Jail, not including mental health services, with around 25% of its population having serious mental illness. The County has recognized both its significant reliance on the Jail for people with mental illness and that appropriate mental health treatment could address this problem. The Alameda County Board of Supervisors' Mental Health Board recognized in 2015 that "Santa Rita Jail has become a warehouse for people with mental illness."[21] The Board further explained that "since there is nowhere to place [individuals with mental health disabilities], they languish in jail, often isolated in jail cells. We need to develop a system so that this population can be diverted out of the criminal justice system and into treatment."[22] More recent County and external reports have echoed these conclusions. As discussed above, studies have shown that evidence-based community mental health services have been effective at reducing arrest rates and incarceration in California and across the country. For example, a 2010 study in California found that the probability of arrest dropped by 56% for

---

[20] *See, e.g.*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMIN., CRISIS SERVICES: EFFECTIVENESS, COST-EFFECTIVENESS, AND FUNDING STRATEGIES (2014); SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMIN., ASSERTIVE COMMUNITY TREATMENT: THE EVIDENCE (2008); SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMIN., PERMANENT SUPPORTIVE HOUSING: THE EVIDENCE (2010); NATIONAL COUNCIL ON DISABILITY, HOME AND COMMUNITY-BASED SERVICES: CREATING SYSTEMS FOR SUCCESS AT HOME, AT WORK AND IN THE COMMUNITY (2015), https://ncd.gov/publications/2015/02242015.

[21] ALAMEDA CNTY. MENTAL HEALTH BD., ANNUAL REPORT TO THE ALAMEDA COUNTY BOARD OF SUPERVISORS, FISCAL YEAR 2014–2015 at 7 (2015), http://www.acbhcs.org/mhb/Resources/MHB_Annual_Report_2015.pdf.

[22] *Id.*

19

SER-112

individuals who were involved in Full Service Partnerships.[23]  Thus, in implementing community-based services to prevent psychiatric institutionalization, the County will also likely reduce incarceration and, in the process, reduce its expenditures for incarceration.  The Mental Health Board's Criminal Justice Subcommittee has reported to the Board of Supervisors that, according to national data, it costs two to three times more for a person with serious mental illness to be incarcerated compared to being housed and receiving treatment in the community, and that mental health programs that included housing led to fewer arrests and shorter jail stays among people with mental illness.  Making the needed modifications may thus also result in a smaller population of prisoners with mental health needs at Santa Rita Jail, which could free up funds to support community-based mental health services and potentially ease the Jail's implementation of remedies to address the conditions we identify in Sections V–VII.

Alameda County government has long been on notice of its needless institutionalization of people with serious mental illness.  In 2015, the Alameda County Board of Supervisors' Mental Health Board wrote of the "dire need" for intensive outpatient services to address the overcrowding and high readmission rates at John George, explaining that "John George remains the single most utilized point of entry into the County mental health care system."[24]  The same report concluded that "[f]ar too many Alameda County residents with mental illness cycle in and out of Santa Rita Jail and John George Psychiatric Hospital," and called for a "comprehensive, integrated system which offers a continuum of care."[25]  In a January 2016 presentation to the Board of Supervisors' Health Committee, BHCS identified several concerns around the lack of coordinated mental health and substance use services, insufficient service coordination across settings, and a lack of 24/7 crisis service coverage, resulting in psychiatric emergency room admissions.  And several other County reports have similarly acknowledged these problems and the needed solutions.

As described at several points above, the County has begun to develop many of the needed services and programs: it offers too-limited mobile crisis services, crisis residential services, Full Service Partnership teams, peer support services, permanent supported housing, supported employment, and substance use disorder services, as described in Section IV.B.2.  It has the framework to divert people from institutions and conduct discharge planning in institutions to help people access these community services.  Yet the scope and supply of each of these services and programs falls short of the need, in many cases as acknowledged by the County, instead causing the County to rely on institutional services.  Though the County could use existing and available resources to rebalance its service system, and although County officials have expressed goals of doing so, the County must complete this work to ensure an adequate array and capacity of community-based services, including crisis services, diversion programs, and appropriate discharge planning, in order to fulfill County residents' right to

---

[23] Nicholas C. Petris Center on Health Care Markets and Consumer Welfare School of Public Health, University of California, Berkeley, Evidence on the Effectiveness of Full Service Partnership Programs in California's Public Mental Health System (2010), https://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.172.8620&rep=rep1&type=pdf.
[24] Alameda Cnty. Mental Health Bd., Annual Report to the Alameda County Board of Supervisors, Fiscal Year 2014–2015 at 6 (2015), http://www.acbhcs.org/mhb/Resources/MHB_Annual_Report_2015.pdf.
[25] Id. at 7.

20

SER-113

receive services in the most integrated setting.  The minimum remedial measures necessary to achieve this goal are described in Section VIII.

## V. MENTAL HEALTH CARE AT SANTA RITA JAIL IS INADEQUATE IN VIOLATION OF THE CONSTITUTIONAL RIGHTS OF PRISONERS WITH SERIOUS MENTAL HEALTH NEEDS

After making several trips to the Santa Rita Jail with our experts; speaking with Jail management, security staff, mental health staff, and hundreds of prisoners; and reviewing thousands of pages of documents, including numerous mental health and other records, the Department has reasonable cause to believe that the Jail fails to provide prisoners with serious mental health needs with adequate mental health care, in violation of their Eighth and Fourteenth Amendment rights.

As discussed above in Section III, Alameda County funds the Jail, which is administered and controlled by the Alameda County Sheriff's Office.  The Jail has the capacity to hold approximately 4000 prisoners.  During most of the period encompassed by our investigation, however, the actual prisoner count has been closer to 2400.[26]  The Jail holds both pre-trial detainees and convicted prisoners.  Approximately 85% of the Jail's population is pre-trial detainees.

While the population of the Jail is, by its very nature, constantly in flux, it includes a large number of individuals with serious mental health needs.  Although the Jail does not specifically categorize prisoners as having "serious mental illness," Jail representatives have stated that approximately 40% of its population is on the mental health caseload.[27]  And in our interviews with the Jail's chief psychiatrist and other key mental health staff, they estimated that approximately 20–25% of the population likely has a serious mental illness.  For those in various specialized housing units, the numbers are likely even higher.  According to the Jail's chief psychiatrist, for example, approximately 50% of the prisoners in the administrative segregation units[28]—the most restrictive in the Jail, other than short-term "safety cells" used up to 72 hours for actively suicidal prisoners—have a serious mental illness.  Our observations of prisoners we

---

[26] While the population at the Jail had declined to approximately 1800 prisoners in May 2020 due to changes to booking and release procedures that were instituted in response to the COVID-19 pandemic, the population has since rebounded to 2200 prisoners as of April 5, 2021. *See Covid-19 Update*, ALAMEDA CNTY. SHERIFF'S OFFICE, https://www.alamedacountysheriff.org/admin_covid19.php (visited June 19, 2020; visited April 6, 2021).

[27] This estimate may undercount the number of prisoners with mental health needs.  A March 25, 2021, report by the California State Auditor found that the Jail fails to "conduct a mental health screening of every inmate, as state regulations require" and instead "only assesses those inmates who exhibit erratic behaviors or disclose a history of mental illness to jail staff."  The report explained that the Jail therefore lacks "sufficient data regarding whether inmates have mental illnesses," information which is "critical" to "minimize the risk of violence, injury, or death."  CALIFORNIA STATE AUDITOR REPORT 2020-102, PUBLIC SAFETY REALIGNMENT REPORT at 22-25 (March 2021).

[28] During the course of our investigation, the Jail changed its nomenclature in relation to these units, so that it now uses the term "Administrative Separation," or "Ad Sep," instead of "Administrative Segregation," or "Ad Seg."  For the sake of consistency, we refer to these units as "administrative segregation."

SER-114

interviewed in administrative segregation suggested that the chief psychiatrist's estimate was accurate, if not perhaps an undercount. As discussed in other sections of this Notice, many of the individuals with serious mental illness at the Jail cycle repeatedly in and out of the Jail, as well as in and out of John George and other institutional settings.

There is one primary unit at the Jail—Unit 9—for male prisoners with mental health needs with any security classification. While Jail officials refer to Unit 9 as a mental health unit, it largely functions not as a therapeutic setting but rather, in all but name, as a restrictive housing unit, because these prisoners are confined to their cells for the vast majority of the day, alone or with another prisoner.[29] Within Unit 9 are different pods, based on security classification. Most prisoners in these pods are placed in two-person cells and are locked in those cells for the vast majority of their waking hours. Jail records show that, depending on their pod, prisoners were limited to less than 1.5 to three hours out of their cells each day. And prisoners on most pods received yard time outdoors for as little as one hour per week, with many receiving no yard time.

Instead of going to the clinic for mental health care, or to a classroom for educational or other programming, prisoners in Unit 9 remain on the Unit. They have access to few group programs on the Unit, and are prohibited from attending the many other programs available to general population prisoners. Mental health staff meet with the prisoners on the Unit, at large tables in the day-room-type area. Prisoners on Unit 9 must wear different color uniforms from the rest of the population, which not only discloses sensitive health information, because staff and other prisoners know that the uniform signifies a mental health diagnosis, but also serves to stigmatize them and marginalize them.

Not all prisoners with serious mental health needs are housed on Unit 9. Women prisoners are housed in a different area of the facility, and there are also men with serious mental health needs housed throughout the facility. Significantly, a number of them are in administrative segregation, which is another form of restrictive housing. Prisoners in administrative segregation are, by policy, permitted at most only five hours outside of their cells per week. Our review of a sample of records revealed many receiving only one or two hours outside of their cells on given weeks, a fact repeatedly mentioned by prisoners in administrative segregation in our conversations with them. When prisoners are permitted to leave their cells, they do so alone—with no opportunity to interact with others—and are still confined to the common indoor pod space. They may not go outdoors.

---

[29] Restrictive housing, elsewhere sometimes referred to as solitary confinement, segregation, or isolation, is any type of detention that involves three basic elements: removal from the general prisoner population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another prisoner; and the inability to leave the room or cell for the vast majority of the day. *Porter v. Clarke*, 290 F. Supp. 3d 518, 528 (E.D. Va. 2018) (citing U.S. DEP'T OF JUSTICE, REPORT AND RECOMMENDATIONS CONCERNING THE USE OF RESTRICTIVE HOUSING at 3 (2016)); *see also, e.g.*, *Wilkinson v. Austin*, 545 U.S. 209, 214, 223–24 (2005) (describing restrictive housing as limiting human contact for 23 hours per day); *Sweet v. Tillery v. Owens*, 907 F.2d 418, 422 (3d Cir. 1990) (describing restrictive housing as being limited to a cell for 21 to 22 hours per day); *Sweet v. S.C. Dep't of Corr.*, 529 F.2d 854, 867 (4th Cir. 1975) (Butzner, J., concurring) (categorizing as restrictive housing being alone in a cell for 24 hours per day, save for two, one-hour periods a week for exercise and a shower).

22

SER-115

The Eighth Amendment's prohibition against cruel and unusual punishment requires jails to provide prisoners with adequate mental health care. *See Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) ("[T]he requirements for mental health care are the same as those for physical health care needs."); *see also Brown v. Plata*, 563 U.S. 493, 503 (2011) (prisoners "with serious mental illness" lacked access to adequate mental health care). The protections afforded pre-trial detainees under the Fourteenth Amendment are at least as great as a convicted prisoner's Eighth Amendment rights. *See Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187–88 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). While a pre-trial detainee may be afforded greater protections, we have conducted our analysis under the Eighth Amendment standard, to which all prisoners at the Jail are at least entitled, because the populations are mixed at the Jail.

The rights of any prisoner under the Eighth Amendment are violated when "officials remain deliberately indifferent to their serious medical needs." *Id.* at 1187 (internal quotation marks omitted). The analysis examines if inadequate medical or mental health care creates a "substantial risk of serious harm" to prisoners, incorporating the possibility of future harm as well as present harm. *See id.* at 1188 (applying "substantial risk of serious harm" language in the Eighth Amendment medical care context); s*ee also Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("That the Eighth Amendment protects against future harm to prisoners is not a novel proposition.").

The existence of serious systematic deficiencies can demonstrate that jail officials are deliberately indifferent to prisoners' medical needs, in violation of the Constitution. *See Madrid v. Gomez*, 889 F. Supp. 1146, 1256 (N.D. Cal. 1995) ("[C]ourts have traditionally held that deliberate indifference can be shown by proving either a pattern of negligent acts or serious systemic deficiencies in the prison's health care program."); *Casey v. Lewis*, 834 F. Supp. 1477, 1543 (D. Ariz. 1993) ("In cases in which the system's constitutionality is at issue, deliberate indifference to the serious medical needs of prisoners may also be 'evidenced by repeated examples of negligent acts' . . . or by 'proving there are such systemic and gross deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care.'") (internal citation omitted). Furthermore, a system-wide policy or practice that leads to a substantial risk of serious harm may be considered holistically to demonstrate a constitutional violation. *See Brown*, 563 U.S. at 505 n.3 (noting that in assertion of system-wide deficiencies in medical and mental health care, there was no need to consider whether specific instances violate the Constitution, because the state of medical and mental health care "taken as a whole" created a constitutional violation).

## A. Many Prisoners at the Jail Have Serious Mental Health Needs, Requiring Treatment

Prisoners with serious mental health needs require treatment in order to ensure that their illnesses are not exacerbated. *See Madrid*, 889 F. Supp. at 1205–06 ("For inmates with serious or painful symptoms, delays lasting days or even weeks can cause unnecessary suffering, exacerbate illness, and have life-threatening medical consequences."). As acknowledged by Jail staff, at least 20–25% of prisoners in the Jail have serious mental illness. By not adequately

23

addressing these prisoners' mental health needs, the Jail places them at significant risk of harm. At least in part as a result of the Jail's failure to address their needs, and as described in more detail below, these prisoners' mental health often deteriorates; they may engage in self-harm, and many are transferred to John George for acute mental health care. Many former prisoners are admitted to John George or other psychiatric institutions, without ever receiving adequate mental health treatment that could avert these admissions and break this pattern of cycling repeatedly into segregated psychiatric institutions. Of the charts our expert reviewed, over 20% showed that the prisoner had to be transferred to John George while in the Jail, and many more showed stays at John George either prior to booking or after release. Of 21 prisoners known to have died in the Jail or from injuries or other causes sustained in the Jail between January 12, 2017, when we opened our investigation and 2020, at least 13 either had apparent indicators of serious mental illness or died due to suicide.

### B. Prisoners with Serious Mental Health Needs Are Subject to a Substantial Risk of Serious Harm as a Result of Inadequate Mental Health Care

The Jail's inadequate mental health care places prisoners with serious mental health needs at substantial risk of harm. The Jail's mental health program is inadequate because it fails to provide essential components that have been identified by courts as being minimally necessary for such a program, including adequate psychotherapy and individualized treatment plans that include close supervision of the prisoner. *See, e.g.*, *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995); *see also Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1188 (M.D. Ala. 2017); *Madrid*, 889 F. Supp. at 1256–58; *Balla v. Idaho State Bd. of Corr.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984); *Ruiz v. Estelle*, 503 F. Supp. 1265, 1339 (S.D. Tex. 1980), *aff'd in part and rev'd in part on other grounds*, 679 F.2d 1115 (5th Cir. 1982). While a denial of any one of these factors alone may not necessarily amount to a constitutional violation, courts have examined these factors together to evaluate the constitutional adequacy of a correctional facility's mental health program.

### 1. Prisoners with Serious Mental Health Needs Are Subject to Harm Because of a Lack of Individualized Treatment, Including Inadequate Psychotherapy and Programming

The failure to treat mental illness can lead to a substantial risk of serious harm, including decompensation and suicidal ideation, constituting a serious medical need under the Eighth Amendment. *See Conn v. City of Reno*, 572 F.3d 1047, 1054–56 (9th Cir. 2009), *judgment vacated on other grounds by Connick v. Thompson*, 563 U.S. 51 (2011); *Madrid*, 889 F. Supp. at 1222. Courts have found mental health care insufficient when use of psychotropic medications supplants the use of mental health therapy. *See, e.g.*, *Braggs*, 257 F. Supp. 3d at 1188 ("The 'basic' mental-health care that States must provide if needed by a prisoner includes not only medication but also psychotherapeutic treatment.") (citation omitted); *Balla*, 595 F. Supp. at 1577 ("[P]rescription of [psychotropic] drugs cannot supplant the necessity of psychiatric counseling."). Without therapy and programs that might, for example, help them learn cognitive or emotional skills, plan for recovery from substance use disorder, and make healthy life choices,

24

SER-117

prisoners with serious mental health needs are at risk of deterioration and eventual re-institutionalization upon their release from incarceration.

The Jail, however, provides little to no individualized treatment, including psychotherapy, to prisoners with serious mental health needs. Instead, mental health care on Unit 9—the unit specifically designated for people with mental health needs—is generally limited to medication administration, screenings for suicidal ideation, and brief conversations with clinicians. Our expert found these conversations to be insufficiently frequent, as well as too brief. In addition, these conversations are usually not held in therapeutic environments, but rather "cell side," or in day rooms within earshot of other prisoners and of security staff. As the Alameda County Sheriff's Office itself has previously acknowledged: "For those housed in high security units, the vast majority of these meetings [for therapy or counseling] take place in the dining area of the housing unit, providing little to no privacy, in an environment not designed for this type of activity."[30] Prisoners are often reluctant to disclose sensitive information necessary to treatment where that information can easily be overheard by staff and other inmates. "[C]ell-front check-ins are insufficient as counseling and do not constitute actual mental-health treatment," as they fail to provide a therapeutic environment. *Braggs*, 257 F. Supp. 3d at 1210; *see also Robinson v. Purcell*, No. 2:14-CV-0790, 2019 WL 1330874, at *6 (E.D. Cal. Mar. 25, 2019) (finding "cell-door consultations posed risks to plaintiff's mental health" because of the need to speak softly for privacy and the impediment plaintiff faced to "speak[ing] freely" due to the "non-confidential nature of these visits"). Prisoners receiving cell-side visits are often reluctant to speak freely, and therefore do not receive the treatment they need, and are thus at risk of further harm and increased risk of poor outcomes such as self-harm, according to our expert. During their brief conversations, clinicians generally encourage prisoners to take medication, rather than utilizing any therapeutic techniques. Further, the Jail provides no group therapy (only a sole educational class) to prisoners on Unit 9. Jail clinicians often are unable to provide even a minimally adequate level of care to the large number of prisoners who need it, resulting in serious harm, including suicide. *See Conn*, 591 F.3d at 1095 ("A heightened suicide risk or an attempted suicide is a serious medical need."). One of the most critical components of a minimally adequate mental health treatment program is the "identification, treatment, and supervision of inmates with suicidal tendencies." *Ruiz*, 503 F. Supp. at 1339. Suicide watches at the Jail—known as "IOL status" (referring to an intensive observation log)—feature unduly harsh conditions, including a prohibition on access to socks, underwear, hygiene products, sheets, reading material, and the commissary. Such punitive conditions are known to discourage prisoners from reporting suicidality.

From 2015 through 2019, there were at least 14 suicides in the Jail, which equates to a rate of suicides that is more than twice the national average. While there were no suicides in 2020, two other suicides occurred at the Jail in the first four months of 2021. In one instance in 2017, L.L., a 29-year-old former Marine, who had previously spent time at both the Jail and John George, hanged himself in administrative segregation 18 days after entering the Jail. Despite his

---

[30] ALAMEDA CNTY. SHERIFF'S OFFICE, MENTAL HEALTH SERVICES IN SANTA RITA JAIL at 9 (2015), http://www.acgov.org/board/bos_calendar/documents/DocsAgendaReg_10_8_15/PUBLIC%20PROTECTION/Regular%20Calendar/Mental_Health_Services_Santa_Rita_Jail.pdf.

SER-118

history of previous suicide attempts, and the fact that he had been hospitalized two months prior at John George for suicidal ideations, L.L. was only briefly placed on Inmate Observation Log (IOL) status, a form of suicide watch employed by the Jail, before being removed from observation later that same day by mental health staff and placed in administrative segregation. The doctor who made this decision stated that this was appropriate because L.L. was not expressing suicidal ideation at the time of his intake and was being cooperative. L.L. received no follow-up mental health evaluation between the time of his intake and his suicide only a few weeks later. Another example involves 20-year-old A.A., also described above, who police brought to Santa Rita Jail while he was experiencing a mental health crisis. A.A.'s parents reportedly informed the police that he was not a danger and was in need of mental health treatment. A.A.'s parents say deputies ignored their requests that their son receive a mental health evaluation. A lieutenant allegedly ordered A.A. chained to a cell door, in violation of the Sheriff's office restraint policy, while he was still experiencing severe symptoms. Left unattended, A.A. appears to have attempted to strangle himself with the chains, and later died.[31]

Other prisoners have suffered harm as a result of the Jail's inadequate provision of mental health care. C.C., a 38-year-old male prisoner with a with a history of bipolar disorder, was incarcerated on January 8, 2019, on a charge of narcotics possession. Although he was assigned to Unit 9 upon intake, he did not receive an initial evaluation until nine days after he was admitted, and then only after his sister called the Jail to inform them that her brother was connected to a community provider, receives injections of Haldol (a psychotropic medication), and "decompensates quickly without medication." C.C. started on Haldol on January 22, 2019, but a clinician's note indicated that he was not seen that day due to overbooking. During a medical evaluation the next day, C.C. reported that he felt like he was in a "dream state," "fired up," and "mildly hallucinating." It also appeared that he was having seizures. Because he reported no thoughts of self-harm, he was not placed on IOL status. The next day however, C.C. was "acting strange, shaking, sweating, and appearing confused." He was observed banging his head on the wall and had a cut on his lip and forehead. When the mental health clinician saw him, he was lying on the floor of his cell naked, picking at the floor, and talking to himself. C.C. was sent to John George later that day, and subsequently transferred from John George to Highland Hospital, where it was ultimately determined that he had several high impact hip fractures.

D.D., a 22-year-old with schizophrenia and over 600 interactions with the County's behavioral health system, including multiple incarcerations at the Jail, and with a history of bipolar disorder was incarcerated on February 22, 2019. He was placed on IOL "for muteness and safety" after he refused to respond to medical or mental health questions. Clinicians did not follow up with D.D. until four days later. Three days after that, on March 1, 2019, a deputy reported to a clinician that D.D. had flooded his cell the day before and was naked, talking and laughing to himself. Despite this behavior, there is no record of any specific therapeutic treatment for D.D., other than a clinician's note that the clinician spoke with D.D. about "coping strategies." The clinician made several cell-side visits while D.D. was on IOL, noting that nothing could be seen because there was no light available to see into the cell. Despite his long

---

[31] Despite multiple requests, Alameda County did not provide records related to this incident.

SER-119

history of mental health needs, and behaviors that presented a clear management problem on the unit, D.D. received only limited cell-side visits, and was not prioritized to receive therapy.

The lapses in mental health treatment for prisoners with serious mental health needs are even more acute for such prisoners in administrative segregation. Those prisoners generally speak with mental health staff infrequently, and only through their cell doors, which, as noted, raises privacy concerns.

The Jail's mental health program lacks meaningful access to substance use disorder treatment, a deficiency that is particularly acute because prisoners with serious mental health needs have a high rate of co-occurring substance use disorders. Over 70% of the charts our expert reviewed indicated that the prisoner had significant substance use problems, sometimes reflecting the use of multiple substances. Several prisoners were noted to be in distress from opioid withdrawal at the time of their mental health assessments in the Jail. But very few charts contained any mention of treatment plans, interventions, or referrals related to those disorders. Typically, the most that mental health staff provides these prisoners is some information in the form of handouts, and in some cases a single educational class, rather than any treatment.

Having enough mental health professionals is an essential part of any constitutionally adequate correctional mental health program. Mental health staff must be employed in numbers sufficient to identify and treat prisoners who have treatable mental illness in an individualized manner. *See Cabrales v. Cnty. of Los Angeles*, 864 F.2d 1454, 1460–61 (9th Cir. 1988) (upholding district court's determination that understaffing of mental health personnel such that prisoners only could receive 12 minutes of care per month created constitutionally inadequate care), *judgment vacated on other grounds*, 490 U.S. 1087 (1989); *Coleman*, 912 F. Supp. at 1298; *Madrid*, 889 F. Supp. at 1256–58; *Balla*, 595 F. Supp. at 1577.

Several factors contribute to the lack of adequate mental health coverage at the Jail. First, when there are not sufficient security personnel present, mental health staff are hampered in their ability to see prisoners. In records we reviewed, it was not unusual to see notes from mental health clinicians documenting this problem. One note regarding a prisoner in administrative segregation, stated: "Writer spoke with [prisoner] at cell door due to shortage of available deputies in the [housing unit]." In another example, a clinician wrote about a prisoner with schizophrenia and schizoaffective disorder who had previously been at John George, Napa State Hospital, and multiple other inpatient settings: "Writer interviewed [prisoner] at the door in H[ousing] U[nit] 2 for follow up d[ue to] shortage of deputies. [Prisoner] repeatedly requested to be taken out to the tables, even after multiple explanations from writer and Sergeant . . . that there was not enough staffing in the HU to do so." In fact, in over 85% of the charts our expert reviewed for this issue, there was a notation of a deputy shortage, resulting in limitations on the ability of mental health staff to adequately assess prisoners.

Second, on Unit 9, in a restriction imposed by security staff, mental health staff are permitted only a two-hour window during each weekday in which to see any prisoners for treatment. Because they have to fit visits with all of the individuals on their caseloads into a two-hour window, mental health staff are not able to spend sufficient time treating prisoners with

SER-120

serious mental health needs. In fact, as they explained to us, they are only able to spend approximately 10 to 15 minutes at a time with each prisoner on their caseloads. Further, mental health staff members with whom we spoke informed us that they do not have the time to run treatment groups or therapeutic programs. This is borne out by notes in records such as, "unable to see inmate due to caseload," or "today this clinician was overbooked." Finally, the Jail does not have sufficient numbers of mental health practitioners for the population it serves, as the Sheriff himself has noted publicly.

2. Prisoners with Serious Mental Health Needs Are Subject to Harm Because of Inadequate Treatment Planning, Including Discharge Planning

The Jail fails to provide individualized treatment plans to prisoners with serious mental health needs, which represents a substantial deviation from a constitutionally sound mental health care program. *See, e.g.*, *Sharp v. Weston*, 233 F.3d 1166, 1168–69, 1169 n.2 (9th Cir. 2000) (upholding denial of request to lift an injunction that included individualized treatment plans as a requirement in providing constitutionally adequate mental health care); *see also Braggs*, 257 F. Supp. 3d at 1206 n.34 (explaining that treatment planning is part of a minimally adequate mental health care system). Treatment plans should be developed, implemented, and monitored by treatment teams to provide adequate focus, purpose, and direction for the delivery of service. Our expert observed that clinicians' notes in the overwhelming majority of the charts she reviewed merely indicate whether or not a prisoner is stable, and clinicians often provide seriously mentally ill prisoners nothing more than handouts that list coping skills or describe deep breathing techniques that may help reduce stress.

In addition, the Jail should provide bridge medications and transition planning. *See Charles v. Orange Co.*, 925 F.3d 73, 84–85 (2d Cir. 2019) (finding plausible the allegation that discharge planning, including interim medication and referrals, "is an essential part of in-custody care"); *Wakefield v. Thompson*, 177 F.3d 1160, 1164 (9th Cir. 1999) (state has constitutional duty to provide medication to outgoing prisoner in a supply sufficient "to ensure that he has that medication available during the period of time reasonably necessary to permit him to consult a doctor and obtain a new supply"); *United States v. County of Los Angeles*, No. CV 15-05903-DDP, 2016 WL 2885855, at * 7, n. 7 (C.D. Cal. May 17, 2016) (finding that *Wakefield* extends to discharge planning for mentally ill inmates as required to provide them medical care after release from custody, and noting that "[i]f anything, a public entity may be more responsible for mental health treatment where the incarceration itself has aggravated or exacerbated the harmful symptoms of mental illness"); *Matysik v. Cnty. of Santa Clara*, No. 16-CV-06223-LHK, 2018 WL 732724, at *12 (N.D. Cal. Feb. 6, 2018) ("[T]here is evidence from which a jury could conclude that Defendants' failure to adopt policies requiring greater coordination related to the release of mentally disabled inmates amounted to a policy or custom [amounting] to deliberate indifference."). The Jail typically does not provide access to sufficient medication and a connection to needed care upon release for prisoners with serious mental health needs.

The Jail also excludes prisoners with serious mental health needs from existing transition services. The Jail has developed a transitional center where prisoners in general population can meet community providers and a program, called Operation My Home Town, which connects

28

soon-to-be-released prisoners to community-based programs assisting with housing, employment, drug and alcohol treatment, and other needs. However, prisoners with serious mental health needs on Unit 9 or in administrative segregation do not have access to these discharge services. These prisoners are among those with the greatest need for such services, in order to ensure that they receive needed mental health treatment in the community. But they often receive little more than a sheet of paper that lists programs in the community.

When prisoners are not provided with discharge planning that connects them to community providers, it is unsurprising that they frequently cycle back to the hospital or the Jail. One such prisoner is E.E., an administrative segregation prisoner who has a history of schizoaffective disorder and polysubstance use disorder and, when not incarcerated, has been connected with a mental health provider or admitted to the hospital at least 135 times. E.E. was in and out of the Jail 13 times during the 13-month period from August 2018 to August 2019. During those 13 incarcerations, the Jail's limited efforts to prepare E.E. for reentry into the community were inconsistent and incomplete. For example, in June 2019, E.E. himself—not his clinician—suggested that he go to a substance use treatment program upon discharge. However, instead of connecting him to the program, Jail staff simply provided bridge medications and a prescription, and spoke with E.E. about the importance of medication compliance to prevent re-arrest. E.E. was back at the Jail a month later. Despite his extensive contacts with the Jail and BHCS, there is no indication that the Jail made any meaningful effort to connect E.E. with community mental health services.

The lack of discharge planning contributes to the cycling we so often observed, as individuals with serious mental health needs are drawn deeper into the criminal justice and public mental health systems through relapse, re-arrest, and re-institutionalization, with fewer and fewer opportunities to stabilize in the community. One prisoner's mental health notes from July 2019 explain that the prisoner was made aware of the "B[ay] A[rea] C[ommunity] S[ervices] Re-entry program" but "does not appear to have engaged." Several lines down in the notes, the clinician writes that this prisoner "has been incarcerated at [the Jail] 15 times since 2015." If the Jail did more than simply making the prisoner aware of community services—if, for instance, it reached out to providers and set up appointments—the prisoner would have been more likely to have engaged in treatment that could reduce his likelihood of repeated hospitalization or incarceration.

### C. Officials at the Jail Have Known of the Risk to Prisoner Health and Safety Posed by Inadequate Mental Health Care and Disregarded It

Jail officials have been put on notice that inadequacies in the Jail's mental health system pose a substantial risk of serious harm to prisoners. The Jail has failed to take steps to eliminate these risks, evincing deliberate indifference to prisoner health and safety. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding that a prison official may be liable under the Eighth Amendment if he "knows of and disregards an excessive risk to inmate health or safety").

There are numerous sources that should have put Jail officials on notice of the risks posed by their deficient mental health care system. Alameda County has long known of the problems related to the provision of mental health care to prisoners with serious mental health needs. In

29

July 2017, a public presentation was given to the Alameda County Board of Supervisors Health Committee on the need to decrease the incarceration of those with mental illness in the County. The Alameda County Mental Health Advisory Board's Criminal Justice Subcommittee investigation[32] noted the "revolving door between John George [and] Alameda County jails."[33] The Criminal Justice Subcommittee identified factors that contributed to this situation including, among other things: the Jail's inadequate discharge planning and coordination of services; frequent inadequate access to psychiatrists; and inadequate substance use disorder treatment.

In addition, lawsuits alleging inadequate mental health care at the Jail have put officials on notice of the risks to prisoner health and safety. *Cf. Disability Rights Mont., Inc. v. Batista*, 930 F.3d 1090, 1099 (9th Cir. 2019) (finding that two prior lawsuits "complaining about factually similar conditions at the prison" supported finding of deliberate indifference) (citing *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013) (concluding that plaintiffs stated a claim for deliberate indifference where "litigation specifically alerted prison officials to the acute problem of inmate suicides")). For instance, *Babu v. County of Alameda*, a federal district court case filed in December 2018, concerns the very subject of this Notice— deficiencies in mental health care provided by the Alameda County Sheriff's Office. *Babu v. Cnty. of Alameda*, 5:18-cv-07677 (N.D. Cal. Apr. 22, 2020), ECF No. 111-1. In the Complaint's first paragraph, it states, "The Alameda County Jail system is broken, especially when it comes to the way it treats people with psychiatric disabilities. . . . Alameda County relies almost entirely on the unconstitutional use of isolation to manage prisoners, including prisoners with significant . . . mental health needs, resulting in horrific suffering."[34] Although the Jail has recently reported its commitment to improve mental health care as part of the ongoing settlement negotiation process in *Babu*, it is not clear what, if any, remedial measures have been put in place, whether they have been incorporated into the Jail's policies and procedures, or whether any measures actually put in place will prove durable. Likewise, Disability Rights California, the federally-mandated protection and advocacy entity for California, issued a letter to Alameda County in November 2019 alleging, after an investigation, that "people with mental health disabilities regularly cycle in and out of . . . the jail system," and noting that "people with mental health disabilities held in jail face dangerous and damaging isolation conditions and inadequate access to programming or meaningful mental health treatment."[35]

---

[32] The Criminal Justice Subcommittee conducted interviews with Oakland Police Department officers, BART Crisis Intervention counselors, social workers, program directors, and program managers to gather information on gaps within the County system. The Criminal Justice Subcommittee also compared the situation in Alameda County with national statistics on the relationship between mental illness and the criminal justice system.

[33] BRIAN BLOOM & DR. NOHA ABOELETA, DECREASING INCARCERATION OF THE MENTALLY ILL IN ALAMEDA COUNTY at 4 (2017), http://www.acgov.org/board/bos_calendar/documents/DocsAgendaReg_7_24_17/GENERAL%20ADMINISTRATI ON/Regular%20Calendar/Community_Mental_Health_7_24_17.pdf.

[34] Complaint at ¶ 1, *Babu v. Cnty. of Alameda*, No. 5:18-cv-07677 (N.D. Cal. Dec. 21, 2018), ECF No. 111-1.

[35] Letter from Disability Rights Cal., to Karyn Tribble, LSCW Dir., Alameda Cnty. Behavioral Health and Services, and Donna Ziegler, Counsel, Alameda Cnty. (Nov. 1, 2019), https://www.afsc.org/sites/default/files/documents/2019-11-01%20DRC%20Findings%20Letter%20%20Access%20Requests%20Alameda%20Cty%20-%20Signed%20%281%29.pdf.

Finally, numerous media reports have raised concerns about the provision of mental health care to prisoners with serious mental health needs at the Jail. The Department's investigation has also provided Jail officials with notice of deficiencies in mental health care. Department attorneys and staff, accompanied by experts, visited the Jail several times in 2017, and again in 2019. At the conclusion of these visits, we provided Jail officials with exit briefings, during which our experts shared their preliminary observations. Our experts expressed their opinions that mental health care for prisoners with serious mental health needs was deficient, and specified the various areas in which such care is inadequate, as described above. Nevertheless, most of the conditions we identified in 2017 were still present when we returned in 2019.

## VI.    THE JAIL'S USE OF PROLONGED RESTRICTIVE HOUSING UNDER CURRENT CONDITIONS, INCLUDING THE FAILURE TO PROVIDE ADEQUATE MENTAL HEALTH CARE, VIOLATES THE CONSTITUTIONAL RIGHTS OF PRISONERS WITH SERIOUS MENTAL ILLNESS

The Jail's use of restrictive housing for prisoners with serious mental illness in current conditions—in which prisoners can spend months, if not longer, locked in their cells, with only three to five hours out of cell per week, and with little to no mental health treatment, therapy, and programming—places prisoners with serious mental illness at a substantial risk of serious harm in violation of the Eighth and Fourteenth Amendments. *See Disability Rights Mont.*, 930 F.3d at 1099 (finding plausible Eighth Amendment claim that placing prisoners with serious mental illness in restrictive housing of 22 to 24 hours per day for months poses substantial risk of serious harm); *Palakovic v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017) (holding that, "in light of the increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health," there was a plausible claim that placing prisoner with history of suicidality in restrictive housing for multiple 30-day stints violated the Eighth Amendment); *Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 946 (N.D. Cal. 2015) ("While housed in segregation, the mentally ill are especially vulnerable, and their mental health symptoms— including depression, psychosis, and self-harm—are especially likely to grow more severe."); *see also Braggs*, 257 F. Supp. 3d at 1247 (noting the "consensus on the substantial risk of harm of decompensation for these mostly severely mentally ill prisoners" from segregation; *Madrid*, 889 F. Supp. at 1265 (using prolonged restrictive housing on prisoners who are, because of their serious mental illness, "at a particularly high risk for suffering very serious or severe injury to their mental health" is "the mental equivalent of putting an asthmatic in a place with little air to breathe"); *Coleman*, 912 F. Supp. at 1320–21 (adopting finding that restrictive housing can "cause further decompensation" to prisoners with mental illness); *Casey*, 834 F. Supp. at 1549 (finding that an extensive use of lockdown in place of mental health care "clearly rises to the level of deliberate indifference to the serious mental health needs of the inmates and violates their constitutional rights to be free from cruel and unusual punishment").

As discussed above, prisoners at the Jail with serious mental illness are regularly placed in administrative segregation, where they spend almost every hour of their days locked in their cells, alone or with one cellmate, with little to no treatment, therapy, or programming. When they do get out, each prisoner is alone (or with their cellmate only), so they do not have any

31

opportunities for social interaction. Jail mental health staff have estimated that approximately 50% of the prisoners in administrative segregation have serious mental illness. As a result, these prisoners are at increased risk of physical self-harm, extreme mental distress, and unnecessary suffering. In fact, we have seen evidence of such harms, as discussed further below, including prisoners swallowing objects, not eating, smearing or eating feces, banging their heads against the wall, and attempting or completing suicide.

The Alameda County Sheriff has acknowledged that one hour per day of out-of-cell time is not sufficient. "We do not like to keep people in those cells for any length of time," he has said.[36] Yet, despite his statements, until very recently the Jail continued to keep individuals locked down with less than one hour out of cell each day for months at a time.[37] In fact, at the time of our last visit, in July 2019, there were 75 prisoners in administrative segregation who had been there for over 90 days, at least 75% of whom had indications of serious mental illness. Thirteen of those prisoners with indications of serious mental illness had been in administrative segregation for more than a year.

Jail officials say that prisoners are placed in administrative segregation if they cannot co-exist with other prisoners, are violent, or need protection, among other reasons. However, our review of classification records for prisoners placed in administrative segregation revealed many instances of prisoners being assigned to such housing for reasons that seemed directly related to their serious mental illness and not due to Jail officials' stated reasons. For example, F.F. had a history of suicide attempts in administrative segregation when a classification deputy approved F.F.'s request to be transferred to a less restrictive pod. The deputy understood that the move could help F.F.'s mental health: "Having a cellmate might help [F.F.] cope with being incarserated [sic]," he wrote. But several weeks later, F.F. was returned to administrative segregation, because of his serious mental illness. The classification deputy explained that F.F. was being re-classified to administrative segregation "due to" his flag as "mental". The deputy made this recommendation despite the fact that the behavioral health professional who had just evaluated F.F. recommended against the transfer, indicating instead that F.F. should be housed in the less restrictive behavioral health unit. Over an approximately three-month period, two behavioral health professionals made five separate recommendations that F.F. be moved to a less restrictive unit. Each time, they were overruled by classification deputies. Their reasons often explicitly cited F.F.'s mental illness. "Due to [F.F.'s] recent mental instability," a deputy wrote, for example, "he will remain in [administrative segregation] at this time."

Another example is G.G., an individual who was sent to John George at least twice during his incarceration at the Jail, and who reported to the Jail that he had previously been housed in minimum security. His classification report from February 2019 from the Glenn Dyer

---

[36] Lisa Fernandez, *Death Rate at Santa Rita Exceeds Nation's Largest Jail System as Critics Call for Reform*, KTVU (Oct. 1, 2019) https://www.ktvu.com/news/death-rate-at-santa-rita-exceeds-nations-largest-jail-system-as-critics-call-for-reform.
[37] We note that, as part of the ongoing settlement negotiation process in the *Babu* case, the Jail reportedly has taken steps to increase out-of-cell time for prisoners. We have not yet seen evidence of how much more time prisoners may get, or how widespread the change is, and there is no evidence that this is memorialized in any policy. Moreover, it is not clear whether such remedial measures will prove durable.

SER-125

Jail, which was operated by the Alameda County Sheriff's Office until it closed in 2019, notes that he "suffers from bipolar [disorder] and is on heavy psychiatric medication that [the Glenn Dyer Jail] doesn't carry. The nurse said that if he missed more than one dose of his [medication] he is likely to have a serious mental breakdown." After several weeks at the Glenn Dyer Jail, G.A. was observed "visibly shaking," "making the sign of the cross," and "displaying bizarre" behavior, and was therefore placed in administrative segregation. A few weeks later, when he was transferred to the Jail, a classification deputy acknowledged that G.G. had been housed in administrative segregation "due to acting strangely during his classification interview"—in other words, for reasons related to his mental health status. The deputy suggested that G.G. "may be suitable for . . . the behavioral health unit." Although two mental health professionals agreed with that assessment and recommended on at least four separate occasions that G.G. be transferred to the behavioral health unit, he remained in administrative segregation. At the time of our visit to the Jail in July 2019, he had not been reclassified.

### A. Prisoners with Serious Mental Illness Are Subject to a Substantial Risk of Serious Harm as a Result of the Jail's Use of Restrictive Housing

The Jail's practice of subjecting prisoners with serious mental illness to prolonged periods of restrictive housing places these prisoners at substantial risk of serious harm. As described above, as of our last visit, prisoners in administrative segregation were, by policy, permitted only five hours outside of their cells per week at most, and our review of a sample of records revealed many receiving only one or two hours outside of their cells on any given week.

The lack of access to adequate mental health care is especially harmful for prisoners who are suicidal. Instead of receiving the constitutionally adequate mental health care required, such as intensive therapeutic interventions, they receive minimal engagement from limited interactions with mental health staff. Notably, despite the known harms of prolonged restrictive housing for people with serious mental illness, at least six of the prisoners who have died by suicide at the Jail since January 1, 2014, were in restrictive housing at the time of their suicide.[38]

One such example is H.H. He was arrested on April 4, 2018, and booked into the Jail early the next morning. During his initial screening, he was observed to have "delusional thoughts," and as a result he was referred to mental health staff. While awaiting re-classification, H.H. was found with fecal matter smeared on his face, and he stated to a deputy that he wanted to be killed or would kill himself. He was moved to a safety cell and put on an IOL. The following day, April 6, a mental health clinician determined that H.H. was no longer suicidal, and he was moved from a safety cell to administrative segregation. There, on April 8, H.H. was found with a bed sheet tied around his neck and tied to another sheet that was wrapped around the top bunk. When a deputy entered his cell, he found H.H. unresponsive, with pale skin. The cell was flooded with water and fecal matter, which had also been spread onto the floor, walls,

---

[38] In addition, in February 2021, an individual in the Jail's quarantine unit for newly booked prisoners died by suicide. The County and the Sheriff's Office have reported that newly-booked individuals at the Jail must complete a 14-day quarantine upon intake, and that on average, those individuals receive approximately one hour of out-of-cell time per week. *Babu v. Cnty. of Alameda*, 5:18-cv-07677 (N.D. Cal. Apr. 7, 2021), ECF 239 at 7.

SER-126

and window.  A fellow prisoner reported that in the hours leading up to his suicide, H.H.'s requests to see mental health staff were ignored.  In addition, although according to Jail policy H.H. was supposed to be observed every 30 minutes, he had not been observed for over an hour, during which time he took his own life.

Other individuals suffer a variety of other significant harms.  Indeed, over half of the episodes of self-injurious behavior that our expert reviewed occurred while prisoners were in restrictive housing.  For example, I.I., a prisoner in restrictive housing with serious mental illness, smeared his feces, wrote words on the walls with his feces, and even ate his feces.  He suffered delusions, believing himself to be Jesus Christ; engaged in head banging; and tried—unsuccessfully—to hang himself.  One clinician hypothesized that I.I. may have been in a "safer placement" in a mental health unit in another jail, but noted that the Jail "does not have a mental health unit," apologizing to I.I. for this fact and "encourag[ing] him to try his best to manage in" administrative segregation while the clinician tried to help him get "to a quieter pod."

Other examples of people who were harmed include J.J., whose chart shows that he told a clinician that he had instructed his wife not to visit him because he was "losing [his] mind" in administrative segregation; F.F., who attempted to suffocate himself on several occasions, including by wrapping clothes around his neck and putting a bag over his head; and K.K., who swallowed pencils, a razor, a screw, and a comb.  One prisoner in administrative segregation who had returned from a short stay at John George less than two months earlier was "refusing to lockdown, naked, urinating all over . . . , putting his bread in the urine then eating it, sticking his finger up his rectum and threatening to kill himself by taking pills."  The experiences of these prisoners mirror that of the many prisoners who told us during our visits to the Jail about "going crazy" and "flipping out" in restrictive housing, due to the isolation they experienced.  Chart notes confirm that the Jail's mental health professionals believe restrictive housing exacerbates prisoners' mental health issues.  As one psychiatrist noted about a prisoner who reported a history of schizophrenia, "Unfortunately patient appears to be doing worse, compared to initial evaluation.  This may be due to continuing to be in administrative segregation."

### B. Officials at the Jail Have Known of, and Disregarded, the Substantial Risk of Serious Harm of Placing Individuals with Serious Mental Illness in Restrictive Housing

Prisoners with serious mental illness in restrictive housing have died by suicide, attempted suicide, or otherwise harmed themselves, as discussed above.  These incidents—most of which were known to Jail officials—should have put Jail officials on notice that they were putting prisoners with serious mental illness at a substantial risk of serious harm by placing them in restrictive housing for prolonged periods.  Moreover, as discussed above, mental health clinicians and other Jail staff specifically raised concerns about whether placement in restrictive housing, such as administrative segregation, was appropriate for prisoners with serious mental illness, further putting officials on notice of the risk to these prisoners.

Following our 2017 visits, the Jail made some changes to its restrictive housing practices, apparently in part in response to the concerns expressed by our experts.  Most notably, the Jail

34

instituted a "Maximum Separation" or "Max Sep" program, which represents a step-down from administrative segregation, allowing prisoners more time out of cell, and allowing them to be out with other prisoners. Nevertheless, the "Max Sep" program is available only to a small percentage of those in administrative segregation. The Jail did not reasonably respond to reduce the risk of serious harm to prisoners with serious mental illness until the very recent—and limited—steps taken as part of the *Babu* negotiations, *see supra* note 37, evincing deliberate indifference to prisoner health and safety.

## VII.  THE JAIL'S TREATMENT OF PRISONERS WITH MENTAL HEALTH DISABILITIES VIOLATES THE AMERICANS WITH DISABILITIES ACT

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1214 (9th Cir. 2008). To establish a Title II claim, one "must show: (1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001) (citation omitted). Title II has been found to "unmistakably" cover correctional institutions. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–10 (1998) (applying Title II in the prison context); *Bell v. Williams*, No. 18-CV-01245-SI, 2019 WL 2358971, at *3 (N.D. Cal. June 4, 2019) (applying Title II in the jail context); *see also Pierce*, 526 F.3d at 1214 (noting that Title II applies to county jails' "services, programs and activities for detainees"). The ADA offers the same protections to prisoners with disabilities whether those disabilities stem from physical or mental impairments. 42 U.S.C. § 12102. Thus, prisoners at the Jail with mental health disabilities are entitled to this protection. Further, the ADA applies to prisoners even if they are not in the general population. "A prisoner's misconduct does not strip him of his right to reasonable accommodations, and a prison's obligation to comply with the ADA and the RA [Rehabilitation Act] does not disappear when inmates are placed in a segregated housing unit, regardless of the reason for which they are housed there." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 291 (3d Cir. 2019).

Some prisoners are placed in administrative segregation or other restrictive housing due to their mental health disabilities, and all prisoners in Unit 9 are placed there precisely due to their mental health disabilities. Yet, prisoners at the Jail who are on Unit 9 or in administrative segregation do not receive the same programming that is available to prisoners in general population. For example, the Alameda County Sheriff's Office provides an array of programs to many prisoners in general population at the Jail, including, educational programs, art therapy, culinary arts, computer coding, job readiness training, financial literacy, and hospitality. And the Jail's transition center allows many prisoners in general population to receive additional services from community-based organizations in areas such as education, employment, housing, and substance use disorder. But none of these programs and services are available to prisoners with mental health disabilities placed on Unit 9 or in administrative segregation. The Jail provides just one program, "Breaking the Chains," on Unit 9, and it is limited to the topic of substance use

35

disorder. As discussed above, Jail officials place prisoners with mental health disabilities in Unit 9, the "mental health" unit, precisely because they have a serious mental illness. As also discussed above, the Jail often places other prisoners with mental health disabilities in administrative segregation for reasons that are directly related to their mental illness, as, for example, with F.F. and G.G., discussed in Section VI, *supra*.

Thus, but for their mental health disabilities, prisoners in Unit 9 and those prisoners placed in administrative segregation due to their mental health disabilities would be able to access the programming provided to the general population. For example, approximately 41% of the stays on Unit 9 over a 19-month period that we examined were classified as "Mental Min." This means that these individuals would have been classified as minimum custody, and housed accordingly, with the attendant access to programming, but for their "mental health" classification. Thus, by virtue only of their mental health disabilities, they were placed in a housing unit where they were denied access to programs that they otherwise would have been able to access, as minimum custody prisoners.

Denying prisoners with a mental health disability equal access to programming and services available to those without disabilities violates Title II of the ADA. *See Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996) (affirming conclusion that prison officials intentionally discriminated against an inmate in violation of the ADA when they excluded him from prison programs and services on account of his disability).

## VIII.   MINIMUM REMEDIAL MEASURES

To remedy the constitutional and statutory violations identified in this Notice, we recommend that the County implement, at minimum, the remedial measures listed below.

### A. Providing Mental Health Services in the Most Integrated Setting

1. Provide evidence-based community-based services in the most integrated setting that are effective at meeting the needs of eligible adults with mental health disabilities in and at serious risk of entering psychiatric institutions in Alameda County and preventing them from unnecessary institutionalization, including:
   a. Implement a comprehensive crisis response system, including an array of integrated crisis residential services, in sufficient capacity to serve adults with mental health disabilities in the most integrated setting and effective mobile crisis services that can respond to individuals wherever they experience crises and that works with law enforcement where appropriate to de-escalate crises and prevent unnecessary arrest and detention, involuntary commitment, or hospitalization.
   b. Implement a sufficient number of Full Service Partnership teams that can provide sufficiently intensive community services to those who need them.
   c. Implement a sufficient quantity of scattered-site, permanent supported housing slots to ensure adults with mental health disabilities can maintain housing in integrated settings.

36

    d.   Implement sufficient community-based services including case management, personal care services to assist with activities of daily living, and supported employment services in the amount, frequency, and duration needed by adults with mental health disabilities in Alameda County.

    e.   Implement peer support services provided by trained and certified peers with lived experience with mental illness in sufficient quantity to be integrated in all aspects of the mental health service system.

    f.   Implement sufficient community-based services that can appropriately support people who have co-occurring diagnoses, such as intellectual disability, substance use disorder, or chronic illnesses.

2. Provide transition and discharge planning, beginning upon admission, to all eligible adults with mental health disabilities in psychiatric institutions in Alameda County.

3. Provide transition and discharge planning, beginning upon admission, for prisoners with mental health disabilities in Santa Rita Jail to prevent needless psychiatric institutionalization for those individuals following release from Jail.

4. Identify eligible individuals who may be at serious risk of psychiatric institutionalization and connect them with appropriate community-based services, including by using the crisis services described above, and by utilizing identified intercepts where individuals with mental health disabilities are known to come into contact with County services or the criminal justice system.

5. Ensure that community-based services and supports are designed to engage and support individuals with mental health disabilities who may be involved in the criminal justice system.

6. Implement systems, including through close coordination between Alameda County BHCS, Alameda County Sheriff's Office and Santa Rita Jail, that ensure people with mental health disabilities can initiate or maintain connections with community-based services while incarcerated and transition seamlessly into such services upon release.

## B. Jail Mental Health Care

1. Ensure that prisoners with serious mental illness receive timely treatment from mental health professionals as clinically appropriate, in a setting that provides privacy.

2. Ensure that appropriate, individualized treatment plans are developed for prisoners with serious mental illness, and implement procedures whereby treatment plans are regularly reviewed to ensure that they are being followed.

SER-130

3. Ensure that all prisoners with serious mental illness receive regular, consistent therapy and counseling, in group and individual settings, as clinically appropriate.

4. Ensure that prisoners at risk of suicide receive appropriate mental health care. The Jail's suicide prevention program should include:
   a. Individual assessments of prisoners to determine whether and when they should be placed on some form of suicide watch, the individualized conditions of that watch, and whether and when they should be removed from that watch; and
   b. Conditions in suicide watch placements that are therapeutic, rather than punitive.

5. Provide transition and discharge planning to prisoners with serious mental illness, including services for prisoners in need of further treatment at the time of discharge to the community. These services should include the following:
   a. Arranging an appointment with community mental health providers for all prisoners with serious mental illness and ensuring, to the extent possible, that prisoners meet with that community mental health provider prior to or at the time of discharge to facilitate a warm handoff;
   b. Providing a supply of bridge medications to prisoners sufficient to last until a prescription can be refilled; and
   c. Arranging with local pharmacies to have prisoners' prescriptions renewed to ensure that they have an adequate supply to last through their next scheduled appointment with a mental health professional.

## C. Restrictive Housing in the Jail

1. Ensure that prisoners with serious mental illness are not placed in restrictive housing for prolonged periods, absent exceptional circumstances, and review prisoners in restrictive housing periodically to ensure that restrictive housing remains appropriate for them.

2. Ensure that if a prisoner shows credible signs of decompensation in restrictive housing, the prisoner's mental health needs are assessed by a mental health professional and promptly addressed.

3. Ensure that prisoners expressing suicidality are not placed in restrictive housing and instead are provided clinically appropriate mental health care.

4. Report and review data regarding lengths of stay in restrictive housing, particularly with respect to prisoners with serious mental illness, and take appropriate corrective action.

SER-131

**D. Jail Compliance with the Americans with Disabilities Act**

1. Ensure that prisoners with mental health disabilities have the opportunity to participate in and benefit from services (including transition services), programs, and activities available to prisoners without disabilities consistent with significant health or safety concerns.

## IX.    CONCLUSION

We have reasonable cause to believe that Alameda County and the Alameda County Sheriff's Office violate the ADA and engage in a pattern or practice of constitutional violations in the conditions at Santa Rita Jail and that Alameda County violates the ADA in its provision of public mental health services.  The remedies we propose are narrowly tailored to correct the conditions found during our investigation and seek to address changes to policies, practices, training, supervision and accountability systems necessary for the County to overcome existing deficiencies and to come into compliance with the Constitution and the ADA.  We look forward to working cooperatively with the County to identify appropriate responses to the violations have identified.

We are obligated to advise you that 49 days after issuance of this letter, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct deficiencies identified in this letter if County officials have not satisfactorily addressed our concerns.  42 U.S.C. § 1997b(a)(1).  The Attorney General may also move to intervene in related private suits 15 days after issuance of this letter.  42 U.S.C. § 1997c(b)(1)(A).  Please also note that this Notice is a public document. It will be posted on the Civil Rights Division's website.

SER-132

FILED

Sep 17 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### RELATED CASE ORDER

A Motion for Administrative Relief to Consider Whether Cases Should be Related or a *Sua Sponte* Judicial Referral for Purpose of Determining Relationship (Civil L.R. 3-12) has been filed. The time for filing an opposition or statement of support has passed. As the judge assigned to case

18-cv-07677-NC   Ashok Babu, et al v. Sheriff Gregory Ahearn, et al

I find that the more recently filed case(s) that I have initialed below are related to the case assigned to me, and such case(s) shall be reassigned to me. Any cases listed below that are not related to the case assigned to me are referred to the judge assigned to the next-earliest filed case for a related case determination.

| Case | Title | Related | Not Related |
|------|-------|---------|-------------|
| 3:19-cv-07423 JSC | Daniel Gonzalez, et al v. Ahearn, et al | | XX |

### ORDER

The parties are instructed that all future filings in any reassigned case are to bear the initials of the newly assigned judge immediately after the case number. Any case management conference in any reassigned case will be rescheduled by the Court. The parties shall adjust the dates for the conference, disclosures and report required by FRCivP 16 and 26 accordingly. Unless otherwise ordered, any dates for hearing noticed motions are vacated and must be re-noticed by the moving party before the newly assigned judge; any deadlines set by the ADR Local Rules remain in effect; and any deadlines established in a case management order continue to govern, except dates for appearance in court, which will be rescheduled by the newly assigned judge.

Dated: _____    By: _____
                                  Nathanael M. Cousins
                                  United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### CLERK'S NOTICE

**The court has reviewed the motion and determined that no cases are related and no reassignments shall occur.**

Dated: September 17, 2020     By: _____

                                  Lili Harrell, Deputy Clerk
                                  408-535-5363

1

SER-133

1  JEFFREY L. BORNSTEIN – 099358
   ERNEST GALVAN – 196065
2  KARA J. JANSSEN – 274762
   REKHA E. ARULANANTHAM – 317995
3  ROSEN BIEN GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
4  San Francisco, California 94105-1738
   Telephone:    (415) 433-6830
5  Facsimile:    (415) 433-7104
   Email:        jbornstein@rbgg.com
6                egalvan@rbgg.com
                 kjanssen@rbgg.com
7                rarulanantham@rbgg.com

8  Attorneys for Plaintiffs

9              UNITED STATES DISTRICT COURT

10     NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

11 | ASHOK BABU, ROBERT BELL,              | Case No. 5:18-CV-07677
   | IBRAHIM KEEGAN-HORNESBY,              |
12 | DEMAREA JOHNSON, BRANDON              | ***BABU* PLAINTIFFS' RESPONSE TO**
   | JONES, STEPHANIE NAVARRO,             | ***GONZALEZ* PLAINTIFFS'**
13 | ROBERTO SERRANO, and                  | **ADMINISTRATIVE MOTION TO**
   | ALEXANDER WASHINGTON on behalf        | **CONSIDER WHETHER THE**
14 | of themselves and all others similarly| ***GONZALEZ v. ALAMEDA COUNTY***
   | situated,                             | ***SHERIFF'S OFFICE*, 3:19-CV-07423**
15 |                                       | **SHOULD BE RELATED**
   |        Plaintiffs,                    |
16 |                                       | Judge:   Hon. Nathanael Cousins
   |        v.                             |
17 |                                       |
   | COUNTY OF ALAMEDA; GREGORY J.         |
18 | AHERN in his official capacity as Sheriff |
   | of the Alameda County Sheriff's Office; |
19 | CAROL BURTON in her official capacity  |
   | as Interim Director of the Alameda County |
20 | Behavioral Health Care Services Agency; |
   | and DOES 1 to 20, inclusive,,         |
21 |                                       |
   |        Defendants.                    |
22

23

24

25

26

27

28

On September 1, 2020, plaintiffs in *Gonzalez, et al. v. Ahern, et al.*¸ Case No. 19-cv-07423-JSC ("*Gonzalez*") filed an administrative motion to this Court for consideration of whether the *Gonzalez* case should be related to *Babu, et al. v. County of Alameda, et al.* ("*Babu*") in light of the *Babu* Plaintiffs' First Amended Complaint (*Babu*, Dkt. 186) and *Gonzalez* plaintiffs Second Amended Complaint (*Gonzalez*, Dkt. 50). *Babu*, Dkt. 195. *Babu* Plaintiffs Ashok Babu, Robert Bell, Ibrahim Keegan-Hornesby, Demarea Johnson, Brandon Jones, Stephanie Navarro, Roberto Serrano, and Alexander Washington ("*Babu* Plaintiffs") submit the following response. Some factors weigh against relating the cases, whereas others weigh in favor. Plaintiffs take no position on whether the cases should be related but note that the cases are in different stages and the *Babu* Parties are far along in working towards a disposition.

**BRIEF SUMMARY OF THE ALLEGATIONS IN BABU AND GONZALEZ AMENDED COMPLAINTS**

**I.  *Babu, et al. v. County of Alameda, et al.***

As described in Plaintiffs' Response to Court's Sua Sponte Referral for Purposes of Determining Relations (Dkt. 140), *Babu* is a federal civil rights lawsuit brought on behalf individuals incarcerated in Alameda County jails, including the Santa Rita Jail ("SRJ" or the "Jail") alleging overuse of isolation, including lack of out of cell time and overclassification; lack of mental health treatment; inadequate suicide prevention; and the punishment of, denial of programs, services, and activities to, and use of force against individuals with psychiatric disabilities as a result of their disabilities. First Amended Civil Complaint for Declaratory and Injunctive Relief, *Babu*, Dkt. 186, ¶¶ 1-4 (Aug. 17, 2020) ("*Babu* FAC"). Related to the COVID-19 pandemic, the *Babu* FAC alleges, among other things, that the "[*Babu*] Defendants' failure to properly implement sufficient policies and procedures regarding the COVID-19 public health emergency and failure to ensure compliance with policies and procedures that have been already put in place." *Babu* FAC, ¶ 5.

## II.    *Gonzalez, et al. v. Ahern, et al.*

*Gonzalez* is a federal civil rights lawsuit brought on behalf of current male prisoners incarcerated at SRJ, as well as male prisoners who were incarcerated at the Jail since November 12, 2017.  Second Amended Complaint, *Gonzalez*, Case No. 19-cv-07423-JSC, Dkt. 10, ¶ 1 (Aug. 31, 2020) ("*Gonzalez* SAC").  The Second Amended Complaint alleges that the general conditions of confinement at SRJ for male inmates, including the inadequate out-of-cell time, lack of outdoor exercise, unsanitary conditions in the male housing units and kitchen, food that is inedible and lacks nutritional value, lack of medical care, group punishment, retaliation against prisoners speaking out against problems, grievance procedures, denials of attorney and family visits and phone calls, and profiteering from charges from commissary and video visits, violate federal law.  *Gonzalez* SAC, ¶ 6.  The lawsuit seeks certification of main class of "all men incarcerated at Santa Rita Jail . . . from November 12, 2017 through the present," and three sub-classes, "prisoners who are pretrial," "prisoners with limited English proficiency," and "men . . . who contracted the corona virus while under the custody of defendants."   *Gonzalez* SAC, ¶ 22; *id.* at page 84, line 26..  The Gonzalez SAC also alleges failure to prevent individuals from becoming infected with COVID-19, failure to provide medical care to those who have contracted COVID-19, and failure to provide medical care to individuals after they were deemed recovered from the virus.  *Gonzalez* SAC, ¶ 6.3.

## ARGUMENT

Plaintiffs do not take a position on whether these cases should be related, but submit this response to aid the Court in its decision.  According to Civil L. R. 3-12(a), cases are related if:

> (1) The actions concern substantially the same parties, property, transaction or event; and (2) it appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges.

/ / /

/ / /

1 **I.    *Babu* and *Gonzalez* Concern Similar, but Not Totally Overlapping Parties and**
2 **Issues**

3        There are similarities and differences in the parties, issues, and relief requested in
4 *Babu* and *Gonzalez*.

5        Although the certified class in *Babu* and the proposed class in *Gonzalez* overlap to
6 some degree, the class in *Babu* is broader: while the *Gonzalez* class is limited to current
7 male individuals incarcerated at the SRJ and those formerly incarcerated there since
8 November 12, 2017, *Gonzalez* SAC, ¶ 11, the *Babu* class includes all current and future
9 male and female individuals incarcerated the Jail, *Babu* FAC, ¶ 165.  Whereas the County
10 of Alameda and Sheriff Ahern, in his official capacity, are named as Defendants in both
11 lawsuits, *Babu* also sues Director of the Alameda County Behavioral Health Care Services
12 Agency Karyn Tribble, in her official capacity, *Babu* FAC, ¶ 5.  *Gonzalez* sues other
13 County employees as well as SRJ contractors Wellpath and Aramark, *Gonzalez* SAC,
14 ¶¶ 20-21.

15        Some of the issues in the two cases overlap in that both cases seek to address the
16 overuse of isolation, lack of out-of-cell time, lack of outdoor time, grievances, and
17 inadequate programming.  *Babu* FAC, ¶¶ 57-100, 128; *Gonzalez* SAC, ¶ 199-226, 227-
18 244.  *Babu* also alleges problems specifically with mental health care, punishment of
19 individuals because of their psychiatric disabilities, inadequate suicide prevention,
20 misclassification, inadequate staffing, inadequate discharge planning, and other issues,
21 *Babu* FAC, ¶ 6, while *Gonzalez* concerns medical care, food issues and other complaints,
22 *Gonzalez* FAC, ¶ 6.  *Babu* brings claims under the Americans with Disabilities Act,
23 Rehabilitation Act, and California equivalents, *Babu* Complaint, ¶¶ 197, 173, 214, 224,
24 whereas *Gonzalez* does not.  *Gonzalez* seeks monetary damages, *Gonzalez* SAC, Prayer for
25 Relief, while *Babu* does not.

26        Both the Babu FAC and Gonzalez SAC allege issues related to the Jail's response to
27 the COVID-19 pandemic.  *Babu* Plaintiffs have been meeting and conferring with
28 Defendants in that case since March 2020 to address Covid-19 issues.  In the *Babu* FAC,

1  Plaintiffs allege inconsistent mask use and social distancing by kitchen workers and

2  supervisors; inadequate provision of cleaning supplies and opportunity for individuals to

3  clean their cells; and failure to test individuals before moving them to different housing

4  areas.  *Babu* FAC, ¶ 163.  As a result of the Jail's failure to fully implement COVID-19

5  precautions, the *Babu* FAC alleges *Babu* class members experience reductions in out of

6  cell time, programming, and mental health services.  *Babu* FAC, ¶ 164.  Regarding the

7  COVID-19 pandemic, the *Gonzalez* Plaintiffs allege that individuals who are vulnerable to

8  serious illness due to COVID-19 due to their age or underlying health conditions have

9  been housed with COVID-19 positive individuals; that individuals who have not fully

10  recovered from COVID-19 are returned to general housing while they may still be

11  contagious; that Jail administrators' COVID-19 website lists inaccurate information; that

12  staff inconsistently wear masks to prevent the spread of COVID-19; and that staff move

13  from housing unit to housing unit without taking proper precautions to prevent spread of

14  the virus.  *Gonzalez* SAC, ¶¶ 172-88.

15  **II.**     **Duplication of Labor and Expense**

16          This Court is well versed in the issues in the *Babu* case so to the extent that there is

17  some overlap there could be some elimination of duplication of labor and expense to the

18  Court, particularly in the areas where the *Gonzalez* and *Babu* cases overlap.  There are also

19  significant differences that the court is in the best position to evaluate in terms of whether

20  relation is proper.

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

## CONCLUSION

2        Some factors weigh against relating the cases, whereas others weigh in favor.

3  Plaintiffs take no position on whether the cases should be related.

4

5  DATED:  September 4, 2020       Respectfully submitted,

6                       ROSEN BIEN GALVAN & GRUNFELD LLP

7

8                  By:  */s/ Rekha Arulanantham*
                          Rekha Arulanantham

9

10                 Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
528 Grand Avenue
Oakland, CA 94610
Telephone: (510) 329-2140
Facsimile:  (510) 580-9410
Email: yhuang.law@gmail.com

DENNIS CUNNINGHAM, SBN 112910
115A Bartlett St.
San Francisco, CA 94110
Telephone: 415-285-8091
Facsimile:  415-285-8092
Email:  denniscunninghamlaw@gmail.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA/ SAN JOSE DIVISION

| | |
|---|---|
| ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNSBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated.<br><br>    Plaintiffs,<br><br>vs.<br><br>COUNTY OF ALAMEDA; GREGORY J. AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office, et al.<br><br><br><br>  Defendants. | No. 5:18-cv-07677 JSC<br><br>**ADMINISTRATIVE MOTION TO CONSIDER WHETHER THE GONZALEZ v. ALAMEDA COUNTY SHERIFF'S OFFICE, 3:19-CV-07423 SHOULD BE RELATED IN LIGHT OF THE FIRST AMENDED COMPLAINT HEREIN, AND THE SECOND AMENDED COMPLAINT IN GONZALEZ.**<br><br>Hon.  NATHANAEL COUSINS |

1

**SER-140**

Procedural History

Hon. Jacqueline Corley, sua sponte, raised the issue of whether the two cases should be related, [Dkt 24, Gonzalez v. Alameda County Sheriff's Office, 3:19-cv-07423 JSC]. This court denied the motion to relate. [Dkt. 142]. Thereafter, the Gonzalez plaintiffs filed a motion to intervene. [Dkt. 149] Before the motion to intervene was decided, the Babu plaintiffs filed a motion for leave to amend, which was granted, and the Babu Plaintiffs filed their First Amended Complaint, adding in language to include covid-19 issues. [Dkt. 186] This court denied the motion to intervene. [ Dkt. 184] the Gonzalez plaintiffs have filed their Second Amended Complaint. [Dkt. 50., Gonzalez v. Alameda County Sheriff's Office, 3:19-cv-07423 JSC].

Basis of Administrative Motion

In light of Judge Corley's prior initiative, and the fact that there are now two amended complaints, the Gonzalez Plaintiffs seek to provide this Court will all opportunity to review and consider whether, with the addition of the covid-19 into the Babu Plaintiffs' First Amended Complaint, and the expansion and clarification regarding Gonzalez' Plaintiffs concerns about conditions of confinement at Santa Rita Jail, these matters should be related, or whether Gonzalez should remain with Judge Corley.

DATED: September 1, 2020        **LAW OFFICE OF YOLANDA HUANG**


__/s/ Yolanda Huang_____
Yolanda Huang

**DENNIS CUNNINGHAM**


_/s/ Dennis Cunningham_____
*Counsel for Plaintiffs*

2

SER-141

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHOK BABU, and others,

          Plaintiffs,

     v.

GREGORY J. AHERN, and others,

          Defendants.

Case No. 18-cv-07677-NC

**ORDER DENYING MOTION TO INTERVENE; GRANTING MOTION FOR LEAVE TO AMEND**

Re: Dkt. Nos. 149, 173

    Before the Court are two motions: (1) a motion to intervene by the plaintiffs in *Gonzalez et al. v. Alameda County Sheriff's Office*, Case No. 19-cv-07423-JSC, and (2) a motion for leave to amend the complaint by plaintiff Ashok Babu. The Court finds that intervention is not required and DENIES the *Gonzalez* plaintiffs' motion to intervene. Because Defendants do not oppose, the Court also GRANTS Babu's motion for leave to amend. Each motion is discussed in turn below.

**I.    Motion to Intervene**

    Federal Rule of Civil Procedure 24(a)(2) permits intervention as a matter of right when the applicant "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Put differently, a would-be intervenor under Rule

1    24(a)(2) must show that: "(1) it has a 'significant protectable interest' relating to the

2    property or transaction that is the subject of the action; (2) the disposition of the action

3    may, as a practical matter, impair or impede the applicant's ability to protect its interest;

4    (3) the application is timely; and (4) the existing parties may not adequately represent the

5    applicant's interest." *Perry v. Schwarzenegger*, 630 F.3d 898, 903 (9th Cir. 2011) (quoting

6    *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1988)).

7         Rule 24 also permits permissive intervention.  Under Rule 24(b)(1), permissive

8    intervention is appropriate when the would-be intervenors "ha[ve] a claim or defense that

9    shares with the main action a common question of law or fact."  Fed. R. Civ. P.

10   24(b)(1)(B).  Courts consider numerous factors including:

11        the nature and extent of the intervenors' interest, their standing to raise

12        relevant legal issues, the legal position they seek to advance, and its probable

13        relation to the merits of the case[,] whether changes have occurred in the

14        litigation so that intervention that was once denied should be reexamined,

15        whether the intervenors' interests are adequately represented by other parties,

16        whether intervention will prolong or unduly delay the litigation, and whether

17        parties seeking intervention will significantly contribute to full development

18        of the underlying factual issues in the suit and to the just and equitable

19        adjudication of the legal questions presented.

20   *Perry*, 630 F.3d at 905 (quoting *Spangler v. Pasadena Bd. of Educ.*, 552 F.2d 1326, 1329

21   (9th Cir. 1977)).

22        The *Gonzalez* plaintiffs seek to intervene under both Rule 24(a)(2) and 24(b)(1).

23   According to the *Gonzalez* plaintiffs, intervention is necessary to give them a forum in

24   which to present and litigate their concerns relating to Santa Rita Jail's handling of the

25   COVID-19 pandemic.  *See* ECF 149 at 17.  Neither rule, however, permits their

26   intervention here.

27        First, intervention as a matter of right is not appropriate because the *Gonzalez*

28   plaintiffs have not shown that the disposition of this lawsuit would impair or impede their

United States District Court
Northern District of California

2

1    ability to protect its interest.  *Gonzalez* plaintiffs are also members of the class previously

2    certified by the Court.  *See* ECF 64.  As members of the class, their interests relating to the

3    Santa Rita Jail's COVID-19 response are already being protected and litigated in this

4    action.  Indeed, in denying the *Gonzalez* plaintiffs' motion for a temporary restraining

5    order, Magistrate Judge Corley noted that much of the *Gonzalez* plaintiffs' concerns were

6    already being addressed here.  *See Gonzalez*, Case No. 19-cv-07423-JSC, ECF 41 at 9–10,

7    12.

8           Second, the *Gonzalez* plaintiffs also fail to show that Babu and his counsel are

9    unable to adequately represent their interests.  This, too, dooms the *Gonzalez* plaintiffs'

10   attempt to intervene as a matter of right.  The *Gonzalez* plaintiffs first argue that their

11   "ultimate goal" differs from that of Babu because they are concerned with sanitation,

12   rather than mental health.  *See* ECF 149 at 11.  But, as Babu's motion for leave to amend

13   and proposed amended complaint make clear, Babu and his counsel are also concerned

14   with sanitation insofar as it relates to Santa Rita Jail's COVID-19 response.  The *Gonzalez*

15   plaintiffs also take issue with Babu's decision to jointly retain an expert, Mike Brady.  *See*

16   ECF 149 at 12.  Their disagreement with Babu's litigation strategy, however, is not

17   sufficient grounds to intervene.  *See League of United Latin Am. Citizens v. Wilson*, 131

18   F.3d 1297, 1306 (9th Cir. 1997).

19          Finally, permissive intervention is not appropriate for similar reasons.  As explained

20   above, the *Gonzalez* plaintiffs have not shown that their interests are inadequately

21   represented by Babu and his counsel.  The *Gonzalez* plaintiffs have also failed to

22   demonstrate that their intervention would not unduly prolong or delay litigation.  The

23   Court first conducted proceedings relating to Santa Rita Jail's COVID-19 response on

24   March 30, 2020.  *See* ECF 85, 86.  Almost six months passed before the *Gonzalez*

25   plaintiffs brought their motion to intervene.  *See* ECF 149.  Permitting intervention now

26   would likely cause undue delay and undermine the parties' progress over the last six

27   months.

28          Accordingly, the Court DENIES the *Gonzalez* plaintiffs' motion to intervene.

SER-144

United States District Court
Northern District of California

## II.    Motion for Leave to Amend

Under Federal Rule of Civil Procedure 15(a)(2), a court "should freely give leave [to amend] when justice so requires."  Rule 15 is applied liberally and a court may not deny leave to amend unless it finds "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, Babu seeks to amend his complaint to clarify their concerns regarding Defendants' COVID-19 related policies and practices.  *See* ECF 173-1.  Babu does not seek to alter their class definition or add additional claims or defendants.  Although Defendants deny the new factual allegations in Babu's proposed amended complaint, they do not oppose Babu's request to amend his complaint.  *See* ECF 181 at 2.

Reviewing Babu's proposed amendments, the Court concludes that there has been no undue delay, bad faith, or improper motive.  Likewise, amendment would not be futile because Babu only seeks to amend his factual allegations.  Given that Defendants do not oppose Babu's motion, Babu's proposed amendments do not prejudice Defendants.

Accordingly, the Court GRANTS Babu's motion for leave to amend.

## III.    Conclusion

The Court DENIES the *Gonzalez* plaintiffs' motion to intervene.  The Court GRANTS Babu's motion for leave to amend his complaint.

**IT IS SO ORDERED.**

Dated:  August 13, 2020

_____
NATHANAEL M. COUSINS
United States Magistrate Judge

SER-145

LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
528 Grand Avenue
Oakland, CA 94610
Telephone: (510) 329-2140
Facsimile:  (510) 580-9410
Email: yhuang.law@gmail.com

DENNIS CUNNINGHAM, SBN 112910
115A Bartlett St.
San Francisco, CA 94110
Telephone: 415-285-8091
Facsimile:  415-285-8092
Email:  denniscunninghamlaw@gmail.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA/ SAN JOSE DIVISION

| | |
|---|---|
| ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNSBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated. | No. 3:19-cv-07423 JSC |
| Plaintiffs, | **ALAMEDA COUNTY MALE PRISONERS** And Former Prisoners, DANIEL GONZALEZ, ROCCI GARRETT, LAWRENCE GERRANS and MICHAEL LUCAS, MARTIN GALLARDO, and SERGIO MORALES-SERVIN REPLY IN SUPPORT OF THEIR MOTION TO INTERVENE AS PLAINTIFFS-INTERVENORS |
| **ALAMEDA COUNTY MALE PRISONERS** And Former Prisoners, DANIEL GONZALEZ, ROCCI GARRETT, LAWRENCE GERRANS and MICHAEL LUCAS, MARTIN GALLARDO, and SERGIO MORALES-SERVIN And JOHN DOEs Nos. 1-- X  on behalf of themselves and others similarly situated, as a Class, and Subclass | |
| Plaintiffs-Intervenors | Date: August 19, 2020<br>Time: 1 p.m.<br>Courtroom: 5, 4th Floor, San Jose<br><br>Hon. Nathanael Cousins, Presiding |
| vs. | |

1

**GONZALEZ PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR INTERVENTION**
*Babu et al. v. Ahern et al.*  United States District Court, Northern District of California, Case No: 5:18-cv-07677 NC

**SER-146**

1  COUNTY OF ALAMEDA; GREGORY J.
2  AHERN in his official capacity as Sheriff of the
   Alameda County Sheriff's Office, et al.

3     Defendants.

4  INTRODUCTION

5     Both Babu plaintiffs and defendants do not deny that Gonzalez' plaintiffs have a significant

6  protectible interest related to covid-19.  Neither Babu plaintiffs nor defendants address the concern

7  that their joint expert lacks all scientific or medical expertise and both ignore the critical difference

8  between the representation afforded the Gonzalez plaintiffs/intervenors and the Babu plaintiffs.

9  This criticial difference is exemplified by the daily, direct communication between the Gonzalez

10 plaintiffs and counsels for the Gonzalez plaintiffs, and the engagement of the Gonzalez plaintiffs in

11 the issue at hand.  Defendant Sheriffs claim without much discussion or factual validation that the

12 Gonzalez plaintiffs and Babu plaintiffs' interests are "identical".   Babu plaintiffs claim that their

13 actions advocating for "enhanced protective measures" are adequate while acknowledging that

14 they have not raised questions concerning the adequacy of medical care, which Gonzalez plaintiffs

15 have raised.  None of the named Babu plaintiffs have contracted COVID-19 while in Santa Rita

16 Jail, raising issues of standing and whether the proposed class meets the ascertain ability

17 requirement.

18    STATEMENT OF FACTS

19    On July 13, 2020, when Plaintiffs/Intervenors filed their motion for intervention,  Santa

20 Rita Jail had five (5) positive inmate  COVID-19 cases, for a total of 72 inmate cases, and six (6)

21 staff/contractor cases, for a total of 41 staff/contractor cases.  Three days later, on July 16, 2020,

22 the number of inmate positive covid cases skyrocketed to 46.  By July 17, 2020, active inmate

23 COVID-19 cases had increased to 101, for a 171 total cases, more than double the total numbers.

24 As of today, two sheriff deputies, including one deputy who had worked in the Santa Rita Jail

25 kitchen have died.  All the inmate kitchen workers tested positive.

26    Plaintiffs/Intervenors counsels receive multiple update calls--daily—from a multitude of

27 the 103 inmates who tested positive in mid-July, covid-19 positive inmates who are currently in the

28 OPHU and not receiving adequate medical care; and, covid positive inmates whom the jail deems

**GONZALEZ PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR INTERVENTION**
*Babu et al. v. Ahern et al.*  United States District Court, Northern District of California, Case No: 5:18-cv-07677 NC

**SER-147**

"completely recovered" and yet report that they had and continue to have, medically untreated symptoms. These inmates have requested retainers for representation by the counsel for the Gonzalez plaintiffs.

COVID-19 cases in California and in Alameda County have also soared in the same period of time, and continue to rise. In the last two weeks of July, Alameda County saw a 26% increase in new cases, with a COVID-19 ratio of 69 cases per 10,000 population. California now has a COVID-19 infection rate of 127 per 10,000 population. California and Alameda have a relatively low death rate, 2% and 1.6% respectively. https://extras.mercurynews.com/coronavirus-tracker/?userCheck=true Santa Rita Jail's inmate death rate is, fortunately at zero (0), but the sheriff's deputy/contractor death rate is 4%, double the California state rate.

https://www.alamedacountysheriff.org/admin_covid19.php

The status conferences on COVID-19 before this Court, was initiated by the Court (Dkt. 77). The Court has stated that the information in these hearings is being shared with all the judges of the Northern District and utilized by the court in developing policies and responses to COVID-19. (March 30, 2020 Transcript p. 26). The Court has also indicated a preference for transparency by directing that data on covid-19 be shared, and that the Jail's Outbreak Control Plan be shared with the public, which led to the creation of the ACSO's Covid-19 webpage. And the Court has stated that science is the basis for evaluating covid-19 and that the issue of COVID-19 is not just about inmate health, but also public health. (April 2, 2020 Transcript p. 27)

The Babu plaintiffs has not raise the issue of appropriate or necessary medical care to COVID-19 positive inmates in these status conferences, although this issue was raised on several occasions by federal public defenders. Babu plaintiffs have filed a motion to for leave to file an amended to add some of the COVID-19 issues. None of the named plaintiffs are indicated to be or have been COVID-19 positive. The primary requests in Babu plaintiffs' proposed first amended complaint are directed at prophylactic measures the Jail could take regarding COVID-19. There is nothing in the proposed amended complaint relating to the medical treatment or lack thereof for active or post COVID-19 infected inmates.

GONZALEZ PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR INTERVENTION
*Babu et al. v. Ahern et al.* United States District Court, Northern District of California, Case No: 5:18-cv-07677 NC

SER-148

**ARGUMENT**

1.  THE BABU PARTIES' LACK OF SCIENTIFIC EXPERTISE HIGHLIGHTS THE INADEQUACY OF THE REPRESENTATION

Science, including medical science and epidemiology, is the underpinning of all efforts directed at COVID-19.  And science is what the Babu parties lack.  Babu defendants critique this issue as merely a difference of "legal tactics".  Babu plaintiffs do not address this issue at all.

For example, in the Babu parties recent evaluation regarding transportation, which was discussed in their joint report (Dkt. 174) and discussed at the July 31, 2020 status conference, there was not a single mention of the issue of aerosols.  COVID-19 is a respiratory ailment, and aerosols are transmitted by humans with each breath.[1]   The aerosol nature of COVID-19 is the reason why outdoor gatherings are permitted but many indoor functions are shuttered.  Yet, in the evaluation of the Santa Rita Jail transportation plan, there were no discussions of air movement, air conditioning, nor the effect of opened or closed windows.  Relying on Mike Brady as an expert *Babu* (5:18-cv-07677-NC) DKT 174, p. 3:9; and having him reviewing and approving the "Covid 19 Transportation Plan." Babu DKT 174, p. 3:6-9; when Mike Brady is not at all qualified to discuss the proper ways to contain a highly contagious, emergent disease is an inadequate, and as such, inadequate representation of the interests of the Gonzalez plaintiffs.   Mike Brady has no medical, no infectious disease, nor even any generalized scientific training. Yet the Babu parties are using him for spot checks of compliance. See Alameda Male Prisoners (3:19-cv-07423-JSC) DKT 28-1, p. 10:17-18.   "Mr. Brady holds a Juris Doctorate from the University of the Pacific, McGeorge School of Law, and a Certificate in Project Management from the University of California at Davis." Id. at p. 3:20-22.

Science or no science is not a mere difference in "legal tactics", but a fundamental question as to the admissibility and whether Mr. Brady's reports, other than as third party eyewitness testimony, can be used to evaluate any of the sufficiency or insufficiencies of Santa Rita Jail's

---

[1] April 16, 2020, N Engl J Med 2020; 382:1564-1567, DOI: 10.1056/NEJMc2004973;

**GONZALEZ PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR INTERVENTION**
*Babu et al. v. Ahern et al.*  United States District Court, Northern District of California, Case No: 5:18-cv-07677 NC

**SER-149**

responses to COVID-19.  *Daubert v. Merrell Dow Pharmaceuticals, Inc*., (Daubert I), 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993.

### 2. GONZALEZ PLAINTIFFS ARE PROVIDING ACCURATE AND IMPORTANT DETAILS OF THE ACTUAL PRACTICES WITHIN SANTA RITA JAIL.

A major difference between the Gonzalez Plaintiffs' interests and the Babu plaintiffs' interests is highlighted by the focus of the Babu plaintiffs on policy, whereas the Gonzalez plaintiffs are focused not only on policy buy also in the implementation of that policy.  The incredible spike in Covid-19 cases in mid-July indicates that despite the Jail's articulated COVID-19 response plan, and the frequent representations to the Court that the jail's efforts are "above and beyond any other facility" (March 30, 2020 Hearing Transcript, p. 44, Line. 23) and that "[t]he sheriff's office is at the forefront of correctional institutions with regard to facing the covid-19 pandemic." (April 10, 2020 Hearing Transcript, p. 4, l. 4); the policies implemented by mid-July were not sufficient to meet the challenges of COVID-19.  And the incidence of the virus is increasing.

The devil's in the details.  There's been no clear report on the results off the contact tracing, but the available public information shows that one of the two Alameda County Sheriff deputies who died of COVID-19, had been assigned to the kitchen; all the kitchen workers tested positive; and, because only the deputy had the ability to enter and exit the jail, the deputy was a highly likely source of covid-19 infection within the jail.  (See Declaration of Gilbert Martinez, ¶2)

### A. The Communication And Close Relationships Between Gonzalez Class Members And Gonzalez Counsel Facilitate Sharing Of Valuable Real Time Information.

One significant difference in the representation of the Gonzalez Plaintiffs from that of the Babu Plaintiffs and is highlighted in the frequency and volume level of communication between the actual class members and Gonzalez' counsels; allows real time information sharing.  (See Declaration of Gilbert Martinez, ¶ 17)  This real time, unfiltered information sharing, which is frequently disparaged by Babu defense counsel, should be welcome and integrated into Jail protocols, because as the Court recognized, the spread of COVID-19, can easily become a

**GONZALEZ PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR INTERVENTION**
*Babu et al. v. Ahern et al.*  United States District Court, Northern District of California, Case No: 5:18-cv-07677 NC

**SER-150**

community wide issue, as evidenced by the uncontrolled outbreak at San Quentin which quickly became the worst outbreak in the State; swamping Marin County's medical facilities; and sick inmates had to be sent to San Mateo's Seton Medical Center https://www.mercurynews.com/2020/06/29/sick-san-quentin-prisoners-could-be-sent-to-seton-medical-center-newsom-says/ .

Although there has not been any public information provided on the root causes of that sudden COVID-19 spike in mid-July in Santa Rita Jail, inmates themselves have relayed observations of contributing factors. Transparency, especially with such a fast moving pandemic can provide greater insight. As evidenced by the observations of Gilbert Martinez, (Dec. Gilbert Martinez ¶¶2-3, 16) there are weaknesses and possible miscalculations that contributed to entire housing units being infected, and a spike of 100 plus infected inmates.

        B. Babu Plaintiffs' Insufficient Real Time Communications Masks The Weaknesses of The Jail's COVID Response.

In Santa Rita Jail, as observed by Mike Brady, sheriff deputies were not consistent in wearing masks. While Babu defendants highlight that it has "enhanced its discipline policy for staff members to maximize compliance with ACSO's policy of requiring staff to wear masks at SRJ," punishment and discipline has its limits. And defendant Sheriff's propensity is for punishment and discipline. A spoonful of sugar is often more helpful in encouraging cooperation, and that apparently may be true with wearing masks and cooperation in testing. At the July 31, 2020 hearing, Mr. Borenstein cited the disparity between Santa Rita Jail and Monterey County, wherein the inmate test refusal rate in Monterey County is one percent, while the test refusal rate at Santa Rita Jail is closer to 30%. (Dkt. 174, p.8,L.6) Another disconnect is between policy and implementation is highlighted. Despite defendant sheriff's assertion that updated educational videos are available for inmates, (Dkt. 174, p. 10, l. 11) these videos obviously have not changed behavior. The discrepancies the between policy and practice within Santa Rita Jail need to be examined. (See Decl. Gilbert Martinez ¶¶ 15-17, Eric Wayne 2-3, Troy Powell ¶¶2-5)

GONZALEZ PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR INTERVENTION
*Babu et al. v. Ahern et al.* United States District Court, Northern District of California, Case No: 5:18-cv-07677 NC

SER-151

Santa Rita Jail has a plethora of policies, probably more than many other local Bay Area Jails. By highlighting the unintended consequences of defendant Sheriff's policies, the Court will be able to ferret out why the covid-19 infection rate at Santa Rita has been so much higher than at any other Bay Area county jail, and to hopefully prevent another spike in COVID-19 infections that could result in a death. Real time, on the ground details are what is necessary for development of an effective Covid-19 Response Plan.

### 3. BABU PLAINTIFFS FAILED TO ADVOCATE FOR IMPROVING THE DIRECT LEVEL OF CARE THE JAIL PROVIDES COVID-19 INFECTED INMATES.

Babu plaintiffs have focused on prevention. This is evidenced by the list of obtainables Babu plaintiffs claim credit for. (Dkt. 169, p. 5-6). None of the obtainables Babu plaintiffs claim credit for pertain to the manner in which COVID-19 infected inmates receive treatment, or improve or have changed the medical treatment or lack thereof that COVID-19 infected inmates have received since the pandemic started. This focus on prevention is evidenced in Babu plaintiffs' proposed first amended complaint. Babu plaintiffs' proposed First Amended complaint, focuses exclusively on those individuals with psychiatric disabilities, or mental health issues, and only addresses the needs of covid-19 infected inmates in generic language, "ensuring proper procedures and policies", "proper operation of quarantine units and medical isolation units" Dkt. 173-1. ¶7

During the status update hearings, members of the Federal public defenders raised specific issues, but not the Babu plaintiffs. Specific issues raised by Federal public defenders included lack of sanitation, concerns over the nomenclature of asymptomatic when clients are "very symptomatic" (3.30.2020 Hearing Transcript pp. 55, 58-59) A member of the public raised the issue of adequate language translations Ibid at 57. Yet, these issues remain and have not been sufficiently addressed. The jail maintains a website that categorizes individuals as asymptomatic and recovered when these individuals report that they are still symptomatic. (See Dec. Gilbert Martinez ¶ ¶ 5-8) And on March 30, 2020, the issue of language translation was raised, and the issue remains that covid-19 infected Spanish speaking inmates are not receiving information in Spanish. (See Dec. Adrian Contreras ¶10)

GONZALEZ PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR INTERVENTION
*Babu et al. v. Ahern et al.* United States District Court, Northern District of California, Case No: 5:18-cv-07677 NC

SER-152

A. Babu Plaintiffs Only Seek Injunctive Relief And Attorneys' Fees.

Babu Plaintiffs are seeking declaratory and injunctive relief and attorneys' fees. Babu Plaintiffs are not seeking damages for any class member. Injunctive relief, and particularly for a class, is an inherently broad brush. Therefore, Babu plaintiffs' complaint is, by choice, less of a focus on the class members, less of a focus on the actual injuries suffered and the nature and specifics of those injuries and more of a focus on the institution, specifically increasing institutional capacity, which the prior actions in this litigation bears out.

One of the pitfalls of seeking only injunctive relief, and having that injunctive relief designed out by a third party expert is that even if the injunctive relief, in this case, the prevention policies Babu plaintiffs have advocated and are advocating; are completely adequate, prevention alone is less than half the equation. For prevention to be effective, there has to be a high caliber of implementation. And for those times in which prevention fails, there must be an adequate medical response to the needs of those inmates who have been or become infected. But in the case of Santa Rita Jail, even the prevention policy is clearly inadequate, given the July spike in infections and the overall increase of covid-19 cases in Alameda County and the State of California.

B. Gonzalez Plaintiffs Seek Injunctive Relief and Damages

Gonzalez Plaintiffs seek injunctive relief and damages, and by having a focus on both remedies, has a more detailed and in-depth lens to investigate the actual impact and outcomes of jail policies, on a daily level, including the impact of these policies on individual inmates. By having a lens partially focused on the people who are to significantly impacted, Gonzalez Plaintiffs understand that any injunctive relief crafted cannot merely appear to improve conditions, but needs to actually improve and ameliorate the problems sought, without creating new and additional unintended consequences. This difference in relief sought by Babu plaintiffs and Gonzalez plaintiffs, changes the focus and breadth of the representation, and for this reason, Gonzalez Plaintiffs assert that the representation to date has been inadequate, and seek intervention.

4. CONCLUSION

Whereas, because the Court is genuinely interested in successfully limiting the spread of Covid-19 in Santa Rita Jail; then having the individuals primarily and immediately affected, the

GONZALEZ PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR INTERVENTION
*Babu et al. v. Ahern et al.* United States District Court, Northern District of California, Case No: 5:18-cv-07677 NC

SER-153

1    inmates, as an active, cooperative and positive contributor toward that goal, is a benefit to the

2    inmates, to the jail, and to the community at large.  Gonzalez plaintiffs request that this Court grant

3    their motion for intervention.

4    DATED: August 3, 2020                    **LAW OFFICE OF YOLANDA HUANG**

5

6                                             __/s/ Yolanda Huang_____
                                             Yolanda Huang
7

8                                            **DENNIS CUNNINGHAM**

9

10                                           __/s/ Dennis Cunningham_____

11                                           *Counsel for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SER-154**

LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
528 Grand Avenue
Oakland, CA 94610
Telephone: (510) 329-2140
Facsimile: (510) 580-9410
Email: yhuang.law@gmail.com

DENNIS CUNNINGHAM, SBN 112910
115A Bartlett St.
San Francisco, CA 94110
Telephone: 415-285-8091
Facsimile: 415-285-8092
Email: denniscunninghamlaw@gmail.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA/ SAN JOSE DIVISION

| | |
|---|---|
| ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNSBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated. <br><br> Plaintiffs, <br><br> **ALAMEDA COUNTY MALE PRISONERS** And Former Prisoners, DANIEL GONZALEZ, ROCCI GARRETT, LAWRENCE GERRANS and MICHAEL LUCAS, MARTIN GALLARDO, SERGIO MORALES-SERVIN, DWIGHT ADAMS, SAUL ESPINOSA, CEDRIC HENRY, OCIE LEE JOHNSON, TYRONNE ALEXANDER JONES, MATTHEW PIERCE, DIONTAY SHACKLEFORD, ERIC WAYNE, And JOHN DOEs Nos. 1-- X on behalf of themselves and others similarly situated, as a Class, and Subclass | No. 5:18-cv-07677 <br><br> **DECLARATION OF ADRIAN CONTRERAS** IN SUPPORT OF **ALAMEDA COUNTY MALE PRISONERS** And Former Prisoners, DANIEL GONZALEZ, et al's MOTION TO INTERVENE. <br><br> Hon. Nathanael Cousins, presiding |

1

DECLARATION OF ADRIAN CONTRERAS IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR INTERVENTION
*Babu, et al. v. Ahern, et al.* United States District Court, Northern District of California, Case No. 5:18-cv-07677 NC

SER-155

|  | Plaintiffs-Intervorns |
| --- | --- |
| | vs. |
| | COUNTY OF ALAMEDA; GREGORY J. AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office, et al. |
| | Defendants. |

I, ADRIAN CONTRERAS, declare:

1. I am currently incarcerated in Santa Rita Jail. I am housed in Housing Unit 6. I have health issues which, if I caught COVID-19, would make it dangerous for me, so I am very careful about COVID-19.

2. I believe that I was diagnosed as being infected with COVID-19 around July 7, 2020. At that time, I was in Housing Unit 22. While I was in Housing Unit 22, there was a lot of inmate movement. I was moved numerous times. Around three or four weeks ago, I started feeling a soreness in my nose and throat. Then I started getting a stomach ache, and having a hard time breathing. I was hyperventilating, like I only had lung." One time, I was coughing so badly, I urinated on myself. It was so bad; I told the deputies. They told me to pack up my belongings for reclassification to HU 8 – quarantine. I immediately fell asleep. Several hours later, the deputies woke me up and told me I was going to the hospital. My throat was so swollen I couldn't breathe and it felt like someone had kicked my chest. I believe I was taken to a local hospital. I was drenched in sweat and delirious.

3. Twenty-four hours later, they said I was stabilized and taken back to jail. Going to the OPHU at Santa Rita Jail was a shock. At the hospital, a nurse or doctor explained everything to me. I felt confident that I was being taken care of, because I was being taken care of. In the OPHU, I still had terrible cramps, diarrhea and couldn't breathe. But in the OPHU, no one told me anything. They would not tell me what was going on. They would not even tell me what my temperature was. The only thing they told me was that there is no medication for the virus. So, only when I was coughing so badly right in front of their face, and choking, would they give me anything at all for being sick. They made it seem like it was my fault I caught the disease.

2

DECLARATION OF ADRIAN CONTRERAS IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR INTERVENTION
*Babu, et al. v. Ahern, et al.* United States District Court, Northern District of California, Case No. 5:18-cv-07677 NC

SER-156

4. In the OPHU I got the chills a lot. I repeatedly asked for my temperature to be read back, and they always refused. Finally, I refused to let them take my temperature because there was no point. I felt like they did not care and were not treating me like a human being.

5. Then I was moved from the OPHU to Housing Unit 8C, which is solitary confinement. HU 8C was very cold. In the move, I lost much of my property and clothes, including my thermals. It will be hard to get thermals again because I am indigent. I also lost my reading materials, laundry soap and drawing pencils. Why would they take away my property?

6. In HU 8C, I asked for books and was told "no books". The deputies told me that the whole jail is shut down and they cannot give me anything. In HU 8C I did not receive laundry exchange or cleaning supplies for 2 weeks. I only received POD time every 48 hours. This means that trash in each cell piles up for 2 days straight. We eat breakfast, lunch and dinner on trays in our cells. Since the jail does not pick up trash, all those trays and left over food sits around for 48 hours. The jail just comes by and passes out the trays and shuts the tray slot.

7. I like being clean and want to stay in a clean cell. I kept trying to get cleaning supplies. This not being able to be clean, not being able to talk to anyone, not getting a response from the jail was taking a toll on me. After a while, the people in 8C started complaining and asking questions – what kind of medication are you offering us? The deputies responded aggressively to questions. If you ask a question, they threaten to take your canteen or tablet. This makes people petrified because they have so few privileges, they don't want to lose any privileges.

8. It is cold in 8C. I have asked for an extra blanket, and the jail will not give me one. My throat is raw and hurts from coughing, I have asked for cough syrup, and the nurse says they are not giving out cough syrup because "they mask the symptoms". I asked for cough drops and the nurse says the same thing. Every night I get a bad headache. I only received cough syrup and Tylenol for 3 days, and I have had covid for over 3 weeks.

9. My current symptoms are: fatigue. I have no energy and I used to be an energetic person. I have cold chills and a soreness in my throat. I get body pains when I lay down for any amount of time. These are not muscle soreness pains, but like a pain in my bones, that shoe up and down my legs from my feet to my hips.

**SER-157**

10.  I speak some Spanish, but I am not fluent.  In HU 8C, there are some guys I call Paisas, who speak only Spanish.  They are very confused and afraid.  There's an older man here who is sick and shaking and can't speak English.  On one has bothered to get an interpreter.  No one at the jail is bothering to explain to him what is going on with him and what is going to happen.

10.  Now they are telling me that if I test negative twice, they will move me out of here.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Because of the coronavirus, and my confinement, I was not able to sign this declaration in person. This declaration was read to me on the phone by Yolanda Huang on July 28, 2020.

On August 1, 2020, I phoned Yolanda Huang to tell her that I had tested negative twice and was moved to Housing Unit 22.

I understand and verify its contents in full, and authorize Yolanda Huang to sign it on my behalf.

Executed on August 3, 2020, in Oakland, California.


__/s/  Yolanda Huang_____
Signed by Yolanda Huang
On behalf of Adrian Contreras

4

DECLARATION OF ADRIAN CONTRERAS IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR INTERVENTION
*Babu, et al. v. Ahern, et al.*  United States District Court, Northern District of California, Case No. 5:18-cv-07677 NC

SER-158

1  LAW OFFICES OF YOLANDA HUANG
   YOLANDA HUANG, SBN 104543
2  528 Grand Avenue
   Oakland, CA 94610
3  Telephone: (510) 329-2140
   Facsimile: (510) 580-9410
4  Email: yhuang.law@gmail.com

5
   DENNIS CUNNINGHAM, SBN 112910
6  115A Bartlett St.
   San Francisco, CA 94110
7  Telephone: 415-285-8091
   Facsimile: 415-285-8092
8  Email: denniscunninghamlaw@gmail.com

9
   Attorneys for Plaintiffs
10

11
                 UNITED STATES DISTRICT COURT
12
      NORTHERN DISTRICT OF CALIFORNIA/ SAN JOSE DIVISION
13

14 | ASHOK BABU, ROBERT BELL, IBRAHIM          No. 5:18-cv-07677
   | KEEGAN-HORNSBY, DEMAREA
15 | JOHNSON, BRANDON JONES,
   | STEPHANIE NAVARRO, ROBERTO              **DECLARATIONOF GILBERT
16 | SERRANO, and ALEXANDER                 MARTINEZ** IN SUPPORT OF
17 | WASHINGTON on behalf of themselves and  **ALAMEDA COUNTY MALE
   | all others similarly situated.          PRISONERS** And Former Prisoners,
18 |                                         DANIEL GONZALEZ, et al's
   |                                         MOTION TO INTERVENE.
19 |           Plaintiffs,
20 |                                         Hon. Nathanael Cousins, presiding
   | **ALAMEDA COUNTY MALE PRISONERS**
21 | And Former Prisoners, DANIEL GONZALEZ,
   | ROCCI GARRETT, LAWRENCE GERRANS
22 | and MICHAEL LUCAS, MARTIN
   | GALLARDO, SERGIO MORALES-SERVIN,
23 | DWIGHT ADAMS, SAUL ESPINOSA,
   | CEDRIC HENRY, OCIE LEE JOHNSON,
24 | TYRONNE ALEXANDER JONES,
   | MATTHEW PIERCE, DIONTAY
25 | SHACKLEFORD, ERIC WAYNE,  And JOHN
   | DOEs Nos. 1-- X  on behalf of themselves and
26 | others similarly situated, as a Class, and
27 | Subclass
28 |

                                    1

Plaintiffs-Intervenors

vs.

COUNTY OF ALAMEDA; GREGORY J.
AHERN in his official capacity as Sheriff of the
Alameda County Sheriff's Office, et al.

Defendants.

I, GILBERT MARTINEZ, declare:

1. I am currently incarcerated in Santa Rita Jail. I was a kitchen worker, and I was a POD worker. On July 8, 2020, all the kitchen workers and laundry workers were housed in Housing Unit ("HU") 25. Kitchen workers were in 25 A, B and C. Laundry workers were in D and E. On Thursday the 9th, we were told that all of us would be moved so that remodeling could be done to the HU 25 lower A bathroom. Although the housing unit deputy said he thought it was a bad idea to mix everyone, Classification Sargeant Calaveri made the decision, and the kitchen workers packed up and moved. Laundry workers were all concentrated in lower D. Kitchen workers were everywhere else. On the day we moved, Tom McHale became sick and they removed him from the housing. That night, there were 66 men in 50 bunks in D and E.

2. While in the kitchen, deputy Rocha was on duty. Deputy Rocha is the deputy who was ultimately hospitalized for covid-19, and died from it. While in duty in the kitchen, Deputy Rocha frequently did not wear his mask, or would pull it down to his chin. On a number of occasions, I walked past deputy Rocha while working in the kitchen, when he did not have a mask on.

3. Over the next four days day, four more inmates became sick, so on Monday July 13, 2020, the jail gave everyone in HU 25 the covid-19 test. And the following day, all the tests came back, that everyone was positive for covid-19. I believe that by moving all of the workers together, and packing us into a smaller area, contributed to all of us testing positive for COVID-19.

4. We were all told that we would get medical care, that we would see a doctor at least once a day, but that did not happen. For the first three days, everyone got Tylenol, 500 mg, once

2

DECLARATION OF GILBERT MARTINEZ IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR INTERVENTION
*Babu, et al. v. Ahern, et al.* United States District Court, Northern District of California, Case No. 5:18-cv-07677 NC

SER-160

a day.  After the third day, no one received anything for how they feel.  We were also not getting any soap.

5.  By Wednesday, July 22, 2020, many of us were alarmed that we were not getting any medical care.  I am congested and have a hard time breathing. I am sneezing and coughing.   My fever comes and goes.  My body has lots of pain.  I am diabetic and concerned about my health.  The meals we receive have been on dirty trays with left over crusted food from past meals on the trays.

6.  Because of these very crummy conditions, I agreed to give an interview to the news.  The only change that has happened is that after the article came out on July 16, 2020, the following week, the jail finally made the improvement of getting rid of those dirty plastic trays for regular meals.  Regular meals are now served on paper trays.  Diet tray, however, are still served on the plastic trays with the same issue of encrusted old food on the bottom.

7.   When I asked the nurse (whose name I could not see because her tag was covered up by her protective equipment) for something to help with my covid-19 symptoms, the nurse said, there's nothing she can prescribe me or anyone else in my pod, and that giving us Tylenol will "cover-up" the symptoms.  So most of us are left to feel terrible.  The doctor, I believe her name is Dr. Molitoris or Dr. Molitorig told me that if we keep complaining about symptoms, she will extend our quarantine, but still refuses to give us anything for our pains or discomfort.

8.  Then, I read the news article in the East Bay Times by Angela Ruggiero that the jail is claiming we are "asymptomatic" and that made me more alarmed.

9.  Many of us have filed grievances on our lack of medical care.  We have asked the Housing Unit deputy to turn on his body-worn-camera and record our statements to the nurse, detailing our symptoms.

10. I am especially concerned that the jail seems to be "rushing" our recovery so that we can go back to work.  All of us feel that we should be getting medical help, and none of us should go back to work until we are tested and confirmed to be covid negative.  We do not want to give this to others.

SER-161

11. Today, July 28, 2020, several of the inmates had to be taken to HU 8 or the OPHU because they have gotten sicker. However, I know that even in HU 8 or the OPHU, the jail does nothing more for them than they do for us. I am very concerned about this lack of medical care.

12. My sister in a registered nurse, and head of nursing at the hospital where she works. In calls with my sister, she told me to ask for an H1 and H2 blockers and anti-histamines such as zyrtec. After my sister gave me this advice, I told the morning medical provider and received Zyrtec and Tylenol for about two days. The Zyrtec was very helpful and allowed me to breathe and sleep at night. However, after two days, the jail cut off all medicine, and gave me nothing for my covid-19 symptoms. For over two weeks, I have not received any medication for the difficulty I have breathing.

14. By August 3, 2020, all of us except for one inmate who had been moved into Housing Unit 34, was put back to work.

15. The Jail has issued new rules about masks, and supposedly everyone, deputies and inmates are suppose to wear a mask. However, I have seen, recently, within the last week, deputies skirting the mask rules. What a deputy will do when they want to speak with someone close to them and be able to talk in a lowered voice, is they will pull the mask away from their face, perhaps 2 inches, and then lean in to talk to that person, be he inmate or fellow deputy. About two-thirds of the deputies are wearing N95 masks. The other third wear a thin blue cloth mask with the sheriff's logo on it.

16. I learned over the weekend that HU 22, the other housing unit where everyone became infected with covid-19, became infected because a new book arrived with covid-19, tested positive for it, and then the jail did not act quickly enough to isolate this person, so this person gave it to the whole housing unit.

16. Although I have been deemed "recovered" and put back to work, I still have pain while breathing. This morning, I spoke to a Dr. Madon (sp?) and Dr. Madon said that perhaps I have ARDS, acute respiratory distress syndrome, perhaps due to the covid-19 virus. He said I would get tested for it. I am waiting for a test. I have had trouble breathing since I was diagnosed with covid-19 around July 13, 2020.

4

DECLARATION OF GILBERT MARTINEZ IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR INTERVENTION
*Babu, et al. v. Ahern, et al.* United States District Court, Northern District of California, Case No. 5:18-cv-07677 NC

SER-162

17. I tried reaching out to Rosen, Bien, and to the Law Office of Yolanda Huang. I have found the Law Office of Yolanda Huang to be accessible, responsive and pro-active. As a result, I have continued my communications with the Law Office of Yolanda Huang, and agreed to submit this declaration to the Court. I and 21 inmates who are now suffering from covid-19, have agreed to communicate and work with the Law Office of Yolanda Huang, and have asked the Law Office of Yolanda Huang to represent us regarding covid-19 and conditions of confinement at Santa Rita Jail. All 21 of us were jail workers who were housed in HU 23 and caught covid-19 because the jail forced everyone to be housed together and because the jail's procedures did not catch Deputy Rocha in enough time. I am waiting for the retainer agreement to arrive.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Because of the coronavirus, and my confinement, I was not able to sign this declaration in person. This declaration was read to me on the phone by Yolanda Huang on July 28, 2020. Then on August 3, 2020, I phoned Yolanda Huang back with more information to be included in this declaration. I understand and verify its contents in full, and authorize Yolanda Huang to sign it on my behalf.

Executed on August 3, 2020, in Oakland, California.


_____/s/ Yolanda Huang_____
Signed by Yolanda Huang
On behalf of Gilbert Martinez

5

DECLARATION OF GILBERT MARTINEZ IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR INTERVENTION
*Babu, et al. v. Ahern, et al.* United States District Court, Northern District of California, Case No. 5:18-cv-07677 NC

SER-163

LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
528 Grand Avenue
Oakland, CA 94610
Telephone: (510) 329-2140
Facsimile: (510) 580-9410
Email: yhuang.law@gmail.com

DENNIS CUNNINGHAM, SBN 112910
115A Bartlett St.
San Francisco, CA 94110
Telephone: 415-285-8091
Facsimile: 415-285-8092
Email: denniscunninghamlaw@gmail.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA/ SAN JOSE DIVISION

| | |
|---|---|
| ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNSBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated. <br><br> Plaintiffs, <br><br> **ALAMEDA COUNTY MALE PRISONERS** And Former Prisoners, DANIEL GONZALEZ, ROCCI GARRETT, LAWRENCE GERRANS and MICHAEL LUCAS, MARTIN GALLARDO, SERGIO MORALES-SERVIN, DWIGHT ADAMS, SAUL ESPINOSA, CEDRIC HENRY, OCIE LEE JOHNSON, TYRONNE ALEXANDER JONES, MATTHEW PIERCE, DIONTAY SHACKLEFORD, ERIC WAYNE, And JOHN DOEs Nos. 1-- X on behalf of themselves and others similarly situated, ~~as a Class, and Subclass~~ | No. 5:18-cv-07677 <br><br> **DECLARATIONOF TROY POWELL** IN SUPPORT OF **ALAMEDA COUNTY MALE PRISONERS** And Former Prisoners, DANIEL GONZALEZ, et al's MOTION TO INTERVENE. <br><br> Hon. Nathanael Cousins, presiding |

1

DECLARATION OF TROY POWELL IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR INTERVENTION
*Babu, et al. v. Ahern, et al.* United States District Court, Northern District of California, Case No. 5:18-cv-07677 NC

**SER-164**

<table>
<tr><td>Plaintiffs-Intervenors<br><br>vs.<br><br>COUNTY OF ALAMEDA; GREGORY J.<br>AHERN in his official capacity as Sheriff of the<br>Alameda County Sheriff's Office, et al.<br><br>Defendants.</td></tr>
</table>

I, ERIC WAYNE, declare:

    1. I am currently incarcerated in Santa Rita Jail. I am housed in Housing Unit 6. I want to inform the Court that the jail goes by what is suppose to be, rather than what is. This is particularly about sanitation issues.

    2. The shower rooms in my housing unit are not clean because it is used by men as a bathroom. This is because when we are out at POD time, there is no bathroom. Our toilets are in our cells, and during POD time, our cells are locked. Therefore, inmates will go into the shower to use the bathroom, leading to a very unhealthy situation.

    3. I have filed grievances, but the grievances are denied. The jail just cites what is suppose to happen, not what is happening. Anyone who walks into our shower area can immediately tell that it is used as a bathroom because of the smell. The jail claims that they open the cell door, once an hour so men can go in and use the toilet. However, the system that the jail uses does not work well. Meaning, if someone has to go to the bathroom, and does go into the cell, then the technician turns the television off. This makes the men who are watching television irritated, and if someone is in their cell going to the bathroom, then this causes tensions. So to get along, most men just use the shower rather than risk a confrontation.

    4. And, the showers are not cleaned even once a day. The showers sometimes are not even cleaned once a week. There is black mold on the floors and some fuzzy yellow stuff on the walls. I now have a bad case of a very contagious fungal infection called: tinea manuum, which is very uncomfortable, and creams the jail has given me is not working.

    5. On August 1, 2020, our housing unit deputy was letting us out for yard time, he had a bandana on his face as a mask. As people were lining up to go outside, the deputy pulled his

bandana down and was talking to the inmates giving them instructions. Then the deputy turned around and the inmates walked behind him as he continued talking and walking, without a mask.

I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Because of the coronavirus, and my confinement, I was not able to sign this declaration in person. This declaration was read to me on the phone by Yolanda Huang on August 3, 2020. I understand and verify its contents in full, and authorize Yolanda Huang to sign it on my behalf. Executed on August 3, 2020, in Oakland, California.


___/s/ Yolanda Huang_____
Signed by Yolanda Huang
On behalf of TROYPOWELL

DECLARATION OF TROY POWELL IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR INTERVENTION
*Babu, et al. v. Ahern, et al.* United States District Court, Northern District of California, Case No. 5:18-cv-07677 NC

SER-166

1   LAW OFFICES OF YOLANDA HUANG
    YOLANDA HUANG, SBN 104543
2   528 Grand Avenue
    Oakland, CA 94610
3   Telephone: (510) 329-2140
    Facsimile:  (510) 580-9410
4   Email: yhuang.law@gmail.com

5
    DENNIS CUNNINGHAM, SBN 112910
6   115A Bartlett St.
    San Francisco, CA 94110
7   Telephone: 415-285-8091
    Facsimile:  415-285-8092
8   Email:  denniscunninghamlaw@gmail.com

9
    Attorneys for Plaintiffs
10

11
                    UNITED STATES DISTRICT COURT
12
         NORTHERN DISTRICT OF CALIFORNIA/ SAN JOSE DIVISION
13

14   ─────────────────────────          No. 5:18-cv-07677
     ASHOK BABU, ROBERT BELL, IBRAHIM
15   KEEGAN-HORNSBY, DEMAREA
     JOHNSON, BRANDON JONES,           **DECLARATIONOF ERIC WAYNE**
16   STEPHANIE NAVARRO, ROBERTO        IN SUPPORT OF **ALAMEDA**
     SERRANO, and ALEXANDER            **COUNTY MALE PRISONERS** And
17   WASHINGTON on behalf of themselves and   Former Prisoners, DANIEL
     all others similarly situated.     GONZALEZ, et al's  MOTION TO
18                                       INTERVENE.
19                Plaintiffs,
                                         Hon. Nathanael Cousins, presiding
20
     **ALAMEDA COUNTY MALE PRISONERS**
21   And Former Prisoners, DANIEL GONZALEZ,
     ROCCI GARRETT, LAWRENCE GERRANS
22   and MICHAEL LUCAS, MARTIN
     GALLARDO, SERGIO MORALES-SERVIN,
23   DWIGHT ADAMS, SAUL ESPINOSA,
     CEDRIC HENRY, OCIE LEE JOHNSON,
24   TYRONNE ALEXANDER JONES,
     MATTHEW PIERCE, DIONTAY
25   SHACKLEFORD, ERIC WAYNE,  And JOHN
     DOEs Nos. 1-- X  on behalf of themselves and
26   others similarly situated, as a Class, and
     Subclass
27

28

                                    1

DECLARATION OF ERIC WAYNE IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR INTERVENTION
*Babu, et al. v. Ahern, et al.*  United States District Court, Northern District of California, Case No. 5:18-cv-07677 NC

**SER-167**

|  |
|---|
| Plaintiffs-Intervenors |
| vs. |
| COUNTY OF ALAMEDA; GREGORY J. AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office, et al. |
| Defendants. |

I, ERIC WAYNE, declare:

    1.  I am currently incarcerated in Santa Rita Jail.  I am housed in Housing Unit 6.  I have health issues which, if I caught COVID-19, would make it dangerous for me, so I am very careful about COVID-19.

    2.  From the behavior of various sheriff deputies, they are not taking this COVID-19 thing seriously.  On Friday, July 31, 2020, deputy Leyba came into our housing unit, to let us out for our PM pod time.  He had his mask on, but below his chin.  He was walking around during POD time, talking to people, inches apart from inmates.  I said something, and he cracked a joke, and said "Cut it out".

    3.  This morning, at around 5:12 a.m., deputy Caron came into our housing unit 6 B, with a male RN, for pill call.  Deputy Caron was escorting the nurse.  He had no mask on, and inmates were walking up to the RN for their daily medication.  The nurse had a N95 mask on.

    I declare under penalty of perjury of the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and belief. Because of the coronavirus, and my confinement, I was not able to sign this declaration in person. This declaration was read to me on the phone by Yolanda Huang on August 3, 2020. I understand and verify its contents in full, and authorize Yolanda Huang to sign it on my behalf. Executed on August 3, 2020, in Oakland, California.

             __/s/ Yolanda Huang_____
             Signed by Yolanda Huang
             On behalf of Eric Wayne

DECLARATION OF ERIC WAYNE IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR INTERVENTION
*Babu, et al. v. Ahern, et al.*  United States District Court, Northern District of California, Case No. 5:18-cv-07677 NC

SER-168

1  LAW OFFICES OF YOLANDA HUANG
   YOLANDA HUANG, SBN 104543
2  528 Grand Avenue
   Oakland, CA 94610
3  Telephone: (510) 329-2140
   Facsimile: (510) 580-9410
4  Email: yhuang.law@gmail.com

5
   DENNIS CUNNINGHAM, SBN 112910
6  115A Bartlett St.
   San Francisco, CA 94110
7  Telephone: 415-285-8091
   Facsimile: 415-285-8092
8  Email: denniscunninghamlaw@gmail.com

9
   Attorneys for Plaintiffs
10

11
                    UNITED STATES DISTRICT COURT
12
        NORTHERN DISTRICT OF CALIFORNIA/ SAN JOSE DIVISION
13

14
   ASHOK BABU, ROBERT BELL, IBRAHIM          No. 5:18-cv-07677 NC
15 KEEGAN-HORNSBY, DEMAREA
   JOHNSON, BRANDON JONES,
16 STEPHANIE NAVARRO, ROBERTO               [Proposed] ORDER GRANTING
   SERRANO, and ALEXANDER                   *GONZALEZ* PLAINTIFFS' REQUEST
17 WASHINGTON on behalf of themselves and   TO INTERVENE AS PLAINTIFF-
   all others similarly situated.           INTERVENOR
18

19              Plaintiffs,

20
   **ALAMEDA COUNTY MALE PRISONERS**
21 And Former Prisoners, DANIEL GONZALEZ,
   ROCCI GARRETT, LAWRENCE GERRANS
22 and MICHAEL LUCAS, MARTIN
   GALLARDO, and SERGIO MORALES-
23 SERVIN And JOHN DOEs Nos. 1-- X  on
   behalf of themselves and others similarly
24 situated, as a Class, and Subclass

25
                Plaintiffs-Intervenors
26

27 vs.

28

                                    1

[Proposed] ORDER ON GONZALEZ PLAINTIFFS' MOTION FOR INTERVENTION
*BABU et al v. AHERN, et al.,*  United States District Court, Northern District of California, Case No No. 5:18-cv-07677

**SER-169**

COUNTY OF ALAMEDA; GREGORY J.
AHERN in his official capacity as Sheriff of the
Alameda County Sheriff's Office, et al.

Defendants.

1
2
3

4        After considering the Gonzalez Plaintiffs' motion to intervene and the response, the Court

5  finds that intervention is appropriate under Fed. Rules of Civ. Proc. 24(a) and 24(b).

6        The request for intervention is granted.

7

8

9  DATED: _____, 2020

10

11                                _____

12                                U.S. DISTRICT JUDGE

[Proposed] ORDER ON GONZALEZ PLAINTIFFS' MOTION FOR INTERVENTION
*BABU et al v. AHERN, et al.,* United States District Court, Northern District of California, Case No No. 5:18-cv-07677

SER-170