**Case Nos. 22-15275, 22-15355, 22-15363, 22-15579**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ASHOK BABU, ET AL.,
*Plaintiffs-Appellees*,

v.

KEENAN G. WILKINS, AKA NERRAH BROWN,
*Objector–Appellant*,

TYLER ABBOTT, ET AL.,
*Objectors–Appellants*,

AMERICAN FRIENDS SERVICE COMMITTEE, ET AL.,
*Objectors–Appellants*,

REGINALD ROBERTSON,
*Objector–Appellant*,

v.

GREGORY J. AHERN, SHERIFF, ET AL.,
*Defendants-Appellees*.

Appeal From The United States District Court,
Northern District of California
Case No. 5:18-cv-07677-NC
Magistrate Judge Nathanael Cousins

**PLAINTIFFS-APPELLEES' REQUEST FOR JUDICIAL NOTICE**

**ROSEN BIEN GALVAN & GRUNFELD LLP**
Lisa Ells
Kara J. Janssen
Amy Xu
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
*Attorneys for Plaintiffs-Appellees*

[4272166.3]

Pursuant to Federal Rule of Evidence 201, Plaintiffs-Appellees ("Plaintiffs") ask the Court to take judicial notice of the following documents in support of Plaintiffs' Answering Brief.

1.  The June 20, 2019 Consent Decree regarding the Sacramento County Jail in *Mays v. Cnty. of Sacramento*, 2:18-cv-02081-TLN-KJN (E.D. Cal. June 20, 2019), which the United States District Court for the Eastern District of California approved and entered as an order (ECF No. 85-1). A true and correct copy of the Sacramento County consent decree is attached hereto as **Exhibit 1**.

2.  The September 3, 2015 Joint Settlement Agreement Regarding the Los Angeles County Jails in *United States v. Cnty. of Los Angeles*, CV No. 15-05903 DDP (JEMx) (C.D. Cal. Sept. 3, 2015), which the United States District Court for the Central District of California approved and entered as an order (ECF No. 14). A true and correct copy of Los Angeles County Jail consent decree is attached hereto as **Exhibit 2**.

3.  The June 6, 1994 Order of the United States District Court for the Eastern District of California in *Coleman v. Wilson*, Case No. CIV-S-90-520 (E.D. Cal. June 6, 1994), adopted by *Coleman v. Wilson*, 912 F. Supp. 1282, 1299 (E.D. Cal. 1995), that required the state to develop remedial plans to address numerous constitutional deficiencies, with assistance from court-appointed monitor and

experts.  A true and correct copy of this order (Dkt. No. 547) is attached hereto as

**Exhibit 3**.

Rule 201 of the Federal Rules of Evidence allows a federal court to take

judicial notice of facts that are "not subject to reasonable dispute because" they

"can be accurately and readily determined from sources whose accuracy cannot

reasonably be questioned."  Fed. R. Evid. 201(b)(2).

Judicial notice is an appropriate mechanism for supplementing the record,

and may be taken at any stage in the proceeding, including on appeal.  Fed. R.

Evid. 201(d).  Courts "'may take notice of proceedings in other courts, both within

and without the federal judicial system, if those proceedings have a direct relation

to matters at issue.'"  *Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011)

(quoting *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971

F.2d 244, 248 (9th Cir. 1992)); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442

F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and

other matters of public record.").

Exhibits A, B, and C are consent decrees or orders issued by district courts

within this circuit addressing conditions of confinement in California prisons and

jails.  All three documents are directly relevant to the arguments in this case as a

point of comparison to the Santa Rita Consent Decree at issue here, particularly as

they relate to Objectors' arguments that the Consent Decree does not provide

substantial relief to the class. All three documents also are "not subject to reasonable dispute" because they contain facts that can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned" Fed. R. Evid. 201(b).

As such, Plaintiffs' request for judicial notice should be granted.


DATED:  April 27, 2023          Respectfully submitted,

                                ROSEN BIEN GALVAN & GRUNFELD LLP

                                By:  */s/ Amy Xu*
                                     Amy Xu

                                *Attorneys for Plaintiffs-Appellees*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the undersigned counsel for Plaintiff-Appellee states the following:

I am aware of one or more related cases currently pending in this court. The following appeals currently pending before this Court have been consolidated because they "raise the same or closely related issues." Ninth Cir. R. 28-2.6(b):

- *Tyler Abbott et al v. Babu et al.*, No. 22-15355;
- *American Friends Service Committee, et al. v. Babu et al.*, No. 22-15363;
- *Keenan G. Wilkins v. Babu et al.*, No. 22-15275;
- *Reginald Robertson v. Babu et al.*, No. 22-15579.

DATED: April 27, 2023      Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Amy Xu*
    Amy Xu

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FED. R. APP. 32(A)(7)(C) AND CIRCUIT RULE 32-1

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the attached brief is proportionally spaced, has a typeface of 14 points and contains 511 words.

DATED:  April 27, 2023          */s/ Amy Xu*
                                Amy Xu

# Exhibit 1
# Plaintiffs' Request for Judicial Notice

1   Aaron J. Fischer (SBN 247391)
      Aaron.Fischer@disabilityrightsca.org
2   Anne Hadreas (SBN 253377)
      anne.hadreas@disabilityrightsca.org
3   DISABILITY RIGHTS CALIFORNIA
    1330 Broadway, Suite 500
4   Oakland, CA  94612
    Telephone: (510) 267-1200
5   Fax: (510) 267-1201

6   Tifanei Ressl-Moyer (SBN 319721)
      tifanei.ressl-moyer@disabilityrightsca.org
7   DISABILITY RIGHTS CALIFORNIA
    1831 K Street
8   Sacramento, CA  95811
    Telephone: (916) 504-5800
9   Fax: (916) 504-5801

10  Donald Specter (SBN 83925)
      dspecter@prisonlaw.com
11  Margot Mendelson (SBN 268583)
      mmendelson@prisonlaw.com
12  Sophie Hart (SBN 321663)
      sophieh@prisonlaw.coom
13  PRISON LAW OFFICE
    1917 Fifth Street
14  Berkeley, California 94710
    Telephone: (510) 280-2621
15  Fax: (510) 280-2704

16  *Attorneys for Plaintiffs*

    Jessica Valenzuela Santamaria (SBN 220934)
      jvs@cooley.com
    Mark A. Zambarda (SBN 314808)
      mzambarda@cooley.com
    Addison M. Litton (SBN 305374)
      alitton@cooley.com
    COOLEY LLP
    3175 Hanover Street
    Palo Alto, CA 94304-1130
    Telephone: (650) 843-5000
    Facsimile: (650) 849-7400

    *Attorneys for Plaintiffs*

    Todd H. Master (SBN 185881)
      tmaster@hrmrlaw.com
    Shawn M. Ridley (SBN 144311)
      sridley@hrmrlaw.com
    HOWARD ROME MARTIN & RIDLEY
    1900 O'Farrell Street, Suite 280
    San Mateo, CA 94403
    Telephone: (650) 365-7715
    Facsimile: (650) 364-5297

    *Attorneys for Defendant*

17                    **UNITED STATES DISTRICT COURT**

18                   **EASTERN DISTRICT OF CALIFORNIA**

19                        **SACRAMENTO DIVISION**

20

| | |
|---|---|
| 21   LORENZO MAYS, RICKY RICHARDSON, JENNIFER BOTHUN, | Case No. 2:18-cv-02081 TLN KJN |
| 22   ARMANI LEE, LEERTESE BEIRGE, and CODY GARLAND, on behalf of themselves | **CLASS ACTION** |
| 23   and all others similarly situated, | **[PROPOSED] CONSENT DECREE** |
| 24                    Plaintiffs, | JUDGE:   Hon. Kendall J. Newman |
| 25          v. | Complaint Filed: July 31, 2018 |
| 26   COUNTY OF SACRAMENTO, | |
| 27                    Defendant. | |
| 28 | |

## A.    Introduction

1.    The parties to this Consent Decree are Plaintiffs Lorenzo Mays, Ricky Richardson, Jennifer Bothun, Armani Lee, Leertese Beirge, Cody Garland, and the class and subclass of people they represent (collectively, "Plaintiffs"), and Defendant County of Sacramento ("Defendant").  The parties enter into this Consent Decree to ensure the provision of constitutional medical and mental health care, to ensure non-discrimination for people with disabilities, and to address the use of restrictive housing in the Sacramento County jails.[1]

2.    Plaintiffs filed this Action on July 31, 2018.  ECF No. 1.  The Action alleges that Defendant fails to provide minimally adequate medical and mental health care to the people incarcerated in its jails, imposes on people in the jails the harmful and excessive use of solitary confinement in violation of the Eighth and Fourteenth Amendments to the United Constitution, and discriminates against certain individuals with disabilities in violation of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act.  *Id.* Defendant has denied liability.  On December 27, 2018, the Court granted the parties' joint motion for class certification.  ECF No. 49.

3.    The Plaintiff class consists of "all people who are now, or in the future will be, incarcerated in the Sacramento County jails" and a subclass of "[a]ll qualified individuals with disabilities, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), who are, or will be in the future, incarcerated in the Sacramento County jails."  ECF No. 49 at 2.

4.    In January 2016, Disability Rights California, Prison Law Office, and the County of Sacramento entered into a Structured Negotiations Agreement as an alternative to imminent litigation.  ECF. No. 35-1.  The parties agreed that the County of Sacramento

---

[1]    For the purposes of this Consent Decree, references to the Sacramento County jails include the Main Jail and the Rio Cosumnes Correctional Center, and any new structures designated to house prisoners under the jurisdiction of the Sacramento County Sheriff subsequent to the date of this Consent Decree.

[PROPOSED] CONSENT DECREE
CASE NO.: 2:18-CV-02081 TLN KJN

would retain mutually agreed-upon experts to evaluate the policies, procedures, practices, and conditions in the jails and to complete reports.  Consistent with this agreement, the County retained five nationally recognized experts (the "Subject Matter Experts"): Eldon Vail as the expert on mentally ill prisoners and the use of segregation; Bruce C. Gage, M.D. as the expert on correctional mental health care; Lindsay M. Hayes as the expert on correctional suicide prevention practices; Sabot Consulting as the expert on correctional disability access; and James Austin as the expert on correctional classification systems and segregated housing.

5.    The Subject Matter Experts conducted extensive tours and reviews of the jail facilities, policies, and procedures and interviewed staff and people incarcerated in the jail. Plaintiffs' counsel did not participate in the Subject Matter Experts' assessments or the completion of their written reports.  The Subject Matter Experts thereafter submitted their final reports setting forth their respective findings and making recommendations for remedial action; the reports are part of the record in this case.  *See* ECF. Nos. 37-7, 37-8, 37-9, 37-10, 37-11.

6.    With respect to medical care in the jails, the parties engaged in direct discussions without benefit or need of joint experts or expert reports or findings.

7.    The parties thereafter negotiated individual remedial plans pertaining to the matters alleged in the Action and those individual plans have been incorporated into a single, global Remedial Plan, attached hereto as **Exhibit A**.

8.    Each party to this Consent Decree was represented by counsel during its negotiation and execution. Plaintiffs and the Plaintiff classes and subclasses are represented by Aaron J. Fischer, Anne Hadreas, and Tifanei Ressl-Moyer, Disability Rights California; Donald Specter, Margot Mendelson, and Sophie Hart, Prison Law Office; and Jessica Valenzuela Santamaria, Mark A. Zambarda, and Addison M. Litton, Cooley LLP. Defendant is represented by Todd H. Master and Shawn M. Ridley, Howard, Rome, Martin, & Ridley.

[PROPOSED] CONSENT DECREE
CASE NO.: 2:18-cv-02081 TLN KJN

9.      Through this Consent Decree, Defendant agrees to implement the measures set forth in the Remedial Plan, subject to monitoring by the Court Experts and Plaintiffs' counsel, negotiation between the parties and, if necessary, enforcement by the Court after use of the Dispute Resolution procedure set forth below.

**B.      Remedial Plan**

10.      Defendant shall fully implement all of the remedial measures, according to specified timeframes (where identified), set forth in the Remedial Plan.  The Remedial Plan is designed to meet the minimum level of mental and medical health care necessary to fulfill Defendant's obligations under the Eighth and Fourteenth Amendments, to avoid the unlawful use of segregated or restrictive housing in the jails, as well as to ensure non-discrimination against people with disabilities in the areas addressed by the Remedial Plan, as required by the ADA and Section 504 of the Rehabilitation Act.

11.      Defendant shall, in consultation and collaboration with Plaintiffs' counsel, develop and implement appropriate and adequate plans, policies, and practices to ensure compliance with the Remedial Plan.  At least 30 days prior to implementing any new plans or policies developed to meet the terms of the Remedial Plan, Defendant will submit such plans or policies to Plaintiffs' counsel for their review and comment.  The parties shall meet & confer in an attempt to informally resolve any disagreements about the adequacy of such plans or policies before implementation.  The parties' informal meet and confer process shall be completed within 30 days. Failing that, any such disagreements shall be resolved pursuant to the dispute resolution procedure set forth below.

12.      Not less than 120 days, and not more than 180 days, after this Consent Decree is approved by the Court, Defendant shall provide to Plaintiffs' counsel and the Court Experts (discussed below) a Status Report which (1) shall include a description of the steps taken by Defendant to implement each provision set forth in the Remedial Plan; and (2) specifies provisions of the Remedial Plan which have not yet been implemented.  With respect to the provisions of the Remedial Plan not yet implemented, Defendant's Status

[PROPOSED] CONSENT DECREE
CASE NO.: 2:18-cv-02081 TLN KJN

Report shall (i) describe all steps taken by Defendant toward implementation; (ii) set forth with as much specificity as possible those factors contributing to non-implementation; and (iii) set forth a projected timeline for anticipated implementation based on the best information available to Defendant.  Not later than the end of each subsequent 180-day period during the term of this Consent Decree, Defendant shall provide to Plaintiffs' counsel and the Court Experts (discussed below) an updated Status Report addressing each item of the Remedial Plan and shall specify whether it believes it is or is not in substantial compliance with each provision of the Remedial Plan.

**C.    Court Experts**

13.    The parties shall jointly request the appointment of Court Experts pursuant to Rule 706 of the Federal Rules of Evidence to advise the Court on the County's compliance or non-compliance with the (a) mental health, (b) medical, and (c) suicide prevention components of the Remedial Plan, to assist with dispute resolution matters addressed below, and to provide testimony, if required, in any proceedings before the Court.   If the parties fail to agree on Rule 706 experts, the parties shall submit recommendations to Magistrate Judge Nathanael Cousins, who shall select individuals to be proposed as Court Experts.

14.    Within 180 days after entry of this Consent Decree, the Court Experts shall each complete a review and report to advise the Parties and the Court on Defendant's progress in implementing the mental health, medical, and suicide prevention components of the Remedial Plan within each such expert's area of expertise.

15.    Not less than 180 days after the completion of their respective first reports, and then every 180 days thereafter during the term of this Consent Decree, the Court Experts shall complete reviews and reports ("180-Day Reports") to advise the parties and the Court on Defendant's compliance or non-compliance with each provision relating to the mental health, medical, and suicide prevention components of the Remedial Plan.  The reports of the Court Experts shall be publicly filed with the Court and shall be admissible as evidence in any proceedings before the Court.

16.     In each 180-Day Report, the Court Experts shall identify whether Defendant is or is not in substantial compliance with each provision relating to the mental health, medical, and suicide prevention components of the Remedial Plan within the expert's area of expertise.  These findings are hereinafter referred to as "Substantial Compliance Determinations."

17.     The Court Experts' duties specified in **Exhibit B** shall be provided to the Court Experts pursuant to Rule 706(b).  The Court Experts shall be entitled to reasonable compensation in an amount approved by the Court, which shall be paid by Defendant.

18.     With appropriate notice, the Court Experts shall have reasonable access to all parts of any Sacramento County jail facility.  Access to the facilities will not be unreasonably restricted.  The Court Experts shall have access to correctional and health care staff and people incarcerated in the jails, including confidential and voluntary interviews as the Court Experts deem appropriate. The Court Experts shall also have access to documents, including budgetary, custody, and health care documents, and institutional meetings, proceedings, and programs to the extent the Court Experts determine such access is needed to fulfill their obligations.  Documents produced to the Court Experts will be made available to Plaintiffs' counsel.  The Court Experts' tours shall be undertaken in a manner that does not unreasonably interfere with jail operations.  The Court Experts shall be bound, where applicable, by the Stipulated Protective Order (Dkt. 27), entered by the Court on October 16, 2018, and attached hereto as **Exhibit C**.

19.     The parties agree that they are each entitled to engage in ex parte communications with the Court Experts.  However, all of the Court Experts' findings and recommendations shall be set forth in writing in their reports.

20.     If, for any reason, a designated Court Expert can no longer serve, the Parties shall attempt to agree on who shall be appointed to serve in such expert's place. If the Parties do not agree, Defendant and Plaintiffs shall each nominate and submit two potential experts for the Court's consideration and selection.

**D.    Notice to Class Members**

21.    Defendant shall post notices to class members of this Action in a manner agreed upon by the parties.  Such notices shall include a brief statement that includes a description of Plaintiffs' claims, the definition of the classes and subclasses, notice that the parties have entered into this Consent Decree, a description of the subject areas covered by the Consent Decree and Remedial Plan, and the contact information for the Prison Law Office and Disability Rights California to allow people incarcerated in the Sacramento County jails to contact Plaintiffs' counsel.  The parties shall meet and confer as to the content of the notice and the method for posting the notice.  Defendant will post notices consistent with the parties' agreement within 30 days after the entry of this Consent Decree, and shall maintain the notices so long as the Consent Decree is in effect, absent further order of the Court.  In the event disagreements arise regarding the contents of such notice, the parties will first meet and confer in an informal attempt to resolve same.  Failing that, any such disagreements shall be resolved pursuant to the dispute resolution procedure set forth below.

**E.    Plaintiffs' Monitoring and Access to Information**

22.    Plaintiffs' counsel shall be permitted to monitor Defendant's compliance with all aspects of the Remedial Plan.  Defendant shall provide Plaintiffs' counsel with access to information, including all Sacramento Jail facilities, documents, records, and staff that Plaintiffs' counsel believes in good faith is necessary to monitor Defendant's compliance with the Remedial Plan subject, where applicable, to the Stipulated Protective Order (Dkt. 47), entered by the Court on October 16, 2018, and attached hereto as **Exhibit C**.  From the date this Consent Decree is entered by the Court, Defendant shall provide Plaintiffs' counsel with access to such information within 21 calendar days of their request.  If Defendant believes that the information requested by Plaintiffs' counsel is not necessary to monitor compliance with the Remedial Plan, or is otherwise unlawful or inappropriate, the parties shall engage in the dispute resolution process described below.

23.     Plaintiffs' counsel shall monitor and report on compliance with the Remedial Plan and, in particular, the County's compliance with the segregation/restrictive housing, Disciplinary Measures/Use of Force for Prisoners with Mental Health/Intellectual Disabilities, and ADA/Disability components of the Remedial Plan. In the reports, Plaintiffs' counsel shall state an opinion as to whether Defendant is or is not in substantial compliance with the segregation, mental health/discipline, and ADA components of the Remedial Plan. These opinions are hereinafter referred to as "Substantial Compliance Determinations."

24.     Defendant shall grant Plaintiffs' counsel and their consultants the opportunity to conduct at least three tours of each Sacramento County jail facility (Main Jail and Rio Cosumnes Correctional Center) per calendar year for the purpose of monitoring compliance with the Remedial Plan so long as the Consent Decree is in effect.  After three years, the parties shall meet and confer about any appropriate adjustments to the frequency of Plaintiffs' tours. Unless otherwise agreed by the parties or ordered by the Court, monitoring tours by Plaintiffs and/or their consultants shall be separated by a period of no less than 120 days.

25.     Tours by Plaintiffs and/or their consultants shall include reasonable access to all of the jail facilities, including all housing units, facilities where health care services are provided, facilities where people with disabilities are or may be housed and provided programming, and any other facilities where services are provided pursuant to the Remedial Plan.  During the tours, Defendant shall make available for interview any supervisory, clinical, custodial, and program staff that have direct or supervisory responsibility for inmate health care, classification, discipline, jail operations, and disability accommodations. Defendant shall provide a Sheriff's Department contact person to ensure cooperation of institution staff with Plaintiffs' counsel in obtaining information requested during the tours. However, Defendant's counsel reserve the right to be present during staff interviews and staff may decline to participate in any interview conducted by Plaintiffs' counsel. During the tours, Defendant shall permit and facilitate Plaintiffs' counsel having confidential and

[PROPOSED] CONSENT DECREE
CASE NO.: 2:18-cv-02081 TLN KJN

voluntary discussions with any incarcerated person or group of incarcerated people at the request of Plaintiffs' counsel, consistent with safety and security needs. Upon request by Plaintiffs and pursuant to the Stipulated Protective Order entered in this case, Defendant shall make available for inspection and/or copying the health care and/or custody files of specified incarcerated persons. Disputes that may arise over Plaintiffs' counsel's access to jail information or personnel shall be addressed by the dispute resolution process.

26.     If Plaintiffs' counsel form the good faith belief that Defendant is not substantially compliant with any component of the Remedial Plan based on the reviews of the Court Experts and/or Plaintiffs' counsel monitoring, Plaintiffs' counsel shall so inform Defendant and, as applicable, the relevant Court Expert(s) of any alleged noncompliance and identify the component of the Remedial Plan alleged to be noncompliant.

27.     Defendant shall investigate the alleged noncompliance and provide Plaintiffs' counsel with a response in writing within 30 calendar days, unless the parties agree that Defendant will include a response in the next scheduled Status Report. Either party shall have the option of requesting an investigation and opinion from the relevant Court Expert. If Plaintiffs' counsel is not satisfied with Defendant's response, the parties shall engage in the dispute resolution process described below.

28.     Defendant shall ensure that Plaintiffs' counsel has access to confidential visits and phone calls with class members. The parties will establish an efficient means to allow Plaintiffs' counsel to interview a class member or group of class members, and to conduct confidential telephonic interviews with individual class members, with reasonable notice, in a manner that does not disrupt jail operations.

29.     Plaintiffs' counsel shall be allowed to send postage pre-paid envelopes (metered) to their clients in the Sacramento County jails.

**F.     Individual Class Member Concerns**

30.     Plaintiffs' counsel may bring concerns about individual people in the jails, including but not limited to issues regarding health care, housing, isolation, disability

[PROPOSED] CONSENT DECREE
CASE NO.: 2:18-CV-02081 TLN KJN

accommodations or access, use of force, or safety/well-being to the attention of Defendant's counsel, or their designee, who shall respond in writing within 10 calendar days, unless the urgency of the issue requires a more expedited response. The parties will work cooperatively to resolve individual concerns.

31.     This process is not meant to replace or circumvent the existing processes for requesting medical or mental health services or following the existing request and grievance processes in the jails.  People in the jails will be encouraged to make use of those processes.

**G.    Dispute Resolution**

32.     Either party may initiate the dispute resolution process with respect to any matter covered by this Consent Decree by providing written notice of a dispute ("Dispute Notice") to the other party.

33.     Following service of the Dispute Notice, the parties shall undertake good faith negotiations at such times and places as they deem sufficient in an effort to resolve the dispute informally between them.  If, within 30 days after service of the Dispute Notice, the parties have failed to resolve the dispute, either party may request that the Court Expert(s) most knowledgeable in the subject matter of the dispute be permitted to evaluate the issue in dispute and prepare a report.  The Court Expert(s) must provide the report regarding the area of disagreement to the parties within 45 days of the request.  Defendant will pay the expert's reasonable fees for any report prepared by a Court expert at the request of a party about a disputed issue, as contemplated by this paragraph.  If the issue in dispute relates to medical care, mental health care, or suicide prevention, the relevant Court Expert shall prepare the report.  If the issue in dispute relates to ADA compliance, restrictive housing, or discipline/use of force, the parties shall attempt to agree on who shall be appointed to serve as the Court Expert.  If the Parties do not agree, Defendant and Plaintiffs' counsel shall each nominate and submit two potential experts for the Court's consideration and selection.

34.     The following general protocol will apply to all disputes arising under this Consent Decree: In the event of disagreement between the parties regarding any aspect of

[PROPOSED] CONSENT DECREE
CASE NO.: 2:18-CV-02081 TLN KJN

this Consent Decree, including but not limited to (1) interpretation of its terms;

(2) implementation of its provisions; and/or (3) a determination of the parties' respective

rights, obligations and duties under same, the parties shall first undertake good faith

negotiations in an effort to resolve the dispute informally between them. The parties

understand and agree that this good faith attempt to resolve the dispute informally between

the parties is a necessary prerequisite before either party may request or avail themselves of

Court assistance or intervention in resolving the dispute. The parties' informal negotiation

process shall be completed within 30 days of the identification of a dispute. In the event the

parties' good faith attempt to resolve the dispute informally proves unsuccessful, the parties

shall next seek the assistance, advice and/or guidance of Magistrate Judge Nathanael Judge

Cousins, or his designee if he is not available, in attempting to resolve dispute.  If Magistrate

Judge Cousins is unable to resolve the dispute, *then and only then* may the parties formally

seek the Court's assistance in resolving the dispute. In the event formal intervention of the

Court is required, the parties agree that Magistrate Judge Cousins may consult, advise and

share with the Court his views regarding the nature of the dispute, the relative merits (or lack

thereof) of the positions taken by the parties and any proposal(s) he might have regarding the

manner in which the dispute should be resolved

**H.    Enforcement**

35.    The Court shall retain jurisdiction to enforce the terms of this Consent Decree

and shall have the power to enforce the agreement through specific performance and all other

remedies permitted by law until Defendant fulfills its obligations under this Consent Decree.

36.    The Protective Order agreed upon by the parties shall remain in force while

this Consent Decree is effective.

**I.    Duration and Termination**

37.    The duration of this Consent Decree is six years from the date this Consent

Decree is entered by the Court, unless it (a) is terminated earlier pursuant to paragraph 39

below, or (b) subject to the dispute resolution process, is extended as to any provision of this

Consent Decree or the Remedial Plan with which the Defendant is not in substantial compliance until such time as substantial compliance is achieved.  Any such extension not mutually agreed upon by the parties shall be subject to the dispute resolution process set forth above.

38.    Defendant may, after conferring with Plaintiffs' counsel, request a finding by the Court that Defendant is in substantial compliance with one or more components of the Remedial Plan and has maintained such substantial compliance for a period of at least twelve months.  Unless otherwise ordered by the Court, such a finding will result in a suspension of monitoring by the relevant Court expert and Plaintiffs' counsel of any such component.

39.    If Plaintiffs form the good faith belief that Defendant is no longer in substantial compliance with any component(s) of the Remedial Plan previously found to be in substantial compliance and as to which monitoring has been suspended, Plaintiffs shall promptly so notify Defendant in writing and present a summary of the evidence upon which such belief is based. Within 30 days thereafter, Defendant shall serve a written response stating whether it agrees or disagrees that it is no longer in substantial compliance with respect to the identified component(s) of the Remedial Plan. In the event that Defendant agrees, monitoring by the Court experts and Plaintiffs pursuant to this Consent Decree shall resume. In the event Defendant disagrees, Plaintiffs may bring a motion before the Court seeking such relief as may be appropriate, including but not limited to reinstating full monitoring, provided that, before bringing such a motion, Plaintiffs have complied with the dispute resolution process described herein.

40.    Defendant may seek termination of this Consent Decree by bringing a termination motion pursuant to 18 U.S.C. § 3626(b)(1)(A)(i), provided however, that (i) Defendant shall not bring any such motion for a period of five years from the date this Consent Decree is entered by the Court; (ii) any termination motion shall be based on a record of no less than one year of substantial compliance with all the requirements of this Consent Decree and the Remedial Plan; and, (iii) prior to bringing such a motion, Defendant

1    shall have complied with the dispute resolution process set forth herein.

2    **J.    Costs and Fees**

3          41.    *Costs and Fees Prior to Entry of the Consent Decree*: The parties agree that,

4    by entry of this Consent Decree, Plaintiffs are the prevailing party in this litigation.

5    Defendant shall pay Plaintiffs' counsel's reasonable fees and expenses incurred from the date

6    that Plaintiffs' counsel commenced an investigation into conditions at the Sacramento

7    County Jails through Final Approval of the Consent Decree, including approval of the

8    Remedial Plan.  The parties shall attempt to agree on the amount of the attorney's costs and

9    fees.  If the parties fail to agree on an amount, they shall mediate the dispute with the

10   assistance of Magistrate Judge Nathanael Cousins.  If the matter is not resolved through

11   mediation by September 2, 2019, the parties agree that the amount of Plaintiffs' attorney's

12   costs and fees will be determined by binding arbitration, administered by JAMS.  The parties

13   will each submit the names of two proposed arbitrators.  To the extent that the parties are

14   unable to agree upon an arbitrator from that list, they shall submit the names to Magistrate

15   Judge Nathanael Cousins and he, or his designee, shall select the arbitrator.  The award will

16   be final and binding on the parties, with no right of appeal.

17         42.    *Costs and Fees for Monitoring and Enforcement*: Subject to Defendant's right

18   to object to the reasonableness of the fees sought by Plaintiffs' counsel, Plaintiffs' counsel

19   shall be compensated for their reasonable time and reasonable expenses (including the costs

20   of any consultants Plaintiffs' counsel may retain) relating to monitoring and enforcing this

21   Consent Decree and Remedial Plan, including any time and expenses incurred in connection

22   with the resolution of any dispute pertaining to such monitoring and enforcement.   As with

23   the fees and costs referenced in paragraph 41, the parties shall attempt to reach an agreement

24   on the issue of monitoring fees and expenses. If the parties fail to reach such an agreement,

25   they shall mediate the dispute with the assistance of Magistrate Judge Nathanael Cousins.  If

26   the matter is not resolved through mediation by September 2, 2019, the parties agree that the

27   issue of monitoring fees and expenses will be determined by binding arbitration,

28

[PROPOSED] CONSENT DECREE
CASE NO.: 2:18-CV-02081 TLN KJN

administered by JAMS.  The parties will each submit the names of two proposed arbitrators.
To the extent that the parties are unable to agree upon an arbitrator from that list, they shall
submit the names to Magistrate Judge Nathanael Cousins and he, or his designee, shall select
the arbitrator.  The award will be final and binding on the parties, with no right of appeal.

43.     *Costs and Fees for Litigation Before the Court*:  Subject to both Court approval and
Defendant's right to object to the reasonableness of the number of hours for which Plaintiffs'
counsel may seek compensation, Defendant agrees to pay Plaintiffs' counsel's reasonable
rates for any litigation required to enforce or defend this Consent Decree or Remedial Plan
before the Court.

**K.     Effect of Consent Decree in Other Actions**

44.     Neither the fact of this Consent Decree nor any statement of claims contained
herein shall be used in any other case, claim, or administrative proceedings, except that
Defendant and its employees and agents may use this Consent Decree and any statement
contained herein to assert issue preclusion or *res judicata*.

45.     Nothing in this Consent Decree is intended to and does not modify, revise or
change any existing orders or consent decrees applicable to Defendant or to operations at or
people housed in the Sacramento County Jails.

**L.     Necessity for Relief as Provided in Remedial Plans**

46.     The parties agree that the relief contained herein is narrowly drawn, extends no
further than necessary to ensure the protection of the federal constitutional and statutory
rights of Plaintiffs, and is the least intrusive means necessary to accomplish those objectives.
**IT IS SO AGREED AND STIPULATED.**

Respectfully submitted,

Dated: ___June 5___, 2019

_____
Margot Mendelson (SBN 268583)
PRISON LAW OFFICE
*Attorney for Plaintiffs*

13

[PROPOSED] CONSENT DECREE
CASE NO.: 2:18-CV-02081 TLN KJN

1    Dated: _6_/_5_, 2019

2

3

4    Dated: _6_|_5_, 2019

5

6

7    Dated: 6/5_____, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Aaron J. Fischer (SBN 247391)
DISABILITY RIGHTS CALIFORNIA
*Attorney for Plaintiffs*

Jessica Valenzuela Santamaria (SBN 220934)
COOLEY LLP
*Attorney for Plaintiffs*

Todd H. Master (SBN 185881)
HOWARD ROME MARTIN & RIDLEY
*Attorney for Defendant*

14

# EXHIBIT A

**Consent Decree**

*Mays v. County of Sacramento*

### *MAYS V. COUNTY OF SACRAMENTO*

### REMEDIAL PLAN

I.   **Definitions**

**"Chief Disciplinary Officer"** is the individual who is responsible for overseeing the disciplinary system and ensuring consistency in disciplinary practices and procedures.

**"County"** refers to Sacramento County.

**"Designated Mental Health Units"** refers to any specialized units specifically operated to house and serve prisoners requiring mental health treatment, including the inpatient unit (2P), the Intensive Outpatient Program (IOP), the Outpatient Psychiatric Pods.

**"Disciplinary Hearing Officer"** includes any sergeant, officer, or other individual who has responsibility for adjudicating a disciplinary report and/or imposing disciplinary measures.

**"Discipline"** is the imposition of penalties for prisoner misconduct that violates Jail facility rules.

**"Disability"** means any physical or mental impairment that substantially limits one or more major life activities. These include, but are not limited to, any disability that would substantially limit the mobility of an individual or an impairment of vision and/or hearing, speaking or performing manual tasks that require some level of dexterity. Additionally, disability includes a physical or mental impairment that would inhibit a person's ability to meet the rules and regulations of the facility.

**"Effective Communication"** means that any written or spoken communication must be as clear and understandable to people with disabilities as it is for people who do not have disabilities.

**"Intellectual Disability"** is a disability characterized by significant limitations in intellectual functioning (such as learning, reasoning, and problem-solving) and in adaptive behavior (conceptual skills such as language, literacy, money, time, and self-direction; social and interpersonal skills; and practical skills such as personal care and schedules/routines). This includes people for whom the onset of the disability occurred before age 18 (developmental disabilities) and people for whom events later in life resulted in similar limitations (for example, head injury, stroke, or dementia).

**"Medical Staff"** means medical personnel including physicians, dentist, pharmacist, nurse practitioners, supervising registered nurses, registered nurses, registered dental hygienists, licensed vocational nurses, pharmacy technicians, medical assistants, registered dental assistants, certified nursing aids and other medical personnel.

"**Medical services**," "**medical treatment**" and "**medical staff**" includes dental services, dental treatment and dental staff, as well as medical pharmacy services and pharmacy staff.

"**Mental health caseload**" means all prisoners in the jail with a current need for any mental health services.

"**Out-of-cell activities**" are activities which occur out of the inmates' cell. Examples of such activities include but are not limited to games, the use of tablets and other socialization among inmates.

"**Provider**" means physician, dentist, pharmacist, physician's assistant, or nurse practitioner.

"**Qualified Mental Health Professional**" means psychiatrists, psychologists, master's level social workers, licensed professional counselors, licensed nurses, or others who by virtue of their education, credentials, and experience are permitted by law to evaluate and provide mental health care to patients.

"**Qualified Health Care Professional**" means physicians, physician assistants, nurses, nurse practitioners, dentists, qualified mental health professionals, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and provide health care to patients.

"**Qualified Sign Language Interpreter**" ("SLI") is an individual, available on-site or through a VRI service, who is adept at American Sign Language and has passed a test and qualified in one of the categories established by the National Association for the Deaf (NAD) or one of the categories established by the Registry of Interpreters for the Deaf (RID).

"**Segregation**" means the confinement in a locked room or cell, with or without a cellmate, with limited social contact as compared with the general population, in conditions characterized by substantial isolation, whether pursuant to disciplinary, administrative, or classification action.  If a housing unit or location does not meet the above definition, the unit will not be considered a segregation unit, regardless of name.

"**Serious Mental Illness**" ("**SMI**") means a mental, behavioral, or emotional disorder of mood, thought, or anxiety that significantly impairs judgment, behavior, capacity to recognize reality, or substantially interferes with primary activities of daily living.

"**Temporary Suicide Precautions Housing**" refers to any non-inpatient unit where the Jail houses prisoners requiring suicide precautions and/or inpatient level of psychiatric care, including but not limited to safety cells, holding cells, North Holding Cell No. 2 at RCCC, Main Jail booking segregation cells, and the classrooms/multipurpose rooms adjacent to the Main Jail housing units.

"**TTYs**" **or** "**TDDs**" means devices that are used with a telephone to communicate with persons who are Deaf by typing and reading communications.

"**Videophone**" means a device with a video camera that can perform bi-directional video and audio transmissions between people in real-time.

"**Video-Relay Services**" or "**VRS**" is a video telecommunications relay service that enables persons with hearing-related disabilities who use Sign Language to communicate with voice telephone users through video equipment, such as a Videophone, rather than through typed text.

"**Video Remote Interpreting service**" or "**VRI service**" means an interpreting service that uses video conference technology over dedicated lines or wireless technology offering clear, delay-free, full-motion video and audio over high-speed connection that delivers high-quality video images as provided in 28 § 35.160(d).

II. **GENERAL PROVISIONS**

A. The County shall maintain sufficient medical, mental health, and custody staff to meet the requirements of this Remedial Plan.

B. The parties agree that the custodial and health care staff must be increased to meet minimal constitutional and statutory standards.  Presently, there are insufficient deputies to supervise out-of-cell activities for people in the general population and administrative segregation, and to provide security for health-related tasks.  The parties agree that reduction in jail population is a cost-effective means to achieve constitutional and statutory standards.

   1. The County intends to hire additional custodial and health care staff.  The parties agree that population reduction of the jails will facilitate compliance with this Remedial Plan.  All population reduction measures should be designed to promote public safety through evidence-based programs.

   2. If through the monitoring process it is determined that the County is not fulfilling the provisions of this Remedial Plan due to staffing deficiencies, the parties will meet and confer regarding what steps to take to reduce the population of the jail, including available resources to facilitate population reduction.

C. The parties agree to meet and confer regarding the gathering and posting of data related to the Jail population. The parties agree that the categories of information to be gathered and publicly posted on a quarterly basis are the following:

   a) the number of people with mental illness booked into jail;

   b) their average length of stay;

   c) the percentage of people connected to treatment;

   d) their recidivism rates;

e)  the total number of people in jail with a mental health need;

f)  the number of people who were receiving mental health services at the time of booking; and

g)  the number of sentenced and unsentenced inmates in custody.

h)  For sentenced people in the jail, the nature of the commitment convictions, length of sentence(s), and level of mental health care (*e.g.*, Acute, IOP, OPP).

i)  For unsentenced people in the jail, the nature of the charges, length of pre-trial detention, and level of mental health care (*e.g.*, Acute, IOP, OPP).

## III.   AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE

### A. Policies and Procedures

1.  It is the County's policy to provide access to its programs and services to prisoners with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No prisoner with a disability, as defined in 42 U.S.C. § 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities or be subjected to discrimination. The County's policy is to provide reasonable accommodations or modifications where necessary, consistent with 28 C.F.R. §§ 35.150 & 35.152, and other applicable federal and state disability law.

2.  The County shall, in consultation with Plaintiffs' counsel, revise its Operations Order to establish standard and consistent procedures for the Jail to ensure compliance with the ADA and the remedial provisions outlined herein.

3.  The County shall, within 12 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, revise policies, procedures, and inmate orientation materials (e.g. Inmate Handbook), in accordance with the revised Operations Order and the remedial provisions outlined herein. A list of policies which the County will revise consistent with the provisions outlined herein, as appropriate and in consultation with Plaintiffs' counsel, is attached as **Exhibit A-1.**

4.  All staff will receive training appropriate to their position on policies and procedures related to compliance with the Americans with Disabilities Act (ADA) and related disability laws.

### B. ADA Tracking System

1.  The County shall develop and implement a comprehensive system (an "ADA Tracking System") to identify and track screened prisoners with disabilities as well as accommodation and Effective Communication needs.

2.  The ADA Tracking System shall identify:

    a) All types of disabilities, including but not limited to psychiatric, intellectual, developmental, learning, sensory, mobility, or other physical disabilities, and special health care needs;

    b) Prisoners with disabilities that may pose a barrier to communication, including but not limited to learning, intellectual, or developmental disabilities, and hearing, speech, or vision impairments;

    c) Accommodation needs, including as to housing, classification, Effective Communication, adaptive supports, and assistive devices;

    d) Prisoners who require specific health care appliances, assistive devices, and/or durable medical equipment (HCA/AD/DME);

    e) Prisoners who are class members in *Armstrong v. Newsom* (N.D. Cal. No. 94-cv-02307), with their applicable disability classification(s) and accommodation need(s).

3. The ADA Tracking System's prisoner disability information will be readily accessible to custody, medical, mental health, and other staff at the Jail who need such information to ensure appropriate accommodations and adequate program access for prisoners with disabilities.

C. **ADA Coordinator**

1. The County shall have a dedicated ADA Coordinator at each facility.

2. The ADA Coordinator position shall be dedicated to coordinating efforts to comply with and carry out ADA-related requirements and policies, shall have sufficient command authority to carry out such duties, and shall work with the executive management team regarding ADA-related compliance, training, and program needs.

3. The County shall clearly enumerate, in consultation with Plaintiffs' counsel, the job duties and training requirements for the ADA Coordinator position and for ADA Deputies assigned to support the ADA Coordinator position.

4. The County shall ensure that ADA Coordinators and ADA Deputies possess requisite training to implement and ensure compliance with the Jail's disability program and services, including operation of the ADA Tracking System.

D. **Screening for Disability and Disability-Related Needs.**

1. The County shall conduct adequate screening of prisoners to be housed in the Jail in order to identify disabilities and disability-related accommodation, housing, classification, and other needs.  All individuals detained at the Jail for any period of time will be assessed for Effective Communication needs, consistent with the provisions herein.

2. The County shall take steps to identify and verify each prisoner's disability and disability-related needs during medical intake screening, including based on:

    a) The individual's self-identification or claim to have a disability;

    b) Documentation of a disability in the individual's health record;

    c) Staff observation that the individual may have a disability that affects placement, program access, or Effective Communication; or

    d) The request of a third party (such as a family member) for an evaluation of the individual for an alleged disability.

### E. Orientation

1. The County shall ensure that, for the population to be housed in the Jails, prisoners with disabilities are adequately informed of their rights under the ADA, including but not limited to:

    a) Accommodations available to prisoners;

    b) The process for requesting a reasonable accommodation;

    c) The role of the ADA coordinator(s) and method to contact them;

    d) The grievance process, location of the forms, and process for getting assistance in completing grievance process;

    e) Instructions on how prisoners with disabilities can access health care services, including the provision of Effective Communication and other accommodations available in accessing those services.

2. Upon processing and classification, prisoners with disabilities shall receive, in an accessible format, the jail rulebook; orientation handbook; and a verbal orientation or orientation video regarding rules or expectations.

3. The County shall accommodate individuals with disabilities in the orientation process through the use of alternative formats (*e.g.* verbal communication, large print, audio/video presentation), when necessary for Effective Communication of the information.

4. The County shall develop an Americans with Disabilities Act Inmate Notice. The Notice shall be prominently posted in all prisoner housing units, in the booking/intake areas, in medical/mental health/dental treatment areas, and at the public entrances of all Jail facilities.

### F. Health Care Appliances, Assistive Devices, Durable Medical Equipment

1. The County shall establish a written policy to ensure provision of safe and operational HCA/AD/DME, with a process for repair and replacement.

2. The County shall timely provide HCA/AD/DME to prisoners with disabilities who require such assistance. The County shall ensure an individualized assessment by medical staff to determine whether HCA/AD/DME is warranted to ensure equal and meaningful access to programs, services, and activities in the Jail.

3. The County shall allow prisoners to retain personal HCAs/ADs/DME (which will include reading glasses), unless there is an individualized determination that doing so would create an articulated safety or security risk.

    a) Where Jail staff determine it is necessary to remove a prisoner's personal HCA/AD/DME for security reasons, the County shall provide an equivalent Jail-issued device unless custody staff, with supervisory review, determine and document, based on an individualized assessment, that the device constitutes a risk of bodily harm or threatens the security of the facility.

    b) If such a determination is made, the ADA coordinator or supervisory-level designee shall document the decision and reasons for it, in writing, and shall consult with medical staff to determine an appropriate alternative accommodation.

4. The County shall, in consultation with Plaintiffs' counsel, implement a written policy governing the release of prisoners who need assistive devices upon release.

    a) The County will ensure that any personal mobility device belonging to a prisoner is returned to the prisoner prior to release from custody.

    b) If a prisoner does not have a personal mobility device, but is ambulatory with the assistance of a cane, crutch, or walker, the prisoner will be permitted to retain such device that was used while in custody upon release, or will be provided a comparable device, upon release.

    c) If a prisoner who is due for release requires a wheelchair, but does not have a personal wheelchair, Jail staff shall coordinate with the prisoner, the prisoner's family or friends, and other County agencies as needed to secure a wheelchair or take other steps to address the individual's needs upon release. The County shall document this process in the ADA Tracking System for purposes of individual tracking and quality assurance.

## G. Housing Placements

1. The County shall house prisoners with disabilities in facilities that accommodate their disabilities.

2. The County shall implement a housing assignment system that includes an individualized assessment of each individual's functioning limitations and restrictions, including but not limited to:

    a) The need for ground floor housing;

    b) The need for a lower bunk;

    c) The need for grab bars in the cell and/or shower;

    d) The need for accessible toilets;

    e) The need for no stairs in the path of travel; and

    f) The need for level terrain.

3. Prisoners with disabilities shall be housed in the Jail consistent with their individual security classification. Prisoners prescribed or possessing HCAs/ADs/DME will not automatically be housed in a medical housing unit. Placement in a medical housing unit will be based on individualized clinical determination of need for treatment.

4. Classification staff shall not place prisoners with disabilities in:

    a) Inappropriate security classifications simply because no ADA-accessible cells or beds are available;

    b) Designated medical areas unless the prisoner is currently receiving medical care or treatment that necessitates placement in a medical setting; or

    c) Any location that does not offer the same or equivalent programs, services, or activities as the facilities where they would be housed absent a disability.

## H. Access to Programs, Services, and Activities

1. The County shall ensure prisoners with disabilities, including those housed in specialized medical units or mental health units (*e.g.*, OPP, IOP, Acute) have equal access to programs, services, and activities available to similarly situated prisoners without disabilities, consistent with their health and security needs. Such programs, services, and activities include, but are not limited to:

    a) Educational, vocational, reentry and substance abuse programs

    b) Work Assignments

    c) Dayroom and other out-of-cell time

    d) Outdoor recreation and fitted exercise equipment

    e) Showers

    f) Telephones

    g) Reading materials

    h) Social visiting

    i) Attorney visiting

    j) Religious services

    k) Medical, mental health, and dental services and treatment

**2.** The County shall provide reasonable accommodations and modifications as necessary to ensure that prisoners with disabilities have equal access to programs, services, and activities available to similarly situated prisoners without disabilities.

3. The County shall develop and implement a written policy for staff to provide appropriate assistance to prisoners with psychiatric, developmental, or cognitive disabilities so that they can fully participate in programs, services, and activities provided at the Jail.

**4.** The County shall implement a written policy for staff to provide assistance to prisoners with disabilities in reading or scribing documents.

5. The County shall provide equal access to library, recreational, and educational reading materials for prisoners with disabilities, including easy reading and large print books for individuals who require such accommodations.

6. The County shall ensure equitable inmate worker opportunities for prisoners with disabilities, including by:

   a) Ensuring clear job duty statements, with essential functions and specific criteria, for each Worker position;

   b) Ensuring that medical staff conduct an individualized assessment to identify work duty restrictions and/or physical limitations to facilitate appropriate work/industry assignments and to prevent improper exclusions from work opportunities;

   c) Providing reasonable accommodations to enable prisoners with disabilities to participate in inmate worker opportunities.

I. **Effective Communication**

1. The County shall assess all individuals detained at the Jail for any period of time for Effective Communication needs, and shall take steps to provide Effective Communication based on individual need.

2. The County's ADA policies shall include comprehensive guidance to ensure Effective Communication for prisoners with vision, speech, hearing, intellectual, learning, or other disabilities. The County shall, in consultation with Plaintiffs' counsel, ensure that sufficient guidance on the provision of Effective Communication is included in Jail custody and health care policies and procedures.

3. Standard for Provision of Effective Communication in Due Process Events and Clinical Encounters

   a) A higher standard for the provision of Effective Communication shall apply in the following situations:

      i. Due Process Events, including the following:

- Classification processes
- Prisoner disciplinary hearing and related processes
- Service of notice (to appear and/or for new charges)
- Release processes
- Probation encounters/meetings in custody

ii. Clinical Encounters, including the following:

- Determination of medical history or description of ailment or injury
- Diagnosis or prognosis
- Medical care and medical evaluations
- Provision of mental health evaluations, rounds, group and individual therapy, counseling and other therapeutic activities
- Provision of the patient's rights, informed consent, or permission for treatment
- Explanation of medications, procedures, treatment, treatment options, or surgery
- Discharge instructions

b) In the situations described in subsection (a), above, Jail staff shall:

i. Identify each prisoner's disability where there may be a barrier to comprehension or communication requiring reasonable accommodation(s);

ii. Provide effective reasonable accommodation(s) to overcome the communication barrier; and

iii. Document the method used to achieve Effective Communication and how the staff person determined that the prisoner understood the encounter, process, and/or proceeding.

4. Effective auxiliary aids and services that are appropriate to the needs of a prisoner with Effective Communication needs shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides, SLIs, readers, sound amplification devices, captioned television/video text displays, Videophones and other telecommunication devices for deaf persons (TDDs), audiotaped texts, Braille materials, large print materials, writing materials, and signage.

5. In determining what auxiliary aid service to provide, the County shall give primary consideration to the request of prisoner with Effective Communication needs.

6. Education providers (*e.g.,* Elk Grove Unified School District) at the Jail will ensure Effective Communication for prisoners participating in education programs, including by providing necessary assistive equipment and take steps to accommodate learning strategies of those prisoner-students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities.

7. The County shall assist prisoners who are unable to complete necessary paperwork (*e.g.*, related to health care, due process, Jail processes) on their own with reading and/or writing as needed.

8. The County shall permit prisoners, including those who are illiterate, non-English speaking, or otherwise unable to submit written or electronic sick call requests, to verbally request care. Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified mental health or medical professional for response in the same priority as those sick call requests received in writing.

9. The County shall post and disseminate notices, policies, job announcements, and other written material in alternative formats to promote Effective Communication.

J. **Effective Communication and Access for Individuals with Hearing Impairments**

1. The County shall develop and implement a policy for newly arrived and newly identified prisoners with hearing disabilities to determine each prisoner's preferred method of communication.

2. Qualified Sign Language Interpreters (SLIs) will be provided during intake and for due process functions, health care encounters, and Jail programming, when sign language is the prisoner's primary or only means of Effective Communication, unless the prisoner waives the assistance of an interpreter and/or delay would pose a safety or security risk.

   a) The County shall maintain a contract or service agreement with interpreter services in order to provide such services for deaf or hearing impaired prisoners. Jail staff will be informed of the availability of contract interpreter services.

   b) Lip reading will not be the sole method of Effective Communication used by staff, unless the prisoner has no other means of communication.

   c) In cases where the use of an SLI is not practicable, or is waived by the prisoner, Jail staff shall employ the most effective form of communication available.

   d) The County will maintain a log of (a) when, for whom, and for what purpose an SLI was used; and (b) when, for whom, and why a SLI was

*not* used for a prisoner with an identified need for SLI services (*e.g.*, prisoner waived SLI or delay would have posed safety or security risk).

 e) When a prisoner waives an SLI, the log must document (a) the method of communication of the waiver, and (b) the method staff used to determine that the waiver was knowing and freely given.

3. Jail Staff shall effectively communicate the contents of the Inmate Handbook and other materials providing information on Jail rules and procedures to all prisoners to be housed in the Jail who are deaf or hard of hearing. For those prisoners for whom written language is not an effective means of communication, Jail Staff may meet this obligation by providing a video of an SLI signing the contents of the Inmate Handbook, along with appropriate technology for viewing, or by providing an SLI to interpret the contents of the Inmate Handbook to the prisoner who is deaf or hard of hearing.

4. The County shall, within 12 months from court approval of the Settlement, make Videophones available for deaf and hard of hearing prisoners. The Videophones shall provide for calls through the use of Video-Relay Services (VRS) at no cost to deaf and hard of hearing prisoners or for calls directly to another Videophone.

5. Deaf/hard of hearing prisoners who use telecommunication relay services, such as Videophone or TDD/TTY machine, in lieu of the telephone shall receive equal access to the Videophone or TDD/TTY services as non-disabled prisoners are afforded for regular telephone usage.

6. The County shall provide deaf/hard of hearing prisoners with additional time for calls using telecommunication relay services, such as a Videophone or TDD/TTY, to account for the fact that signed and typed conversations take longer than spoken conversations. The County shall document the time that each prisoner uses and has access to such equipment.

7. Prisoners who require an SLI as their primary method of communication shall be provided an SLI for education, vocational, or religious programs and services.

8. Public verbal announcements in housing units where individuals who are deaf or hard of hearing reside shall be delivered on the public address system (if applicable) and by flicking the unit lights on and off several times to alert prisoners that an announcement is imminent. This includes announcements regarding visiting, meals, recreation release and recall, count, lock-up, and unlock. Verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, as consistent with individual need. These procedures shall be communicated to prisoners during the orientation process and also shall be incorporated into relevant policies and post orders.

### K.  Disability-Related Grievance Process

1. The County shall implement a grievance system for prisoners with disabilities to report any disability-based discrimination or violation of the ADA, this Remedial Plan, or Jail ADA-related policy, and shall provide a prompt response and equitable resolution in each case.

2. The County shall ensure that the grievance procedures are readily available and accessible to all prisoners.

   a) The County shall make reasonable efforts to ensure all prisoners are aware of the disability grievance procedures, including the availability of accommodations and staff assistance to submit a grievance and/or appeal.

   b) The County shall ensure the prisoners with disabilities have meaningful access to grievance forms, including through provision of staff assistance and large print materials.

3. Response to Grievances

   a) The County shall develop and implement an ADA grievance process that includes (1) a reasonable timeline for response to ADA-related grievances and appeals, including an expedited process for urgent ADA grievance (*e.g.*, involving prisoner safety or physical well-being); and (2) provision for interim accommodations pending review of the individual's grievances/appeals.

   b) The County shall ensure that prisoners with communication needs are interviewed and provided assistance as part of the grievance/appeal process where necessary to ensure meaningful access and Effective Communication.

   c) The County shall document each denial of a reasonable accommodation request and shall record the basis for such determination.

   d) The County shall provide in writing a copy of the grievance (or appeal) response to the prisoner, including the resolution, the basis for a denial (if applicable), and the process for appeal.

   e) The County shall ensure that completed grievance responses are effectively communicated to prisoners with disabilities.

4. The submission, processing, and responses for disability-related grievances and complaints shall be tracked.

### L.  Alarms/Emergencies

1. The County shall ensure that all written policies regarding alarms and emergencies contain mandatory provisions to accommodate prisoners with disabilities.

2. The County shall implement written policies regarding the expectations of staff as to prisoners with identified disabilities during emergencies and alarms, including as to disabilities that may affect prisoners' ability to comply with orders or otherwise respond to emergencies and alarms. For example, the policies shall ensure appropriate handling of prisoners with mobility-related disabilities who are unable to prone or take a seated position on the ground during an alarm or emergency. Such policies shall be communicated to staff, incorporated into the relevant Operations Orders, and communicated to prisoners with disabilities using Effective Communication.

3. The County shall implement written policies for staff regarding communicating effectively and appropriately with prisoners who have disabilities that may present barriers to communication during emergencies or alarms.

4. In order to facilitate appropriate accommodations during alarms or emergencies, the County shall offer, but shall not require, individuals who have disabilities visible markers to identify their disability needs (*e.g.*, identification vests). The County shall maintain a list, posted in such a way to be readily available to Jail staff in each unit, of prisoners with disabilities that may require accommodations during an alarm or emergency.

5. The County shall install visual alarms appropriate for individuals who are deaf or hard of hearing, which shall comply with relevant fire code regulations.

6. All housing units shall post notices for emergency and fire exit routes.

M. **Searches, Restraints, and Extractions**

1. The County shall modify its written policies to ensure that prisoners with mobility impairments, including those with prosthetic devices, receive reasonable accommodations with the respect to the following: (1) Pat searches and unclothed body searches; (2) Application of restraints devices, including Pro-Straint Chair; and (3) Cell extractions.

N. **Transportation**

1. The County shall provide reasonable accommodations for prisoners with disabilities when they are in transit, including during transport to court or outside health care services.

2. Prescribed HCAs/ADs/DME, including canes, for prisoners with disabilities shall be available to the prisoner at all times during the transport process, including in temporary holding cells, consistent with procedures outlined in Part VII.

3. The County shall use accessible vehicles to transport prisoners in wheelchairs and other prisoners whose disabilities necessitate special transportation, including by maintaining a sufficient number of accessible vehicles. (295)

    4.  Prisoners with mobility impairments shall be provided assistance onto transport vehicles.

**O.** **Prisoners with Intellectual Disabilities**

    1.  The County shall, in consultation with Plaintiffs' counsel, develop and implement a comprehensive written policy and procedure regarding prisoners with an Intellectual Disability, including:

        a)  Screening for Intellectual Disabilities;

        b)  Identification of prisoners' adaptive support needs and adaptive functioning deficits; and

        c)  Monitoring, management, and accommodations for prisoners with Intellectual Disabilities.

    2.  A multidisciplinary team that includes appropriate health care staff will monitor and ensure appropriate care for prisoners with an Intellectual Disability. The multidisciplinary team will develop an individualized plan for each prisoner with an Intellectual Disability, which addresses: (1) safety, vulnerability, and victimization concerns, (2) adaptive support needs, (3) programming, housing, and accommodation needs. The multidisciplinary team's plan will be regularly reviewed and updated as needed.

    3.  Prisoners with an Intellectual Disability assigned to a work/industry position will be provided additional supervision and training as necessary to help them meet the requirements of the assignment.

**P.** **ADA Training, Accountability, and Quality Assurance**

    1.  The County shall ensure all custody, health care, facility maintenance, and other Jail staff receive ADA training appropriate to their position.

        a)  The County shall provide to all staff appropriate training on disability awareness, including the use and purpose of accommodations and modifications in accordance with the ADA.

        b)  The ADA training shall include: formalized lesson plans and in-classroom or virtual training for staff (including managers, supervisors, and rank-and-file staff) provided by certified or otherwise qualified ADA trainers.

    2.  ADA instructors shall have appropriate ADA training and subject matter expertise necessary to effectively provide ADA training to staff.

    3.  The County shall, in consultation with Plaintiffs' counsel, develop and implement written policies and procedures regarding monitoring, investigating, and tracking staff violations (or allegations of violations) of ADA requirements and Jail ADA policies.

4. The County shall develop an ADA accountability plan that will ensure quality assurance and establish staff accountability for egregious, serious, or repeated violations of the ADA and Jail ADA-related policies and procedures.

## Q. Accessibility Remedial Plan to Address Physical Plant Deficiencies

1. The County shall, within 24 months from court approval of the Settlement and in consultation with Plaintiffs' counsel, develop and fully implement an Accessibility Remedial Plan to address Jail physical plant deficiencies that result in access barriers for prisoners with disabilities. In the interim, the Sheriff's Office shall house prisoners with disabilities in the most integrated and appropriate housing possible, providing reasonable accommodations and assistance where necessary to ensure appropriate accessibility to Jail programs, services, and activities.

2. The Accessibility Remedial Plan shall ensure the following:

   a) Adequate provision of accessible cells and housing areas with required maneuvering clearances and accessible toilet fixtures, sanitary facilities, showers, dining/dayroom seating, and recreation/yard areas.

   b) Accessible paths of travel that are compliant with the ADA.

   c) Equal and adequate access for all prisoners with disabilities to Family and Attorney Visiting areas in reasonable proximity to their housing location.

## IV. MENTAL HEALTH CARE

### A. Policies and Procedures

1. The County shall establish policies and procedures that are consistent with the provisions of this Remedial Plan and include the following:

   a) A written document reflecting the complete spectrum of mental healthcare programming and services provided to prisoners;

   b) Minimum and maximum timeframes for when each type of mental healthcare service will be completed, including but not limited to laboratory tracking and psychiatry follow-up services, in accordance with prevailing community and professional standards;

   c) An intake and referral triage system to ensure timely and effective resolution of inmate requests and staff referrals for mental healthcare;

   d) Specific credentialing requirements for the delivery of mental healthcare services, including but not limited to only qualified mental health professionals may make critical treatment decisions.

   e) Clinical monitoring of inmates, including but not limited to those who are involuntarily medicated, clinically restrained or secluded, segregated, or on suicide watch;

    f)  Descriptions of specialized mental health programming that specifically identify admitting and discharge criteria and the staff members who have the authority to place inmates in specialized mental health housing;

    g)  Procedures for involuntary medications and other appropriate measures for the management of inmates with serious mental illness who lack the capacity to give informed consent, in accordance with relevant state law;

    h)  Training for all staff members who are working with inmates with mental illness in all aspects of their respective duty assignments.

2.  The County's policies and procedures shall be revised, as necessary, to reflect all of the remedial measures described in this Remedial Plan.

3.  The County shall continue to operate its acute inpatient program and its Outpatient Psychiatric Pod (OPP) program. The County shall establish a new Intensive Outpatient Program (IOP) for inmates who require a higher level of outpatient psychiatric care than what is provided in the OPP program.

4.  The County shall operate its non-acute mental health programs – IOP, OPP, and General Population-Mental Health – consistent with the JPS Psychiatric Services overview, attached as **Exhibit A-2**.

## B. Organizational Structure

1.  The County shall develop and implement a comprehensive organizational chart that includes the Sheriff's Department ("Department"), Correctional Health Services ("CHS"), Jail Psychiatric Services ("JPS"), Chief Administrative Officer, Medical Director of the JPS Program, and any other mental health staff, and clearly defines the scope of services, chains of authority, performance expectations, and consequences for deficiencies in the delivery of mental health care services.

2.  A Medical Director of Jail Psychiatric Services shall be designated and shall oversee all mental health care functions in the jails, including psychiatric prescribers and psychiatric nurses.  The Director shall possess clinical experience and a doctoral degree.

3.  The Medical Director of Jail Psychiatric Services shall participate in jail executive leadership and shall be responsible for overseeing program development, clinical practice, and policy, as well as interfacing with jail and medical leadership and community mental health.

## C. Patient Privacy

1.  All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff.  In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any

other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification.

   a) For any determination that a clinical interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination.  Such decisions shall be reviewed through the Quality Assurance process.

   b) If the presence of custody staff  is determined to be necessary to ensure the safety of medical staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

   c) The County's patient privacy policies, as described in this section, shall apply to contacts between inmates and Triage Navigator Program staff and/or other staff that provide mental health-related services on site at the Jail.

2. Jail policies that mandate custody staff to be present for any mental health treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above.  Custody and mental health staff shall be trained accordingly.

3. It shall be the policy of the County that mental health clinicians shall not conduct their patient contacts at cell front except pursuant to documented refusals or specific, documented security concerns that warrant cell front contacts.

4. For each clinical contact, mental health staff shall document whether the encounter was confidential, including whether it took place at cell front.  If the contact occurred at cell front or otherwise was non-confidential, the reasons shall be clearly documented in the individual patient record and for purposes of Quality Assurance review procedures.

5. A process shall exist for sick call slips or other mental health treatment-related requests to be collected without the involvement of custody staff.

D. **Clinical Practices**

1. Mental health staff shall develop and maintain at each jail facility an accurate case list of all prisoners requiring mental health treatment services at the jail ("caseload") which, at a minimum, lists the patient's name, medical chart number, current psychiatric diagnoses, date of booking, date of last appointment, date of next appointment, and the name of the treating prescriber.

2. Qualified mental health professionals shall have access to the patient's medical record for all scheduled clinical encounters.

3. Qualified mental health professionals shall provide individual counseling, group counseling, and psychosocial/psychoeducational programs based on individual patients' clinical needs.

4. A qualified mental health professional shall conduct and document a thorough assessment of each individual in need of mental health care following identification.

**5.** The County shall ensure prompt access to psychiatric prescribers following intake and in response to referrals and individual patient requests in accordance with the referral and triage timelines defined in the Access to Care provisions, below.

**6.** The County shall, in consultation with Plaintiffs' counsel, implement an electronic system for tracking mental health evaluation, treatment, and other clinical contacts, as well as sick call slips and other mental health treatment-related requests or referrals.

7. The County shall develop and implement an electronic tracking system with alert and scheduling functions to ensure timely delivery of mental health services to individual patients.

8. Treatment planning:

    a) The County shall ensure that each prisoner on the mental health caseload receives a comprehensive, individualized treatment plan based on the input of the Multi-Disciplinary Treatment Team (MDT).  The MDT shall include multiple clinical disciplines with appropriate custody and counseling staff involvement.

    b) The treatment plan shall reflect individual clinical need, and the County shall ensure that all clinically indicated services are available and provided.

    c) The treatment plan shall include, at a minimum, the frequency of follow-up for clinical evaluation and adjustment of treatment modality, the type and frequency of diagnostic testing and therapeutic regimens (which may include clinical contacts more frequent than the minimum intervals described herein), and instructions about adaptation to the correctional environment.

    d) This treatment plan shall include referral to treatment after release from the facility when recommended by treatment staff.

    e) Custody staff shall be informed of a patient's treatment plan where appropriate to ensure coordination and cooperation in the ongoing care of the patient.

    f) The County shall, in consultation with Plaintiffs' counsel, develop and implement a Treatment Plan Form that will be used to select and

document individualized services for prisoners who require mental health treatment.

g) The County shall implement guidelines and timelines for the initiation and review of individual treatment plans, consistent with the JPS Psychiatric Services overview, attached as **Exhibit A-2**.

E. **Medication Administration and Monitoring**

1. The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws and through the following:

   a) The County shall ensure that initial doses of prescribed medications are delivered to inmates within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner;

   b) The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health care records relating to ongoing care needs.  The policy shall ensure that any ongoing medication, or a clinically appropriate alternative, shall be provided within 48 hours of verification of the prescription or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple prescribers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.

   c) The County shall ensure that medical staff who administer medications to inmates document in the inmate's Medical Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, and (3) the date and time for any refusal of medication.

2. Qualified mental health professionals shall, for each individual patient, establish targets for treatment with respect to the use of psychotropic medication and shall assess and document progress toward those targets at each clinical visit.

3. Qualified mental health professionals shall, for each individual patient, monitor and document the following with respect to psychotropic mediations: (1) levels of medications, (2) adverse impacts (including through renal and liver function tests where indicated), (3) side effects, and (4) efficacy.

4. Qualified mental health professionals shall, for each individual patient, conduct and document baseline studies, including ECG, blood, urine, and other studies, as clinically appropriate, prior to the initiation of treatment.

5.  The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

6.  Medication adherence checks that serve a clinical function shall be conducted by nursing staff, not custody staff. Custody staff shall conduct mouth checks when necessary to ensure institutional safety and security.

7.  Psychiatric prescribers shall consider clinically indicated considerations and conduct an in-person consultation, with the patient prior to changing or initiating medications. In the event there is no in-person consultation before prescribing or changing medications the psychiatric prescriber shall note and document the reasons for why there was not an in-person consultation with the patient.

**F.  Placement, Conditions, Privileges, and Programming**

1.  Placement:

   a)  It shall be the policy of the County to place and treat all prisoners on the mental health caseload in the least restrictive setting appropriate to their needs.

   b)  Placement in and discharge from Designated Mental Health Units shall be determined by qualified mental health professionals, with consultation with custody staff as appropriate.

   c)  Absent emergency circumstances, the County shall obtain the assent of qualified mental health professionals before transferring prisoners with SMI into or out of Designated Mental Health Units.

   d)  It shall be the policy of the County to place prisoners with SMI in appropriate settings that ensure provision of mental health services, patient safety, and the facilitation of appropriate programs, activities, and out-of-cell time.  Co-housing with other populations shall be avoided to the extent that such a practice prevents or hinders any of the above.

   e)  All patients requiring placement in a Designated Mental Health Unit shall be provided access to such placement and care based on current clinical need and without any requirement for director-level approval.

2.  Programming and Privileges

   a)  All Designated Mental Health Units shall offer a minimum of 7 hours of unstructured out-of-cell time per week and 10 hours of structured out-of-cell time per week for each prisoner. While out-of-cell hours per prisoner may vary from day to day, each prisoner will be offered some amount of out-of-cell time every day of the week. All treatment and out-of-cell time shall be documented for each prisoner, and reviewed as part of Quality Assurance procedures.

b) The County shall ensure that prisoners on the mental health caseload have access and opportunity to participate in jail programming, work opportunities, and education programs, consistent with individual clinical input.

c) The County shall develop and implement, in the 2P inpatient unit and the IOP unit, a program for progressive privileges (including time out of cell, property allowances, etc.) for patients as they demonstrate behavioral progress. A patient's level of privileges and restrictions shall be based on both clinical and custody input regarding current individual needs. The County shall ensure a process to review custody classification factors when necessary, so that placement, privileges, and restrictions match current individual circumstances and needs.

d) Individuals on a mental health caseload shall receive, at minimum, privileges consistent with their classification levels, absent specific, documented factors which necessitate the withholding of such privileges. Clinical staff shall be informed of the withholding of privileges and the reasons for the withdrawal shall be documented and regularly reviewed by clinical and custody staff. The restoration of privileges shall occur at the earliest time appropriate based on individual factors.

e) Where a prisoner in a Designated Mental Health Unit is subject to any restrictions of property, privileges, or out-of-cell time, the mental health treatment provider and Multi-Disciplinary Treatment Team will, on a weekly basis, assess and discuss with the prisoner progress and compliance with the prisoner's individual case plan. This process will include clinical contact in a private, face-to-face, out-of-cell setting. The Multi-Disciplinary Treatment Team will provide input to classification staff regarding the prisoner's mental health and appropriateness for removal of imposed restrictions. Classification staff will follow the recommendation of the Multi-Disciplinary Treatment Team to remove restrictions unless there is a clear, documented security reason to maintain the restriction.

3. Conditions:

a) Staff shall provide prisoners in Designated Mental Health Units with the opportunity to maintain cell cleanliness and the opportunity to meet their hygiene needs.  Custody and clinical staff shall provide assistance to prisoners on these matters, as appropriate to individual patient needs

b) The County shall ensure uniformity of practice with respect to cell searches, such that searches are not done for punitive or harassment reasons. The County shall monitor whether cell search practices may be serving as a disincentive for prisoners in Designated Mental Health

Units to leave their cells for treatment or other out-of-cell activities, and shall take steps to address the issue as appropriate.

4. Bed planning:

a) The County shall provide a sufficient number of beds in Designated Mental Health Unit, at all necessary levels of clinical care and levels of security, to meet the needs of the population of prisoners with SMI.

b) The County shall conduct a bed needs assessment, to be updated as appropriate, in order to determine demand for each category of Designated Mental Health Unit beds and shall ensure timely access to all levels of mental health care, consistent with individual treatment needs.

c) The County shall establish mental health programming for women that ensures timely access to all levels of care and is equivalent to the range of services offered to men.

5. General Exclusion of Prisoners with Serious Mental Illness from Segregation

a) Prisoners with Serious Mental Illness will not be housed in Segregation units, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and there is no reasonable alternative, in which cases the provisions of **Section VIII.D** of the Segregation/Restrictive Housing Remedial Plan shall apply.

b) Where prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit are assessed a Disciplinary Segregation term, they will serve the term in a Designated Mental Health Unit, except in rare cases where the prisoner presents an immediate danger or significant disruption to the therapeutic setting, and shall receive structured out-of-cell time and programming as determined by the Multi-Disciplinary Treatment Team.

6. Access to Care

a) The County shall designate and make available custody escorts for mental health staff in order to facilitate timely completion of appointments and any other clinical contacts or treatment-related events.

b) The County shall ensure sufficient and suitable treatment and office space for mental health care services, including the Triage Navigator Program and other mental health-related services provided on site at the Jail.

c) Locations shall be arranged in advance for all scheduled clinical encounters.

d) The County shall track and document all completed, delayed, and canceled mental health appointments, including reasons for delays and cancelations.  Such documentation shall be reviewed as part of the Quality Assurance process.

e) Referrals and triage:

   i. The County shall maintain a staff referral process (custody and medical) and a kite system for prisoners to request mental health services.  Referrals by staff or prisoners must be triaged within 24 hours.

   ii. Referrals and requests for mental health services shall be handled in accordance with the following timeframes, and based on the definitions and guidance in **Exhibit A-2**:

   ▪ Prisoners with <u>"Must See" (Emergent)</u> mental health needs shall be seen for assessment or treatment by a qualified mental health professional as soon as possible, and within six (6) hours. Prisoners with emergent mental health needs shall be monitored through continuous observation until evaluated by a mental health professional.

   ▪ Prisoners with <u>Priority (Urgent)</u> mental health needs shall be seen for assessment or treatment by a qualified mental health professional within 36 hours.

   ▪ Prisoners with <u>Routine</u> mental health needs shall be seen for assessment or treatment by a qualified mental health professional within two (2) weeks;

   ▪ Prisoners whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication.

### G. Medico-Legal Practices

1. The County shall provide access to appropriate inpatient psychiatric beds to all patients who meet WIC § 5150 commitment criteria.  At the time a patient's need for inpatient care is identified, commitment paperwork shall be initiated immediately.  Placement in an inpatient unit shall occur at the earliest possible time, and in all cases within 24 hours.  For individual prisoners placed on a pre-admit or wait list for inpatient placement, affirmative steps to process and place them shall begin immediately.

2. The County shall not discharge patients from the LPS unit and immediately re-admit them for the purpose of circumventing LPS Act requirements.  For patients with continuing need for LPS commitment, the County shall follow all required procedures under the LPS Act.

3. The County shall review all County and JPS policies and procedures for PREA compliance, and revise them as necessary to address all mental health-related requirements.

**H. Clinical Restraints and Seclusion**

1. Generally:

   a) It is the policy of the County to employ restraints and seclusion only when necessary and to remove restraints and seclusion as soon as possible.

   b) It is the policy of the County to employ clinical restraints and seclusion only when less restrictive alternative methods are not sufficient to protect the inmate-patient or others from injury. Clinical restraint and seclusion shall not be used as punishment, in place of treatment, or for the convenience of staff.

   c) The placement of a prisoner in clinical restraint or seclusion shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs.

   d) When clinical restraints or seclusion are used, Jail staff will document justification for their application and the times of application and removal of restraints.

   e) There shall be no "as needed" or "standing" orders for clinical restraint or seclusion.

   f) Individuals in clinical restraints or on seclusion shall be on constant watch, or on constant video monitoring with direct visualization every 15 minutes. All checks will be documented.

   g) Fluids shall be offered at least every four hours and at meal times.

2. Clinical Restraints

   a) The opinion of a qualified health care professional or qualified mental health professional on placement and retention in restraints will be obtained within one hour from the time of placement.

   b) A thorough clinical assessment shall be conducted by qualified health care professional or qualified mental health professional every four hours to determine the need for continued restraint.

   c) Individuals in restraints shall be checked every two hours by a nurse for vital signs, neurovascular assessment, and limb range, and offered an opportunity for toileting.

3. Reentry Services

a) The County shall provide a 30-day supply of current psychotropic medications to inmates on the mental health caseload, who have been sentenced and have a scheduled released date, immediately upon release.

b) Within 24 hours of release of any inmate who is on the mental health caseload and classified as pre-sentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the inmate's current psychotropic medications.

c) The County, in consultation with Plaintiffs' counsel, develop and implement a reentry services policy governing the provision of assistance to prisoners on the mental health caseload, including outpatient referrals and appointments, public benefits, medical insurance, housing, substance abuse treatment, parenting and family services, inpatient treatment, and other reentry services.

d) The County agrees that, during the course of the implementation of the remedial plans contained in this agreement, it will consider Plaintiffs' input on measures to prevent unnecessary or avoidable incarceration of individuals with serious mental illness.

## I. Training

1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

   a) All jail custody staff shall receive formal training in mental health, which shall encompass mental health policies, critical incident response, crisis intervention techniques, recognizing different types of mental illness, interacting with prisoners with mental illness, appropriate referral practices, suicide and self-harm detection and preventions, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

   b) Custody staff working in Designated Mental Health Units shall receive additional training, including additional information on mental illness, special medico-legal considerations, de-escalation techniques, working with individuals with mental health needs, relevant bias and cultural competency issues, and the jail's mental health treatment programs.

   c) Mental health staff shall receive training on the correctional mental health system, correctional mental health policies, suicide assessment and intervention, relevant bias and cultural competency issues, and treatment modalities to be offered in the jails.

## V.  DISCIPLINARY MEASURES AND USE OF FORCE FOR PRISONERS WITH MENTAL HEALTH OR INTELLECTUAL DISABILITIES

### A.  Role of Mental Health Staff in Disciplinary Process

1. The County's policies and procedures shall require meaningful consideration of the relationship of a prisoner's behavior to any mental health or intellectual disability, the efficacy of disciplinary measures versus alternative interventions, and the impact of disciplinary measures on the health and well-being of prisoners with disabilities.

2. Prisoners who are alleged to have committed a rules violation shall be reviewed by a qualified mental health professional if any of the following apply:

   a) Prisoner is housed in any Designated Mental Health Unit;

   b) Jail staff have reason to believe the prisoner's behavior was unusual, uncharacteristic, or a possible manifestation of mental illness;

   c) Prisoner is on the mental health caseload and may lose good time credit as a consequence of the disciplinary infraction with which he or she is charged.

3. If any of the above criteria is met, the qualified mental health professional shall complete the form attached as **Exhibit A-3** (JPS-Rules Violation Mental Health Review) and indicate:

   a) Whether or not the reported behavior was related to mental illness, adaptive functioning deficits, or other disability;

   b) Whether the prisoner's behavior is, or may be, connected to any of the following circumstances:

      i. An act of self-harm or attempted suicide

      ii. A cell extraction related to transfer to a medical/mental health unit or provision of involuntary treatment

      iii. Placement in clinical restraints or seclusion.

   c) Any other mitigating factors regarding the prisoner's behavior, disability, and/or circumstances that should be considered and whether certain sanctions should be avoided in light of the prisoner's mental health disability or intellectual disability, treatment plan, or adaptive support needs.

B. **Consideration of Mental Health Input and Other Disability Information in Disciplinary Process**

1. The County shall designate one Chief Disciplinary Hearing Officer for each jail facility, who shall be responsible for ensuring consistency in disciplinary practices and procedures.

2. The Disciplinary Hearing Officer shall ensure that prisoners are not disciplined for conduct that is related to their mental health or intellectual disability.

3. The Disciplinary Hearing Officer shall consider the qualified mental health professional's findings and any other available disability information when deciding what, if any, disciplinary action should be imposed.

4. The Disciplinary Hearing Officer shall consider the qualified mental health professional's input on minimizing the deleterious effect of disciplinary measures on the prisoner in view of his or her mental health or adaptive support needs.

5. If the Disciplinary Hearing Officer does not follow the mental health staff's input regarding whether the behavior was related to symptoms of mental illness or intellectual disability, whether any mitigating factors should be considered, and whether certain sanctions should be avoided, the Disciplinary Hearing Officer shall explain in writing why it was not followed.

6. Prisoners will not be subjected to discipline which prevents the delivery of mental health treatment or adaptive support needs, unless necessary for institutional safety.

7. Prisoners shall not be subject to discipline for refusing treatment or medications, or for engaging in self-injurious behavior or threats of self-injurious behavior.

C. **Accommodations for Prisoners with Mental Health or Intellectual Disabilities During the Disciplinary Process**

1. The County shall provide reasonable accommodations during the hearing process for prisoners with mental health or intellectual disabilities.

2. The County shall take reasonable steps to ensure the provision of effective communication and necessary assistance to prisoners with disabilities at all stages of the disciplinary process.

D. **Use of Force for Prisoners with Mental Health or Intellectual Disabilities**

1. The County's Correctional Services Operations Orders shall include language that ensures meaningful consideration of whether a prisoner's behavior is a manifestation of mental health or intellectual disability.

2. For prisoners with a known mental health or intellectual disability, and absent an imminent threat to safety, staff shall employ de-escalation methods that take into account the individual's mental health or adaptive support needs.

3. The County's Correctional Services Use of Force policies shall include a definition and a protocol for a planned Use of Force that provides appropriate guidance for a planned Use of Force that involves a prisoner with mental health or intellectual disability.

4. Prior to any *planned* Use of Force, such as a cell extraction, against a prisoner with mental health or intellectual disabilities, there will be a "cooling down period," consistent with safety and security needs. This period includes a structured attempt by mental health staff (and other staff if appropriate), to de-escalate the situation and to reach a resolution without Use of Force. Such efforts, including the use of adaptive supports, will be documented in writing. Medical and/or mental health staff should be consulted if the purpose of the cell extraction is related to the delivery of treatment.

5. The County shall require video documentation for any planned Use of Force, absent exigent circumstances. Jail staff shall endeavor to record the specific actions, behavior, or threats leading to the need for Use of Force, as well as efforts to resolve the situation without Use of Force.

6. The County shall ensure the completion of supervisory review of Use of Force incidents, including video (for any planned Use of Force), interviews, and written incident documentation, in order to ensure appropriateness of Use of Force practices including de-escalation efforts. The County shall take corrective action when necessary.

7. The County shall review and amend as appropriate its policies on Use of Force, including its policies on Custody Emergency Response Team (CERT) and Cell Extraction Procedures.

E. **Training and Quality Assurance**

1. All custody staff, and mental health staff, shall be trained on the policies and procedures outlined herein that are relevant to their job and classification requirements. Custody staff will receive periodic training on identifying behaviors that may be manifestations of mental illness and other situations warranting a referral to mental health staff, including for a Rules Violation Mental Health Review or other mental health assessment.

2. All custody staff shall be trained on the identification of symptoms of mental illness, the provision of adaptive supports, and the use of de-escalation methods appropriate for prisoners with mental health or intellectual disabilities.

3. The County shall track the outcomes of all disciplinary hearings for prisoners who are on the mental health caseload or who have intellectual disabilities,

including whether the recommendation of the mental health professional was followed.

4. The County shall track all Uses of Force (planned and reactive) involving prisoners who are on the mental health caseload or who have intellectual disabilities, including the number of Uses of Force and the number of cell extractions by facility.

5. The County shall implement a continuous quality assurance/quality improvement plan to periodically audit disciplinary and Use of Force practices as they apply to prisoners who are on the mental health caseload or who have intellectual disabilities.

## VI.   MEDICAL CARE

### A. Staffing

1. The County shall provide and maintain sufficient staffing to meet professional standards of care and to execute the requirements of this Remedial Plan, including clinical staff, office and technological support, QA/QI units, and custody staff for escorts and transportation.

2. Provider quality shall be evaluated regularly to ensure that relevant quality of care standards are maintained. This review shall be in addition to the peer review and quality improvement processes described in this plan. The parties shall meet and confer regarding any deficiencies identified in the evaluation. Should the parties disagree regarding matters of provider quality, the Court Expert shall evaluate the quality of provider care and to complete a written report.

### B. Intake

1. All prisoners who are to be housed shall be screened on arrival in custody by Registered Nurses (RNs).  RN screening shall take place prior to placement in jail housing.

2. Health care intake screening shall take place in a setting that ensures confidentiality of communications between nurses and individual patients. Custody staff may maintain visual supervision but may not be close enough to overhear communication, unless security concerns based on an individualized determination of risk that includes a consideration of requests by the health care staff require that custody staff be closer at hand.  There shall be visual and auditory privacy from other prisoners.

3. The County shall, in consultation with Plaintiffs, revise the contents of its intake screening, medical intake screening, and special needs documentation to reflect community standards and ensure proper identification of medical and disability related needs.

4. Nurses who perform intake screening shall consult any available electronic health care records from prior incarcerations or other County agencies. The form shall include a check box to confirm that such a review was done.

5. The County shall make best efforts to verify a patient's prescribed medications and current treatment needs at intake, including outreach to pharmacies and community providers to request prescriptions and other health care records relating to ongoing care needs. The policy shall ensure that any ongoing medication, or a clinically appropriate alternative, shall be provided within 48 hours of verification of the prescription or from a determination by a physician that the medication is medically necessary. Any orders that cannot be reconciled or verified, such as those with conflicting prescriptions from multiple prescribers, shall be referred to a health care provider for reconciliation or verification the next clinic day after booking.

6. The County shall follow a triage process in which intake nurses schedule patients for follow-up appointments based on their medical needs and acuity at intake, and shall not rely solely on patients to submit Health Services Requests once housed. The policy shall, in consultation with Plaintiffs' counsel, establish clear protocols that include appropriate intervals of care based on clinical guidelines, and that intake nurses shall schedule follow-up appointments at the time of intake based on those protocols.

7. All nurses who perform intake screenings will be trained annually on how to perform that function.

C. **Access to Care**

1. The County shall ensure that Health Services Requests (HSRs) are readily available to all prisoners, including those in segregation housing, from nurses and custody officers.

2. The County shall provide patients with a mechanism for submitting HSRs that does not require them to share confidential health information with custody staff. The County shall install lockboxes or other secure physical or electronic mechanism for the submission of HSRs (as well as health care grievances) in every housing unit. Designated health care staff shall collect (if submitted physically) or review (if submitted electronically) HSRs at least two times per day in order to ensure that CHS receives critical health information in a timely manner. Designated health care staff shall also collect HSRs during pill call and shall go door to door in all restricted housing units at least once a day to collect HSRs. HSRs and health care grievances will be promptly date- and time-stamped. The County may implement an accessible electronic solution for secure and confidential submission of HSRs and health care grievances.

3. The County shall establish clear timeframes to respond to HSRs:

a) All patients whose HSRs raise emergent concerns shall be seen by the RN immediately on receipt of the HSR.  For all other HSRs, a triage RN shall, within 24 hours of receipt of the form (for urgent concerns) or within 72 hours of receipt of the form (for routine concerns):

    i. conduct a brief face-to-face visit with the patient in a confidential, clinical setting;

    ii. take a full set of vital signs, if appropriate;

    iii. conduct a physical exam, if appropriate;

    iv. assign a triage level for a provider appointment of emergent, urgent, routine, or written response only;

    v. inform the patient of his or her triage level and response time frames;

    vi. provide over-the-counter medications pursuant to protocols; and

    vii. consult with providers regarding patient care pursuant to protocols, as appropriate.

b) If the triage nurse determines that the patient should be seen by a provider:

    i. patients with emergent conditions shall be treated or sent out for emergency treatment immediately;

    ii. patients with urgent conditions shall be seen within 24 hours of the RN face-to-face; and

    iii. patients with only routine concerns shall be seen within two weeks of the RN face-to-face.

c) Patients whose requests do not require formal clinical assessment or intervention shall be issued a written response, with steps taken to ensure effective communication, within two weeks of receipt of the form.

d) The County shall permit patients, including those who are illiterate, non-English speaking, or otherwise unable to submit written or electronic HSRs, to verbally request care. Such verbal requests shall immediately be documented by the staff member who receives the request on an appropriate form and transmitted to a qualified medical professional for response in the same priority as those HSRs received in writing.

4. The County shall designate and make available custody escorts for medical staff in order to facilitate timely and confidential clinical contacts or treatment-related events.

5. The County shall track and regularly review response times to ensure that the above timelines are met.

6. The County shall discontinue its policy of prohibiting patients from reporting or inquiring about multiple medical needs in the same appointment.

7. When a patient refuses a medical evaluation or appointment, such refusal will not indicate a waiver of subsequent health care.

   a) When a patient refuses a service that was ordered by medical staff based on an identified clinical need, medical staff will follow up to ensure that the patient understands any adverse health consequences and to address individual issues that caused the patient to refuse the service.

   b) Any such refusal will be documented by medical staff and must include (1) a description of the nature of the service being refused, (2) confirmation that the patient was made aware of and understands any adverse health consequences by medical staff, (3) the signature of the patient, and (4) the signature of medical staff witness. In the event that obtaining the signature of a patient is not possible, medical staff shall document the circumstances.

**D. Chronic care**

1. Within three months of the date the Consent Decree is issued by the Court, the County shall, in consultation with Plaintiffs' counsel, develop and implement a chronic disease management program that is consistent with national clinical practice guidelines.  The chronic disease program will include procedures for the identification and monitoring of such patients and the establishment and implementation of individualized treatment plans consistent with national clinical practice guidelines.

   a) The chronic disease management program shall ensure that patients with chronic illness shall be identified and seen after intake based on acuity (on the day of arrival for patients with high acuity and not to exceed 30 days for all others). The County will timely provide clinically indicated diagnostic testing and treatment, including prior to this post-intake appointment. Follow-up appointments will be provided in intervals that do not exceed 90 days unless such patients are clinically stable on at least two consecutive encounters, in which case follow-up appointment intervals will not exceed 365 days (and sooner if clinically indicated), subject to a chart review by a clinician at least every six (6) months.

   b) The chronic disease management program shall ensure that patients are screened for Hepatitis C at intake. If medical staff recommend Hepatitis testing based on screening results, such testing shall be offered on an "opt-out" basis for those individuals who remain in custody long enough to receive a housing unit assignment. If the individual declines

the testing, the refusal shall be documented in the health record. Patients found to have Hepatitis C shall be offered immunizations against Hepatitis A and Hepatitis B.

c) The chronic disease management program shall include a comprehensive diabetic management protocol that conforms to the guidance of the ADA's Diabetes Management in Correctional Institutions. The protocol shall be developed in coordination with custody administration to address normal circadian rhythms, food consumption times, and insulin dosing times.

d) The chronic disease management program shall ensure that patients who take medications for their chronic conditions shall have the medications automatically renewed unless the provider determines that it is necessary to see the patient before renewing the medication. In that case, the patient shall be scheduled to be seen in a reasonable time period to ensure medication continuity.

2. The County shall track compliance with the chronic disease management program requirements for timely provision of appointments, procedures, and medications. The County shall ensure that its electronic medical record system is adequate to support these critical functions.

3. The County shall review its infection control policies and procedures for dialysis treatment to ensure that appropriate precautions are taken to minimize the risk of transmission of blood-borne pathogens, given the proximity of HCV+ and HCV- patients receiving dialysis in the same room.

E. **Specialty care**

1. The County shall develop and implement policies regarding specialty referrals using an algorithm with evidence-based referral criteria and guidelines.

2. Within three months of the date the Consent Decree is issued by the Court, the County shall develop and implement policies and procedures to ensure that emergency consultations and diagnostic and treatment procedures, as determined by the medical provider, are provided immediately; high priority consultations and procedures, as determined by the medical provider, are seen within 21 calendar days of the date of the referral; and routine consultations and procedures, as determined by the medical provider, are seen within 90 calendar days of the date of the referral.

3. Patients whose routine specialty consultation or procedure do not take place within 90 calendar days from the date of the referral shall be examined by a clinician monthly and evaluated to determine if urgent specialty care is indicated.

4. Within 5 calendar days of the completion of a high priority specialty consultation or procedure or within 14 calendar days of a routine specialty

consultation or procedure, patients returning to the Sacramento jails shall have their specialty reports and follow up recommendations reviewed by a jail nurse practitioner, physician's assistant or physician.  A nurse practitioner, physician's assistant or physician will review this information with the patient within 14 calendar days of the receipt of the specialist's report.

5. Specialty care consultations and outside diagnostic and treatment procedures shall be tracked in a log that identifies the referral request date, the date the referral was sent to the specialty care provider, the appointment date for the consultation or procedure is scheduled, the date the appointment takes place, and, if the appointment is rescheduled or cancelled, the reason it was rescheduled or canceled.

6. Requests for specialty consultations and outside diagnostic and treatment procedures shall also be tracked to determine the length of time it takes to grant or deny the requests and the circumstances and reasons for denials.

7. At least twice a year, the County shall conduct an audit of specialty care referral logs described in subsections (5) and (6), above, and complete a report as to whether each category of specialty care is provided in a reasonable timeframe, consistent with established timeframes. If any specialty care area has a record of untimely appointments as determined by the Correctional Health Service Continuous Quality Improvement Committee, the County shall report to Plaintiffs and the parties shall meet and confer to take prompt steps to address the issue. The County will provide Plaintiffs access to the specialty care referral logs and audit reports periodically and upon written request. The parties will work to resolve issues with untimely specialty care in individual patient cases and with respect to systemic trends, including through the dispute resolution process.

8. The County shall consider implementing an e-referral system to reduce delays and facilitate communication between specialists and primary care providers, as well as reducing unnecessary transportation costs and unnecessary specialist appointments by ensuring that the specialist has all the information he or she needs before an appointment takes place.

9. The County shall ensure that utilization management and/or scheduling staff provides notification of whether a patient's specialty care appointment is scheduled to occur within the timeline pursuant to the referral and/or clinical recommendation, including as follows:

   a) Medical staff may request and obtain information as to whether any patient's specialty care appointment is scheduled, and as to the general timing of the appointment (e.g. within a one-week's date range).

   b) If a specialty care appointment is denied or is not scheduled to occur within the timeline pursuant to the referral and/or clinical

recommendation, such information will be affirmatively provided to the treatment team and to the patient.

c) If a previously scheduled specialty care appointment is postponed to a date that is outside the timeline pursuant to the referral and/or clinical recommendation, such information will be affirmatively provided to the treatment team and to the patient.

10. The County shall consider creating a physical therapy clinic at the jail to more efficiently meet the significant demand for this service.

### F. Medication administration and monitoring

1. The County shall develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws and through the following:

   a) ensuring that initial doses of prescribed medications are delivered to patients within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner;

   b) ensuring that medical staff who administer medications to patients document in the patient's Medical Administration Record (1) name and dosage of each dispensed medication, (2) each date and time medication is administered, (3) the date and time for any refusal of medication, and (4) in the event of patient refusal, documentation that the prisoner was made aware of and understands any adverse health consequences by medical staff.

2. The County shall provide sufficient nursing and custody staffing to ensure timely delivery and administration of medication.

3. The County shall provide pill call twice a day in each housing unit, at regular times that are consistent from day to day, except as may be required by non-routine facility security concerns.  The County shall develop and implement policies and procedures to ensure that prescribed medications are provided at therapeutically appropriate times as determined by the ordering physician. Any patient who requires administration of medications at times outside the regular pill call shall be provided that medication at the times determined by the ordering physician.

4. The County shall develop and implement policies and procedures to ensure that patients are provided medications at therapeutically appropriate times when out to court, in transit to or from any outside appointment, or being transferred between facilities. If administration time occurs when a patient is in court, in transit or at an outside appointment, medication will be administered as close as possible to the regular administration time.

5. The County shall develop and implement policies and procedures to ensure that medication efficacy and side effects are monitored by staff and reviewed by appropriate clinicians at appropriate intervals.

6. The County shall explore the expansion of its Keep-on-Person medication program, (especially for inhalers and medications that are available over-the-counter in the community) and to facilitate provision of medications for people who are out to court, in transit, or at an outside appointment.

## G. Clinical space and medical placements

1. The County shall provide adequate clinical space in every facility to support clinical operations while also securing appropriate privacy for patients. Adequate clinical space includes visual and auditory privacy from prisoners and auditory privacy from staff, the space needed reasonably to perform clinical functions as well as an examination table, sink, proper lighting, proper equipment, and access to health care records.

2. The County shall ensure that any negative pressure isolation rooms meet community standards, including an antechamber to ensure that the room remains airtight, appropriate pressure gauges, and regular documented checks of the pressure gauges.

3. The County shall ensure that absent individualized, documented safety and security concerns, patients in acute medical or quarantine placements shall be allowed property and privileges equivalent to what they would receive in general population based on their classification levels.

4. The County shall ensure that patients in medical placements are not forced to sleep on the floor, including by providing beds with rails or other features appropriate for patients' clinical needs and any risk of falling.

5. The County shall not discriminate against patients in medical placements solely because of their need for C-Pap machines, but instead shall provide access to programs and services in accordance with their classification level, as set forth in the ADA Remedial Plan.

## H. Patient privacy

1. The County shall develop and implement policies and procedures to ensure that appropriate confidentiality is maintained for health care services. The policies shall ensure confidentiality for clinical encounters, including health care intake screening, pill call, nursing and provider sick call, specialty appointments, and mental health treatment. The policies shall also ensure confidentiality for written health care documents, such as health care needs requests and grievances raising medical care or mental health care concerns, which shall not be collected by custody staff.

2. The County shall provide adequate clinical space in each jail to support clinical operations while also securing appropriate privacy for patients, including visual and auditory privacy from prisoners and auditory privacy from staff.

3. All clinical interactions shall be private and confidential absent a specific, current risk that necessitates the presence of custody staff. In making such determination, custody and clinical staff shall confer and review individual case factors, including the patient's current behavior and functioning and any other security concerns necessary to ensure the safety of medical staff. Such determinations shall not be based on housing placement or custodial classification. The issuance of pills does not constitute a clinical interaction.

   a) For any determination that a clinical interaction with a patient requires the presence of custody staff, staff shall document the specific reasons for the determination. Such decisions shall be reviewed through the Quality Assurance process.

   b) If the presence of a correctional officer is determined to be necessary to ensure the safety of staff for any clinical counter, steps shall be taken to ensure auditory privacy of the encounter.

   c) The County's patient privacy policies, as described in this section, shall apply to contacts between patients and all staff who provide health-related services on site at the Jail.

4. Jail policies that mandate custody staff to be present for any medical treatment in such a way that disrupts confidentiality shall be revised to reflect the individualized process set forth above. Custody and medical staff shall be trained accordingly.

**I. Health care records**

1. The County shall develop and implement a fully integrated electronic health record system that includes medical, psychiatric, and dental records and allows mental health and medical staff to view the medical and mental health information about each patient in a single record. This shall be accomplished within 12 months of the date the Consent Decree is issued by the Court.

2. Until such a system is implemented, the County shall develop and implement policies and procedures to ensure that medical staff have access to mental health information and mental health staff have access to medical information, as needed to perform their clinical duties. This information shall include all intake records. Medical and mental health staff shall be trained in these policies and procedures within one month of the date the Consent Decree is issued by the Court.

3. The County shall develop and implement policies and procedures to monitor the deployment of the CHS Electronic Health Records to ensure the records system is modified, maintained, and improved as needed on an ongoing basis,

including ongoing information technology support for the network infrastructure and end users.

**J.  Utilization management**

1. The County shall revise its utilization management (UM) system to ensure that critical health decisions about patients' access to care are made with sufficient input from providers and a thorough review of the health care records.

2. The County shall ensure that decisions about a patient's access to, timing of or need for health care are made by a physician, with documented reference to the patient's medical record. Nurses may gather information and coordinate the UM process, so long as it does not interfere with that requirement.  All decisions by the UM committee shall be documented, including the clinical justification for the decision.

3. The UM system shall ensure that providers and patients are promptly informed about decisions made by the UM committee, including denial of a specialist referral request.

4. The UM system shall include an appeal process to enable patients and providers to appeal a decision denying a referral request.

**K.  Sanitation**

1. The County shall consult with an Environment of Care expert to evaluate facilities where patients are housed and/or receive clinical treatment, and to make written recommendations to address issues of cleanliness and sanitation that may adversely impact health.

**L.  Reproductive and Pregnancy-Related Care**

1. The County shall ensure that pregnant patients receive timely and appropriate prenatal care, specialized obstetrical services when indicated, and postpartum care (including mental health services).

2. The County will provide pregnant patients comprehensive counseling and timely assistance in accordance with their expressed desires regarding their pregnancies, whether they elect to keep the child, use adoptive services, or have an abortion.

3. The County shall provide non-directive counseling about contraception to female prisoners, shall allow female prisoners to continue an appropriate method of birth control while incarcerated (with consideration given to the patient's preference and/or current method of birth control), and shall provide access to emergency or other contraception when appropriate.

**M.  Transgender and gender nonconforming health care**

1. The County shall implement policies and procedures to provide transgender and intersex prisoners with care based upon an individualized assessment of

the patient's medical needs in accordance with accepted standards of care and prevailing legal and constitutional requirements, including, as appropriate:

   a) Hormone therapy

   b) Surgical care

   c) Access to gender-affirming clothing

   d) Access to gender-affirming commissary items, make-up, and other property items

2. The County shall ensure that medical and mental health staff have specific knowledge of and training on the WPATH Standards of Care.

### N. Detoxification protocols

1. Within three months of the date the Consent Decree is issued by the Court, the County shall develop and implement protocols for assessment, treatment, and medication interventions for alcohol, opiate, and benzodiazepine withdrawal that are consistent with community standards.

2. The protocols shall include the requirements that (i) nursing assessments of people experiencing detoxification shall be done at least twice times a day for five days and reviewed by a physician; (ii) nursing assessments shall include both physical findings, including a full set of vital signs, as well as psychiatric findings; (iii) medication interventions to treat withdrawal syndromes shall be updated to provide evidence-based medication in sufficient doses to be efficacious; (iv) the County shall provide specific guidelines to the nurses for intervention and escalation of care when patients do not respond to initial therapy; and (v) patients experiencing severe, life-threatening intoxication (an overdose) or withdrawal shall be immediately transferred under appropriate security conditions to a facility where specialized care is available.

### O. Nursing protocols

1. Nurses shall not act outside their scope of practice.

2. To that end, the County shall revise its nursing standardized protocols to include assessment protocols that are sorted, based on symptoms, into low, medium, and high risk categories.

   a) Low-risk protocols would allow RNs to manage straightforward symptoms with over-the-counter medications;

   b) Medium-risk protocols would require a consultation with a provider prior to treatment; and

   c) High-risk protocols would facilitate emergency stabilization while awaiting transfer to higher level of care.

P. **Reviews of in-custody deaths**

1. Preliminary reviews of in-custody deaths shall take place within 30 days of the death and shall include a written report of the circumstances and events leading to the death, with the goal to identify and remedy preventable causes of death and any other potentially systematic problems.

2. Mortality reviews shall include an investigation of the events occurring prior to the death, an analysis of any acts or omissions by any staff or prisoners which might have contributed to the death, and the identification of problems for which corrective action should be undertaken.

Q. **Reentry Services**

1. The County shall provide a 30-day supply of current medications to patients who have been sentenced and have a scheduled released date, immediately upon release.

2. Within 24 hours of release of any patient who receives prescription medications while in custody and is classified as pre-sentence, the County shall transmit to a designated County facility a prescription for a 30-day supply of the patient's current prescription medications.

3. The County, in consultation with Plaintiffs, shall develop and implement a reentry services policy governing the provision of assistance to chronic care patients, including outpatient referrals and appointments, public benefits, inpatient treatment, and other appropriate reentry services.

R. **Training**

1. The County shall develop and implement, in collaboration with Plaintiffs' counsel, training curricula and schedules in accordance with the following:

   a) All jail custody staff shall receive formal training in medical needs, which shall encompass medical treatment, critical incident response, crisis intervention techniques, recognizing different types of medical emergencies, and acute medical needs, appropriate referral practices, relevant bias and cultural competency issues, and confidentiality standards. Training shall be received every two years, at minimum.

VII. **SUICIDE PREVENTION**

A. **Substantive Provisions**

1. The County recognizes that comprehensive review and restructuring of its suicide assessment, monitoring, and prevention practices are necessary to address the risk of suicide and self-harm attendant to detention in a jail setting.

2. The County shall establish, in consultation with Plaintiffs' counsel, a new Suicide Prevention Policy that shall be in accordance with the following:

B. **Training**

1. The County shall develop, in consultation with Plaintiffs' counsel, a four- to eight-hour pre-service suicide prevention curriculum for new Jail employees (including custody, medical, and mental health staff), to be conducted in person in a classroom or virtual classroom setting, that includes the following topics:

   a) avoiding obstacles (negative attitudes) to suicide prevention;

   b) prisoner suicide research;

   c) why facility environments are conducive to suicidal behavior;

   d) identifying suicide risk despite the denial of risk;

   e) potential predisposing factors to suicide;

   f) high-risk suicide periods;

   g) warning signs and symptoms;

   h) components of the jail suicide prevention program

   i) liability issues associated with prisoner suicide;

   j) crisis intervention.

2. The County shall develop, in consultation with Plaintiffs' counsel, a two-hour annual suicide prevention curriculum for all custody, medical, and mental health staff, to be conducted in person in a classroom or virtual classroom setting, that includes:

   a) review of topics (a)-(j) above

   b) review of any changes to the jail suicide prevention program

   c) discussion of recent jail suicides or attempts

3. Custody officers assigned to Designated Mental Health Units shall receive additional specialized training on suicide prevention and working with prisoners with serious mental illness.

4. All mental health staff, including nurses, clinicians, and psychiatrists, shall receive additional training on how to complete a comprehensive suicide risk assessment and how to develop a reasonable treatment plan that contains specific strategies for reducing future suicidal ideation.

5. All mental health staff and custody officers shall be trained on the appropriate use of safety suits—*i.e.*, not to be utilized as a default, not to be used as a tool in behavior management, not to be utilized for patients being observed at 30-minute observations.

6. The County shall ensure that all staff are trained in the new Suicide Prevention Policy.

C. **Nursing Intake Screening**

1. Intake screening for suicide risk will take place at the booking screening and prior to a housing assignment. If clinically indicated, JPS will then perform an additional clinical assessment after the inmate is placed in a housing assignment.

2. All nursing intake screening shall be conducted in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

3. The County shall revise its nursing intake assessment procedures and screening forms to ensure timely identification of acute and high-risk mental health conditions, consistent with the recommendations made by Lindsey Hayes. Intake screening, as documented on screening forms, shall include:

   a) Review of suicide risk notifications in relevant medical, mental health, and custody records, including as to prior suicide attempts, self-harm, and/or mental health needs;

   b) Any prior suicidal ideation or attempts, self-harm, mental health treatment, or hospitalization;

   c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;

   d) Other relevant suicide risk factors, such as:

      i. Recent significant loss (job, relationship, death of family member/close friend);

      ii. History of suicidal behavior by family member/close friend;

      iii. Upcoming court appearances;

   e) Transporting officer's impressions about risk.

4. Regardless of the prisoner's behavior or answers given during intake screening, a mental health referral shall always be initiated if there is a documented history related to suicide or self-harm, including during a prior incarceration.

5. The County shall develop and implement a written policy and procedure for referrals to mental health by intake staff.  The policy shall correspond with the triage system and timeframes set forth in the Mental Health Remedial Plan.

6. Any prisoner expressing current suicidal ideation and/or current suicidal/self-injurious behavior shall be designated as an emergent referral and immediately referred to mental health staff.

D. **Post-Intake Mental Health Assessment Procedures**

1. All mental health assessments shall be conducted in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

2. Mental health staff shall conduct assessments within the timeframes defined in the mental health referral triage system.

3. The County shall revise its mental health assessment procedures and related forms to ensure identification of historical and current patient mental health and suicide risk information, consistent with the recommendations of the subject matter expert.

E. **Response to Identification of Suicide Risk or Need for Higher Level of Care**

1. When a prisoner is identified as at risk for suicide and placed by custody staff in a safety cell, on suicide precautions, and/or in a safety suit, mental health staff shall be contacted immediately.  A qualified mental health professional, or other appropriately trained medical staff in consultation with mental health staff, shall complete a confidential in-person suicide risk assessment as soon as possible, consistent with the "must-see" referral timeline.

2. Consistent with current RCCC policy, if there is no mental health staff on site at RCCC at the time that an emergent mental health need is identified, the prisoner shall be transported to the Main Jail for emergency evaluation within two hours of the initial report.

3. The County shall revise its JPS suicide risk assessment procedures and forms in consultation with Plaintiffs.  The County shall ensure that its JPS suicide risk assessment process, policies, and procedures consider and document the following:

    a) Review of suicide risk notifications and records from any previous incarcerations at the Jail, including records pertaining to suicide attempts, self-harm, and/or mental health needs;

    b) Other prior suicide ideation or attempts, self-harm, mental health treatment or hospitalization;

    c) Current suicidal ideation, threat, or plan, or feelings of helplessness and/or hopelessness;

    d) Suicide risk factors and protective factors, such as:

        i. Recent significant loss (job, relationship, death of family member/close friend);

        ii. History of suicidal behavior by family member/close friend;

iii. Upcoming court appearances;

 e) Transporting officer's impressions about risk;

 f) Suicide precautions, including level of observation.

4. The County shall ensure that the meal service schedule or other custody-related activities cause no delay in the completion of suicide risk assessments for prisoners.

## F. Housing of Inmates on Suicide Precautions

1. The County's policy and procedures shall direct that prisoners, including those identified as being at risk for suicide, be treated in the least restrictive setting appropriate to their individual clinical and safety needs.

## G. Inpatient Placements

1. The County shall ensure that prisoners who require psychiatric inpatient care as clinically indicated are placed in the 2P unit within 24 hours of identification, absent exceptional circumstances.  In all cases, the provision of clinically indicated treatment to any prisoner requiring inpatient level of care shall be initiated within 24 hours.

## H. Temporary Suicide Precautions

1. No prisoner shall be housed in a safety cell, segregation holding cell, or other Temporary Suicide Precautions Housing for more than six (6) hours. If mental health or medical staff determine it to be clinically appropriate based on detoxification-related needs, this time limit may be extended to no more than eight (8) hours. If exceptional circumstances prevent transfer within these timelines, those circumstances shall be documented, and transfer shall occur as soon as possible. This does not preclude the housing of a prisoner in the IOP unit if clinically indicated.

2. The County shall ensure, including by revising written policies and procedures where necessary, the timely and adequate completion of medical assessments for prisoners in need of suicide precautions, as required under Operations Order 4/05 (*i.e.*, within 12 hours of placement of the next daily sick call, whichever is earliest, and then every 24 hours thereafter).

3. The County shall ensure that any cell used for holding prisoners on suicide precautions is clean prior to the placement of a new prisoner, as well as cleaned on a normal cleaning schedule.

4. The County shall create and implement a written policy ensuring adequate frequency for meals, fluids, hygiene, showers, prescribed medications, and toileting when a prisoner is in cell used for holding prisoners on suicide precautions.

5. Inmates on suicide precautions shall not automatically be on lockdown and should be allowed dayroom or out-of-cell access consistent with security and clinical judgments.

6. The classrooms or multipurpose rooms adjacent to the housing units in the Main Jail are designed for, and should be made available for, prisoner programs and treatment.  Absent an emergency, the County shall not use the classrooms and multipurpose rooms to hold prisoners pending a mental health evaluation or on suicide precautions.  Where such emergency occurs, the County shall document the reasons for retention and move the prisoner, within six (6) hours, to the inpatient unit or other appropriate housing location for continued observation, evaluation, and treatment.

I. **Suicide Hazards in High-Risk Housing Locations**

1. The County shall not place prisoners identified as being at risk for suicide or self-harm, or for prisoners requiring IOP level of care, in settings that are not suicide-resistant as consistent with Lindsay Hayes's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities."

2. Cells with structural blind spots shall not be used for suicide precaution.

J. **Supervision/Monitoring of Suicidal Inmates**

1. The County shall ensure adequate visibility and supervision of prisoners on suicide precautions.

2. The County shall not cover cell windows with magnetic flaps or any other visual barrier preventing visibility into any cell that is housing a prisoner on suicide precautions or awaiting an inpatient bed, unless there is a specific security need and then for only a period of time necessary to address such security need.

3. The County shall revise its policies regarding the monitoring of prisoners on suicide precautions to provide for at least the following two defined levels of observation:

   a) Close observation shall be used for prisoners who are not actively suicidal but express suicidal ideation (*e.g.*, expressing a wish to die without a specific threat or plan) or have a recent prior history of self-destructive behavior.  Close observation shall also be used for prisoners who deny suicidal ideation or do not threaten suicide but are engaging in other concerning behaviors indicating the potential for self-injury.  Staff shall observe the prisoner at staggered intervals not to exceed every 15 minutes and shall document the observation as it occurs.

   b) Constant observation shall be used for prisoners who are actively suicidal, either threatening or engaging in self-injury, *and* considered a high risk for suicide.  An assigned staff member shall observe the

prisoner on a continuous, uninterrupted basis.  The observation should be documented at 15-minute intervals.  Staff should be physically stationed outside of the prisoner's cell to permit continuous, uninterrupted observation.

4. For any prisoner requiring suicide precautions, a qualified mental health professional shall assess, determine, and document the clinically appropriate level of monitoring based on the prisoner's individual circumstances. Placement in a safety cell shall not serve as a substitute for the clinically-determined level of monitoring.

5. Video monitoring of prisoners on suicide precaution shall not serve as a substitute for Close or Constant observation.

### K. Treatment of Inmates Identified as at Risk Of Suicide

1. Qualified mental health professionals shall develop an individualized treatment plan and/or behavior management plan for every prisoner that mental health staff assesses as being a suicide risk.

2. Treatment plans shall be designed to reduce suicide risk and shall contain individualized goals and interventions.  Treatment plans shall be reviewed following discharge from suicide precautions and updated as clinically indicated.

3. All assessments, treatment, and other clinical encounters shall occur in an area that provides reasonable sound privacy and confidentiality.  If a custody officer is present, the officer should be positioned in a place that allows for observation of the prisoner but maintains sound privacy, unless there is a clearly identified security or safety risk.

### L. Conditions for Individual Inmates on Suicide Precautions

1. The County's Suicide Prevention Policy shall set forth clear and internally consistent procedures regarding decisional authority for determining the conditions for individual inmates on suicide precautions.  Mental health staff shall have primary authority, consistent with individualized classification and security needs, with respect to the following:

### M. Property and Privileges

1. Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff, depending on suicide risk, the removal and/or return of routine privileges (*e.g.*, visits, telephone calls, recreation) that are otherwise within the limitations of a prisoner's classification security level. Any removal of privileges shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

2. Qualified mental health professionals shall have the primary responsibility to determine, based on clinical judgment and on a case-by-case basis in consultation with custody staff depending on suicide risk, the removal and/or return of a prisoner's clothing and possessions (*e.g.*, books, slippers/sandals, eyeglasses) that are otherwise within the limitations of a prisoner's classification security level.  The removal of property shall be documented with clinical justification in the prisoner's medical/mental health record and reviewed on a regular basis.

3. Cancellation of privileges should be avoided whenever possible and utilized only as a last resort.

N. **Use of Safety Suits**

1. Decisions about the use of a safety suit (smock) or removal of normal clothing will be under mental health staff's authority, based on individualized clinical judgment along with input from custody staff.

2. Custody staff may only temporarily place an inmate in a safety suit based on an identified risk of suicide by hanging until the qualified mental health professional's evaluation, to be completed within the "must see" referral timeline. Upon completion of the mental health evaluation, the mental health professional will determine whether to continue or discontinue use of the safety suit.

3. If an inmate's clothing is removed, the inmate shall be issued a safety suit and safety blanket.

4. As soon as clinically appropriate, the provision of regular clothing shall be restored.  The goal shall be to return full clothing to the inmate prior to discharge from suicide precautions.

5. A qualified mental health professional shall conduct daily assessments of any prisoner in a safety suit and document reasons for continued use when clinically indicated.

6. If a qualified mental health professional determines that 30-minute (or less frequent) observations are warranted for a prisoner, safety suits shall not be used on that prisoner.

7. Safety suits shall not be used as a tool for behavior management or punishment.

O. **Beds and Bedding**

1. All prisoners housed for more than four hours on suicide precautions and/or in an inpatient placement shall be provided with an appropriate bed, mattress, and bedding unless the prisoner uses these items in ways for which they were not intended (*e.g.*, tampering or obstructing visibility into the cell).  Such a determination shall be documented and shall be reviewed on a regular basis.

P. **Discharge from Suicide Precautions**

1. A qualified mental health professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate and that appropriate treatment and safety planning is completed.

2. Treatment plans shall be written for all prisoners discharged from suicide precautions. The treatment plan shall describe signs, symptoms, and circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur.

3. Qualified mental health professionals shall provide clinical input regarding clinically appropriate housing placement (*e.g.*, whether isolation is contraindicated for the prisoner) upon discharge. Custody and classification shall consider such clinical input in determining post-discharge placement and conditions of confinement. Once clinically discharged from suicide precautions, the prisoner shall be promptly transferred to appropriate housing.

4. Prisoners discharged from suicide precautions shall remain on the mental health caseload and receive regularly scheduled clinical assessments and contacts. Unless a prisoner's individual circumstances direct otherwise, a qualified mental health professional shall provide follow-up assessment and clinical contacts within 24 hours of discharge, again within 72 hours of discharge, again within one week of discharge.

Q. **Emergency Response**

1. The County shall keep an emergency response bag that includes appropriate equipment, including a first aid kit, CPR mask or Ambu bag, and emergency rescue tool in close proximity to all housing units. All custodial and medical staff be trained on the location of this emergency response bag and shall receive regular training on emergency response procedures, including how to use appropriate equipment.

2. All custody and medical staff shall be trained in first aid and CPR.

3. It shall be the policy of the County that any staff who discovers an inmate attempting suicide shall immediately respond, survey the scene to ensure the emergency is genuine, and alert other staff to call for medical personnel. Trained staff shall begin to administer standard first aid and/or CPR, as appropriate.

R. **Quality Assurance and Quality Improvement**

1. The County shall establish regularly scheduled multidisciplinary meetings related to treatment, and plan of care issues, on a monthly basis, between medical, and mental health personnel.

2. The County shall, in consultation with Plaintiffs' counsel, revise its in-custody death review policy and procedures. Reviews shall be conducted with the active participation of custody, medical, and mental health staff. Reviews shall include analysis of policy or systemic issues and the development of corrective action plans when warranted.

3. For each suicide and serious suicide attempt (*e.g.*, requiring hospitalization), the County's Suicide Prevention Task Force shall review: 1) the circumstances surrounding the incident; 2) the procedures relevant to the incident; 3) all relevant training received by involved staff; 4) pertinent medical and mental health services/reports involving the victim; and 5) any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt. Where applicable, the Review Team shall generate recommendations for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

4. The County will track all critical incidents which include prisoner suicides, attempted suicides, and incidents involving serious self-harm. The County shall review critical incidents and related data through its quality assurance and improvement processes.

5. The County shall implement a continuous quality assurance/quality improvement plan to periodically audit suicide prevention procedures that include, but are not limited to: intake screening (to include audits to ensure that staff ask and record all suicide screening questions), mental health assessments, suicide risk assessments, crisis response, and treatment plans/behavior management plans for prisoners identified as being at risk of suicide or self-harm.

## VIII. SEGREGATION/RESTRICTIVE HOUSING

### A. General Principles

1. Prisoners will be housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other prisoners, and the public.

   a) The County shall not place prisoners in more restrictive settings, including Segregation, based solely on a mental illness or any other disability. Prisoners will be housed in the most integrated setting appropriate to their individual needs.

   b) The County shall not place prisoners into Segregation units based solely on classification score.

   c) The County shall review the housing and restrictions of female prisoners classified as high security to ensure that this population is not subject to Segregation conditions of confinement.

d) Specialized medical units (e.g., Main Jail 2 West Med/Psych, Main Jail 2 East) and mental health units (e.g., OPP, IOP, MHU, 2P) are not Segregation housing units. The County shall ensure that prisoners housed in these units receive daily access to out-of-cell time, telephones, showers, and other programs, services, and activities consistent with their classification and treatment plan.

2. The County shall not place a prisoner in Segregation units without first determining that such confinement is necessary for the safety of the staff, other prisoners, or the public. The County shall clearly document in writing the specific reason(s) for a prisoner's placement and retention in Segregation housing. The reason(s) shall be supported by clear, objective evidence. Prisoners will remain in Segregation housing for no longer than necessary to address the reason(s) for placement.

3. The County shall not place the following prisoners in a Segregation setting unless necessary to address a serious risk of physical harm, and in such cases only for the minimum time necessary to identify an alternative appropriate placement:

a) Prisoners with acute medical needs that require an inpatient level of care and/or daily nursing care;

b) Prisoners who are pregnant, post-partum, who recently had a miscarriage, or who recently had a terminated pregnancy.

B. **Conditions of Confinement**

1. The County will provide at least 17 hours of out-of-cell time per week for all prisoners, with the exception of prisoners subject to Administrative Segregation Phase I and Disciplinary Segregation in accordance with this remedial plan. The County will monitor out-of-cell time, and if minimum out-of-cell time requirements are routinely not being met at a particular facility or in a particular housing unit, the Sheriff's Department division commander or designee will review the situation and take appropriate steps to resolve the issue.

a) The County shall implement a policy to document out-of-cell time provided to each prisoner. The County shall conduct monthly audits to ensure that prisoners have been provided the required treatment and recreation time out of cell. This data will be regularly reviewed as part of the County's Quality Assurance procedures.

2. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner seven (7) days per week, including outdoors/recreation time when feasible. The County shall offer out-of-cell time at appropriate times of day.

3. The County shall modify its non-disciplinary Segregation policies and procedures to allow reasonable access to the following: (1) Personal phone

calls for all prisoners, including at least five hours or three weekdays per week of phone access during normal business hours; (2) Education, rehabilitation, and other materials (e.g. writing implements, art supplies, tablets), for in-cell activities; (3) Personal and legal visiting; (4) Religious services; and (5) Commissary.

    a) The conditions and privileges described above shall be provided unless there is a specific safety or security issue preventing provision of such materials or the prisoner is subjected to disciplinary action.

4. Cell windows shall not be covered with magnetic flaps, towels, sheets, or any other visual barrier preventing visibility into and out of the cell, unless there is a specific security or privacy need that is documented, and then for only a period of time necessary to address such security or privacy need. This provision shall apply to all cells housing prisoners.

5. The County shall establish procedures so that all housing unit cells are searched and cleaned prior to a prisoner's placement in the cell.

6. The County shall establish procedures to ensure that no prisoner is placed in a Segregation housing cell without a mattress and appropriate bedding.

## C. Mental Health Functions in Segregation Units

1. Segregation Placement Mental Health Review

    a) All prisoners placed in a non-disciplinary Segregation housing unit and all prisoners housed in a Disciplinary Detention unit shall be assessed by a qualified mental health professional within 24 hours of placement to determine whether such placement is contraindicated. All prisoners subjected to Disciplinary Segregation conditions for 72 hours in their general population housing unit (*i.e.*, confined to cell 23 hours per day) shall also be assessed by a qualified mental health professional no later than the fourth day of such placement.

    b) Any decision to place prisoners with Serious Mental Illness in Segregation shall include the input of a qualified mental health professional who has conducted a clinical evaluation of the prisoner in a private and confidential setting (absent a specific current risk that necessitates the presence of custody staff), is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

    c) Mental Health Staff shall consider each prisoner's age and cognitive functioning as part of the Segregation Placement review. Staff shall receive training regarding the features of youth and brain development of young adults (*i.e.*, 24 years old and younger) and the needs of individuals with intellectual disabilities.

d) If mental health or medical staff find that a prisoner has a Serious Mental Illness or has other contraindications to Segregation, that prisoner shall be removed from Segregation absent exceptional and exigent circumstances.

e) The County shall document and retain records of all Segregation Placement mental health evaluations, as described above. The County shall consult with Plaintiffs regarding such documentation, including the development of new forms where necessary.

2. Segregation Rounds and Clinical Contacts

a) Cell checks (to ensure that prisoners are safe and breathing) shall be conducted for all prisoners in Segregation at least every 30 minutes, at staggered intervals. Completion of cell checks will be timely documented.

b) A qualified mental health or medical professional shall conduct check-ins at least once a week, to assess and document the health status of all prisoners in Segregation, and shall make referrals as necessary. The check-in shall include a brief conversation with each prisoner, a visual observation of the cell, and an inquiry into whether the prisoner would like to request a confidential meeting with a mental health or medical provider. Steps shall be taken to ensure effective communication, as well as auditory privacy consistent with security needs. When a prisoner in Segregation requests a confidential meeting with a mental health or medical provider, or the medical or mental health professional identifies a mental health or medical need, staff shall make appropriate arrangements to include triage, examination and treatment in an appropriate clinical setting. In such cases, staff shall give the prisoner the opportunity to complete a health care request but will otherwise initiate a referral without requiring the prisoner to complete a request form.

3. Response to Decompensation in Segregation

a) If a prisoner in Segregation develops signs or symptoms of mental illness where such signs or symptoms had not previously been identified, suffers deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, the prisoner shall immediately be referred for appropriate assessment and treatment from a qualified mental health professional who will recommend appropriate housing and/or programming.

b) Jail staff shall follow a mental health recommendation to remove a prisoner from Segregation unless such removal poses a current safety risk that is documented. In such a case, the Commander or management-

level designee shall be notified and staff shall work to remove the prisoner from Segregation and secure a placement in an appropriate treatment setting at the earliest possible time.

**D. Placement of Prisoners with Serious Mental Illness in Segregation**

1. Prisoners with a mental health condition meeting criteria for placement in a Designated Mental Health Unit (2P, IOP, OPP) will not be placed in Segregation, but rather will be placed in an appropriate treatment setting – specifically, the inpatient unit or other Designated Mental Health Unit providing programming as described in **Exhibit A-2**.

2. In rare cases where a prisoner with a mental health condition meeting criteria for placement in a Designated Mental Health Unit presents an immediate danger or significant disruption to the therapeutic milieu, and there is no reasonable alternative, such a prisoner may be housed separately for the briefest period of time necessary to address the issue, subject to the following:

   a) The prisoner shall receive commensurate out-of-cell time and programming as described in **Exhibit A-2** (including for IOP and OPP, 10 hours/week of group treatment/structured activities, 7 hours/week unstructured out-of-cell time, weekly individual clinical contact) with graduated programming subject to an individualized Alternative Treatment Program.

   b) The prisoner shall receive the following:

      i. As part of the weekly confidential clinical contact, the clinician shall assess and document the prisoner's mental health status and the effect of the current placement on his or her mental health, and determine whether the prisoner has decompensated or is at risk of decompensation.

      ii. The weekly check-ins described in **Section VIII.C.2.b** shall supplement, and not be a substitute for, the weekly treatment session described herein.

      iii. Treatment provided in the least restrictive setting that is appropriate based on the prisoner's circumstances.

      iv. Privileges commensurate with the Designated Mental Health Unit program, unless modified in an Alternative Treatment Program based on individual case factors that are regularly reviewed.

      v. Daily opportunity to shower.

3. A prisoner with Serious Mental Illness requiring restraints (*e.g.*, handcuffs, belly chains, etc.) shall not be denied clinically indicated group or individual treatment due to security factors, absent exceptional circumstances that are

documented. Prisoners with Serious Mental Illness housed in Segregation who require restraints when out of cell shall have the opportunity to work their way out of restraints through graduated programming subject to an individualized Alternative Treatment Program.

E. **Administrative Segregation**

1. Use of Administrative Segregation

   a) Only the Classification Unit can assign a prisoner to Administrative Segregation.

   b) The County may use Administrative Segregation in the following circumstances:

      i. Objective evidence indicates that a prisoner participated in a recent assault and the assaultive behavior involved an assault on staff or visitors, serious injury, use of a weapon, gang removals, or multiple prisoner assaults. Mutual combat situations that do not otherwise qualify for Administrative Segregation are excluded.

      ii. During a brief investigative period not to exceed ten days while Classification staff attempts to verify the need for Protective Custody or while the prisoner is awaiting transfer to another facility.

   c) The Compliance Commander shall have the authority to place prisoners in Administrative Segregation under the following circumstances:

      i. The prisoner poses an extraordinary safety risk and no other housing unit is sufficient to protect the prisoner from harm;

      ii. The prisoner has failed to integrate into a lesser restrictive housing setting because of repeated and recent history of assaultive behavior or current threats of violence associated with being in a lesser restrictive setting; or

      iii. Objective evidence indicates that the prisoner attempted to escape or presents an escape risk.

2. Notice, Documentation, and Review of Administrative Segregation Designations

   a) The Classification Unit shall document the rationale for designating a prisoner for Administrative Segregation in the classification file using objective evidence. For prisoners younger than 24, the Classification Unit shall consider the prisoner's age as a mitigating factor when assigning the prisoner to Administrative Segregation.

b) Classification shall attempt to down-class prisoners to a lesser restrictive housing setting at the earliest possible opportunity, consistent with safety and security.

c) County shall provide prisoners in Administrative Segregation with a written notice within 72 hours of the prisoner's initial placement in Administrative Segregation, explaining the reasons for the prisoner's Administrative Segregation designation and how the prisoner may progress to a lesser restrictive housing setting.

d) Prisoners housed in Segregation units will, at least every thirty (30) days, receive face-to-face interviews in a private out-of-cell setting, consistent with individual security needs, to discuss progress and compliance with their individual case plan as part of a classification review. Consideration will be given to their mental health and to their appropriateness for transfer to a less restrictive setting.

e) The Compliance Commander or higher-ranked officer will review and approve the decision to designate a prisoner for Administrative Segregation for longer than 15 days.

f) The County shall document the reason the prisoner is retained in the same Administrative Segregation Phase. The prisoner will be given written notice of the reasons the prisoner is being retained in the same Phase of Administrative Segregation and what conduct the prisoner is required to exhibit to progress to a lesser restrictive housing setting.

g) The Compliance Commander or higher-ranked officer must approve the continued retention of a prisoner in Administrative Segregation for longer than 90 days, and the Compliance Commander or higher-ranked officers must reauthorize such placement at least every 90 days thereafter.

3. Administrative Segregation Phases

a) The County shall develop and implement a phased system for prisoners designated as Administrative Segregation to achieve a lesser restrictive housing setting.

b) Administrative Segregation Phase I:

i. This is the most restrictive designation for prisoners in Administrative Segregation.

ii. Prisoners shall be offered a minimum of one hour per day out of cell time for a total of seven hours per week.

iii. Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least five of the seven hours per week.

      iv. Prisoners shall not remain in Phase I for longer than 15 days unless the prisoner engages in new conduct warranting retention in Administrative Segregation as specified in **Section VIII.E.1.b.**

  c) Administrative Segregation Phase II:

     a) Prisoners shall be offered a minimum of 17 hours of out of cell time per week.

     b) Prisoners shall be offered an opportunity for Out-of-Cell Activities for at least 10 of the 17 hours per week.

     c) Prisoners shall be offered the opportunity to program in groups of two to four prisoners, unless pairing with another prisoner is not possible for safety or security reasons, and those reasons are documented by the County.

     d) The County shall develop a program of incentives for good behavior.

     e) Prisoners shall not remain in Phase II for longer than 30 days unless the prisoner commits a serious behavioral violation while in Administrative Segregation: fighting; threatening staff or other prisoners; resisting or delaying an order from staff that impedes Jail operations (e.g., failure to lock down); refusing to submit to a search of person or property; destroying or damaging Jail property (excluding property issued to a prisoner and/or minor defacing of property or destruction of low-value property) or facilities; possessing contraband that implicates safety or security (e.g., weapons, razors, unauthorized medication, but not extra clothing, commissary items, or food); cell flooding; tampering with cell locking mechanisms or other security features (e.g., cameras); and/or sexual activity/harassment. In the event a prisoner engages in a serious behavioral violation, the conduct will be referred to the Classification Sergeant or higher-ranking officer, who shall have the discretion to extend the prisoner's Phase II time by 15 days, and shall develop an individual behavioral management plan, if one does not yet exist, for the prisoner.

F.  **Protective Custody**

1. When a prisoner faces a legitimate threat from other prisoners, the County will seek alternative housing, by transferring the threatened prisoner to the general population of another facility or unit, or to a special-purpose housing (Protective Custody) unit for prisoners who face similar threats.

2. The County will not operate Protective Custody units with Segregation-type conditions of confinement. Prisoners placed in Protective Custody shall have

the same programs and privileges as general population prisoners, absent exceptional circumstances that are documented.

3. The County shall create a policy that describes the process and criteria for placement of prisoners into Protective Custody. The County shall consult with Plaintiffs to develop such a policy.

4. Prisoners who are lesbian, gay, bisexual, transgender, or intersex (LGBTI) or whose appearance or manner does not conform to traditional gender expectations should not be placed in Segregation or Protective Custody solely on the basis of such identification or status, or because they are receiving gender dysphoria treatment.

   a) When a prisoner who is LGBTI or gender nonconforming faces a legitimate threat, the County shall identify alternative housing, with conditions comparable to those of general population. Privileges and out-of-cell time for this population will be documented and regularly reviewed by supervisory level staff to ensure appropriate housing, out-of-cell-time, and related conditions for this group of prisoners.

   b) In deciding whether to assign a transgender or intersex prisoner to a facility or program for male or female prisoners, the County shall consider on a case-by-case basis whether a placement would ensure the prisoner's health and safety, and the health and safety of other prisoners, giving serious consideration to the prisoner's own views.

   c) Jail staff will receive training on the unique issues of managing transgender prisoners, with refresher training at least bi-annually.

5. For prisoners who are LGBTI or whose appearance or manner does not conform to traditional gender expectations, the County shall identify the prisoner's preferred gender of jail staff who will perform searches of the prisoner.  The County shall honor the request except in exigent circumstances when doing so is not possible.

## G. Disciplinary Segregation

1. The County will not place a prisoner in disciplinary housing pending investigation of, and due process procedures for, an alleged disciplinary offense unless the prisoner's presence in general population would pose a danger to the prisoner, staff, other prisoners or the public.

2. The County will adhere to a discipline matrix, developed in consultation with Plaintiffs, that clearly defines when disciplinary housing may be imposed.

3. Prisoners who are found to have violated disciplinary rules following due process procedures will be placed in Segregation only after the County has determined that other available disciplinary options are insufficient, with reasons documented in writing.

4. The denial of out-of-cell time for more than four (4) hours will not be imposed as a sanction absent a formal disciplinary write-up and due process hearing.

5. Prisoners serving a Disciplinary Segregation term shall receive at least seven (7) hours per week of out-of-cell time. Out-of-cell time with the opportunity to exercise shall be provided to each prisoner one (1) hour a day, seven (7) days per week.

6. Prisoners in Disciplinary Segregation shall, absent an individualized assessment of security risk that is documented be provided at least one book (which prisoners may regularly exchange), legal documents, hygiene materials, legal phone calls, and legal visits.

7. No Disciplinary Segregation term for non-violent rules violations will exceed 15 days.

8. The County will, in consultation with Plaintiffs' counsel, modify its inmate discipline policy and practice to limit placements in Disciplinary Segregation conditions to no more than 15 days, absent cases of serious violations stemming from distinct incidents and with Watch Commander-level approval.

9. No prisoner shall be placed in Disciplinary Segregation for more than 30 consecutive days.

10. If after a Disciplinary Segregation term, Jail staff, with the input of a mental health clinician, determine that the prisoner cannot safely be removed from Segregation, placement on Administrative Segregation status may occur only subject to the process set forth in **Section VIII.E**.

11. Once a prisoner has been moved out of Disciplinary Segregation, that prisoner shall not be placed back into Disciplinary Segregation absent (a) a new incident warranting discipline, and (b) completion of all mental health review procedures required for new Segregation placements.

H. **Avoiding Release from Jail Directly from Segregation**

1. The County will avoid the release of prisoners from custody directly from Segregation-type housing, to the maximum extent possible.

2. If a sentenced prisoner housed in Segregation has an upcoming expected release date (i.e. less than 120 days), the County will take and document steps to move the prisoner to a less restrictive setting, consistent with safety and security needs. If Segregation becomes necessary during this time, the County will provide individualized discharge planning to prepare the sentenced prisoner for release to the community.

I. **No Food-Related Punishment**

1. The County shall modify its policy and take steps to ensure that the denial or modification of food is never used as punishment. The County shall eliminate

use of "the loaf" as a disciplinary diet.  Nothing in this paragraph shall be read to preclude the County from denying a prisoner use of the commissary.

J. **Restraint Chairs**

1.  Restraint chairs shall be utilized for no more than six hours.

2.  The placement of a prisoner in a restraint chair shall trigger an "emergent" mental health referral, and a qualified mental health professional shall evaluate the prisoner to assess immediate and/or long-term mental health treatment needs.

3.  The opinion of a qualified medical professional on placement and retention in a restraint chair will be obtained within one hour from the time of placement.

IX.  **QUALITY ASSURANCE SYSTEMS FOR HEALTH CARE TREATMENT**

A. **Generally**

1.  The County shall develop and implement, in collaboration with Plaintiffs' counsel, a quality assurance ("QA") plan to regularly assess and take all necessary measures to ensure compliance with the terms of this Remedial Plan.

2.  The QA/QI Unit shall meet regularly and include representatives from all levels of the organization and from all facilities. The meeting shall include custody representatives for topics that are relevant to custody operations.

3.  The County shall provide sufficient resources to the QA/QI program.

B. **Quality Assurance, Mental Health Care**

1.  The JPS Medical Director, the JPS Program Manager, jail administrators, and the medical psychiatric, dental, and nursing directors, or appropriate designees, will attend and participate in this process at a minimum of every quarter. Formal minutes will be taken and maintained whenever the committee convenes.

2.  The mental health care quality assurance plan shall include, but is not limited to, the following:

    a)  Intake processing;

    b)  Medication services;

    c)  Screening and assessments;

    d)  Use of psychotropic medications;

    e)  Crisis response;

    f)  Case management;

    g)  Out-of-cell time;

    h)  Timeliness of clinical contacts;

    i)  Provision of mental health evaluation and treatment in confidential settings;

    j)  Housing of inmates with SMI, including timeliness of placements in higher levels of care and length of stay in various units;

    k)  Number of commitments pursuant to Welf. & Inst. Code § 5150, *et seq.*;

    l)  Use of restraint and seclusion;

    m) Tracking and trending of agreed upon data on a quarterly basis;

    n)  Clinical and custody staffing;

    o)  Morbidity and mortality reviews with critical analyses of causes or contributing factors, recommendations, and corrective action plans with timelines for completion; and

    p)  Corrective action plans with timelines for completion to address problems that arise during the implementation of this Remedial Plan and prevent those problems from reoccurring.

3. The County will conduct peer and supervisory reviews of all mental health staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.

## C. Quality Assurance, Medical Care

1. The County shall establish a Quality Assurance/Quality Improvement (QA/QI) Unit to develop accurate tracking mechanisms and monitor the timeliness and effectiveness of the following processes of health care, ensuring that all are reviewed at least annually, and shall recommend corrective action for all deficiencies:

    a)  intake screenings;

    b)  emergent, urgent, and routine requests from patients and staff referrals for health care, including Health Service Request availability;

    c)  clinical monitoring of patients, including the delivery of chronic care services to those patients who qualify as chronic care patients;

    d)  prescriptive practices by the prescribing staff;

    e)  medication administration, including the initiation of verified medications, the first doses of medications, medication errors, patient refusals, and patterns of medication administration;

    f)  grievances regarding healthcare;

    g)  specialty care (including outside diagnostic tests and procedures);

    h)  clinical caseloads;

    i)   coordination between custody staff and medical staff, including escorts to medical appointments and delivery of care.

2. The studies shall be done with sufficient sample numbers to arrive at statistically valid conclusions. The studies shall include (a) a clearly articulated goals, objective, and methodology to determine if standards have been met, including a sampling strategy; (b) data collection; (c) analysis of data to identify trends and patterns; (d) analysis to identify the underlying causes of problems; (e) development of remedies to solve problems; (f) a written plan that identifies responsible staff and establishes a specific timeline for implementing remedies; (g) follow-up data collection; and (h) analysis to determine if the remedies are effective.

3. The QA/QI Unit study recommendations shall be published to all staff.

4. The County will conduct peer and supervisory reviews of all medical staff and professionals at least annually to assess compliance with policies and procedures and professional standards of care.

# EXHIBIT A-1

**Consent Decree**

*Mays v. County of Sacramento*

**EXHIBIT A-1**
**ADA COMPLIANCE REMEDIAL PLAN**
**Sacramento County Jail – Policies Warranting ADA-Related Revisions**

## SHERIFF'S DEPARTMENT OPERATIONS ORDERS

### 02/01 Use of Force

Effective Communication

Procedures for Prisoners Manifesting Serious Mental Illness

### 02/02 Use of Restraint Devices

Effective Communication

Mobility-Related Disability Accommodations

### 02/03 Use of Pro-Straint Chair

Effective Communication

Mobility-Related Disability Accommodations

### 02/05 CERT and Cell Extraction Procedures

Effective Communication

Identification and Tracking of ADA Needs and Accommodations

Procedures for Prisoners Manifesting Serious Mental Illness

### 02/06 Prisoner Searches

Effective Communication

Identification and Tracking of ADA Needs and Accommodations

### 02/12 Transportation of Prisoners

Mobility-Related Disability Accommodations, HCA/AD/DME

### 03/12 Evacuation Plan - Main Jail

Provision of ADA Reasonable Accommodations

### 03/13 Evacuation Plan – RCCC

Provision of ADA Reasonable Accommodations

Sacramento County Jail – Policies to Revise re ADA

Page | 2

## 04/01 Intake, Search, Reception and Holding

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

## 04/08 Prisoner Orientation

Effective Communication

ADA Coordinator and Disability-Related Grievance and Accommodation Process

## 04/09 Release Procedures

HCA/AD/DME, Provision of ADA Reasonable Accommodations

Effective Communication

## 06/02 Housing Plan

Identification and Tracking of ADA Needs and Accommodations

Equal Access

## 06/10 Recreation, Exercise and Showering

Equal Access

Mobility-Related Disability Accommodations

Staff Assistance of Inmates with Disabilities

## 06/13 Telephone/TDD/TTY Equipment Access

Equal Access

Effective Communication

Video Relay Services/Videophones

## 06/14 Interpreter Services

Identification and Tracking of ADA Needs and Accommodations

Updates as to Provision of Sign Language Interpreter Procedures

## 07/01 Inmate Message Requests (KITE's)

Sacramento County Jail – Policies to Revise re ADA
Page | 3

ADA Coordinator and Disability-Related Grievance and
Accommodation Process

Staff Assistance of Inmates with Disabilities

## 07/02 Grievances

ADA Disability-Related Grievance and Accommodation Process

Staff Assistance of Inmates with Disabilities

## 07/03 Discipline Plan

Effective Communication

Coordination with JPS, Consideration of Mental Health/Intellectual
Disability Factors

Identification and Tracking of ADA Needs and Accommodations

## 08/04 Educational Services

Equal Access. Reasonable Accommodations

Effective Communication

## 08/06 Prisoner Services

Equal Access

## 10/01 Health Care Services

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

## 10/04 Medical Intake Screening

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

Sacramento County Jail – Policies to Revise re ADA

Page | 4

## CORRECTIONAL HEALTH SERVICES POLICIES AND PROCEDURES

### 1107 Decision Making-Special Needs

Identification and Tracking of ADA Needs and Accommodations

Prisoners with ID/DD

### 1302 Staff Development and Training

General ADA Requirements

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

ADA Coordinator and Disability-Related Grievance and Accommodation Process

### 1400 Medical Transportation

Mobility-Related Disability Accommodations, HCA/AD/DME

### 1404 Receiving Screening

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

Prisoners with ID/DD

### 1407 Access to Treatment

ADA Coordinator and Disability-Related Grievance and Accommodation Process

Effective Communication

### 1409 Clinic Care

Equal Access

Staff Assistance of Inmates with Disabilities

### 1413 Use of Restraints and the Pro-Straint Chair

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

Sacramento County Jail – Policies to Revise re ADA
Page | 5

Mobility-Related Disability Accommodations

**1417 Adult Developmental Disability**

Updates to Policy Consistent with Remedial Plan

**1423 Post Release Medical Care Planning**

HCA/AD/DME

**1435 Inmate Health Care Grievances**

Disability-Related Grievance and Accommodation Process

Staff Assistance of Inmates with Disabilities

**1436 Two East Inmate Transfers**

Equal Access

Disability-Related Grievance and Accommodation Process

**1439 Reports of Disabilities or Impairments**

Identification and Tracking of ADA Needs and Accommodations

Sacramento County Jail – Policies to Revise re ADA

Page | 6

## JAIL PSYCHIATRIC SERVICES POLICIES

### 800 Discharge Planning

Effective Communication

### 1022 Overview of Staff Responsibilities

Updates Pursuant to Mental Health Remedial Plan, ADA Remedial Plan, Mental Health/Disciplinary Measures Remedial Plan

Effective Communication

### 1025 Interpreters for the Hearing Impaired

Identification and Tracking of ADA Needs and Accommodations

Updates as to Provision of Sign Language Interpreter Procedures

### 1037 Outpatient Intake

Identification and Tracking of ADA Needs and Accommodations

Effective Communication

### 1049 Suicide Prevention Program

Effective Communication

# EXHIBIT A-2

**Consent Decree**

*Mays v. County of Sacramento*

**MENTAL HEALTH TREATMENT**

**OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)**

**INTENSIVE OUTPATIENT PROGRAM (Projected - 85 to 120 beds)**

**Caseload of 10 per LCSW/MSW**

I. **Admission Criteria**
- The presence of suicidal ideations without a plan or intent and requiring enhanced observation and safety measures;
- 2P Pre-Admissions who require 1:1 observation for acute suicidal ideations and/or attempts (with placement in inpatient unit within 24 hours of identified inpatient need);
- Discharge from the Acute Inpatient Unit upon recommendation of discharging Psychiatrist;
- Acute onset or significant decompensation of a serious mental illness characterized by increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment; and/or
- Inability to function in General Population (GP) or Outpatient Psychiatric Pod (OPP) and,
  i. The presence of dysfunctional or disruptive social interaction including withdrawal, bizarre or disruptive behavior, inability to respond to staff directions, provocative behavior toward others, inappropriate sexual behavior, etc., **as a consequence of serious mental illness**; and/or
  ii. A significant impairment in the activities of daily living including eating, grooming and personal hygiene, maintenance of housing area, and ambulation, **as a consequence of serious mental illness**.

II. **Service Components**
- Case Management provided by LCSW or MSW.
- Two (2), one (1)-hour Group Therapy Sessions per day, 5 days a week, will be offered to each inmate-patient, unless clinical indicators or Alternative Treatment Plan (see below) precludes participation.
- At least seven (7) hours of unstructured out-of-cell time per week
- 1:1 confidential contact with a mental health professional every 7 days or more often if clinically indicated.
- Psychological testing as clinically indicated.
- Graduated Programming for inmate-patients requiring restrictive housing and/or restriction of privileges due to severity of symptoms and/or behaviors and/or classification. Alternative Treatment Program (ATP) will be initiated and documented in Treatment Plan.  ATP will address barriers to treatment, ATP goals and progress toward least restrictive housing and/or privileges. ATP will provide clear system of opportunities for inmate-patients to gain additional

**MENTAL HEALTH TREATMENT**

**OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)**

privileges based on progress in program.

- Multi-Disciplinary Treatment Team (MDT) Meetings (Initial 14 day and then every 60 days or sooner if clinically indicated).
- Treatment Plan initiated within 14 days of IOP placement and then every 60 days or sooner if clinically indicated.
- Initial MD or NP assessment within 5 days of admit and then every 30 days thereafter (or more often if clinically indicated).
- Staggered 30-minute cell checks performed by Custody for all inmate-patients participating in the program.
- Designated Custody Staff who participate as part of the MDT.
- Treatment planning when moving to less intensive level of mental health care.
- Discharge planning and continuity of care with community providers

### III. Treatment Goals

Treatment goals will address mental health conditions which are limiting an inmate's ability to adjust to incarceration and focus on symptom reduction and management, coping skills and stress reduction.  Treatment goals may include:

- Medication compliance (if applicable)
- Substance Abuse Recovery/Prevention
- Activities of Daily Living (ADL) Skill Development
- Crisis intervention/Adjusting to incarceration
- Symptom reduction
- Socialization and recreation
- Behavior management (if applicable)
- Coping skills
- Stress reduction
- Return to GP-MHC or OPP-MHC

### IV. IOP Officers (24/7 Coverage)

Designated IOP Officers will be active members of the treatment team.  In order for the Officers to take active roles in treatment, dayshift Officers must participate in weekly (or more often if needed) treatment team meetings with JPS staff and contribute information on inmate-patient behavior (both directly observed, and communicated by night shift deputies).

Duties and Responsibilities of the IOP Officers include:

**MENTAL HEALTH TREATMENT**

**OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)**

- Staggered 30-minute safety checks of all inmate-patients housed in the IOP.
- Daily security checks. Inmate movements to, from, and within the facility.
- Oversight of food delivery.
- Oversight of medical, dental, and psychiatric requests/services.
- Oversight of daily indoor and outdoor recreation.
- Housing moves and inmate conflict mediation.
- Incident investigation/documentation for both jail and criminal level offenses.

The IOP Officer also has additional program specific duties which include:

- Ensuring the safety and security of the JPS/IOP civilian staff.
- Inmate-patient movement to/from groups and individual contacts with JPS/IOP staff.  If needed, Officers will stand by while the civilian staff conducts daily group therapy (two to three hours each day) and separate one-to-one therapy/education sessions.
- Daily cell inspections.
- Provide IOP inmate-patients with the opportunity or assistance needed to meet their basic hygiene needs and the opportunity to maintain clean cells and activity/housing areas.

**V. Discharge Criteria**

- Able to function in a GP-MHC or OPP-MHC setting.
- Stabilization of the crisis behavior and the ability to function in a less clinically structured environment.
- Has clinically decompensated to the extent that placement into the Acute Inpatient Unit is required.
- Has reached release date, and clinical services will be transferred to community service provider.

## MENTAL HEALTH TREATMENT

## OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)

**OUTPATIENT PSYCHIATRIC POD (PROJECTED - 200 BEDS)**

**Caseload of 25 per LCSW/MSW**

I.      **Admission Criteria**

- Qualifying diagnosis (see below) **and** are unable to house in general population due to severity of symptoms, potential for victimization and/or significant difficulty maintaining ADLs.
- Diagnosed with a serious mental illness (SMI):
  1. Schizophrenia (all subtypes)
  2. Delusional Disorder
  3. Schizophreniform Disorder
  4. Schizoaffective Disorder
  5. Brief Psychotic Disorder
  6. Intellectual Disability with prior Regional Center Services and/or with a co-occurring serious mental illness
  7. Other Specified and Unspecified Schizophrenia Spectrum and other Psychotic Disorder
  8. Major Depressive Disorder
  9. Bipolar Disorders I and II
  10. Other Specified and Unspecified Bipolar and Related Disorders
  11. Borderline Personality Disorder

II.     **Service Components**

- Case Management provided by LCSW or MSW.
- One (1) 1-hour Group Therapy Sessions per day, 7 days a week, will be offered to each OPP-MHC inmate-patient.  Three (3) additional hours of structured out-of-cell time will be offered to each OPP-MHC inmate-patient by recreational technicians or other service providers.
- At least seven (7) hours of unstructured out-of-cell time per week
- Psychological testing as clinically indicated.
- 1:1 confidential contact with mental health professional at least every 14 days or more often if clinically indicated.
- Treatment Plan initiated within 30 days of placement in OPP-MHC and updated every 6 months or sooner if clinically indicated.
- Evaluation by psychiatrist or psychiatric nurse practitioner every 30-90 days (or more often if clinically indicated).
- Treatment planning when moving to less intensive level of mental health care.
- Discharge planning and continuity of care with community providers

III.    **Treatment Goals**

**MENTAL HEALTH TREATMENT**

**OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)**

- Stabilization of mental health symptoms and overall improvement in functioning
- Medication compliance (if applicable)
- Substance Abuse Recovery/Prevention
- Activities of Daily Living (ADL) Skill Development
- Crisis intervention/Adjusting to incarceration
- Symptom reduction
- Socialization and recreation
- Behavior management (if applicable)
- Hygiene skills
- Coping skills
- Stress reduction
- Discharge planning and continuity of care with community providers

IV.     **Discharge Criteria**
- Able to function in a GP-MHC.
- Stabilization/resolution of mental health symptoms and ability to function in a less clinically structured environment.
- Clinically decompensates and requires higher level of care and placement in IOP.
- Clinically decompensates to the extent that placement into the Acute Inpatient Unit is required.
- Has reached release date, and clinical services will be transferred to community service provider.

# MENTAL HEALTH TREATMENT

## OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)

**GENERAL POPULATION – MENTAL HEALTH CASELOAD**

**Caseload of 28-30 per LCSW/MSW**

**I.       Admission Criteria**

- Diagnosed mental health disorder
- Exhibits symptom control or partial remission as result of treatment

**II.      Service Components**

- Case Management provided by LCSW or MSW.
- Individual or group treatment provided as clinically indicated.
- Psychological testing as clinically indicated.
- 1:1 confidential contact by mental health professional at least every 90 days or more often if clinically indicated.
- Treatment Plan initiated within 30 days of placement in GP-MHC and updated every 12 months or sooner if clinically indicated.
- Evaluation by psychiatrist or psychiatric nurse practitioner every 90 days (if prescribed psychotropics), or more often if clinically indicated.
- Treatment planning when moving off mental health caseload.
- Discharge planning and continuity of care with community providers

**III.     Treatment Goals**

- Symptom management
- Medication monitoring
- Crisis intervention/Adjusting to incarceration
- Preventing decompensation

**IV.     Discharge Criteria**

- Remission of symptoms, no longer requires medication monitoring or mental health services.
- Clinically decompensates and requires higher level of care and placement in IOP or OPP.
- Clinically decompensates to the extent that placement into the Acute Inpatient Unit is required.
- Has reached release date, and clinical services will be transferred to community service provider.

## MENTAL HEALTH TREATMENT

## OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)

**INTAKE & CRISIS RESPONSE TEAM**

Current JPS staff will continue to manage all new intakes, priority referrals and must-sees. These staff will not carry a caseload and will be available to respond to new intakes and crisis referrals on a 24/7 basis.

## DEFINITIONS

**Must-See Referrals**

Referrals for currently suicidal (i.e., attempt, ideation, or self-injurious behavior), homicidal or gravely disabled inmate-patients (5150 evaluations), acute crisis related to nature of charges or other arrest factors, alleged Prison Rape Elimination Act victim assessments, and/or custody or administration requests urgent evaluation.

**Priority Referrals**

Referrals for inmate-patients reporting recent psychiatric hospitalization, intellectual disability with observed poor adaptive functioning, suicidal ideation within past two weeks, demonstrating worsening of mental health symptoms, identified as a possible suspect per Prison Rape Elimination Act, or other significant mental health symptoms that staff may have reason to be concerned about inmate's mental stability.

**Routine Referrals**

Referrals for inmate-patients reporting current or prior mental health treatment, currently prescribed psychiatric medication or reporting to receive medication in community.  May have complaints of adjustment or other mental health issues, and/or significant AVATAR history, but are stable.

**Mental Health Caseload (MHC)**

Inmate-patients open to JPS and receiving mental health services in General Population-Mental Health Caseload (GP-MHC), Outpatient Psychiatric Pod (OPP-MHC), Intensive Outpatient Program (IOP-MHC), or on the Acute Inpatient Unit (2P).

**General Population (GP-MHC)**

Inmate-patients classified as GP-MHC meet the following criteria:

- Stable, on psychotropics, or
- Stable, not receiving psychotropics but may require time-limited services to address mental health symptoms.

**MENTAL HEALTH TREATMENT**

**OVERVIEW OF SACRAMENTO COUNTY JAIL NON-ACUTE-MENTAL HEALTH PROGRAMS/SERVICES (JAIL PSYCHIATRIC SERVICES)**

## DEFINITIONS

**Intensive Outpatient Unit (IOP-MHC)**

Inmate-patients classified as IOP-MHC meet any of the following criteria:

- The presence of suicidal ideations without a plan or intent and requiring enhanced observation and safety measures;
- 2P Pre-Admissions who require 1:1 observation for acute suicidal ideations and/or attempts;
- Discharge from the Acute Inpatient Unit upon recommendation of discharging Psychiatrist;
- Acute onset or significant decompensation of a serious mental illness.

**Outpatient Psychiatric Pod (OPP)**

Inmate-patients classified as OPP-MHC meet the following criteria:

- Diagnosed with serious mental illness and are unable to be housed in general population due to severity of symptoms, potential for victimization and/or significant difficulty maintaining ADLs.

**Acute Inpatient Unit (2P)**

18-bed LPS designated facility.

- Inmate-patients meet criteria for either voluntary or involuntary acute inpatient psychiatric treatment

# EXHIBIT A-3

**Consent Decree**

*Mays v. County of Sacramento*

**Sacramento County Sheriff's Department**
Correctional Health Services
**JPS – Rules Violation Mental Health Review**

Name: _____   DOB: _____

X-Ref: _____

Date of Incident: _____   Rules Violation Charge(s): _____

Type of Review:      ☐ Record Review and Clinical Evaluation      ☐ Record Review Only
(The clinician will complete an in-person interview with the inmate unless there are specific reasons why an interview is not necessary or appropriate.)
*For Clinical Evaluations: Inform the inmate of purpose of evaluation and that information is __not__ confidential and will be used for purposes discipline review/hearing.*

Is the inmate currently receiving mental health services?                    ☐ Yes    ☐ No

Level of MH services:    ☐ 2P Pre-Admit    ☐ 2P    ☐ IOP    ☐ OPP    ☐ GP    ☐ JBCT

1a) Is there a possibility of a nexus between the inmate's mental illness/symptoms and/or
developmental disability/functioning deficits and the behavior(s)?        ☐ Yes    ☐ No

1b) Was the inmate's behavior connected to any of the following? *(If any are checked, Rule Violation should be cancelled.)*
☐ An act of self-harm or attempted suicide
☐ A cell extraction related to transfer to a medical/mental health unit or provision of involuntary treatment
☐ Placement in mental health restraints or seclusion

2) If the inmate is found guilty of the offense(s), what mental health factors and/or developmental disability/cognitive or adaptive functioning deficits should the hearing officer consider when assessing the penalty? **(Check all that apply):**

☐ N/A                                            ☐ Dementia
☐ Difficulty maintaining/performing ADLs        ☐ Poor social skills and/or peer interactions
☐ Psychotic symptoms                            ☐ Difficulty processing information/verbal commands
☐ Intellectual disability                       ☐ Traumatic Brain Injury
☐ Poor impulse control (must be related to mental health diagnosis)
☐ Other Mitigating Factors: _____

3) If the inmate is found guilty of the offense(s), what penalties may have an adverse impact on inmate's mental health condition or functioning **(Check all that apply):**

☐ N/A                                            ☐ Loss of commissary privileges
☐ Loss of social visits                         ☐ Loss of dayroom/outdoor recreation
☐ Loss of tablet privileges                     ☐ Loss of telephones
☐ Housing Relocation                            ☐ Loss of good time
☐ Loss of work time                             ☐ Disciplinary housing unit
☐ Isolation Housing (Full restriction)          ☐ Lockdown for less than 24 hours
☐ Assigned Extra Work Duty

6)  Provide narrative of findings that should be considered by the hearing officer, regarding: (1) whether there is a nexus between the inmate's behavior and mental illness and/or developmental disability, (2) any relevant mitigating circumstances, and (3) penalties that should be avoided.
(If no in-person interview/clinical evaluation was completed, please explain.)

_____
Reviewer's Name

_____
Signature

_____
Date of Review

# EXHIBIT B

**Consent Decree**

*Mays v. County of Sacramento*

## MAYS v. COUNTY OF SACRAMENTO
### DUTIES OF RULE 706 EXPERTS

Pursuant to Rule 706(b) of the Federal Rules of Evidence, the parties set forth the duties of the Court Experts.

1. The Court Experts shall advise the parties and the Court on Defendant's compliance or non-compliance with the medical care, mental health care, and suicide prevention provisions of the Remedial Plan, to assist with dispute resolution matters, and to provide testimony, if required, in any proceedings before the Court.

2. Within 180 days after entry of this Consent Decree, and then every 180 days thereafter during the term of this Consent Decree, the Court Experts shall each complete comprehensive reviews and reports ("180-Day Reports") to advise the parties and the Court on Defendant's compliance or non-compliance with the Remedial Plan.

3. In each 180-Day Report, the Court Experts shall state their opinion as to whether Defendant is or is not in substantial compliance with each material component of the Remedial Plan within the expert's area of expertise. These opinions are referred to in the Consent Decree as "Substantial Compliance Determinations." The 180-Day Reports shall be considered separate and apart from any evaluations and reports prepared as part of the dispute resolution process set forth in the Consent Decree and shall be admissible in evidence in any proceedings before the Court.

4. The Court Experts shall be entitled to reasonable expenses incurred plus reasonable hourly and/or daily rates, which shall be paid by Defendant.

5. With appropriate notice, the Court Experts shall have reasonable access to all parts of any Sacramento County jail facility. Access to the facilities will not be unreasonably restricted. The Court Experts shall have access to correctional and health care staff and people incarcerated in the jails, including confidential and voluntary interviews as they deem appropriate. The Court Experts shall also have access to documents, including budgetary, custody, and health care documents, and institutional meetings, proceedings, and programs to the extent the Court Experts determine such access is needed to fulfill their obligations. The Court Experts' tours shall be undertaken in a manner that does not unreasonably interfere with jail operations as reasonably determined by jail administrators.

6. The Court Experts may engage in ex parte communications with the parties, as requested. However, all of the Court Experts' findings and recommendations shall be set forth in writing in their reports.

7. Pursuant to the dispute resolution procedures set forth in the Consent Decree, either party may request that the relevant Court Expert evaluate the issue in dispute and prepare a

report. The expert must provide the report regarding the area of disagreement to the parties and the Mediator within 45 days of the request.  Defendant will pay the Court Experts' reasonable fees for any reports prepared by a Court expert at the request of a party about a disputed issue, as contemplated by this paragraph.

# EXHIBIT C

**Consent Decree**

*Mays v. County of Sacramento*

1   AARON J. FISCHER (SBN 247391)        JESSICA VALENZUELA
    (Aaron.Fischer@disabilityrightsca.org)  SANTAMARIA (220934)
2   ANNE HADREAS (SBN 253377)            (jvs@cooley.com)
    (Anne.Hadreas@disabilityrightsca.org)  MARK A. ZAMBARDA (314808)
3   DISABILITY RIGHTS CALIFORNIA         (mzambarda@cooley.com)
    1330 Broadway, Suite 500             ADDISON M. LITTON (305374)
4   Oakland, CA 94612                    (alitton@cooley.com)
    Telephone: (510) 267-1200            COOLEY LLP
5   Fax: (510) 267-1201                  3175 Hanover Street
                                         Palo Alto, CA 94304-1130
6   TIFANEI RESSL-MOYER (SBN 319721)     Telephone: (650) 843-5000
    (Tifanei.Ressl-                      Facsimile: (650) 849-7400
7   Moyer@disabilityrightsca.org)
    DISABILITY RIGHTS CALIFORNIA         KATHLYN A. QUERUBIN
8   1831 K Street                        (275085)
    Sacramento, CA 95811                 (kquerubin@cooley.com)
9   Telephone: (916) 504-5800            COOLEY LLP
    Fax: (916) 504-5801                  101 California Street, 5th Floor
                                         San Francisco, CA 94111-5800
10                                       Telephone: (415) 693-2000
    DONALD SPECTER (SBN 83925)           Facsimile: (415) 693-2222
11  (DSpecter@prisonlaw.com)
    MARGOT MENDELSON (SBN 268583)
12  (MMendelson@prisonlaw.com)           Attorneys for Plaintiffs
    SOPHIE HART (SBN 321663)
13   SophieH@prisonlaw.com
    PRISON LAW OFFICE
14  1917 Fifth Street
    Berkeley, California 94710
15  Telephone: (510) 280-2621
    Fax: (510) 280-2704
16
    Attorneys for Plaintiffs
17

18              **IN THE UNITED STATES DISTRICT COURT**

19            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

20  LORENZO MAYS, RICKY              Case No. 2:18-cv-02081 TLN KJN
    RICHARDSON, JENNIFER BOTHUN,     (PC)
21  ARMANI LEE, LEERTESE BEIRGE,
    and CODY GARLAND, on behalf of   CLASS ACTION
22  themselves and all others similarly
    situated,
23
                  Plaintiffs,         STIPULATION AND ~~PROPOSED~~
24                                    PROTECTIVE ORDER
         v.
25
26  COUNTY OF SACRAMENTO,
27                Defendant.
28

## 1.    A.    PURPOSES AND LIMITATIONS

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted.   Accordingly, Plaintiffs Lorenzo Mays, Ricky Richardson, Jennifer Bothun, Armani Lee, Leertese Beirge, and Cody Garland and Defendant County of Sacramento (the "Parties") hereby stipulate to and petition the Court to enter the following Stipulated Protective Order.  The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.

Defendant asserts that it will only designate materials as "CONFIDENTIAL" under this Protective Order if they contain sensitive health or other personal information, or if they contain information that has been deemed confidential by the Sacramento County Sheriff's Department or other relevant agency for safety and security reasons and has been restricted from general distribution, including but not limited to inmates and the public.

Defendant agrees that Plaintiffs may request, and Defendant will provide, inmate custody and/or health records upon such request.

Documents and information provided to Disability Rights California ("DRC") pursuant to DRC's statutory access authority during the course of its investigation preceding this litigation may be submitted to the court. Such materials will be presumed to be "CONFIDENTIAL" pursuant to this Agreement and Protective Order, except to the extent that the Parties agree the materials do not warrant such designation or where a Party disputes the designation, in which case that Party must employ the dispute resolution procedure outlined in Section 6 below.

### B.    GOOD CAUSE STATEMENT

This action is likely to involve sensitive information for which special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted. Such confidential and proprietary materials and information consist of protected health information and otherwise sensitive personal information pertaining to Plaintiffs and members of the purported class and other information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, or common law. Accordingly, to expedite the flow of information, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in preparation for and in the conduct of trial, to address their handling at the end of the litigation, and serve the ends of justice, a protective order for such information is justified in this matter.

### C.    ACKNOWLEDGEMENT OF PROCEDURE FOR FILING UNDER SEAL

The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Local Civil Rule 141 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal. There is a strong presumption that the public has a right of access to judicial proceedings and records in civil cases. In connection with non-dispositive motions, good cause must be shown to support a filing under seal. *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1176 (9th Cir. 2006), *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002), *Makar-Welbon v. Sony Electrics, Inc.*, 187 F.R.D. 576, 577 (E.D. Wis. 1999) (even stipulated protective orders require good cause showing), and a specific showing of good cause

or compelling reasons with proper evidentiary support and legal justification, must be made with respect to Protected Material that a party seeks to file under seal. The parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL does not—without the submission of competent evidence by declaration establishing that the material sought to be filed under seal qualifies as confidential, privileged, or otherwise protectable—constitute good cause. Further, if a party requests sealing related to a dispositive motion or trial, then compelling reasons, not only good cause, for the sealing must be shown, and the relief sought shall be narrowly tailored to serve the specific interest to be protected. *See Pintos v. Pacific Creditors Ass'n*., 605 F.3d 665, 677-79 (9th Cir. 2010). For each item or type of information, document, or thing sought to be filed or introduced under seal in connection with a dispositive motion or trial, the party seeking protection must articulate compelling reasons, supported by specific facts and legal justification, for the requested sealing order. Again, competent evidence supporting the application to file documents under seal must be provided by declaration. Any document that is not confidential, privileged, or otherwise protectable in its entirety will not be filed under seal if the confidential portions can be redacted. If documents can be redacted, then a redacted version for public viewing, omitting only the confidential, privileged, or otherwise protectable portions of the document, shall be filed. Any application that seeks to file documents under seal in their entirety should include an explanation of why redaction is not feasible.

2.      <u>DEFINITIONS</u>

2.1     <u>Challenging Party</u>:  a Party or Non-Party that challenges the designation of information or items under this Order.

2.2     <u>"CONFIDENTIAL" Information or Items</u>:  information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

2.3     <u>Designating Party</u>:  a Party or Non-Party that designates information

3.

1 or items that it produces in disclosures or in responses to discovery as

2 "CONFIDENTIAL."

3      2.4 <u>Disclosure or Discovery Material</u>: all items or information, regardless

4 of the medium or manner in which it is generated, stored, or maintained (including,

5 among other things, testimony, transcripts, and tangible things), that are produced,

6 made available for inspection, or generated in disclosures or responses to discovery

7 in this matter.

8      2.5 <u>Expert</u>: a person with specialized knowledge or experience in a matter

9 pertinent to the litigation who has been retained by a Party or its counsel to serve as

10 an expert witness or as a consultant in this action.

11      2.6 <u>Non-Party</u>: any natural person, partnership, corporation, association,

12 or other legal entity not named as a Party to this action.

13      2.7 <u>Outside Counsel of Record</u>: attorneys who are retained to represent or

14 advise a party to this action and have appeared in this action on behalf of that party

15 or are affiliated with a law firm which has appeared on behalf of that Party (as well

16 as their support staff).

17      2.8 <u>Party</u>: any party to this action, including all of its officers, directors,

18 employees, consultants, retained experts, and Outside Counsel of Record (and their

19 support staffs).

20      2.9 <u>Producing Party</u>: a Party or Non-Party that produces Disclosure or

21 Discovery Material in this action.

22      2.10 <u>Professional Vendors</u>: persons or entities that provide litigation

23 support services to Counsel of Record or the Parties(e.g., photocopying,

24 videotaping, translating, preparing exhibits or demonstrations, and organizing,

25 storing, or retrieving data in any form or medium) and their employees and

26 subcontractors.

27      2.11 <u>Protected Material</u>: any Disclosure or Discovery Material that is

28 designated as "CONFIDENTIAL."

2.12   <u>Receiving Party</u>:  a Party that inspects or receives Disclosure or Discovery Material from a Producing Party.

3.   <u>SCOPE</u>

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party.  Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.   <u>DURATION</u>

Once a case proceeds to trial, information that was designated as CONFIDENTIAL or maintained pursuant to this protective order used or introduced as an exhibit at trial becomes public and will be presumptively available to all members of the public, including the press, unless compelling reasons supported by specific factual findings to proceed otherwise are made to the trial judge in advance of the trial. *See Kamakana*, 447 F.3d at 1180-81 (distinguishing "good cause" showing for sealing documents produced in discovery from "compelling reasons" standard when merits-related documents are part of court record). Accordingly, the terms of this protective order do not extend beyond the commencement of the trial.

5.    DESIGNATING PROTECTED MATERIAL

5.1    Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards described herein.  The Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited.  Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2    Manner and Timing of Designations.  Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a)    for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" to each page that contains protected material.  If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the

1    protected portion(s) (e.g., by making appropriate markings in the margins).

2         A Party or Non-Party that makes original documents or materials available for

3 inspection need not designate them for protection until after the Receiving Party has

4 indicated which material it would like copied and produced. During the inspection

5 and before the designation, all of the material made available for inspection shall be

6 deemed "CONFIDENTIAL." After the Receiving Party has identified the documents

7 it wants copied and produced, the Producing Party must determine which documents,

8 or portions thereof, qualify for protection under this Order. Then, before producing

9 the specified documents, the Producing Party must affix the "CONFIDENTIAL"

10 legend to each page that contains Protected Material. If only a portion or portions of

11 the material on a page qualifies for protection, the Producing Party also must clearly

12 identify the protected portion(s) (e.g., by making appropriate markings in the

13 margins).

14       (b)    for testimony given in deposition or in other pretrial or trial proceedings,

15 that the Designating Party identify on the record, before the close of the deposition,

16 hearing, or other proceeding, all protected testimony.

17       (c)    for information produced in some form other than documentary and for

18 any other tangible items, that the Producing Party affix in a prominent place on the

19 exterior of the container or containers in which the information or item is stored the

20 legend "CONFIDENTIAL." If only a portion or portions of the information or item

21 warrant protection, the Producing Party, to the extent practicable, shall identify the

22 protected portion(s).

23       5.3    <u>Inadvertent Failures to Designate</u>. If timely corrected, an inadvertent

24 failure to designate qualified information or items does not, standing alone, waive

25 the Designating Party's right to secure protection under this Order for such material.

26 Upon timely correction of a designation, the Receiving Party must make reasonable

27 efforts to assure that the material is treated in accordance with the provisions of this

28 Order.

6.      CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1      <u>Timing of Challenges</u>.  Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.  Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2      <u>Meet and Confer</u>.  The Challenging Party shall initiate the dispute resolution process by providing written notice to the Designating Party of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order.  The Challenging Party and the Designating Party shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice.  In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation.  A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3      <u>Joint Stipulation.</u> If the Challenging Party and the Designating Party cannot resolve a challenge without court intervention, the Parties shall prepare a joint statement regarding the dispute pursuant to Civil Local Rule 251.  The Designating Party shall file and serve a motion to retain confidentiality, attaching the Parties' joint

statement regarding the dispute, within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all Parties shall continue to treat the material in question to the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

6.4     The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all Parties shall continue to treat the material in question to the level of protection to which it is entitled under the Producing Party's designation until the

1  court rules on the challenge.

2  7.  ACCESS TO AND USE OF PROTECTED MATERIAL

3  7.1  <u>Basic Principles.</u> A Receiving Party may use Protected Material that is

4  disclosed or produced by another Party or by a Non-Party in connection with this

5  case only for prosecuting, defending, or attempting to settle this litigation. Such

6  Protected Material may be disclosed only to the categories of persons and under the

7  conditions described in this Order. When the litigation has been terminated, a

8  Receiving Party must comply with the provisions of section 13 below (FINAL

9  DISPOSITION).

10  Protected Material must be stored and maintained by a Receiving Party at a

11  location and in a secure manner that ensures that access is limited to the persons

12  authorized under this Order.

13  7.2  <u>Disclosure of "CONFIDENTIAL" Information or Items</u>.

14  This Protective Order is intended to and does preclude Counsel of Record from

15  allowing Plaintiff to possess or retain a copy of any information designated

16  "CONFIDENTIAL." However, this Protective Order is not intended to and does not

17  preclude Counsel of Record from displaying, disclosing or discussing the contents of

18  such information or items to Plaintiff. The Parties agree that information or items

19  labeled "CONFIDENTIAL" may be displayed or disclosed to or discussed between

20  Counsel of Record and Plaintiff to the extent necessary to conduct litigation.

21  In addition to the above, unless otherwise ordered by the court or permitted in

22  writing by the Designating Party, a Receiving Party may disclose any information or

23  item designated "CONFIDENTIAL" only to:

24  (a)  the Receiving Party's Counsel of Record in this action, as well as

25  employees of said Counsel of Record to whom it is reasonably necessary to disclose

26  the information for this litigation (as well as support staff);

27  (b)  the officers, directors, and employees of the Receiving Party to whom

28  disclosure is reasonably necessary for this litigation and who have signed the

1 "Acknowledgment and Agreement to Be Bound" (Exhibit A);

2      (c)     Experts (as defined in this Order) of the Receiving Party to whom

3 disclosure is reasonably necessary for this litigation and who have signed the

4 "Acknowledgment and Agreement to Be Bound" (Exhibit A);

5      (d)     the court and its personnel;

6      (e)     court reporters and their staff, professional jury or trial consultants,

7 mock jurors, and Professional Vendors to whom disclosure is reasonably necessary

8 for this litigation and who have signed the "Acknowledgement and Agreement to be

9 Bound" (Exhibit A);

10      (f)     during their depositions, witnesses in the action to whom disclosure is

11 reasonably necessary and who have signed the "Acknowledgment and Agreement to

12 Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered

13 by the court.  Pages of transcribed deposition testimony or exhibits to depositions

14 that reveal Protected Material must be separately bound by the court reporter and

15 may not be disclosed to anyone except as permitted under this Stipulated Protective

16 Order.

17      (g)     the author or recipient of a document containing the information or a

18 custodian or other person who otherwise possessed or knew the information; and

19      (h)     any mediator or settlement officer, and their supporting personnel,

20 mutually agreed upon by any of the parties engaged in settlement discussions.

21 8.    <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED</u>
22     <u>IN OTHER LITIGATION</u>

23      If a Party is served with a subpoena or a court order issued in other litigation

24 that compels disclosure of any information or items designated in this action as

25 "CONFIDENTIAL" that Party must:

26      (a)     promptly notify in writing the Designating Party.  Such notification shall

27 include a copy of the subpoena or court order;

28      (b)     promptly notify in writing the party who caused the subpoena or order

1  to issue in the other litigation that some or all of the material covered by the subpoena

2  or order is subject to this Protective Order. Such notification shall include a copy of

3  this Stipulated Protective Order; and

4       (c)     cooperate with respect to all reasonable procedures sought to be pursued

5  by the Designating Party whose Protected Material may be affected.

6       If the Designating Party timely seeks a protective order, the Party served with

7  the subpoena or court order shall not produce any information designated in this

8  action as "CONFIDENTIAL" before a determination by the court from which the

9  subpoena or order issued, unless the Party has obtained the Designating Party's

10  permission. The Designating Party shall bear the burden and expense of seeking

11  protection in that court of its confidential material – and nothing in these provisions

12  should be construed as authorizing or encouraging a Receiving Party in this action to

13  disobey a lawful directive from another court.

14  9.     A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE
        PRODUCED IN THIS LITIGATION

15

16       9.1     Production of Protected Material by a Non-Party

17       The terms of this Order are applicable to information produced by a Non-Party

18  in this action and designated as "CONFIDENTIAL." Such information produced by

19  Non-Parties in connection with this litigation is protected by the remedies and relief

20  provided by this Order. Nothing in these provisions should be construed as

21  prohibiting a Non-Party from seeking additional protections.

22       9.2     Production of a Non-Party's Protected Material by a Party

23       (a)     In the event that a Party is required, by a valid discovery request, to

24  produce a Non-Party's confidential information in its possession and the Party is

25  subject to an agreement with the Non-Party not to produce the Non-Party's

26  confidential information, then the Party shall:

27       (1)     promptly notify in writing the Requesting Party and the Non-

28  Party that some or all of the information requested is subject to a confidentiality

12.
Stipulated Protective Order
(Case No. 2:18-cv-02081 TLN KJN)

1  agreement with a Non-Party;

2          (2)     promptly provide the Non-Party with a copy of the Stipulated

3  Protective Order in this litigation, the relevant discovery request(s), and a reasonably

4  specific description of the information requested; and

5          (3)     make the information requested available for inspection by the

6  Non-Party.

7      (b)     If the Non-Party fails to object or seek a protective order from this Court

8  within 14 days of receiving the notice and accompanying information, the Receiving

9  Party may produce the Non-Party's confidential information responsive to the

10  discovery request.  If the Non-Party timely seeks a protective order, the Receiving

11  Party shall not produce any information in its possession or control that is subject to

12  a confidentiality agreement with the Non-Party before a determination by the court.[1]

13  Absent a court order to the contrary, the Non-Party shall bear the burden and expense

14  of seeking protection in this Court of its Protected Material.

15  10.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

16          If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed

17  Protected Material labeled "CONFIDENTIAL" to any person or in any circumstance

18  not authorized under this Stipulated Protective Order, the Receiving Party must

19  immediately (a) notify in writing the Designating Party of the unauthorized

20  disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected

21  Material, (c) inform the person or persons to whom unauthorized disclosures were

22  made of all the terms of this Order, and (d) request such person or persons to execute

23  the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit

24  A.

25  11.    INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE
        PROTECTED MATERIAL
26

27  _____
[1] The purpose of this provision is to alert the interested parties to the existence of confidentiality
28  rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality
    interests in this court.

                                            13.              Stipulated Protective Order
                                                       (Case No. 2:18-cv-02081 TLN KJN)

1    When a Producing Party gives notice to Receiving Parties that certain
2    inadvertently produced material is subject to a claim of privilege or other protection,
3    the obligations of the Receiving Parties are those set forth in Federal Rule of Civil
4    Procedure 26(b)(5)(B).  This provision is not intended to modify whatever procedure
5    may be established in an e-discovery order that provides for production without prior
6    privilege review.  Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the
7    Parties reach an agreement on the effect of disclosure of a communication or
8    information covered by the attorney-client privilege or work product protection, the
9    Parties may incorporate their agreement in the stipulated protective order submitted
10   to the Court.

11   12.   MISCELLANEOUS

12      12.1   Right to Further Relief.  Nothing in this Order abridges the right of any
13   person to seek its modification by the court in the future.

14      12.2   Right to Assert Other Objections.  By stipulating to the entry of this
15   Protective Order no Party waives any right it otherwise would have to object to
16   disclosing or producing any information or item on any ground not addressed in
17   this Stipulated Protective Order.  Similarly, no Party waives any right to object on
18   any ground to use in evidence of any of the material covered by this Protective
19   Order.

20      12.3   Filing Protected Material.   Without written permission from the
21   Designating Party or a court order secured after appropriate notice to all interested
22   persons, a Party may not file in the public record in this action any Protected Material.
23   A Party that seeks to file under seal any Protected Material must comply with Civil
24   Local Rule 141.  Protected Material may only be filed under seal pursuant to a court
25   order authorizing the sealing of the specific Protected Material at issue. If a Party's
26   request to file Protected Material under seal is denied by the court, then the Receiving
27   Party may file the information in the public record unless otherwise instructed by the
28   court.

13.    <u>FINAL DISPOSITION</u>

(a)    Counsel of Record are entitled to retain an archival copy of all documents, pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Counsel of Record is not required to destroy or return copies of Protected Material that may be stored on back-up tapes created in the Receiving Party's normal course of business and retained for disaster-recovery purposes. Any such archival or back-up tape copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

14.    <u>VIOLATION</u>

Any violation of this Order may be punished by appropriate measures including, without limitation, contempt proceedings and/or monetary sanctions.

1    IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

2    DATED: October 10, 2018          /s/ Aaron J. Fischer
                                      AARON J. FISCHER (SBN 247391)
3                                     DISABILITY RIGHTS CALIFORNIA

4
                                      Attorneys for Plaintiffs
5

6    DATED: October 10, 2018          /s/ Margot Mendelson (as authorized on
                                      10/10/18)
7                                     MARGOT MENDELSON (SBN 268583)
8                                     PRISON LAW OFFICE

9
                                      Attorneys for Plaintiffs
10

11   DATED: October 10, 2018          /s/ Jessica Valenzuela Santamaria (as
                                      authorized on 10/10/18)
12                                    JESSICA VALENZUELA SANTAMARIA
                                      (220934)
13                                    COOLEY LLP

14                                    Attorneys for Plaintiffs

15
     DATED: October 10, 2018          /s/ Shawn M. Ridley (as authorized on
16                                    10/10/18)
                                      SHAWN M. RIDLEY (SBN 144311)
17                                    HOWARD ROME MARTIN & RIDLEY,
                                      LLP
18

19                                    Attorneys for Defendant
20                                    County of Sacramento

21

22
     PURSUANT TO STIPULATION, IT IS SO ORDERED.
23
     Dated:  October 16, 2018
24

25

26   KENDALL J. NEWMAN
     UNITED STATES MAGISTRATE JUDGE

27   /mays2081.po

28
                              16.              Stipulated Protective Order
                                          (Case No. 2:18-cv-02081 TLN KJN)

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Eastern District of California on July 31, 2018, in the case of *Mays, et al. v. County of Sacramento* (Case No. 2:18-cv-02081 TLN KJN). I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Eastern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of _____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____
    [printed name]

Signature: _____
    [signature]

17.                              Stipulated Protective Order
                        (Case No. 2:18-cv-02081 TLN KJN)

# Exhibit 2
# Plaintiffs' Request for Judicial Notice

JS-6

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF JIM MCDONNELL, in his Official Capacity,<br><br>Defendants. | CV No. 15-05903 DDP (JEMx)<br><br>**JOINT SETTLEMENT AGREEMENT REGARDING THE LOS ANGELES COUNTY JAILS; AND STIPULATED ORDER OF RESOLUTION** |

## I.  INTRODUCTION

1.     The United States of America, acting through the United States Department of Justice ("United States"), the County of Los Angeles ("County") and Sheriff Jim McDonnell, in his official capacity ("Sheriff"), (collectively, the "Parties") share a mutual interest in treating all members of the community with respect, promoting safe and effective custodial care, protecting public safety, and upholding the constitutional rights of prisoners.[1]

---

[1]     "Prisoners" is a defined term in Section III of this Agreement and includes pre-trial detainees and individuals convicted of a criminal offense.

1

2.       The Los Angeles County Jails ("Jails") are an integral part of the public safety system in Los Angeles County, California.  Together, the Jails form the largest jail system in the nation and house among the highest populations of prisoners with mental illness.  Maintaining these facilities is an immensely complex enterprise -- approximately 15,500 to 19,500 prisoners are held in custody daily, spread across multiple custody facilities, numerous patrol stations, and over 29 courthouses.  These facilities' primary function is to incarcerate individuals accused or convicted of committing a crime.  In doing so, these facilities provide food, shelter, and clothing, but must also address the serious medical and mental health needs of the prisoners and ensure their reasonable safety.

3.       The United States acknowledges that the County and the Sheriff have demonstrated a renewed commitment to reforming the Jails and have begun to implement improved policies and practices designed to enhance the treatment and care of prisoners with mental illness.  The County and the Sheriff are also exploring strategies to safely divert individuals with mental illness from the criminal justice system, whenever possible.  The United States further acknowledges that the number of suicides at the Jails decreased in 2014 from the previous year.  In addition, the County and the Sheriff have made significant commitments to protect prisoners from abuse and excessive force by staff that further the Parties' mutual interest.  Finally, the United States acknowledges that some of the needed changes the County and the Sheriff seek to implement through this Agreement will require the allocation of additional resources to the Sheriff's Department and the Los Angeles County Department of Mental Health ("DMH").

4.       Accordingly, this Joint Settlement Agreement Regarding the Los Angeles County Jails ("Agreement") is intended to build upon measures that are underway and to sustain systemic improvements that are designed to protect

prisoners from conditions in custody that place them at unreasonable risk of harm from suicide, self-injurious behavior, or unlawful injury by others, in accordance with their constitutional rights.  This Agreement also is expected to have collateral benefits that promote public safety, improve confidence in the County's criminal justice system, and support the County's and the Sheriff's collaborative efforts to expand comprehensive and effective mental health diversion and re-entry programs that are designed to lead to more positive outcomes in the care and custody of individuals with serious mental illness who are also participants in the criminal justice system.

## II.   BACKGROUND

5.     The County owns and funds the operations of the Jails.  The Sheriff's Department is responsible for providing care, custody, and control of prisoners at the Jails.  The Sheriff's Department Medical Services Bureau provides medical care within the Jails.  DMH is responsible for providing mental health care in the Jails through its Jail Mental Health Services program.

6.     The Sheriff is an elected official who is responsible for operating and exercising authority over the Jails.

7.     In June 1996, the Department of Justice notified the County and Sheriff that it was opening an investigation under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, to determine whether the conditions in the Jails violate the constitutional rights of its prisoners.

8.     In September 1997, the Department of Justice issued a findings letter alleging that mental health care at the Jails violated prisoners' constitutional rights. The letter further alleged that systemic deficiencies contributed to the violations, including inadequate:  (1) intake screening and evaluation; (2) diagnosis; (3) referral to mental health professionals; (4) treatment plans; (5) administration of medications; (6) suicide prevention; (7) tracking and medical record keeping; (8) staffing; (9) communication; and (10) quality assurance.

9.     In December 2002, following extensive negotiations and additional site visits, the Parties entered into a Memorandum of Agreement (MOA) that outlined a series of reforms to ensure that adequate and reasonable mental health care services are provided at the Jails. The MOA also included measures to protect prisoners with mental illness from abuse and mistreatment.

10.     Under the MOA, the County and the Sheriff have made significant improvements to the delivery of mental health care at the Jails, including implementing electronic medical records, increasing mental health staffing, and developing roving evaluation teams composed of mental health professionals and specially-trained custody staff.  Despite considerable progress, the United States alleges that systemic deficiencies remain related to suicide prevention and mental health care that violate prisoners' constitutional rights.  The Department of Justice notified the County and the Sheriff of these allegations in a letter dated June 4, 2014, following on-site evaluations with expert consultants.

11.     In September 2013, the Department of Justice opened a separate investigation of the Jails under CRIPA and 42 U.S.C. § 14141 ("Section 14141") to address allegations of use of excessive force against all prisoners at the Jails, not just prisoners with mental illness.  During the course of the investigation, the County and the Sheriff entered into a comprehensive settlement agreement to resolve *Rosas v. McDonnell*, Case No. CV 12-0428-DDP (C.D. Ca. filed on Jan. 18, 2012) (hereinafter "*Rosas*"), a class action lawsuit alleging abuse and excessive force by staff at certain Jails located in downtown Los Angeles.  As part of the *Rosas* settlement agreement, the County and the Sheriff have agreed to implement significant measures to protect prisoners from excessive force by staff, including improvements in policies, training, incident tracking and reporting, investigations, resolution of prisoner grievances, prisoner and staff supervision, and accountability.

12.     This Agreement addresses remaining allegations concerning suicide prevention and mental health care at the Jails resulting from the partial implementation of the 2002 MOA and current conditions within the Jails.  This Agreement also extends the remedial measures in the Implementation Plan of the *Rosas* settlement agreement to fully resolve the Department of Justice's CRIPA findings regarding alleged mistreatment of prisoners with mental illness and claims under Section 14141 regarding alleged excessive force against prisoners at all of the Jails.

13.     As indicated in Section VII of this Agreement, the Parties consent to a finding that this Agreement complies in all respects with the provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626(a).

14.     Except to enforce, modify, or terminate this Agreement, this Agreement, and any findings made to effectuate this Agreement, will not be admissible against either the County or the Sheriff in any court for any purpose. Moreover, this Agreement is not an admission of any liability on the part of the County or the Sheriff, and/or either of its employees, agents, and former employees and agents, or any other persons, and will not constitute evidence of any pattern or practice of wrongdoing.

### III.    DEFINITIONS

15.     The following definitions will apply to terms in this Agreement:

(a)     "Sheriff's Department" refers to the Los Angeles County Sheriff's Department, which is responsible for all custody, corrections, and security functions within the Los Angeles County Jails system, including the provision of medical care to prisoners through the Sheriff's Department Medical Services Bureau.

(b)     "Jails" refers to the Los Angeles County Jails system, and shall include Men's Central Jail ("MCJ"), Twin Towers Correctional Facility ("TTCF"), Inmate Reception Center ("IRC"), Century

5

Regional Detention Facility ("CRDF"), North County Correctional Facility ("NCCF"), Pitchess Detention Center ("PDC"), and other facilities in which prisoners are detained or held in custody by the County and the Sheriff, including lockup facilities and courthouse holding areas as well as any visiting area in the facility, and any facility that is built, leased, or otherwise used, to replace or supplement the current Jails or any part of the Jails.

(c) "United States" or "DOJ" refers to the United States Department of Justice, specifically the Special Litigation Section of the Civil Rights Division and the United States Attorney's Office for the Central District of California, which represent the United States in this matter.

(d) "The County" refers to the County of Los Angeles, the Los Angeles County Sheriff's Department, the Los Angeles County Department of Mental Health, and the agents and employees of the Sheriff's Department and the Department of Mental Health. The Department of Mental Health ("DMH") includes any successor County department that assumes the duties and responsibilities of DMH.

(e) "Sheriff" refers to the Los Angeles County Sheriff, currently Jim McDonnell, an independently-elected constitutional officer, in his official capacity, and any predecessors or successors in office, including any designated acting or interim Sheriff.

(f) "Custody staff" means sworn deputy sheriffs and custody assistants.

(g) "Days" are measured in calendar days; weekend days and County holidays are included.

(h) "Normal business work days" means all days except for weekend days and County holidays.

(i) "Describe" means provide a clear and detailed description of something done, experienced, seen, or heard.

6

(j) "Document" when used in this Agreement as a verb means completing a record of information either in hard copy or in electronic format.

(k) "Effective Date" means the date the Court enters the signed Agreement as an order of the Court, or July 1, 2015, whichever is earlier.

(l) "Emergency maintenance needs" means a need that if left unattended could result in imminent danger to the life, safety, or health of prisoners.

(m) An "emergent" or "urgent" mental health need, as used in this Agreement, is one which the Arrestee Medical Screening Form (SH-R-422) or its equivalent and/or the Medical/Mental Health Screening Questionnaire indicate that immediate action is required to preserve life, prevent serious bodily harm, or relieve significant suffering.

(n) "Good cause" means fair and honest reasons, regulated by good faith on the part of either party, that are not arbitrary, capricious, trivial, or pretextual.

(o) "Implement" or "implementation" means putting a remedial measure into effect, including informing, instructing, or training impacted personnel as required by this Agreement, and ensuring that policies or procedures are in fact followed.

(p) "Include," "includes," or "including" means "include, but not be limited to" or "including, but not limited to."

(q) "Jail Reception Centers" mean all Sheriff's Department processing facilities that handle incoming bookings and arrests and that are responsible for medical and mental health screenings and classification, including the Inmate Reception Center and the Century

7

Regional Detention Facility.  This does not include Sheriff's Department station jails.

(r)     "Mental Health Housing" refers to prisoner housing areas in the Jails that include only the Forensic In-Patient (FIP), High Observation Housing (HOH), and Moderate Observation Housing (MOH) areas.

    (i)     "Correctional Treatment Center" or "CTC" refers to the licensed health facility with a specified number of beds within the Jails designated to provide health care to that portion of the prisoner population that does not require a general acute care level of services, but which is in need of professionally supervised health care beyond that normally provided in the community on an outpatient basis.

    (ii)    "Forensic In-Patient" or "FIP" can be used interchangeably with Mental Health Unit of the Correctional Treatment Center (MHU CTC).  The FIP is located in the CTC and houses prisoners who present an acute danger to self or others or are gravely disabled due to a mental illness and require inpatient care.

    (iii)   "High Observation Housing" or "HOH" refers to designated areas for prisoners with mental illness who require an intensive level of observation and care and/or safety precautions.

    (iv)    "Moderate Observation Housing" or "MOH" refers to designated areas for prisoners with a broad range of mental health diagnoses and functioning whose mental health needs can be cared for in a less intensive and more open setting than the HOH areas, but preclude general population housing.

8

(s)  "Monitor" or "Independent Monitor" means the individual selected by the Parties whose duties, responsibilities, and authority are set forth in Section VI of this Agreement.

(t)  "Subject Matter Experts" or "SMEs" means the individuals selected by the Parties whose duties, responsibilities, and authority are set forth in Section VI of this Agreement.

(u)  "Prisoners" or "Prisoner" is construed broadly to refer to one or more individuals detained at, or otherwise housed, held, in the custody of, or confined at the Jails based on arrests, detainers, criminal charges, civil contempt charges, or convictions.

(v)  "Psychotropic medication" means any substance used to treat mental health problems or mental illness and is capable of modifying mental activity or behavior.

(w)  "Qualified Medical Staff" refers to physicians, physician assistants, nurse practitioners, registered nurses, certified nursing assistants, and licensed vocational nurses, each of whom is permitted by law to evaluate and care for the medical needs of patients.

(x)  "Qualified Mental Health Professional" or "QMHP" refers to psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients.

(y)  "Clinical Restraints" is any device that limits a person's ability to move freely and has been ordered or approved by a licensed psychiatrist for the purpose of managing behavior that appears to be symptomatic of a mental illness.

(z)   "Security Restraints" is any device that limits a person's ability to move freely and has not been ordered by a licensed psychiatrist or Qualified Medical Staff.

(aa)  "Serious mental illness" includes psychotic disorders, major mood disorders (including major depression and bipolar disorders), and any other condition (excluding personality disorders, substance abuse and dependence disorders, dementia, and developmental disability) that is associated with serious or recurrent significant self-harm, suicidal ideation, imminent danger to others, current grave disability, or substantially impaired ability to understand routine instructions, or that prevents access to available programs. Although personality disorders alone generally do not qualify as serious mental illness, personality disorders associated with serious or recurrent significant self-harm do qualify as serious mental illnesses.

(bb)  "Suicide attempt" means any serious effort to commit an act of self-harm that can result in death and involving definite risk.

(cc)  "Serious suicide attempt" means a suicide attempt that resulted in or could have resulted in significant and life-threatening injury.

(dd)  "Suicide Precautions" means any level of watch, observation, or measures specifically intended to prevent suicide or self-harm and includes both Suicide Watch and Risk Precautions as defined in this Agreement.

(ee)  "Suicide Watch" means the level of watch, observation, or measures intended to identify and safely maintain prisoners who are imminently suicidal and require admission to the Mental Health Unit of the Correctional Treatment Center (MHU CTC or FIP) on a 72-hour hold, in accordance with California Welfare and Institutions Code Section 5150.

10

(ff) "Risk Precautions" means a level of watch, observation, or measures used to identify and safely maintain those prisoners who require heightened observation and daily re-evaluation, and require admission to HOH but are not considered to pose an imminent risk of suicide.

(gg) "Suicide resistant location" means a housing assignment in which known or apparent suicide hazards do not exist or have been removed.

(hh) "Self-injurious behavior" means any behavior that is self-directed and deliberately results in injury or the potential for injury to oneself and there is no evidence of suicidal intent.

(ii) "Serious self-injurious behavior" means self-injurious behavior where the injury is significant enough that it could lead to loss of life or limb or have serious medical complications.

(jj) "Direct constant observation" means continuous uninterrupted observation of a prisoner within a proximity that ensures the observer can both see and hear the prisoner to assure the prisoner's well-being, absent extraordinary circumstances.

(kk) "Unobstructed visual observation" means continuous but not necessarily uninterrupted observation within a reasonable physical distance of the prisoner(s).

(ll) "Train" means to instruct in skills to a level that the trainee has the demonstrated proficiency, through an assessment or evaluation, to implement those skills as and when called for. "Trained" means proficient in the skills.

(mm) Throughout this Agreement, the following terms are used when discussing compliance: substantial compliance, partial compliance, and non-compliance. "Substantial Compliance" means that the County and the Sheriff have achieved compliance with the material components of the relevant provision of this Agreement in accordance

11

with the Monitor and SMEs' monitoring plan and compliance measures. "Partial Compliance" means that the County and the Sheriff have achieved compliance on some, but not all, of the material components of the relevant provision of this Agreement. "Non-compliance" means that the County and the Sheriff have not met most or all of the material components of the relevant provision of this Agreement. Non-compliance with mere technicalities, or temporary failure to comply coupled with prompt and appropriate corrective action during a period of otherwise sustained compliance, will not constitute failure to maintain Substantial Compliance. At the same time, temporary compliance during a period of otherwise sustained Non-compliance will not constitute Substantial Compliance.

(nn) "Policy" or "Policies" mean regulations, directives, or manuals, regardless of name, that have been approved by a senior executive within the Sheriff's Department ("LASD") or DMH and that describe the duties, functions, or obligations of LASD or DMH staff and provide specific direction in how to fulfill those duties, functions, or obligations. References to "existing" policies mean those policies in effect on the Effective Date of this Agreement, and include any subsequent revisions or changes made to those policies after the Effective Date of this Agreement.

## IV. OVERALL OBJECTIVES AND GOALS

16. Consistent with constitutional standards, the County and the Sheriff will provide prisoners at the Jails with safe and secure conditions and ensure their reasonable safety from harm, including serious risk from self-harm and excessive force, and ensure adequate treatment for their serious mental health needs. In order to achieve and maintain these objectives, the County and the Sheriff agree to

12

continue, and where appropriate enhance, their current policies and practices, and to implement the additional measures set forth in this Agreement.

17.     The Parties recognize that the County and the Sheriff have made considerable progress to improve conditions and the delivery of mental health care at the Jails, but that additional measures are necessary to provide prisoners at the Jails with safe and secure conditions, ensure their reasonable safety from harm, including serious risk from self-harm and excessive force, and meet the serious mental health needs of prisoners, in accordance with prisoners' constitutional rights.  The measures set forth in this Agreement address the following areas:  (1) training; (2) suicide hazard inspections; (3) intake; (4) medical records; (5) mental health referrals; (6) mental health follow-up; (7) suicide risk procedures; (8) staffing; (9) environmental conditions; (10) allowable property privileges; (11) communication related to mental health; (12) safety checks; (13) quality improvement plan; (14) mental health housing; (15) medication; (16) restraints; (17) suicide death reviews and critical incident reviews; (18) mental health treatment; and (19) use of force.   The County and the Sheriff agree to maintain an adequate system of mental health screening, assessment, treatment planning, and record-keeping as specifically set forth in this Agreement.

# V.   **SUBSTANTIVE PROVISIONS**

## A.   **Training**

18.     Within three months of the Effective Date, the County and the Sheriff will develop, and within six months of the Effective Date will commence providing:  (1) a four-hour custody-specific, scenario-based, skill development training on suicide prevention, which can be part of the eight-hour training described in paragraph 4.8 of the Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2) a two-hour custody-specific, scenario-based, skill development training on suicide prevention to all existing

13

Deputies and Custody Assistants at their respective facilities, which can be part of the eight-hour training described in paragraph 4.7 of the Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)     suicide prevention policies and procedures, including observation and supervision of prisoners at risk for suicide or self-injurious behavior;

(b)     discussion of facility environments and staff interactions and why they may contribute to suicidal behavior;

(c)     potential predisposing factors to suicide;

(d)     high-risk suicide periods and settings;

(e)     warning signs and symptoms of suicidal behavior;

(f)     case studies of recent suicides and serious suicide attempts;

(g)     emergency notification procedures;

(h)     mock demonstrations regarding the proper response to a suicide attempt, including a hands-on simulation experience that incorporates the challenges that often accompany a jail suicide, such as cell doors being blocked by a hanging body and delays in securing back-up assistance;

(i)     differentiating between suicidal and self-injurious behavior; and

(j)     the proper use of emergency equipment.

19.     Commencing July 1, 2015, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental

14

Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)      32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016). Deputies at these facilities will receive an eight hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four hour refresher course every other year thereafter.

(ii)      Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)      Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training, related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*. This training will be completed by December 31, 2016. Custody Assistants will receive a four hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

20.      Commencing no later than July 1, 2017, the County and the Sheriff will provide:

15

(a) Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

   (i) 32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019. Deputies at these facilities will receive an eight hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four hour refresher course every other year thereafter.

   (ii) Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

21. Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

22. Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known

16

relevant and available information on prisoners' mental health status and suicide risk. Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**B.** **Suicide Hazard Inspections**

23. Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards. The County and the Sheriff will utilize a nationally-recognized audit tool for the review. From this tool, the County and the Sheriff will:

(a) develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b) prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

24. The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**C.** **Intake**

25. The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable. Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

26. Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in

17

the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the
Medical/Mental Health Screening Questionnaire and to expedite such prisoners for
mental health evaluation upon arrival at the Jail Reception Centers and prior to
routine screening. Prisoners who are identified as having emergent or urgent
mental health needs, including the need for emergent psychotropic medication, will
be evaluated by a QMHP as soon as possible but no later than four hours from the
time of identification.

27.     Consistent with existing Sheriff's Department policies, the County
and the Sheriff will ensure that all prisoners are individually and privately screened
by Qualified Medical Staff or trained custody personnel as soon as possible upon
arrival to the Jails, but no later than 12 hours, barring an extraordinary
circumstance, to identify a prisoner's need for mental health care and risk for
suicide or self-injurious behavior. The County and the Sheriff will ensure that the
Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening
Form (SH-R-422) or its equivalent, and/or the Confidential Medical Mental Health
Transfer Form are in the prisoner's electronic medical record or otherwise
available at the time the prisoner is initially assessed by a QMHP.

28.     The County and the Sheriff will ensure that any prisoner who has been
identified during the intake process as having emergent or urgent mental health
needs as described in Paragraph 26 of this Agreement will be expedited through
the booking process. While the prisoner awaits evaluation, the County and the
Sheriff will maintain unobstructed visual observation of the prisoner when
necessary to protect his or her safety, and will conduct 15-minute safety checks if
the prisoner is in a cell.

29.     The County and the Sheriff will ensure that a QMHP conducts a
mental health assessment of prisoners who have non-emergent mental health needs
within 24 hours (or within 72 hours on weekends and legal holidays) of a
registered nurse conducting an intake nursing assessment at IRC or CRDF.

18

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**D.     Medical Records**

31.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

(a)     current suicide risk;

(b)     hoarding medications; and

(c)     prior suicide attempts.

32.     Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

33.     The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)     Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)     Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units

19

1  of service than hours worked, and to determine whether contacts with

2  those prisoners are inconsistent with their clinical needs;

3     (c)    Where supervisors identify discrepancies through these reviews, they

4  will conduct a more thorough review using a DMH-developed

5  standardized tool and will consider detailed information contained in

6  the electronic medical record and progress notes;

7     (d)    Serious concerns remaining after the secondary review will be

8  elevated for administrative action in consultation with DMH's

9  centralized Human Resources.

10     34.    The County and the Sheriff will conduct discharge planning and

11  linkage to community mental health providers and aftercare services for all

12  prisoners with serious mental illness as follows:

13     (a)    For prisoners who are in Jail seven days or less, a preliminary

14  treatment plan, including discharge information, will be developed.

15     (b)    For prisoners who are in Jail more than seven days, a QMHP will also

16  make available:

17     (i)    for prisoners who are receiving psychotropic medications, a 30-

18  day prescription for those medications will be offered either

19  through the release planning process, through referral to a re-

20  entry resource center, or through referral to an appropriate

21  community provider, unless clinically contraindicated;

22     (ii)    in-person consultation to address housing, mental

23  health/medical/substance abuse treatment, income/benefits

24  establishment, and family/community/social supports. This

25  consultation will also identify specific actions to be taken and

26  identify individuals responsible for each action;

27     (iii)    if the prisoner has an intense need for assistance, as described in

28  DMH policies, the prisoner will further be provided direct

20

linkage to an Institution for Mental Disease ("IMD"), IMD-
Step-down facility, or appropriately licensed hospital;

(iv) if the prisoner has a moderate need for assistance, as described
in DMH policies, and as clinically appropriate to the needs of
the prisoner, the prisoner will be offered enrollment in Full
Service Partnership or similar program, placement in an Adult
Residential Facility ("Board and Care") or other residential
treatment facility, and direct assistance accessing community
resources; and

(v) if the prisoner has minimal needs for assistance, as described in
DMH policies, the prisoner will be offered referrals to routine
services as appropriate, such as General Relief, Social Security,
community mental health clinics, substance abuse programs,
and/or outpatient care/support groups.

(c) The County will provide a re-entry resource center with QMHPs
available to all prisoners where they may obtain information about
available mental health services and other community resources.

**E.** **Mental Health Referrals**

35.     Consistent with existing DMH and Sheriff's Department policies, the
County and the Sheriff will ensure that custody staff, before the end of shift, refer
prisoners in general or special populations who are demonstrating a potential need
for routine mental health care to a QMHP or a Jail Mental Evaluation Team
("JMET") member for evaluation, and document such referrals.  Custody staff will
utilize the Behavior Observation and Referral Form.

36.     Consistent with existing DMH policies, the County and the Sheriff
will ensure that a QMHP performs a mental health assessment after any adverse
triggering event, such as a suicide attempt, suicide threat, self-injurious behavior,
or any clear decompensation of mental health status.  For those prisoners who

21

repeatedly engage in self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior. The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event. The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

37. Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis. Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

38. Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails. In conducting the rounds, either the clinician, the JMET deputy, or the prisoner may request an out-of-cell interview. This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

22

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their request to custody staff or other prisoners.

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**F.      Mental Health Follow Up**

41.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch. The protocols will provide:

(a)      intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)      an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)      every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)      all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

42.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the

23

QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

    (a)    the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four Days, following discontinuance of risk precautions;

    (b)    the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

    (c)    the prisoner will remain in HOH or be transferred to MOH, as determined on a case by case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

    (d)    the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

43.    Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

    (a)    Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

    (b)    If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to

mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)   A QMHP will participate in weekly walks, as specified in Paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs;

(d)   Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

**G.   Suicide Risk Procedures**

44.   Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier. Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

45.   Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit. All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

46.   The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**H.   Staffing**

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement. Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**I.     Environmental Conditions**

48.     Within three months of the Effective Date, the County and the Sheriff will have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning of, and trash collection and removal in, housing, shower, and medical areas, in accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility Sanitation, Safety, and Maintenance.

49.     Within three months of the Effective Date, the County and the Sheriff will have a maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation, and cooling systems are adequately maintained and installed.  The plan will also include steps to treat large mold infestations.

50.     Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will

26

1 ensure that all prisoners have access to basic hygiene supplies, in accordance with
2 CCR Title 15 § 1265: Issue of Personal Care Items.

3 **J.    Allowable Property Privileges**

4      52.    The County and the Sheriff will implement policies governing
5 property restrictions in High Observation Housing that provide:

6      (a)    Except when transferred directly from FIP, upon initial placement in
7            HOH:

8            (i)    Suicide-resistant blankets, gowns, and mattresses will be
9                  provided until the assessment set forth in section (a)(ii) below is
10                 conducted, unless clinically contraindicated as determined and
11                 documented by a QMHP.

12           (ii)   Within 24 hours, a QMHP will make recommendations
13                  regarding allowable property based upon an individual clinical
14                  assessment.

15     (b)    Property restrictions in HOH beyond 24 hours will be based on
16            clinical judgment and assessment by a QMHP as necessary to ensure
17            the safety and well-being of the prisoner and documented in the
18            Electronic Medical Record.

19     53.    If otherwise eligible for an education, work, or similar program, a
20 prisoner's mental health diagnosis or prescription for medication alone will not
21 preclude that prisoner from participating in said programming.

22     54.    Prisoners who are not in Mental Health Housing will not be denied
23 privileges and programming based solely on their mental health status or
24 prescription for psychotropic medication.

25 **K.    Communication Related to Mental Health**

26     55.    Relevant custody, medical, and mental health staff in all High
27 Observation Housing units will meet on Normal business work days and such staff
28 in all Moderate Observation Housing units will meet at least weekly to ensure

coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

56.    Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**L.    Safety Checks**

57.    Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)    Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security. Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)    Custody staff will document their checks in a format that does not have pre-printed times;

(c)    Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

28

      (d)     Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace 15 minute checks in non-FIP housing, subject to approval by the Monitor;

      (e)     A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments.

      (f)     Supervision of prisoners in mental health housing will be conducted at the following intervals:

          (i)     FIP:  Custody staff will perform safety checks every 15 minutes.  DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

         (ii)     High Observation Housing:  Every 15 minutes;

       (iii)     Moderate Observation Housing:  Every 30 minutes.

    58.    Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

      (a)     At least every 30 minutes in housing areas with cells;

      (b)     At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room.

      (c)     Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

29

(d)     At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security. Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by custodial staff.

59.     Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**M.     Quality Improvement Plan**

60.     Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

30

(a)    Suicides and serious suicide attempts:

    (i)    Prior suicide attempts or other serious self-injurious behavior

    (ii)    Locations

    (iii)    Method

    (iv)    Lethality

    (v)    Demographic information

    (vi)    Proximity to court date;

(b)    Use of clinical restraints;

(c)    Psychotropic medications;

(d)    Access to care, timeliness of service, and utilization of the Forensic In-patient Unit; and

(e)    Elements of documentation and use of medical records.

62.    The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

## N.    Mental Health Housing

63.    The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis. The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

64.    Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails. The County and the Sheriff will begin implementation of each plan within 90 days of plan completion. These plans will describe the projected capacity required,

31

strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation. Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**O.    Medication**

65.    Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.

66.    Consistent with existing DMH policies, prisoners in High Observation Housing and Moderate Observation Housing, and those with a serious mental illness who reside in other housing areas of the Jails, will remain on an active mental health caseload and receive clinically appropriate mental health treatment, regardless of whether they refuse medications.

67.    Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)    documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)    discussion of a prisoner's refusal in treatment team meetings;

(c)    the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)    consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)    individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

68.    Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but

32

staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

**P.**    **Restraints**

69.    Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

70.    Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH.  Such policies will provide that:

(a)    Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)    Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)    Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas;

(d)    Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis,

33

Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

71.     The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**Q.     Suicide Death Reviews and Critical Incident Reviews**

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel

34

who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

75.    Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)    Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)    Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)    The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)    The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

76.    The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)    Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including

35

Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b) Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary;

(c) Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide. The report will include:

 (i) time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

 (ii) a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

 (iii) copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

 (iv) a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

 (v) reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

36

(vi)    a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii)    a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii)    a clinical mortality review;

(ix)    a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x)    a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

77.    The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health. The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)    Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)    Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)    Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to

37

other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d) Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e) Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

78. The County and the Sheriff will maintain a county-level Suicide Prevention Advisory Committee that will be open to representatives from the Sheriff's Department Custody Division, Court Services, Custody Support Services, and Medical Services Bureau; the Department of Mental Health; the Public Defender's Office; County Counsel's Office; the Office of the Inspector General; and the Department of Mental Health Patients' Rights Office. The Suicide Prevention Advisory Committee will meet twice per year and will serve as an advisory body to address system issues and recommend coordinated approaches to suicide prevention in the Jails.

**R. Mental Health Treatment**

79. (a) Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

    (i) therapeutically appropriate individual visits with a QMHP;

    (ii) therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session;

38

(b) The County and the Sheriff will provide prisoners outside of mental health housing with medication support services when those prisoners are receiving psychotropic medications and therapeutically appropriate individual monthly visits with a QMHP when those prisoners are designated as Seriously Mentally Ill.

(c) The date, location, topic, attendees, and provider of programming or therapy sessions will be documented. A clinical supervisor will review documentation of group sessions on a monthly basis.

80. (a) The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record. To implement this requirement, the County and the Sheriff will follow the schedule below:

(i) By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii) By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(iii) By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b) No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused

39

to leave their cells that day. That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business work day. The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

**S.** **Use of Force**

81. Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel: Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

82. With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

83.     The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility. The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage. The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018. The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded, whichever happens later.

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations. Specifically:

(a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

85.     The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment.  The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

## VI.     IMPLEMENTATION, COMPLIANCE ASSESSMENT, ENFORCEMENT, AND TERMINATION

### A. Review and Implementation of Policies, Procedures, and Programs

87.     The County and the Sheriff are committed to continuous quality improvement and have taken significant steps to review and update policies and procedures to protect the constitutional and federal rights of prisoners at the Jails. Where necessary, the County and the Sheriff will maintain existing policies, procedures, and practices to support the substantive provisions in this Agreement.

88.     The County and the Sheriff will review all relevant policies, procedures, and other written executive-approved directives within four months of the Effective Date to ensure that they are consistent with the terms of this Agreement, unless they were reviewed and revised for such purposes within six months preceding the Effective Date.

89.     (a) If the County or the Sheriff create or materially revise a policy related to this Agreement after the Effective Date, the following process will be followed before implementation:

(1)     the County and Sheriff will provide a copy of the proposed policy to the Monitor and DOJ prior to its implementation;

(2)     the Monitor and DOJ will have 30 days to review the policy and submit comments, if any, to the County and the Sheriff;

42

(3) if the Monitor and DOJ do not submit any comments within the 30-day period, the County and the Sheriff will begin implementation of the policy no later than 180 days after the expiration of the 30 day-review period or notice that no comments will be forthcoming;

(4) if the Monitor or DOJ objects to the proposed policy, the Monitor or DOJ will note the objection in writing to all Parties within the respective review period;

(5) if there is any objection to the proposed policy, the County and the Sheriff will have 30 days to address the objection(s);

(6) if the Monitor and the Parties cannot resolve the objection(s), either Party may ask the Court to resolve the matter;

(7) the Monitor may extend any time frame within this paragraph by up to 15 additional days. Further extensions may be granted by the Monitor with the agreement of both Parties when necessary to permit amicable resolution of objections.

(b) If after the Effective Date, the County or the Sheriff is confronted with a critical circumstance requiring immediate action, the County or the Sheriff may create or substantially revise, and then implement, a policy related to this Agreement without the prior review of the Monitor and DOJ, so long as the review, comment, and objection procedures set forth above in subparagraph (a) are followed immediately upon implementation.

90. The County and the Sheriff will provide relevant staff with any policy that is created or materially revised after the Effective Date if it relates to the provisions of this Agreement. The County and the Sheriff will further document that any such policy has been received by that staff and that such staff has been trained, instructed, or briefed, as appropriate, on that policy.

43

**B. Compliance Coordination Unit**

91.     The County and the Sheriff will establish and maintain a compliance coordination unit for the duration of this Agreement.  The unit will:

(a)     serve as a liaison between the Parties and the Monitor and assume primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor;

(b)     maintain sufficient records to document that the requirements of this Agreement are being properly implemented (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, use-of-force reports);

(c)     provide written answers by electronic mail or other format when necessary and any documents requested by the Monitor or DOJ concerning implementation of this Agreement in a timely manner;

(d)     coordinate and monitor compliance and implementation activities, including coordination between Custody and DMH staff, and assist managers in assigning compliance tasks to County or Sheriff personnel; and

(e)     ensure that the County and the Sheriff notify DOJ and the Monitor of any suspected or apparent suicide within 24 hours and make related reports available to the Monitor and DOJ for inspection.

**C. Self-Assessments and Reports**

92.     (a)  Fifteen days before the end of the reporting period described in Paragraph 109 of this Agreement, the County and the Sheriff will provide the Monitor and DOJ a Self-Assessment Status Report that includes:

(1)     the actions taken by the County and the Sheriff during the review period to implement this Agreement including the status of ongoing and continuous improvement activities;

44

(2)     responses to concerns or recommendations made in prior reports by the Monitor;

(3)     a summary of any audits related to the provisions of this Agreement that were completed in the reporting period; and

(4)     relevant trend data including the information described in Paragraphs 61 and 77(a).

(b)  Self-Assessment Status Reports prepared pursuant to this Paragraph will be treated as confidential and not further disclosed or attached to any court document, unless filed under seal with Court approval, without the consent of the County and the Sheriff or by order of the Court.  The Monitor, SMEs, and other monitoring staff, however, will be permitted to use the information contained in the Self-Assessment Status Reports to prepare the Monitor's reports to the Court.

**D. Independent Monitor**

93.     In order to assess and report on the implementation of this Agreement and whether the implementation is having the intended beneficial impact on conditions at the Jails, the Monitor, the SMEs, and their staff will:

(a)     conduct the audits, reviews, and assessments specified in this Agreement;

(b)     review County and Sheriff policies, procedures, training curricula, and other documents related to this Agreement developed and implemented pursuant to this Agreement;

(c)     conduct such additional audits, reviews, and assessments consistent with this Agreement as the  Monitor and the Parties jointly agree are appropriate, or in the case of a dispute which the Parties cannot in good faith resolve, as ordered by the Court; and

(d)     evaluate the implementation of Section V.S. of this Agreement concerning use of force consistent with the Settlement Agreement and Implementation Plan-approved in *Rosas*.

45

94.     The Parties have selected Richard Drooyan as the Independent Monitor.  The Monitor and his staff will not, and are not intended to, replace or assume the role and duties of the County or the Sheriff and will have only the duties, responsibilities, and authority conferred by this Agreement.

To assess and report whether the provisions of this Agreement have been implemented, and whether the County and the Sheriff are in compliance with the substantive provisions of this Agreement, the Monitor will:

(a)     evaluate the implementation of Section V ("Substantive Provisions") of this Agreement and, where applicable, the Settlement Agreement and Implementation Plan approved in *Rosas*;

(b)     conduct specific audits, reviews, and assessments consistent with this Agreement or otherwise if the Parties agree in writing; and

(c)     prepare reports as provided in this Agreement.

95.     The Parties have also selected Bruce C. Gage, M.D., and Manuel David Romero as Subject Matter Experts ("SMEs").  The SMEs and their staff will not, and are not intended to, replace or assume the role and duties of the County or the Sheriff and will have only the duties, responsibilities, and authority conferred by this Agreement.  The SMEs will, in conjunction with the Monitor, assess compliance with the substantive provisions of this Agreement by providing expertise within the scope of their subject matters.

96.     The Monitor and/or SMEs may hire or contract with additional persons with knowledge or expertise not already provided by the SMEs, or where delegation to a subordinate staff member would be appropriate, as reasonably necessary to perform the tasks assigned by this Agreement.  The Monitor will notify the County, the Sheriff, and DOJ in writing when the Monitor or SMEs are considering such additional persons.  The Parties will have an opportunity, if desired, to interview the candidate(s) and request reasonable information about the candidate's background and experience.  If the Parties agree to the Monitor's

46

proposal, the Monitor or SMEs will be authorized to hire or contract such additional persons. If the Parties do not agree to the proposal, the Parties will have ten business days to disagree with the proposal in writing. The Parties will not unreasonably withhold approval. If the Parties are unable to reach agreement within ten business days of receiving notice of this disagreement, the Court will resolve the dispute.

97. If not already developed by the Monitor and SMEs and agreed-to by the Parties before the execution of this Agreement, within three months of the appointment of the Monitor and SMEs by the Court, the Monitor and SMEs will develop a plan for conducting the above audits, reviews, and assessments, and will submit that plan to the Parties for review and approval. The plan will:

(a) set out a methodology for reviewing each of the substantive provisions of this Agreement, including which provisions will be assessed together, if any, and the thresholds for achieving Substantial Compliance; and

(b) set out a schedule for conducting the assessments required by this Agreement.

98. The Monitor, SMEs, and any person hired or contracted to assist the Monitor or SMEs will be subject to (a) the supervision and orders of the Court consistent with the terms of this Agreement; (b) the terms of this Agreement; (c) any applicable law; and (d) any security protocols while in the Jails.

99. The County and the Sheriff will bear all reasonable fees and costs of the Monitor, the SMEs, and their staff. Travel, lodging, and per diem expenses will be reimbursed at the same rate as provided for County employees. In the event that any dispute arises regarding the reasonableness or payment of the Monitor's, SMEs', or their staff's fees and costs, the Parties and the Monitor will attempt to resolve the dispute cooperatively before seeking the assistance of the Court.

100.   At the request of the County and the Sheriff, and with the consent of the DOJ, the Monitor, SMEs, and their staff may provide technical assistance. Such assistance may not interfere with the Monitor's or SMEs' duties under this Agreement, create additional duties or obligations that are enforceable under this Agreement, or otherwise alter or modify the terms of this Agreement. Additionally, whenever the County or the Sheriff identifies and implements its own quality improvement measures that are not related to any of the terms of this Agreement, those quality improvement measures will not be monitored or enforced under this Agreement.

101.   Should all the Parties agree that the Monitor, a SME, or a member of their staff has exceeded his or her authority or is not fulfilling his or her duties in accordance with this Agreement, the Parties may petition the Court for the immediate removal and replacement of the Monitor, SME, or staff person.  After good faith attempts to resolve such issues informally, any Party may petition the Court for the removal of the Monitor, a SME, or any member of their staff, for good cause, which may include, but is not limited to:  gross neglect of duties; willful misconduct; inappropriate personal relationship with a Party, any Party employee, or prisoner; conflicts of interest; any criminal conduct; or any significant violations of security protocols during the pendency of this Agreement.

102.   The Parties recognize the Monitor and SMEs may have existing clients who may now be, or in the future may be, adverse to the County or the Sheriff in transactions or litigation.  For the duration of this Agreement, however, unless such conflict is waived by all Parties, the Monitor, the SMEs, and their staff will not accept any new employment or retention for consulting services regarding alleged actions or inactions by the County or the Sheriff, or any County or Sheriff's employee, including any actions or inactions involving any prisoner that present a conflict of interest with the Monitor's, SME's, or staff member's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any

48

current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the County, the Sheriff, or their departments, officers, agents, or employees. Similarly, the Monitor, the SMEs, and their staff will not accept employment or provide consulting services (on a paid or unpaid basis) by any Defendant to this matter to act as a defense witness in connection with a private claim or suit against the County, the Sheriff, or their departments, officers, agents, or employees. This provision does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

**E.** **Access and Confidentiality**

103.    With the exception of documents within the attorney-client and attorney-work-product privileges, and notwithstanding the confidentiality restrictions of the Health Insurance Portability and Accountability Act ("HIPAA"), the California Confidentiality of Medical Information Act (Civil Code § 56, *et seq*.), and California Welfare and Institutions Code § 5328 (related to confidentiality of mental health records), the Monitor, SMEs, their staff, and the United States, its attorneys, consultants, and agents will have full and complete access to the Jails and all relevant individuals, facilities, prisoner medical and mental health records, documents, data, and meetings related to the provisions of this Agreement.

104.    Other than as expressly provided in this Agreement, the Monitor, the SMEs, their staff, and DOJ will maintain confidential all, and will not distribute or disclose any, non-public information provided by the County and the Sheriff pursuant to this Agreement. This Agreement will not be deemed a waiver of any privilege or right the County or the Sheriff may assert, including those recognized at common law or created by statute, rule, or regulation, against any other person or entity with respect to the disclosure of any document or information.

**F. Public Statements, Testimony, and Records**

105.   Except as required by the terms of this Agreement, an order from the Court, the express written agreement of all Parties, or at meetings of the County of Los Angeles Board of Supervisors, the Monitor, SMEs, and their staff will not make any public or press statements (at a conference or otherwise), issue findings, offer expert opinion, or testify in any other litigation or proceeding regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement.  If the Monitor, SMEs, or any of their staff receive a subpoena, he or she will promptly notify the Parties and thereafter advise the subpoenaing court of the terms of this Agreement.

106.   The Monitor, SMEs, and their staff will be permitted to initiate and receive ex parte communications with all Parties.

107.   The Monitor, SMEs, and their staff are not a State, County, or local agency, or an agent thereof, and accordingly, the records maintained by them, or any of them, will not be deemed public records subject to public inspection.  If the Monitor, SMEs, or any of their staff receive a request for inspection of their records related to this Agreement, he or she will promptly notify the Parties.

108.   This Agreement is enforceable only by the Parties.  No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.

**G. Monitoring Reports**

109.   Every six months, the Monitor will file public written reports with the Court describing the steps taken by the County and the Sheriff to implement this Agreement and evaluating the extent to which the County and the Sheriff have complied with this Agreement.  Specifically, the Monitor and SMEs will evaluate the status of compliance for each substantive provision of this Agreement using the

50

following standards:  (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-compliance.  In order to assess compliance, the Monitor and SMEs will review a sufficient number of pertinent documents to accurately assess current conditions, interview all relevant staff, interview a sufficient number of prisoners to accurately assess current conditions, and take other reasonable actions consistent with this Agreement, as needed, to fulfill their responsibilities under this Agreement.  The Monitor, the SMEs, and their staff will be responsible for independently verifying representations from the County or the Sheriff regarding progress toward compliance, and examining supporting documentation.  Each monitoring report will describe the steps taken by members of the monitoring team to analyze conditions and assess compliance, including reference to the documents reviewed and individuals interviewed, and the factual basis for the Monitor's and SMEs' findings.  Such reports and findings will not be admissible by or against the County or the Sheriff in any proceeding other than a proceeding related to the enforcement of this Agreement initiated and handled exclusively by the County, the Sheriff, or the United States.

110.   At least 30 days before the anticipated filing of such reports, the Monitor will provide the Parties with a draft copy and an opportunity to respond. The Monitor will consider the Parties' responses and make appropriate changes, if any, before filing.  The Parties may file separate responses with the Court within 15 days after the filing by the Monitor although nothing in this Agreement will be construed to require the filing of such responses.  All public court filings by the Monitor and any Party will be written with due regard for the privacy interests of individual prisoners and staff and the interest of the County and the Sheriff in protecting against disclosure of information not permitted by this Agreement.

111.   Except for the provisions of Section V.S. of this Agreement that have different Compliance Periods under the Settlement Agreement, Implementation Plan, and Monitoring Protocols approved in *Rosas*, upon the Monitor's and SMEs'

51

conclusion that the County and the Sheriff have achieved and maintained Substantial Compliance with a substantive provision of this Agreement for a period of twelve (12) consecutive months, the Monitor and SMEs will no longer be required to assess or report on that provision. Where the Monitor and SMEs conclude that the County and the Sheriff have achieved and maintained Substantial Compliance with a substantive provision of this Agreement, as described immediately above, at one Jail facility but not at other facilities, the Monitor and SMEs will no longer be required to assess or report on that provision as it applies to the facility found to be in sustained compliance. The Parties expect that there will be multiple independent operative compliance periods under the supervision of the Monitor.

112. If the Monitor identifies a critical and time sensitive issue that the County or the Sheriff should address during a six-month reporting period and that should not be delayed until the time the Monitor must provide the Parties with a draft copy of the monitoring report, the Monitor will provide the Parties with a verbal report on the critical issue as soon as possible, and the Monitor will provide a written report to the Parties within 30 days of the Monitor's identification of the critical issue.

**H. Court Jurisdiction, Modification, Enforcement, and Termination**

113. The Court shall retain jurisdiction over the implementation of this Agreement at the existing Jails or any other facility used to replace or supplement the Jails for all purposes.

114. The County and the Sheriff will ensure that all of the terms in this Agreement are implemented. Unless otherwise provided in a specific provision of this Agreement, the implementation of this Agreement will begin immediately upon the Effective Date.

115. Unless otherwise agreed to under a specific provision of this Agreement, the County and the Sheriff will implement all provisions of this Agreement within six months of the Effective Date.

116. To ensure that the substantive provisions of this Agreement are implemented in accordance with the terms of this Agreement, the Court will retain jurisdiction to enforce this Agreement only until either:

(a) the County and the Sheriff have achieved and maintained Substantial Compliance with each and every substantive provision of this Agreement for a period of twelve (12) consecutive months (or other time period provided in a specific provision of this Agreement or the relevant Compliance Period under the Settlement Agreement, Implementation Plan, and Monitoring Protocols approved in *Rosas*); or

(b) the Monitor, with Court approval, determines that the overall objectives and goals of this Agreement have been met even where the specific requirements of substantive provisions of this Agreement may be only in Partial Compliance.

Either of the conditions described in sub-paragraphs (a) or (b) above will be deemed to fully satisfy this Agreement. At that time, the County and the Sheriff may seek to terminate this Agreement with the Court consistent with the requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626(b).

117. The United States acknowledges the good faith of the County and the Sheriff in committing to the reforms set forth in this Agreement. The United States, however, reserves the right to seek enforcement of the provisions of this Agreement with the Court if it determines that the County or the Sheriff has failed to substantially comply with any substantive provisions of this Agreement. Before pursuing any remedy with the Court, the United States agrees to give written notice to the County and the Sheriff in accordance with the Local Rules of the Central

District of California.  The County and the Sheriff will have 30 days from receipt of such notice to cure the alleged failure (or such additional time as is reasonable due to the nature of the issue and agreed upon by the Parties).  During the 30-day period, the Parties will meet and confer in good faith to resolve any disputes regarding the alleged failure or to otherwise explore a joint resolution.  The Monitor and SMEs may assist the Parties in reaching a mutually agreeable resolution to the alleged compliance failure, including facilitating conference meetings and providing relevant factual assessments.

118.   In case of an emergency posing an imminent and serious threat to the health or safety of any prisoner or staff member at the Jails, the United States may omit the notice and cure requirements set forth above and seek enforcement of the Agreement with the Court.

119.   The Parties may jointly stipulate to make changes, modifications, and amendments to this Agreement, which will be effective absent further action from the Court, 30 days after a stipulation signed by all of the Parties has been filed with the Court.  Any Party may seek to modify this Agreement with the Court if that Party establishes by a preponderance of the evidence that a significant change in the law or factual conditions warrant the modification and that the proposed modification is suitably tailored to the changed circumstances.

120.   The Parties agree to defend the provisions of this Agreement.  The Parties will notify each other of any court or administrative challenge to this Agreement.  In the event any provision of this Agreement is challenged in any state court, removal to a federal court shall be sought by the Parties.

121.   The County and the Sheriff agree to promptly notify DOJ if any term of this Agreement becomes the subject of collective bargaining consultation and to consult with DOJ in a timely manner regarding the position the County or the Sheriff takes in any collective bargaining consultation connected with this Agreement.

122.   This Agreement will constitute the entire integrated agreement of the Parties and will supersede the 2002 Memorandum of Agreement Between the United States and Los Angeles County, California, Regarding Mental Health Services at the Los Angeles County Jail ("2002 MOA").  No prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein, in this litigation or in any other proceeding.

123.   The Agreement will be applicable to, and binding upon, all Parties, their officers, agents, employees, assigns, and their successors in office.

124.   Failure by any Party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver of the Party's right to enforce other deadlines or provisions of this Agreement.

## VII.   <u>STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. § 3626</u>

125.   The Parties stipulate and the Court finds, pursuant to 18 U.S.C. § 3626(a),  that although this matter was not actually litigated or resolved on the merits, the prospective relief in this Agreement is narrowly drawn, extends no further than necessary to correct the violations of federal rights as alleged by the United States in its Complaint, is the least intrusive means necessary to correct those alleged violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.  If the Court does not make the requisite findings and the United States' Complaint is dismissed with prejudice, the Parties agree that this Agreement will become a binding Memorandum of Agreement that will supersede the 2002 MOA.  Any admission made for purposes of this Agreement is not admissible if presented by third parties in another proceeding.

Respectfully submitted this ___ day of _____, 2015.

For the UNITED STATES OF AMERICA:

LORETTA E. LYNCH
Attorney General

EILEEN M. DECKER
United States Attorney

_____
MARK KAPPELHOFF
Acting Deputy Assistant Attorney
General

LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division

_____
ROBYN-MARIE LYON MONTELEONE
Assistant United States Attorney
Assistant Division Chief
Civil Rights Unit Chief, Civil Division

_____
JUDITH C. PRESTON
Acting Chief

_____
JOANNA HULL
Assistant United States Attorney
    U.S. Attorney's Office for the
    Central District of California
300 North Los Angeles Street, Suite 7516
Los Angeles, California 90012

_____
LAURA L. COON
Special Counsel
LUIS E. SAUCEDO
CATHLEEN S. TRAINOR
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
    PHB 5026
Washington, D.C.  20530

56

For the COUNTY OF LOS ANGELES and the LOS ANGELES COUNTY
SHERIFF, in his official capacity:


_____
JIM MCDONNELL
Sheriff


_____
MARY C. WICKHAM
Interim County Counsel
County of Los Angeles


_____
RODRIGO A. CASTRO-SILVA
Senior Assistant County Counsel
County of Los Angeles


IT SO ORDERED


DATED: September 03, 2015

_____
UNITED STATES DISTRICT JUDGE

57

# Exhibit 3
# Plaintiffs' Request for Judicial Notice



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, WINIFRED WILLIAMS
DAVID HEROUX, DAVID McKAY, ROY
JOSEPH, and all others similarly
situated,

        Plaintiffs,           No. CIV S-90-0520 LKK JFM P

    vs.

PETE WILSON, Governor of the State
of California, JOSEPH SANDOVAL,
Secretary of Youth and Corrections
Agency, JAMES GOMEZ, Director of
the California Department of
Corrections, NADIM KHOURY, M.D.,
Assistant Deputy Director for
Medical Services, JOHN S. ZIL, M.D.,
Chief, Psychiatric Services,

        Defendants.         <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

       Plaintiffs are state prisoners proceeding with this class

action challenge to the delivery of mental health care at most

institutions within the California Department of Corrections.

Plaintiffs raise claims under 42 U.S.C. § 1983 based on alleged

violations of the Eighth and Fourteenth Amendments to the United

States Constitution and under the Rehabilitation Act, 29 U.S.C.

§ 794.

1

PROCEDURAL HISTORY

This action was commenced as an individual action by plaintiff Ralph Coleman proceeding in propria persona. On June 25, 1991, plaintiff filed a request for substitution of counsel. On the same day, plaintiff and four other individuals, through counsel, filed a motion to amend the complaint and a motion for class certification. By order filed July 10, 1991, this court granted plaintiff's request for substitution of counsel and plaintiffs' present counsel were substituted in as counsel of record. By order filed August 12, 1991, plaintiffs' motion to amend the complaint was granted and plaintiffs' motion for class certification was set for hearing on August 29, 1991. Following the hearing, this court recommended and the district court ordered certification of the following class:

> [A]ll inmates with serious mental disorders who are now or who will in the future be confined within the California Department of Corrections (except the San Quentin State Prison, the Northern Reception Center at Vacaville and the California Medical Facility-Main at Vacaville).

(Class Certification Order, filed November 14, 1991, at 4-5.)

On August 1, 1991, following the heat and medication related deaths of three inmates receiving psychotropic medication at California Medical Facility (CMF) at Vacaville, plaintiffs filed a motion for preliminary injunctive relief. Plaintiffs sought a court order requiring defendants to "take all feasible measures necessary to implement within one week" temporary hot weather emergency plans at all state prisons covered by this action and to adopt a final comprehensive hot weather emergency plan. Plaintiffs

AO 72
(Rev 8/82)

also sought appointment of a special master to monitor defendants'
compliance with the temporary and final plans. The motion for
preliminary injunction was also set for hearing on August 29, 1991.

At the time set for hearing, defendants filed a
memorandum, dated August 27, 1991, from the Deputy Director of the
Institutions Division of the California Department of Corrections
(CDC) and the Assistant Deputy Director of Health Care Services for
CDC addressed to wardens, chief medical officers and chief
psychiatrists at institutions within CDC. The title of the
memorandum was "Prevention of Heat-Related Pathologies Plan." The
memorandum directed all addressees to "initiate the subject plan at
your institution" and to incorporate enumerated policies into the
plan.

On the basis of that memorandum and the evidence of
defendants' apparent efforts to implement at least a temporary
emergency hot weather plan, the court continued the hearing on the
preliminary injunction for two weeks. At the hearing, plaintiffs
presented evidence that the temporary plan had not been implemented
at least at Folsom Prison in the time since the first hearing. The
court gave defendants five days to respond to plaintiffs' evidence.

In findings and recommendations filed October 22, 1991,
this court found that plaintiffs had "presented significant
evidence that there are many inmates throughout the California
prison system who are both on psychotropic medications and in
prisons which are subject to extreme heat conditions." (Findings
and Recommendations, filed October 22, 1991, at 4.) This court

3

found "evidence that defendants have not, in the past, been
adequately attentive to either the need for adequate cooling in the
face of extreme heat, or to the special needs of inmates on
psychotropic medications." (Id.) However, this court also found
that defendants were then taking steps to remedy the problem by
promulgating a temporary plan and "gathering information for the
preparation and promulgation of a systemwide permanent plan." (Id.
at 5.) The action was then set for trial on June 1, 1992, and this
court directed the parties to conduct discovery so that a hearing
on heat-related issues could be held on or before April 16, 1992,
if necessary. This court specifically found that "absent good
faith implementation of the August 27, 1991 memorandum and efforts
toward a permanent plan, the balance of hardships would tip
decidedly in favor of plaintiffs." (Id. at 7.) However,
defendants' efforts at the time led this court to find that
injunctive relief was not then warranted. (Id.) No objections to
the findings and recommendations were filed, and they were adopted
by the district court by order filed November 14, 1991.

On April 2, 1992, plaintiffs renewed their motion for
preliminary injunctive relief. The evidence tendered by plaintiff
at that time demonstrated that defendants had done almost nothing
about a permanent plan over the winter months. (See Declaration of
Katherine Sher, filed April 2, 1992, at paragraph 17.) On the eve
of the hearing, after settlement negotiations supervised by U.S.

/////

/////

AO 72
(Rev 8/82)

Magistrate Judge Gregory G. Hollows, the parties agreed on the terms of a stipulated preliminary injunction. The stipulated injunction was entered on the record on May 11, 1992.

At the request of the parties, trial of this matter was continued to March 1, 1993, so that they could pursue settlement discussions concerning all of the issues raised in the action. Those discussions were supervised and facilitated by Judge Hollows.[1] The parties were unable to resolve the issues presented by this litigation and trial commenced on March 1, 1993. This court heard evidence for thirty-nine days. Trial concluded on June 21, 1993, and the matter was thereafter submitted for decision.

## EXPERT WITNESSES

The court heard testimony from seven expert witnesses for plaintiffs and four expert witnesses for defendants.[2] Following is a brief summary of the expert testimony tendered to the court.[3] The qualifications and background of each of these experts is set forth in the Appendix to this opinion.

/////

---

[1] This court is enormously indebted to Judge Hollows for his work as settlement judge in this case.

[2] Pursuant to court order, the direct testimony of expert witnesses was received through signed declarations. The opposing party was allowed to conduct extensive cross-examination of each expert witness, and the party tendering the witness was given an opportunity to conduct a redirect examination.

[3] Plaintiffs also offered expert testimony from Terry Kupers, M.D. The court has not considered Dr. Kupers' testimony in making these findings and recommendations.

AO 72
(Rev 8/82)

A.   Plaintiffs' Experts

Dr. Stuart Grassian testified concerning the psychiatric consequences of solitary or small group confinement.  Dr. Grassian also testified concerning mental health care issues at Pelican Bay State Prison, including the prevalence of mental illness at the prison and in the Pelican Bay Security Housing Unit (SHU) in particular, staffing levels, screening for mental illness, access to care, including access to inpatient and intensive outpatient care, administration of medications, involuntary medication, medical records, quality assurance/peer review, suicide prevention, and the relationship between security issues and the mental health needs of the inmate population.

To prepare for his testimony, Dr. Grassian toured Pelican Bay State Prison, particularly the SHU.  He conducted interviews with twenty-nine inmates housed at the prison, twenty-four of whom were housed in the SHU; each interview was approximately thirty or forty minutes and Dr. Grassian reviewed whatever medical information was made available for each of these inmates.  He spoke briefly with a staff psychiatrist, a staff psychologist, and Pelican Bay's litigation coordinator during his tour.  Dr. Grassian also reviewed medical and central files of most of the inmates interviewed, documents produced by defendants relating to the provision of mental health care at Pelican Bay, and the deposition testimony of six health professionals employed at Pelican Bay and of Dr. John Zil, the Chief Psychiatrist for the CDC.

/////

Dr. Thomas Greenfield testified concerning the prevalence of mentally ill inmates in the CDC based on his work as a consultant in the preparation of the Stirling Report.[4/]  Dr. Greenfield also testified concerning a reanalysis of the Stirling Report prevalence data that he performed in 1991 for Scarlett Carp & Associates, consultants hired by the CDC to evaluate mental health care delivery in the prison system.[5/]  Dr. Greenfield also testified concerning the adequacy of screening for mental illness at institutions within the CDC and about inmates' self-reported willingness to received mental health treatment in those institutions.  Finally, Dr. Greenfield offered testimony concerning flaws in the method used by the CDC to seek resources for mental health care.

Dr. Craig Haney offered testimony concerning the Stirling Report, including the validity and quality of the methodology used by the researchers who conducted the study and the reliability of the prevalence data contained in the Report.  Dr. Haney also offered testimony regarding living conditions in the Pelican Bay SHU and the Violence Control Unit (VCU) that is part of the SHU, the psychological impact on mentally ill inmates subjected to those

---

[4/]  The Stirling Report is discussed more fully in a later section of this opinion.  The report was a legislatively mandated study entitled "Current Description, Evaluation, and Recommendations for Treatment of Mentally Disordered Criminal Offender."  The prevalence data are contained in Volume I of the report.

[5/]  The Scarlett Carp Report is a published report of a study conducted by independent consultants hired by the CDC in 1991.  The report is discussed more fully in a subsequent section of this opinion.

7

conditions, and the adequacy of the psychiatric services available to such inmates. In preparation for his testimony Dr. Haney observed the SHU and the VCU, interviewed inmates and staff, and reviewed documents. Dr. Haney also offered testimony concerning the psychological impact of other SHU units throughout the CDC. This testimony was based on review of documents as well as interviews with and observation of inmates in the Pelican Bay SHU who had previously been housed in other SHU units.

Dr. Edward Kaufman testified concerning the delivery of mental health care in the California Department of Corrections and at six specific prisons in the class.[6] He also testified about staffing, screening for mental illness, medical records, evaluations for placement in a residential psychiatric program (so-called "Category J" evaluations[7]), other outpatient psychiatric programs, access to inpatient care, prescription, administration and availability of psychotropic medications, housing of mentally ill inmates in administrative segregation, suicide prevention, mental health care training for custody staff, use of tasers and other gun-fired projectiles on mentally ill inmates, treatment of substance abuse in mentally ill inmates, and quality assurance/peer review.

---

[6] California Correctional Institution at Tehachapi, California State Prison/Corcoran, R. J. Donovan Correctional Facility, California Men's Colony, California State Prison/Avenal, and the Correctional Training Facility at Soledad.

[7] The principal acute mental health category is Category J. Other mental health categories include Category I, Category K and Category U. (Petrella Declaration at 30.)

AO 72
(Rev 8/82)

Dr. Kaufman's testimony was based on tours of four institutions, where he interviewed staff and prisoners, reviewed central and medical files and observed the facilities.[8] He also reviewed other medical records for inmates in the CDC, including reports of nine suicides at California Men's Colony and incident reports regarding inmates restrained by tasers and 37mm guns. He also reviewed deposition transcripts, exhibits, and documents from the four institutions that he toured and from Avenal and Soledad. He also reviewed documents produced by defendants regarding systemwide policies and problems, including the Stirling Report, the Scarlett Carp reports[9], and major Budget Change Proposals. Finally, Dr. Kaufman relied on literature in the fields of psychiatry, mental health delivery systems, forensic mental health and related fields.

Dr. V. Meenakshi offered testimony on numerous issues relating to the provision of mental health care at six institutions in the class.[10] Dr. Meenakshi's testimony addressed the following issues: screening and referral, access to care, adequacy of inpatient care, administrative and segregated housing units, medical records, involuntary medication, tasers and restraints,

---

[8] California Men's Colony, R. J. Donovan Correctional Facility, California Correctional Institution at Tehachapi, and California State Prison/Corcoran.

[9] The Scarlett Carp consultants published a series of reports before their final report was published in February 1993.

[10] California Institution for Women, Central California Women's Facility, Northern California Women's Facility, Mule Creek State Prison, California Correctional Center, and Sierra Conservation Center.

9

AO 72
(Rev 8/82)

staffing shortages and problems with recruitment, quality
assurance, informed consent, medication distribution and
monitoring, suicide prevention, and the effects of exposure to heat
on inmates taking psychotropic medications.  Dr. Meenakshi's
testimony was based on tours of several prisons, interviews with
staff and prisoners, review of documents produced by defendants,
and review of numerous inmates' psychiatric and central files.

Dr. Russell Petrella testified regarding the necessary
elements of an adequate mental health care delivery system, the
adequacy of the management of mental health care and the adequacy
of mental health resources in the CDC.  He also testified about
numerous mental health care issues at five institutions in the
class,[11]/ and the delays and backlog created in referring inmates
for Category J evaluation.  Finally, he testified regarding care
for mentally retarded inmates.

Dr. Petrella toured four prisons in the class.[12]/  At
each institution he interviewed staff and prisoners, reviewed
medical files and observed the facilities.  He also reviewed
additional medical records, deposition transcripts, exhibits and
other documents, including documents and reports describing
systemwide policies and problems.

In connection with his opinion on the backlog of inmates
waiting for referral for Category J evaluation, Dr. Petrella

[11]/   California Men's Colony, California Institution for Men,
Calipatria, Chuckawalla Valley State Prison, and Wasco State Prison.

[12]/   California Men's Colony, Wasco State Prison, California
Institution for Men, and Calipatria.

10

reviewed deposition testimony, documents, and medical, psychiatric and central files of a sample of inmates originally referred for Category J evaluation who were subsequently reevaluated and reclassified as general population inmates. He also reviewed questionnaire responses and correspondence to plaintiff's counsel from some of these inmates.

B. Defendants' Experts

Dr. Louis L. Beermann, the Chief Psychologist for the CDC, testified concerning the development and implementation of the suicide prevention program used by the CDC, as well as the historical and current suicide rates in the Department.

Steven Cambra offered testimony concerning the training required for new correctional employees in the CDC, the in-service training provided at each institution in the CDC, and the on-the-job training at institutions throughout the Department. He also testified about the role of custody staff in the provision of care to mentally ill inmates, placement of inmates in administrative segregation and security housing units, and conditions of confinement in such units. Mr. Cambra' testimony was based on his personal experience and observation, as well as review of Department policy and documents.

Dr. Joel A. Dvoskin testified concerning the mental health care delivery system in the CDC. Dr. Dvoskin was one of the consultants hired by Scarlett Carp and Associates to conduct the 1991 study of mental health care delivery in the CDC. He testified about the services necessary for a mental health care delivery

11

system to function adequately, problems within the CDC system, the Scarlett Carp consultants' recommendations for remedying those problems, and the prevalence of inmates in the CDC needing treatment for serious mental disorders on any given day. Finally, he testified about placement of mentally ill inmates in administrative segregation or security housing units, suicide prevention, and the need for a management information system and some form of quality assurance.

Dr. Dennis Koson testified concerning the definition of serious mental disorder, the need for screening and the screening procedures that are used at the reception centers at Wasco State Prison and R. J. Donovan Correctional Facility. Dr. Koson also offered testimony concerning organization of the CDC mental health care delivery system and some of the problems that obtain in the present structure. Finally, he testified about the placement of mentally ill inmates in administrative segregation.

Dr. Koson's opinion was based on tours of nine prisons in the class,[13] prior experience in other prison litigation, and on his work as one of the consultants for the Scarlett Carp Study.

/////
/////
/////
/////

---

[13] California Institution for Women, Central California Women's Facility, Northern California Women's Facility, California Men's Colony, Mule Creek State Prison, Wasco State Prison, California Institution for Men, Calipatria State Prison, and Richard J. Donovan Correctional Facility.

12

STANDARDS[14]/

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

In the instant case, plaintiffs contend that defendants have violated and are continuing to violate their rights under the Eighth Amendment to the United States Constitution.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on convicted prisoners and applies to "the treatment a prisoner receives in prison and the conditions under which he is confined." Helling v. McKinney, ___ U.S. ___, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993).

> When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being. . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his

---

14/     As noted infra, this court is reserving findings and recommendations on plaintiffs' claims regarding treatment of mentally retarded inmates pending further briefing. For the reasons discussed below, this court finds the evidence of defendants' constitutional violation with respect to the treatment of mentally ill inmates so clear that the court need not reach plaintiffs' claim under the Rehabilitation Act at this time. Therefore, the only standards set forth in this section are those that apply to plaintiffs' Eighth Amendment claim.

13

AO 72
(Rev 8/82)

1        basic human needs - e.g., food, clothing,
2        shelter, medical care, and reasonable safety -
           it transgresses the substantive limits on state
3        action set by the Eighth Amendment. . . .

4 Id., quoting DeShaney v. Winnebago County Dept. of Social Services,

5 489 U.S. 189, 199-200 (1989); see also Hoptowit v. Ray, 682 F.2d

6 1237, 1253 (9th Cir. 1982) ("The Eighth Amendment requires that

7 prison officials provide a system of ready access to adequate

8 medical care").  Access to adequate mental health care is a

9 necessary part of an adequate medical care system in prison.  Id.

10 at 1253; Balla v. Idaho State Bd. of Corrections, 595 F.Supp. 1558,

11 1576-77 (D. Idaho 1984), quoting Bowring v. Godwin, 551 F.2d 44

12 (4th Cir. 1977).

13       In Balla, the district court described six components

14 essential to a minimally adequate mental health care system.  These

15 components are:  (1) a systematic program for screening and

16 evaluating inmates to identify those in need of mental health care;

17 (2) a treatment program that involves more than segregation and

18 close supervision of mentally ill inmates; (3) employment of a

19 sufficient number of trained mental health professionals; (4)

20 maintenance of accurate, complete and confidential mental health

21 treatment records; (5) administration of psychotropic medication

22 only with appropriate supervision and periodic evaluation; and (6)

23 a basic program to identify, treat, and supervise inmates at risk

24 for suicide.  Balla at 1577.

25       Inadequate medical care in prison constitutes cruel and

26 unusual punishment in violation of the Eighth Amendment when the

inadequacies rise to the level of "deliberate indifference to

14

serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). An Eighth Amendment claim based on deliberate indifference to medical needs is comprised of an objective component and a subjective component. Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). The objective component focuses on whether the deprivation of medical care is "sufficiently serious," while the subjective component focuses on whether the defendant officials "act[ed] with a sufficiently culpable state of mind." Id. As a general rule, the state of mind required for an Eighth Amendment violation is one of "'obduracy and wantonness.'" Id. at 2324, quoting Whitley v. Albers, 475 U.S. 312 (1986). In cases raising claims based on inadequate medical care, "wantonness" is shown by proof of deliberate indifference on the part of defendant officials. Wilson at 2326-27.

Deliberate indifference is shown where inmates are unable to make their medical problems known to medical staff that is competent to examine inmates and diagnose illnesses, as well as to treat medical problems or provide referrals and access to those who can provide treatment. Hoptowit at 1253. The Seventh Circuit has held that deliberate indifference to the serious medical needs of prisoners may be demonstrated by proof of "such systemic and gross deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care." Wellman v. Faulkner, 715 F.2d 269, 272 (7th Cir. 1983), cert. denied, 468 U.S. 1217 (1984).

/////

AO 72
(Rev 8/82)

15

## ANALYSIS

At the outset, this court finds that there is virtually no dispute over the objective component of plaintiffs' claims. As discussed in detail below, plaintiffs have clearly shown, and defendants have effectively acknowledged, that the delivery of mental health care within the California Department of Corrections is, and for many years has been, grossly inadequate.

The remaining question is whether defendants have acted with deliberate indifference to the serious medical needs of inmates with serious mental disorders. This court finds the evidence of defendants' deliberate indifference manifest; defendants have for years ignored the considered advice of their own experts about the woeful deficiencies in their system. In the interim, untold thousands of mentally ill inmates have gone undiscovered, undiagnosed, and untreated while, at the same time, being subjected to conditions that aggravate their illnesses. Additionally, mentally ill inmates who do receive some forms of treatment suffer needless, extended, and medically harmful delays in access to necessary psychiatric care.[15]/

/////

15/ Plaintiffs presented compelling and tragic evidence at trial of the suffering of mentally ill inmates in California's prisons, both through the declarations of their expert witnesses, see, e.g., Declaration of V. Meenakshi, M.D., filed February 5, 1993, passim; Declaration of Stuart Grassian, M.D., filed February 5, 1993, passim; Declaration of Dr. Russell C. Petrella, filed February 5, 1993, at 160-183; Declaration of Edward Kaufman, M.D., filed February 5, 1993, passim, and through the testimony of inmate witnesses at trial, see, e.g., testimony of James Moore, March 5, 1993; James O'Donnal, March 5, 1993; Rahsson Bowers, March 5, 1993; Winifred Williams, March 19, 1993.

16

A. History

    1. Workload Study

In 1984, management in the California Department of Corrections recognized that the CDC and the California Department of Finance had not established a staffing ratio of psychiatrists and psychologists to inmates in the CDC. (Plaintiffs' Exhibit 456 at vi, 1.) Defendant Khoury, then Chief of the Health Services Unit for the California Department of Corrections, was directed to develop such staffing ratios. Id.[16]/ A CDC Health Services Unit task force was created and assigned the task of conducting a workload study to develop these ratios. (Id.)

In the workload study, completed in May 1986 and published in August 1986, the task force found, inter alia, that the absence of a standardized staffing formula had led to staffing patterns which had "almost doubled the average caseload for psychiatrists and psychologists" over the preceding seven years. (Id. at 1.) In addition, "the dramatic escalation in the number of inmates,[17]/ [as well as] legislative changes, court orders, and

/////

---

16/ Plaintiffs' Exhibit 456 shows that the Chief of the Health Services Unit was directed to undertake this task "[d]uring the 1984-85 Departmental budget hearing." (Id. at 1.) Defendant Khoury testi-fied that he became Chief of the Health Services Unit in January 1985 and that he initiated the study. Testimony of Dr. Nadim Khoury, M.D., Reporter's Transcript (RT), March 29, 1993, at 14-56, 14-63, 14-64.

17/ The task force found that the inmate population had increased 138% in the seven years preceding its study, while the number of budgeted positions for psychiatrists and psychologists increased by only 29%. It is not clear whether all the budgeted positions were in fact filled. (See Exhibit 456 at 11.)

17

settlement agreements with the Department[18] . . . increased the number of required evaluations and treatments done by the psychiatric staff." (Id. at 2.)

The task force drew the following conclusions:

1. The practice of allocating Psychiatrist and Psychologist positions without consideration of population or workload is inappropriate.

2. Court orders and mandates are increasing the workload demands of the psychiatric staff.

3. The current workload is clearly excessive with the existing resources.

(Id. at vi.) The task force recommended adoption of the following ratios of staff to inmates:

| | | |
|---|---|---|
| Reception Centers: | Psychologist | 1:121 |
| | Psychiatrist | 1:278 |
| Referral Centers: | Psychologist | 1:666 |
| | Psychiatrist | 1:498 |
| CIW[19] | Psychologist | 1:350 |
| | Psychiatrist | 1:559 |
| Outpatient Facilities | Psychologist | 1:2636 |
| | Psychiatrist | 1:2125 |

(Id. at vi.)

The workload study, though approved by defendant Khoury, was not adopted by the CDC. (Testimony of Dr. Nadim Khoury, Reporter's Transcript (RT), March 30, 1993, at 15-131, 132.) To this day, ten years after formal recognition of the problem,

---

18/ The task force noted an increase in litigation against CDC involving psychiatric care issues. In so noting, the report states that "[t]he contention of the courts is that inmates must be provided with a comparable scope and quality of psychiatric care services as found in the community at large." (Id. at 5.) (Emphasis added.)

19/ California Institution for Women.

18

defendants have not adopted a staffing ratio for either

psychiatrists or psychologists to the inmate population.

(Testimony of James Gomez, RT, May 17, 1993, at 74.)  Instead, the

CDC still relies on the budget change proposal process criticized

in the 1986 workload study.  (Id.; Plaintiff's Exhibit 456 at 1.)

Further, as will be discussed in greater detail infra, the CDC is

intolerably understaffed in the area of mental health care.

### 2. Stirling Report

In 1986, responding to a legislative mandate,[20] the

CDC undertook a "study of the prevalence of mental illness among

inmates and parolees" and a "systematic evaluation of mental health

service delivery in the correctional system." (Plaintiffs' Exhibit

1 at ii-1.)  The researchers were directed to focus on

> the prevalence of Severe Mental Disorder (SMD)
> among prisoners and parolees;[21] evaluate
> available mental health services and facilities
> for these populations and forecast program

---

[20]  1984/1986 Assembly Bill 2390 (Stirling).  (Plaintiff's Exhibit 1 at i-1.)

[21]  Severe mental disorder is defined in the legislation as "an illness or disease or condition which substantially impairs the person's thought, perception of reality, emotional process, or judgement; or which grossly impairs behavior, or which demonstrates evidence of an acute brain syndrome. . . .  The term 'severe mental disorder'. . . does not include a personality or adjustment disorder, epilepsy, mental retardation or other developmental disabilities, or addiction to or abuse of intoxicating substances."  Cal. Penal Code § 2962; (Plaintiffs' Exhibit 1, at i-1).  The Stirling Report stated that the disorders assessed in the prevalence survey included organic brain syndrome, schizophrenia, affective (mood) disorders, obsessive compulsive disorder, anxiety disorders (including phobias, generalized anxiety disorder, panic disorders, and post traumatic stress disorder), and somatization disorder.  (Id. at ii-1.)  The study also went beyond the statutory definition of SMD and gathered data for diagnosis of alcohol and substance abuse and/or disorders "because of the importance of these disorders for service planning."  (Id.)

19

> needs; review and make recommendations
> regarding screening proceedings; and design 'a
> study of the effectiveness of treatment
> programs in reducing the level of re-offending
> among parolees with mental disorders.

(Plaintiffs' Exhibit 1 at i-1.)  The purpose of the Stirling study

was to remedy the "lack of systematic psychiatric epidemiological

data on the California prison population for use in projecting

mental health service needs."  (Id. at ii-3.)  The study noted that

> [t]he intent of the Stirling legislation is to
> strengthen the capabilities of CDC, through its
> Office of Health Care Services, working in
> concert with the State Department of Mental
> Health (DMH), to provide effective mental
> health treatment for the severely mentally
> disordered (SMD) offender, during incarceration
> and parole. . . .22/

The prevalence study was conducted in July 1987 and

published in July 1989 as Volume I of the Stirling Report.

(Plaintiffs' Exhibit 1.)  The prevalence study divided inmates into

two groups.  The first group was called the "unidentified" general

population group, i.e., inmates "who had not been assigned

psychiatric categories in the CDC inmate classification system."

(Id. at ii-3.)  The second group was drawn from "psychiatrically

identified" inmates, i.e., those who in June 1987 had "specific

---

22/  The primary goal of the legislation was "foremost, to find cost-effective ways to reduce the damages to society incurred by releasing SMD offenders to the community who, by dint of inadequate or inappropriate treatment, or no treatment at all, would remain at risk (perhaps increased risk) of re-offending, possibly violently." (Plaintiffs' Exhibit 1, at i-1.)  Ultimately, the Technical Advisory Committee concluded, however, that "a study to determine whether (and to what degree) mental health intervention might reduce criminal recidivism was premature, given the budget and feasible timeline." (Id. at ii-1.)  Therefore, that portion of the study was only designed and was not conducted.  (Id. at ii-2.)

AO 72
(Rev 8/82)

psychiatric classifications and/or were located in specific psychiatric facilities used by CDC." (Id. at ii-3.) These two groups were assessed for lifetime diagnosed SMD and for SMD with disorder-associated symptoms in the preceding month. (Id. at ii-7.) The lifetime disorders included organic brain syndrome - severe, schizophrenia, major depression, and the bipolar disorders. (Id.)

The study found that approximately 13 percent of inmates in the unidentified group and 35 percent of the psychiatrically identified inmates, or 14 percent of the total population, suffered from one of the major illnesses during their lifetime. (Id. at ii-8, ii-9.) The study further found that 6.9 percent of inmates in the unidentified group and 27.5 percent of inmates in the psychiatrically identified group, or 7.9 percent of the total population, had suffered disorder-associated symptoms in the preceding month. (Id.)

In July 1987, at the time the study was conducted, the inmate population was approximately 59,000 inmates. (Id. at ii-3, ii-9.) Given that population size, the study found that "even the small base-rate of 7% for the four serious disorders amounts to over 4,000 undetected SMD individuals." (Id.)

The report found that "[t]he survey results imply that there are somewhat over 5,000 . . . SMD inmates with some current symptoms in 1988. This number is projected to more than double by

/////

21

the year 2,000." (Id. at ii-10.)[23/] The study also found that,
given the scarcity of psychiatric resources in the CDC, "it is
likely that few of the psychiatrically unidentified group would
have access to desirable levels and durations of service." (Id.)

Volume II of the Stirling Report, called "Array and
Administration of Services," was published in November 1988.
(Plaintiffs' Exhibit 2.) That portion of the study found
significant deficiencies in mental health services within the CDC,
particularly in the areas of screening and staffing. The
consultants made several recommendations relevant to this
litigation, including recommendations that CDC set adequate
staffing standards for all mental health professionals, determine
why there is a problem with recruitment and retention of mental
health professionals, adequately document mental health contacts
and develop a quality assurance program, conduct initial screenings
in an atmosphere more conducive to obtaining relevant information,
standardize mental health testing, evaluate time and criteria
involved in transfers for psychiatric care, and evaluate extending
inmates' length of stay at Reception Centers to provide additional
opportunities for psychiatric evaluation. (Plaintiffs' Exhibit 2
at iii-iv.)

---

[23/] In fact, with a total prison population of just over 118,000 today
(see Department of Corrections Weekly Report of Population as of
Midnight May 15, 1994, filed May 25, 1994), that number has likely at
least doubled already. Defendants' expert, Dr. Dvoskin, opined that
"the level of need in the California Department of Corrections for
treatment of serious mental disorder on any given day would be
approximately 11 to 15 percent of the total population." (Dvoskin
Declaration at 6.)

Defendants did not accept the prevalence data from the Stirling Report, nor did they adopt the recommendations of the report. (See Testimony of James Gomez, RT, May 17, 1993, at 52-55.) The deficiencies described therein remain to this day, over five years after issuance of Volume II of the Stirling Report.

### 3. The Scarlett Carp Report

In 1991, the CDC commissioned yet a third study of mental health services in the Department.[24/] (RT, May 17, 1993, at 90-91.) The Department contracted with Scarlett Carp and Associates, Inc. to conduct the study. Hereinafter, the study is referred to as the Scarlett Carp study or the Scarlett Carp Report. The purpose of the Scarlett Carp study was to "design three alternative mental health service delivery systems" for the CDC. (Plaintiff's Exhibit 96 at 1.) All three alternatives were to include screening, follow-up evaluation, crisis care, inpatient psychiatric hospital care, intermediate care, outpatient care, pre-release services, and parolee outpatient services as component parts. (Id. at 1-2.) The difference between each system was based on resources underpinning a particular design; one was to be designed based on existing resources, a second based on a potential 10 percent budget cut, and a third based on "increased resources to the level necessary to support an enhanced system." (Id.)

June 15, 1991 was designated as the official start date for the Scarlett Carp study. (Id. at 1.) At the outset of the

---

24/ The workload study was done internally. Both the Stirling Report and the Scarlett Carp Report were prepared by independent consultants.

AO 72
(Rev 8/82)

study, the consultants interviewed twelve individuals identified as "key stakeholders." (Id. at 3.) Six management officials within the California Department of Corrections, including defendants Khoury and Zil, were in the group.[25/] (Id.) During June and July 1991, the consultants interviewed these persons and others. Several significant deficiencies in mental health care delivery within CDC were noted by the interviewees and described in an initial progress report dated June/July 1991. (Id. at 5.)

In September/October 1991, the consultants issued a second progress report. (Plaintiff's Exhibit 1398.) In that progress report, the consultants indicated that a delivery system designed around a 10% reduction in resources would not meet "a constitutionally acceptable level of care;" therefore, discussion of this alternative was omitted. (Id. at i, 38.)

The September/October 1991 progress report contained several observations of problems with the current delivery system, including the following:

> Screening and follow-up evaluations not formalized and staffing is inconsistent.

> Inpatient Hospital Care is ill defined with regard to CDC expectations and bed utilization.

> Enhanced Outpatient Care is ill defined with regard to treatment objectives and population to be served.

---

25/ Other CDC employees interviewed were David Tristan, the Deputy Director for Institutions and John O'Shaughnessy, CDC Chief, Mental Health Services Branch. Robert H. Denninger, CDC Chief Deputy Director and Kyle McKinsey, Deputy Director, CDC Planning and Construction Division, were to be interviewed during the month of July, 1991. (Id.)

24

Crisis Care and Outpatient general population services need formalization, and resources are inconsistent.

The centralized/regional method of service delivery does not provide equal access to care for all inmates.

Services for women are not equal to those for men.

There is an inadequate exchange of inmate mental health clinical records, which reduces the effectiveness and continuity of service delivery systems. This is particularly applicable regarding the transfer of prisoners between institutions and of inmates to the parolee outpatient clinics.

. . . .

. . . .

. . . .

While professional services are generally being provided by psychiatrists, psychologists, and social workers, supplementary, lower level clinicians are needed throughout the system to assist in (1) mental health screening, (2) crisis care, (3) housing management and care, and (4) to provide supportive clinical work.

Recruitment and retention problems for mental health professionals at institutions located in rural areas is problematic.

There is a lack of routine mental health data collection that (1) tracks and monitors inmate/parolee patients, (2) analyzes inmate/parolee mental health needs, and (3) evaluates mental health services/programs/interventions.

(Id. at 32-33.)26/

/////

---

26/ Many of these findings were similar to findings in the June/July 1991 progress report drawn from the stakeholder interviews. (See Plaintiff's Exhibit 96 at 5.)

25

AO 72
(Rev 8/82)

The consultants found that only a delivery system based on enhanced resources would satisfy constitutional requirements after the inmate population expanded beyond the size of the 1991/92 population. (See id. at 36-37.)[27]/

In February 1992, the consultants published a third progress report. (Plaintiff's Exhibit 691.) Appended to that report are several tables which compare staffing levels existing within the CDC in 1991/92 with projected staffing needs for 1996/97 based on projected prison population for those years. In 1991/92, the CDC had a total of 277.4 positions authorized for mental health care. (Id. at Table B, Table E.) Two hundred eight and three tenths of those positions were filled. (Id.) The consultants projected a need for 732 staff positions by 1996/97. (Id.)

The final report from Scarlett Carp and Associates is dated February 16, 1993. (Defendants' Exhibit D1338.) The final report describes several deficiencies in the existing CDC mental health delivery system. The consultants found, inter alia, that

> [s]ervice delivery tends to be inconsistent, informal, crisis-oriented, and largely unmonitored. . . . Mentally ill inmates are as likely as not to receive minimal treatment until they decompensated [sic] to the point where inpatient hospitalization or transfer to an Enhanced Outpatient Program bed is the only option. . . . There is also the perception and belief among some institution staff that, unlike medical conditions, treatment of mentally ill inmates is not their responsibility. Others express concern about

27/ The consultants were of the opinion that the then current resources "[might] minimally meet constitutional standards for the 1991/92 inmate population, but [would] be inadequate to meet future needs." (Id. at 37.)

26

> their inability to provide needed services due
> to the lack of mental health resources.
> Furthermore, the current system is
> understaffed.
>
> The level of service availability varies widely
> from institution to institution, as does the
> amount and type of staff providing services.
> The current system of classifying mentally ill
> inmates further hinders timely transfer of
> inmates considered stable, or assessed as not
> mentally ill, out of mental health beds.
> Inmates so classified must wait to be
> reclassified through the CDC classification
> system (which is responsible for classification
> of all inmates) before they can transfer, which
> further renders an already strained system
> inefficient.

(Id. at 34.) The final report again highlighted the deficiencies
noted in the 1991 progress reports. (Id.)

The final Scarlett Carp report includes data regarding
the prevalence of inmates within the CDC who suffer from mental
impairments; the consultants found that 11.07% of males committed
to the CDC suffer from serious mental impairments, and 9.47% suffer
from moderate mental impairments. while 15.21% of female inmates
suffer from serious mental impairments and 9.03% suffer from
moderate mental impairments. (Id. at ix, Table ES-1.) The report
recommends a delivery system based on a decentralized cluster model
described in the previous progress reports, and includes a finding
that 340.8 additional mental health positions and 183.5 new medical
positions will be required to implement the system.[28]

---

28/ The recommendations of the Scarlett Carp Report are not
summarized in depth; this court makes no finding with regard to
whether defendants can satisfy the requirements of the injunctive
relief recommended herein by implementing the recommendations of that
report. The court does note, however, that the Scarlett Carp Report's
recommendations were based on a projected inmate population for

27

It is apparent from the three extensive studies undertaken by the CDC in the last ten years that certain specific problems which profoundly affect the availability of mental health care for inmates in the CDC have been repeatedly described to defendants. In particular, defendants have known for nine years that their program for screening and identifying mentally ill inmates is ineffectual, that their mental health care delivery system is understaffed, that their recruitment program is underresourced, that the mental health staff they do have is significantly overworked, and that they lack necessary quality assurance programs and sufficient inpatient and outpatient resources to aid practitioners in the provision of appropriate care. Despite this knowledge, defendants have failed to take any significant steps to address the deficiencies and the problems identified in the Stirling Report and the Scarlett Carp reports.

B. The Magnitude of the Problem

1. Introduction

At trial, experts for both plaintiffs and defendants testified concerning the necessary elements of an adequate system for delivery of mental health care in prison. These elements

---

1996/97 of "over 119,000." (Defendants' Exhibit 1338 at xi.) This figure was based on a population sized at "150 percent of design bed capacity." (Id. at xi, 16) This projection was significantly underestimated; at the time of trial of this action in early 1993 the inmate population was 113,000 and the CDC was operating at 186 percent of capacity. (See Testimony of James Gomez, May 17, 1993, at 7, 14, 47.) On May 15, 1994, the inmate population was just over 118,000 and the CDC was operating at 175% of capacity. Department of Corrections Weekly Report of Population as of Midnight May 15, 1994, filed May 25, 1994.

28

include screening and identification of mentally ill inmates; prompt access to mental health professionals for diagnosis and treatment; patient access to necessary and appropriate levels of care as determined by clinicians, including outpatient care, residential care, crisis care, and inpatient care; medical records and an information management system; and a quality assurance system. (Declaration of Dr. Russell C. Petrella, filed February 5, 1993, at 13-22; Declaration of Joel A. Dvoskin, Ph.D., filed February 17, 1993, at 2-3, 9.) This expert testimony closely tracks the essential components described by the district court in Balla; the court in Balla also noted that an adequate suicide prevention program is constitutionally required and the parties here have litigated the adequacy of the CDC's suicide prevention program.

This court finds that the above components are essential to a minimally adequate mental health treatment system. Each of these components is necessary to insure that mental health care needs of inmates will be known timely by medical staff competent to provide necessary care. Hoptowit at 1253.

The mental health care delivery system in the California Department of Corrections lacks each of these elements, either in whole or in part. The result is a system charitably described by defendants' expert, Dr. Dvoskin, as "inefficient in function." (Dvoskin Declaration at 3.) In fact, it is a constitutionally

/////

/////

29

AO 72
(Rev 8/82)

inadequate system which cannot and does not meet the serious medical needs of mentally ill inmates incarcerated in California's prisons.

The defendants have no system in place for screening and identifying mentally ill inmates. As a result, thousands of inmates suffering from mental illness remain unidentified as needing care. These inmates either go undetected and without care, or they come to the attention of staff only when they behave in bizarre or inappropriate ways. Inmates in the latter category are often dealt with solely in punitive fashion, without regard to the impact of such punitive measures on their psychiatric condition.

The CDC is significantly and chronically understaffed in the area of mental health care; even those inmates who are identified as needing mental health care suffer lengthy waits for necessary evaluation and treatment. The CDC has a profoundly inefficient medical recordkeeping system. In some instances records are not kept at all or are kept only haphazardly. Those records that are kept are often inaccurate and incomplete. Those medical records that are maintained do not travel with inmates when they move from one facility to another.

The result of these and other inadequacies is a system which causes terrible suffering for thousands of inmates afflicted with severe mental illness. Defendants have known about the woeful inadequacies in the delivery of mental health care within the California Department of Corrections for over eight years. Defendants have done little to rectify the egregious defects that

30

1  have repeatedly been brought to their attention by their own

2  consultants and employees.  This court finds that defendants for

3  several years have been and still are in violation of the

4  requirements of the Eighth Amendment to the United States

5  Constitution by deliberately failing to provide a minimally

6  adequate mental health care delivery system within the California

7  Department of Corrections.

8                    2.   Screening and Identification of Mentally Ill
9                         Inmates

10          In order to provide necessary mental health care to

11 prisoners with serious mental disorders, there must be a system in

12 place to identify those individuals, both at the time they are

13 admitted to the Department of Corrections and during their

14 incarceration.  (Petrella Declaration at 14; Declaration of Dr.

15 Edward Kaufman, filed February 5, 1994, at 17.)  The CDC lacks an

16 adequate mechanism for screening for mental illness, either at the

17 time of reception or during incarceration, and has lacked adequate

18 screening since at least 1987.  (Petrella Declaration at 25-26;

19 Kaufman Declaration at 18; Declaration of Thomas Greenfield, Ph.D.,

20 filed February 5, 1994, at 19.)

21          At trial, Director Gomez testified that the CDC still did

22 not have a standardized mental health screening form.  (RT, May 17,

23 1993, at 49; RT, June 21, 1993, at 39-25.)  Director Gomez also

24 testified that there were no standardized procedures for screening

25 at reception centers.  (RT, May 17, 1993, at 49.)

26          Defendants' expert Dr. Koson testified that the screening

process at the reception center at Wasco State Prison differed from

31

AO 72
(Rev 8/82)

the screening process at the reception center at R.J. Donovan
Correctional Facility. (Declaration of Dr. Dennis Koson, filed
February 16, 1993, at 5-6.) Dr. Koson also opined that the
screening process at both these institutions "appears to function
appropriately." (Koson Declaration at 5.) This court finds that
the overwhelming weight of the evidence before the court
demonstrates that screening and identification of mentally ill
inmates throughout the CDC is inadequate. The court's conclusion
rests, in part, on the conclusions of the Scarlett Carp study, an
exhibit tendered by defendants. Dr. Koson was one of the
consultants on the Scarlett Carp study. (Koson Declaration,
Exhibit A at page 8.) The absence of formalized screening and
follow-up evaluations was a deficiency noted by the Scarlett Carp
consultants in several of their reports, including the final report
dated February 16, 1993 which was tendered as an exhibit by
defendants. (Defendants' Exhibit 1338 at 34.)

Plaintiff's experts observed a variety of inadequate,
haphazard screening efforts at various prisons across the state,
both on initial intake into the CDC and on transfer between
prisons. At California Institution for Women, inmates often
arrived without a psychiatric file from either the state prison or
the county jail from which they were transferred. (Declaration of
Dr. V. Meenakshi, filed February 5, 1994, at 33.) They were
screened by a Medical Technical Assistant (MTA) "who does not
necessarily have any formal training in recognizing mental
illness." (Id.) Dr. Meenakshi made similar findings at Central

32

California Women's Facility. (Id. at 41-42.) At Northern

California Women's Facility, some inmates were not screened at all.

(Id. at 67.) At Mule Creek State Prison, MTAs conducted general

intake interviews while inmates were in the holding tank within

earshot of other inmates and staff; screening questionnaires were

not designed to elicit all relevant information. (Id. at 92.) The

intake process at California Correctional Center did not include

psychiatric screening; inmates were identified only if they

reported that they were taking psychotropic medication. (Id. at

103.) Similarly, no psychiatric screening was performed at Sierra

Conservation Center. (Id. at 109.)

At California Institution for Men the only question asked

to screen for mental illness was whether the inmate had ever been

admitted to a psychiatric hospital. (Petrella Declaration at 25-

26.) The screening took place in a room that was crowded with

naked inmates, completely chaotic, and devoid of privacy. This

compounded the inadequacy of the minimal screening procedure and

destroyed any confidence in the self-reporting upon which this

screening procedure relied. (Id. at 26, 77-78.)

At Calipatria, inmates were interviewed by an MTA; often

the MTA lacked access to the medical file at the time of the

interview and the psychiatric screening that did take place was

inadequate. (Id. at 89-91.) At Chuckawalla Valley State Prison

inmates were screened via a record review conducted by a nurse or

an MTA. This record review did not always bring a mentally ill

inmate to the attention of medical staff. (Id. at 114-115.)

AO 72
(Rev 8/82)

At Wasco State Prison, there was a two-level screening process. (Id. at 139.) The first level was for individuals on initial arrival at Wasco. (Id.) This level was reported to be "largely appropriate," though comprised of only a limited series of questions regarding psychiatric history, current medications and past suicide attempts. (Id.) The second level of review was for individuals identified at the first level as needing evaluation. (Id.) The second level was described as very weak, with a very weak referral system and little follow up for the evaluations. (Id.)

At the receiving and releasing unit in California Correctional Institution at Tehachapi, screening was based on a single question about whether an inmate took medication. (Kaufman Declaration at 37-38). The interviews were conducted by a sergeant or an MTA in an environment that was not conducive to accurate self-reporting. (Id.) Fifty to seventy-five percent of inmates arrived with a list of medications they took. (Id.) Inmates arriving from Los Angeles County Jail might arrive with a report stating "psychiatric treatment" but containing no specific information. (Id. at 37-38.) The receiving and releasing unit did not get any medical records from the jail. (Id. at 38.)

Similarly, at California State Prison/Corcoran, screening for mental illness was limited to screening which asked whether an inmate was on psychotropic medication. (Id. at 72.) At R.J. Donovan Correctional Facility, an MTA made an initial assessment of an inmate's medical needs as soon as the inmate arrived. (Id. at

34

87.)  Psychiatric screening was not a routine part of this initial assessment, although referrals for evaluation were made "if the inmate's history shows a need for psychiatric evaluation."  (Id.) At Pelican Bay State Prison, there was no organized system to screen inmates for mental illness through late 1992.  (Declaration of Dr. Stuart Grassian, filed February 5, 1994, at 47.)

As a result of the absence of an adequate, systemized screening program, a significant number of mentally ill inmates go undetected.  (Meenakshi Declaration at 33-35.)  Only those inmates who self-report or present with medical records demonstrating a prior psychiatric history, those who exhibit bizarre behavior, or those who ask to be seen by a psychiatrist will be identified as needing psychiatric care.[29/]  (Id.)  Other inmates with serious mental illness in remission, with suicidal tendencies, or with a serious mental illness the symptoms of which are not apparent to an untrained observer are left unidentified and without access to necessary care.  (Id.)

As discussed above, mentally ill inmates who are not identified at the time they are received into the CDC or when they are transferred between institutions often only come to the attention of staff when they exhibit bizarre behavior.  At the present time, new custody staff only receives three hours of training in "Unusual Inmate Behavior."  (Declaration of Steve

---

29/  As is discussed in section 4(d), infra, inmates who act out as a result of mental illness are often treated only as custody problems and subjected solely to punitive measures rather than provided with necessary care in conjunction with appropriate discipline.

AO 72
(Rev 8/82)

Cambra, filed February 11, 1993, at 3.) The three hour mandatory course covers "situations when an inmate should be referred for a psychiatric evaluation, skills to use in dealing with a disturbed inmate, actions to be taken with a suicidal inmate and the importance of familiarizing the correctional officer with the inmates in his or her assigned areas of supervision." (Id. at 3-4.)

In-service training is offered at institutions in the class. (Id. at 5.) One of the in-service training courses offered at California Men's Colony is a two hour course called "The Skillful Observer." (Id.) This course includes refresher training on when mental health referral is required. (Id.)

Dr. Kaufman testified that a minimum of twelve hours of training for new custody staff should be required. (Kaufman Declaration at 28.) Dr. Kaufman also opined that a more in-depth course should be required for correctional officers who work with mentally ill inmates. (Id.) As will be discussed in further detail, infra, inmates who exhibit bizarre behavior or other psychiatric symptoms are often dealt with solely in punitive fashion by custody staff. This court finds that the training for custody staff to recognize the signs and symptoms of mental illness is inadequate.

### 3. Access to Competent Staff

#### a. Staffing

There is no dispute that the CDC is seriously and chronically understaffed in the area of mental health care. The

36

workload study, undertaken almost a decade ago, found that the need for psychiatric services was far in excess of the staffing resources available. (Plaintiffs' Exhibit 456 at vi.) The two subsequent studies confirmed this. (Plaintiff's Exhibit 2 (Volume II of the Stirling Report); Defendants' Exhibit 1338 at, e.g., 34 (Scarlett Carp Final Report).)

The Scarlett Carp consultants found that 732 staff positions would be necessary to adequately staff mental health care for an inmate population of 119,000 inmates. (Defendants' Exhibit 1338 at xi; Plaintiffs' Exhibit 691 at Table B.) The fiscal year 1992/93 budget for CDC contained 376.6 authorized mental health care positions to serve an inmate population of 113,000. (Defendants' Exhibit 1338 at 36; RT, May 17, 1993, at 7.)[30]

Mentally ill inmates are housed at all institutions throughout the CDC, and the significant and chronic understaffing problem obtains systemwide. (See Meenakshi Declaration at 30-32 (California Institution for Women); 40, 63-65 (Central California Women's Facility); 67, 85-87 (Northern California Women's Facility); 91, 100-101 (Mule Creek State Prison); 102-103 (California Correctional Center); 108-109 (Sierra Conservation Center); Kaufman Declaration at 33-36, 38, 40-41 (California Correctional Institution at Tehachapi); 69-72 (California State Prison/Corcoran); 86 (R. J. Donovan Correctional Facility); 104-107

---

[30] The CDC had a twenty-five percent vacancy rate in mental health care positions for fiscal year 1991/92. (Plaintiff's Exhibit 691 at Table E.) There was no evidence that this vacancy rate had changed significantly at the time of trial.

AO 72
(Rev 8/82)

(California Men's Colony); 144-146 (Avenal State Prison); 154-155
(Soledad); Petrella Declaration at 73, 78-80 (California
Institution for Men); 88-89, 107-110 (Calipatria); 114, 117
(Chuckawalla Valley State Prison); 119-122 (Wasco State Prison);
Grassian Declaration at 17, 45 (Pelican Bay State Prison).)

Defendants offered no evidence to rebut plaintiffs'
testimony in this regard. To the contrary, defendant Gomez
testified that psychiatric staffing has "lagged behind" the
staffing for other key positions within the Department for the past
twelve years. (RT, May 17, 1993, at 73-74.) Defendant Khoury's
testimony confirmed that departmental requests for mental health
care staffing are based on percentages of outdated or
underestimated inmate populations. For example, he testified that
the request for mental health care staffing for the 1992/93 fiscal
year was derived by adding to the total number of outpatient beds
authorized for the 1989/90 budget a percentage increase equal to
the percentage increase of all male inmates in the system between
the fall of 1988 and July of 1991. (RT, March 30, 1993, at 15-
170.) The 1993/94 budget request was based on the same formula,
except that the formula relied on a projected male inmate
population by June 1994 of 103,971. (Id. at 15-171, 15-172.)[31]/
In fact, it appears that the male inmate population was at or above
that figure at the time of trial of this action in May 1993.
(See RT, May 17, 1993, at 7 (Director Gomez' testimony that total

---

[31]/ This request was not approved for inclusion in the budget in any
event. (RT, March 30, 1993, at 15-172.)

38

inmate population at time of trial was 113,000); RT, March 30, 1993 at 15-173 (Defendant Khoury's estimate that total population at time of trial was 109,000, with the female population comprising approximately 8,000 or 9,000 of the total number of inmates).)

While these concessions by defendants are significant, even they must be viewed as efforts to portray years of indifference in a favorable light. It is clear from the evidence that defendants have deliberately ignored years worth of substantial, competent evidence about what is required to adequately staff their mental health care delivery system.

There are several reasons for the understaffing. First, despite the studies done by and for the CDC since 1984, defendants have not adopted a method for determining necessary mental health staffing ratios. (RT, May 17, 1993, at 14.) As a result, defendants have perpetuated a vicious circle for over a decade: they fail adequately to screen and identify the number of mentally ill inmates in the CDC, so they claim they have no method for adequately assessing staffing needs.[32/] At the same time, the failure to adequately screen and identify mentally ill inmates is attributable to the chronic understaffing that has plagued the Department. The dilemma is, of course, illusory. The Department

---

[32/] At trial, Director Gomez, while acknowledging that he was not a psychiatrist or a clinician, explained that he rejected the prevalence data contained in the Stirling Report because "[i]t didn't reconcile with what [he] felt was going on in the institutions" and because "[s]taff were not capable of explaining to me, whether it be Dr. Zil or Dr. Khoury or John O'Shaughnessy [the top mental health care officials in the department], they were not capable of providing me the kind of answers I felt I needed." (RT, May 17, 1993, at 52, 54, 55.)

AO 72
(Rev 8/82)

has already conducted three studies to address prevalence of mental illness and staffing needs, and the information needed to appropriately determine staffing needs is well developed and readily available.

Problems with recruiting and retaining staff contribute to the chronic understaffing. In 1991/92 approximately 25% of the positions authorized for mental health care were unfilled. (Plaintiff's Exhibit 691, Tables B and E.) Defendants do not offer competitive salaries to psychiatrists and psychologists. (RT, March 29, 1993, at 14-142, 14-170, 14-171.) Defendants have institutions in remote areas of the state where it is difficult to recruit psychiatric professionals and they continue to house mentally ill inmates at those institutions. (See, e.g., RT, March 29, 1993, at 14-135.) Defendant Khoury testified that it is more difficult to recruit physicians to work with inmate populations, and that other incentives such as "safety retirement" and improved working conditions are a necessary part of an adequate recruitment program. (RT, March 29, 1993, at 14-143.)

This court finds that defendants are violating the Eighth Amendment by their present level of staffing. Defendants do not employ a number of trained mental health professionals sufficient to meet the constitutionally mandated minimum needs of mentally ill inmates incarcerated in the State of California, and they know that they do not.

/////

/////

AO 72
(Rev 8/82)

### b. Competence of Staff

It was undisputed that the most efficacious method for assessing the competence of medical staff is through a quality assurance/peer review program. (Petrella Declaration at 21; Kaufman Declaration at 30; Dvoskin Declaration at 9.) The CDC has no effective quality assurance or peer review program either department-wide or at individual institutions within the class. (See Petrella Declaration at 28 (department-wide); 113 (no program at Calipatria), 137 (at time of trial, Wasco "in the very early stages of developing a quality assurance program"); Grassian Declaration at 53 (no program at Pelican Bay State Prison); Kaufman Declaration at 46 (no program at Tehachapi), 142 (program exists at California Men's Colony but it is ineffective); 151 (quality assurance/utilization review committee began at Avenal in July 1991 but apparently no longer exists); Meenakshi Declaration at 32-33 (no program at California Institution for Women), 66 (no program at Central California Women's Facility), 90 (no quality assurance at Northern California Women's Facility, and only limited, flawed peer review program at said facility), 102 (Mule Creek State Prison has quality assurance committee, but psychiatric services are never discussed).) The few efforts at quality assurance and peer review in the system are "rudimentary." (Kaufman Declaration at 30.)

Defendants' own expert, Dr. Dvoskin, opined that "a large system such as the California Department of Corrections could probably not provide adequate mental health care without some sort of management information system and some form of quality

41

assurance." (Dvoskin Declaration at 9.) At this point, defendants have no effective method for insuring the competence of their mental health staff, and, hence, for insuring that mentally ill inmates in the department have access to competent care. In this regard, they are violating the class members' Eighth Amendment right of access to adequate mental health care.

### 4. Care of Mentally Ill Inmates

#### a. Introduction

Mentally ill inmates within the CDC do not have constitutionally adequate access to necessary care. There are significant delays in, and sometimes complete denial of, access to necessary medical attention, multiple problems with use and management of medication, and inappropriate use of involuntary medications. In addition, the mental health status of class members is adversely impacted by inappropriate use of punitive measures without regard to the impact of such measures on their medical condition.

In large measure, these deficiencies are attributable to the problems in screening, evaluation, and staffing already described. However, the existing system for delivering care uses a referral and classification system that facilitates unconscionable delays and sometimes results in a complete denial of care even for those persons this inadequate system has identified as needing treatment.[33]/ Finally, this system does not give sufficient

---

33/ Dr. Khoury described the referral and classification system described _infra_ as resulting in "bus therapy" -- inmates traveling on buses back and forth between institutions without adequate determina-

42

weight to medical opinion in decisions regarding access to medical

care and does not allow sufficient consultation with and

consideration of medical opinion in decisions regarding discipline

and/or behavior control.

              b.   <u>Delays in Access to Care</u>

      The September/October 1991 Scarlett Carp progress report

described the existing structure of the mental health care delivery

system in the CDC as comprised of the following:

> **Screening at intake/diagnostic.**
>
> **Follow-up evaluations.**
>
> **Inpatient Hospital Care** – provided
> predominantly at CMF and ASH[34]/ by DMH[35]/
> (708 beds).  18 inpatient beds, staffed by CDC
> personnel, are located at CIM.[36]/
>
> **Enhanced Outpatient Care** – provided at CMF,
> CMC[37]/, and CWI [sic][38]/ (2,421 beds).
> Services provided in this program range from
> acute care to sheltered outpatient care, but
> exact bed designations for each are not
> official.  A 60-bed day treatment program is
> also provided at CMF by DMH.
>
> **Crisis Care** – informal, provided within each
> institution with existing resources, which are
> variable.  The use of infirmary beds for crisis
> care is estimated at 30 to 40 percent of the
> total available infirmary beds in the institutions.

---

tions regarding the need for care.  (RT, March 30, 1993, at 15-15.)

[34]/  Atascadero State Hospital.

[35]/  California Department of Mental Health.

[36]/  California Institution for Men.

[37]/  California Men's Colony.

[38]/  California Institution for Women.

AO 72
(Rev. 8/82)

1         **Outpatient Care** - informal, limited to
2         medication only for the most part. Some
        psychological services available depending on
3         the institution's staffing.

4 (Plaintiff's Exhibit 1398 at 32.)

5       There are significant and unacceptable delays at each

6 level of care. (Petrella Declaration at 39.) These delays at each

7 stage cause significant pain and suffering to inmates in need of

8 mental health care. (Id. at 40.) Frequently, such inmates receive

9 no care at all or only medication; they are often housed in

10 administrative segregation or security housing units while awaiting

11 care. (Id.)

12       Dr. Petrella stated that he was informed by a physician

13 at Calipatria that inmates on antipsychotics were seen within a

14 week of arrival and inmates on tranquilizers were seen within a

15 month of arrival; Dr. Petrella's review of the medical records

16 showed delays of several weeks. (Petrella Declaration at 91-92.)

17 The physician at Calipatria reported to Dr. Petrella that he was

18 not able to provide follow-up care to any inmate on a regular

19 basis; inmates at Calipatria reported that their requests to see a

20 psychiatrist were ignored for days and weeks. (Id. at 92.)

21       At Chuckawalla Valley State Prison, inmates referred for

22 psychiatric evaluation often had to wait several weeks to see a

23 psychiatrist. (Id. at 114.) In some cases, such inmates were

24 placed in administrative segregation during this wait, even where

25 the symptoms requiring the evaluation included self-harming

26 behavior. (Id. at 115.)

/////

44

AO 72
(Rev 8/82)

At Wasco State Prison, the demands on psychiatric staff were so acute that the majority of their attention was focused on crisis patients. (Id. at 122.) Inmates referred by physicians for further diagnostic interviews had to wait several weeks for such evaluation. (Id. at 123.)

At Tehachapi, delays of over five months for routine psychological evaluations were "not unusual." (Kaufman Declaration at 36.) At R.J. Donovan Correctional Facility, inmates experienced significant delays in access to a clinician. (Id. at 90.) New evaluations were performed in approximately 20 to 25 minutes, which was an insufficient amount of time to perform an adequate evaluation. (Id.) Follow-up visits were even shorter and less frequent. (Id. at 91.)

At Central California Women's Facility, inmates on psychotropic medications often waited months to see a psychiatrist; some mentally ill inmates there reported never having seen a psychiatrist. (Meenakshi Declaration at 47-49.) Dr. Meenakshi testified that inmates at Northern California Women's Facility who were taking psychotropic medications "have had virtually no access to a psychiatrist." (Id. at 70.) Seven inmates that she interviewed there reported that their repeated requests for access to a psychologist or psychiatrist had been ignored. (Id.)

At Mule Creek State Prison, inmates with serious mental illness were seen by a psychiatrist only once or twice a year. (Id. at 93.) The visits lasted only 5-15 minutes. (Id.)

/////

45

In addition to the delays in access to care within each institution, delays in access to enhanced outpatient or inpatient care, which generally require transfer to another facility, were substantial. When an inmate at a general population institution was found to be in need of enhanced outpatient care or inpatient care, the clinician making that determination could not simply refer the inmate to one of the enhanced outpatient facilities or to an inpatient hospital for necessary care. Instead, the clinician had to refer the inmate to the receiving institution for evaluation to see whether the inmate fit into one of approximately four ill-defined classification categories. (Petrella Declaration at 30; RT, March 30, 1993, at 15-11, 15-13.)

This referral system has historically resulted in a backlog of inmates waiting for acceptance of the referral to the appropriate institutions for further determination as to whether or not they are eligible for care. (RT, March 30, 1993, at 15-16; see discussion infra.) In addition to the fact that there is insufficient staff to complete the evaluations, the CDC system is also structured so that an inmate must go through the custody classification process before he or she can be transferred. (Defendants' Exhibit 1338 at 34.) This builds in additional delays. (Id.)

In November 1991, the Department had a backlog of approximately 400 inmates waiting for transfers to California Medical Facility or California Men's Colony for psychiatric evaluations. (Petrella Declaration at 151; Testimony of Louis L.

46

Beermann, Ph.D., RT, April 14, 1993, at 22-6.)  A special clinical assessment team was formed to travel to reception centers to reevaluate inmates who were waiting for such transfers.  (Petrella Declaration at 151; Testimony of Louis L. Beermann, Ph.D., RT, April 14, 1993, at 22-3.)  The team was comprised mostly of psychologists, and included a  psychiatrist and a classification service representative.  (RT, April 14, 1993, at 22-3 - 22-6.)[39] This first team rejected 60% of the inmates who had been referred for psychiatric evaluation.  (Petrella Declaration at 153.)  This rejection rate was double the historical rejection rate of inmates who were evaluated for a week or two in the intake unit at either CMC or CMF.  (Id.)

By July or August of 1992, the backlog of inmates awaiting psychiatric evaluation was again up to 300 inmates. (Petrella Declaration at 156.)  A special assessment team headed by Dr. Beermann went out again in December 1992 in an effort to reduce the backlog, and again rejected a large percentage of inmates. (Id.)  At trial in April 1993, Dr. Beermann testified that the backlog of inmates awaiting transfer for evaluation was "under 200, perhaps 180 something."  (RT, April 14, 1993, at 22-9.)

The delays in transfer for evaluation were unacceptably lengthy.  Inmates waited for transfer for several weeks or months, during which time they often received no psychiatric care other

---

[39]  The classification service representative was included "so that he or she could make the -- put their stamp of approval on" the clinical recommendation that the inmate be transferred to CMC or CMF, or returned to general population.  (RT, April 14, 1993, at 22-6.)

AO 72
(Rev 8/82)

than medication. (See, e.g., Kaufman Declaration at 20; Petrella Declaration at 40, 146.) These were inmates who manifested severe psychiatric symptoms to a clinician. The delays are constitutionally unacceptable.

Similarly, when a clinician in the CDC determines that an inmate is in need of inpatient hospitalization, the inmate must generally be referred to a facility operated by the California Department of Mental Health (DMH), either Atascadero State Hospital or the DMH facility at California Medical Facility. DMH clinicians evaluate the referred inmates to determine whether they will be accepted for care. (Kaufman Declaration at 9; Petrella Declaration at 31.) The rejection rate from Atascadero State Hospital is approximately 50%. (Kaufman Declaration at 9.) Delays in transfer to Atascadero can be several months. (Id.) Since these persons are inmates exhibiting symptoms deemed by a staff physician to require inpatient hospitalization for psychiatric illness, the delays are egregious.

c. Medication Management

As noted in the Scarlett Carp report, outpatient care is limited primarily to medication. (Plaintiff's Exhibit 1398 at 32.) Use of psychotropic medications is not properly monitored. (Kaufman Declaration at 11.) Inmates experience delays in receiving their medication when they are transferred to another institution, when placed on lockdown status, and when their prescriptions expire. Numerous other problems in medication management were observed by plaintiffs' experts. (See, e.g.,

48

Meenakshi Declaration at 36 (some medications unavailable in CDC; prescriptions changed too frequently), 55 (no system in place at Central California Women's Facility to alert staff when prescription expires), 72 (at Northern California Women's Facility, medications were prescribed and discontinued in an "erratic manner," medications were prescribed and/or renewed without evaluation and/or mental status examination, and medications were prescribed in dosages too low to have therapeutic effect), 95-96 (no system in place at Mule Creek State Prison to alert physician when prescription expires, no monitoring for inmates on Lithium and Tegretol, lack of proper informed consent for use of such medications, inadequate monitoring of inmates on other medications, no system to prevent hoarding of medication); Petrella Declaration at 132 (significant problems with monitoring medication and providing follow-up care at Wasco State Prison, no formal mechanism for notifying staff when a prescription expired); Kaufman Declaration at 24 (new, very efficacious drugs for treatment of schizophrenia and depression, which drugs would require close monitoring of patients, not available to inmates in CDC); 147-148 (backlog of patients at Tehachapi such that physician could only see patients every eight weeks, even though inmates might need prescriptions refilled after only a month).)

/////
/////
/////
/////

Many of the problems with medication management are attributable, once again, to the severe staffing problem in the CDC.[40]/ In addition, problems are attributable to the shockingly inadequate development and use of medical records at most institutions in the class. (See Section 5, infra.)

The court further finds, however, that the present practices with regard to medication management are constitutionally unacceptable. As noted above, the Eighth Amendment requires that psychotropic medication be administered only with appropriate supervision and periodic evaluation. Defendants' supervision of the use of medication is completely inadequate; prescriptions are not timely refilled, there is no adequate system to prevent hoarding of medication, there is no adequate system to ensure continuity of medication, inmates on psychotropic medication are not adequately monitored, and it appears that some very useful medications are not available because there is not enough staff to do necessary post-medication monitoring.

Finally, the issues with regard to regulating heat exposure for inmates on psychotropic medication are presently the subject of a preliminary injunction issued by the district court. This court will recommend that the preliminary injunction be made a

---

[40]/ Plaintiffs presented a great deal of testimony suggesting that psychotropic medications should only be prescribed by a psychiatrist. Under California law, any licensed physician may prescribe medication. California Business & Professions Code § 2051. Defendants' mental health care system must provide for the administration of such medication in a manner consistent with the requirements of the federal constitution; that is, psychotropic medication must be administered only with appropriate supervision and periodic evaluation. Balla, 595 F.Supp. at 1577.

50

permanent injunction to remain in effect for a period of three years. The principal obstacle in this regard was motivating defendants to develop the heat management plans that are the subject of that injunction; now that the plans are developed and in use, defendants have little reason to abandon them and good reasons to keep them in place.

                **d.   Use of Disciplinary/Behavior Control
                       Measures Against Mentally Ill Inmates**

As noted above, many inmates do not come to the attention of either medical or custody staff until they exhibit bizarre or inappropriate behavior. Defendants make no effort to determine when this behavior is the result of decompensation as a result of mental illness.

Custody staff within CDC lack sufficient training to differentiate between an inmate who is acting out as a result of mental illness and an inmate who is acting out for other reasons. (Kaufman Declaration at 28.) As a result, mentally ill inmates who act out are typically treated with punitive measures, without regard to their mental status. (Petrella Declaration at 33; Kaufman Declaration at 28-29.)

At some institutions administrative segregation is used as a substitute for hospitalization, as an overflow for the outpatient program, as housing following treatment in the infirmary for an acute psychiatric episode, and to house inmates awaiting transfer for psychiatric evaluation. (See, e.g., Meenakshi Declaration at 19 (California Institution for Women), 94 (Mule Creek State Prison); Kaufman Declaration at 44 (Tehachapi), 95-96

51

(R.J. Donovan).)  In all institutions, placement in segregated housing occurs as a result of disciplinary proceedings.  In either event, placing mentally ill inmates in administrative segregation or segregated housing exacerbates the underlying mental illness, induces psychosis, and increases the risk of suicide.  (Kaufman Declaration at 25; Grassian Declaration at 5-15).

Plaintiffs' experts reported on the denial of access to necessary care and the suffering caused by placement and retention of mentally ill inmates in administrative segregation or segregated housing throughout the CDC.  (See, e.g., Meenakshi Declaration at 19-24, 50-54, 94-95; Grassian Declaration at 18-42; Petrella Declaration at 60-61, 62-63, 81-82, 92-94, 142-144; Kaufman Declaration at 44-45, 78-79, 95-99, 107-110.)

Dr. Grassian described the particular types of psychological symptoms and injury caused by housing in the security housing unit (SHU) at Pelican Bay State Prison.  Dr. Grassian described a group of psychiatric symptoms which have come to be identified with isolation, both in prison settings and in prisoner of war camps.  (Grassian Declaration at 6-12.)  These symptoms include overt paranoia, hyperresponsivity to external stimuli, perceptual distortions and hallucinations, panic attacks, difficulties with thinking, concentration, and memory, emergence of primitive, aggressive fantasies, and problems with impulse control. (Id. at 6-8.)

Dr. Grassian interviewed twenty-four inmates in the Pelican Bay SHU.  (Grassian Declaration at 17.)  He testified that

> [o]f these, at least seven were actively
> psychotic and urgently in need of acute
> hospital treatment. Nine others suffered
> serious psychopathological reactions to SHU
> confinement, including in several cases a
> history of periods of psychotic
> disorganization. Of the remaining eight, five
> gave a history of psychiatric problems not
> clearly exacerbated by SHU, two others appeared
> to be free of psychiatric difficulties, and in
> one a language barrier prevented adequate
> evaluation. I also interviewed two inmates in
> general population who had a history of prior
> SHU incarceration. Both had a history of
> psychotic disorders which were significantly
> worsened during their past incarceration in
> SHU.

(<u>Id</u>. at 17-18.) Dr. Grassian testified that seven inmates he
interviewed were too ill to discuss whether housing in SHU had
exacerbated their illness, though it appeared that it had. (<u>Id</u>. at
33.) Nine others, however, had developed psychiatric problems
while in SHU that were "strikingly consistent" with the group of
symptoms described earlier. (<u>Id</u>.) Dr. Grassian also testified
that while the acute symptoms experienced by these individuals
would likely subside upon release from SHU, "many of these inmates
will likely suffer permanent harm as a result of their confinement
in SHU." (<u>Id</u>. at 43.)

Defendants and their employees recognize the danger to
mentally ill inmates from housing in segregated housing units,
particularly Pelican Bay SHU. (<u>See</u> RT, March 29, 1993, at 14-77;
Grassian Declaration at 44 (discussing deposition testimony of Dr.
Zil).) Nonetheless, defendants continue to house mentally ill
inmates in these units. Defendants' use of administrative
segregation and segregated housing at Pelican Bay SHU and statewide

53

to house mentally ill inmates violates the Eighth Amendment because mentally ill inmates are placed in administrative segregation and segregated housing without any evaluation of their mental status, because such placement will cause further decompensation, and because inmates are denied access to necessary mental health care while they are housed in administrative segregation and/or segregated housing.

Inmates who act out are also subjected to the use of tasers and 37mm guns, without regard to whether their behavior was caused by a psychiatric condition and without regard to the impact of such measures on such a condition.

The Department of Corrections calls tasers and 37mm guns "non-lethal weapons." (Kaufman Declaration at 159.) Both are projectile-type weapons. A taser is a weapon that fires a needle-like dart attached to a wire through which the victim receives an electric shock. (Id.) The 37mm gas gun is used to fire rubber bullets or wooden blocks. (Id.)

Dr. Kaufman cited fourteen examples of mentally ill patients who were tasered and/or shot with the 37mm gun. Each confrontation commenced with a conflict between inmates or between and inmate and staff. In each situation, Dr. Kaufman testified, custody staff escalated the conflict by demanding compliance to orders. When the inmate refused to comply, the staff (custody and medical) suited up in gloves, masks, goggles and raincoat-like suits. (Kaufman Declaration at 162.) If it was deemed necessary (and typically it was) to physically remove the inmate from his

54

cell, the "cell extraction team" suited up in protective vests (flack jackets), helmets, face guards, heavy gloves and large plastic shields. (Kaufman Declaration at 162.) These staff members then approached the inmate with the weapon and spoke through masks and shields. (Id.)

Tasering a person using psychotropic medications may "result in heart beat irregularity or death." (Id. at 159.) In many of the incidents described by Dr. Kaufman, inmates sustained physical injuries from the use of these weapons. (Id. at 163.) In addition, use of these weapons could, and often did, cause further damage to and deterioration of the inmate's mental condition. (Id.; Petrella Declaration at 34.) It also reduced the possibility that future mental health treatment would be successful. (Kaufman Declaration at 163.)

Dr. Petrella stated that in all his experience he has yet to see a situation where the use of tasers or 37mm guns on a mentally ill patient was warranted. (Petrella Declaration at 34.) Dr. Kaufman agreed that the use of either tasers or 37mm guns on any mentally ill inmate was inappropriate. (Kaufman Declaration at 12, 29.)

At Wasco, Dr. Petrella found that inmates are "tasered simply after refusing custody staff orders, without any professional mental health intervention." (Petrella Declaration at 128.) This can have grave consequences for the medicated inmate. One inmate at Wasco was tasered after refusing to take medication; he was then involuntarily medicated. (Id. at 129.) In another

55

example, an inmate was "tasered, forcibly medicated, and placed in restraints" as a result of the inmate's attempt to self-mutilate. (Id. at 126.)

Strict guidelines for the use of tasers on inmates taking psychotropic medication were issued to all Wardens by directive dated September 29, 1992. (Meenakshi Declaration at 98.) It is clear from the evidence that this directive was not adequately communicated to staff. Some of the doctors were unaware of the directive at the time of their depositions, (Id. at 97, 106, 110), and some were unaware that the use of tasers on persons using psychotropic medications could have adverse effects. (Kaufman Declaration at 47.)

Other measures which may be required for proper management of mentally ill inmates are used inappropriately throughout the CDC. There was uncontradicted evidence that mechanical restraints are necessary in some instances for proper management of a mentally ill inmate, but that such restraints should only be used when physical assault, by the mentally ill inmate against others or against him or herself, is imminent or has just occurred, and that such restraints should only be used in accordance with strict guidelines. (Petrella Declaration at 35; Meenakshi Declaration at 82.) Since the use of mechanical restraints is only appropriate when a psychological emergency has occurred, it is necessary to provide follow-up psychiatric care to the mentally ill inmate after restraints have been used. (Petrella Declaration at 128.) Procedures for use of these restraints vary

56

from institution to institution within the class, and there is no systemwide review in place to ensure appropriate use of such restraints. (Id. at 36.)

Similarly, involuntary medication is in certain instances a necessary treatment modality for a mentally ill inmate. (See, e.g., Kaufman Declaration at 142.) In Washington v. Harper, 494 U.S. 210, 227 (1990), the United States Supreme Court held that prison officials may administer psychotropic medications to an inmate against his or her will. However, the Court held that an inmate has a liberty interest protected by the Due Process Clause of the Fourteenth Amendment in refusing such medication unless the inmate has a serious mental illness, the inmate is dangerous to self or others, and the treatment is in the inmate's medical interest. (Id.)

An inmate is entitled to certain procedural protections before he or she is involuntarily medicated. (Id. at 228, 233.) First, the decision to medicate must be made by medical professionals. (Id. at 231.) Second, the inmate is entitled to review of that medical decision at an administrative hearing. (Id. at 235.) The inmate is entitled to notice of the hearing, the right to present at the hearing, and the right to present and cross-examine witnesses. (Id.)

The purpose of the hearing is principally to review a medical treatment decision made by a medical professional. (Id. at 232.) The issues for review are (1) whether the inmate suffers from a mental disorder; (2) whether as a result of that disorder

57

the inmate is dangerous to self or others; and (3) the type and dosage of medication. (<u>Id</u>. at 232.) Under the policy at issue in <u>Washington v. Harper</u>, the type and dosage of medication was reviewed on a "regular basis. (<u>Id</u>.)

In <u>Washington v. Harper</u>, the Supreme Court approved a policy which mandated that the hearing committee be composed of a psychiatrist, a psychologist, and a prison administrator. (<u>Id</u>. at 229.) The policy also provided that "[n]one of the committee members may be involved, at the time of the hearing, in the inmate's treatment or diagnosis; members are not disqualified from sitting on the committee, however, if they have treated or diagnosed the inmate in the past." (<u>Id</u>.) The committee's decision was also subject to review by the Superintendent of the facility. (<u>Id</u>.)

There are several deficiencies in the use of involuntary medications throughout the California Department of Corrections and at particular institutions in the class.

At California Men's Colony, in an emergency the psychiatric officer of the day can make a telephone order for involuntary medication of an inmate without examining the inmate; the medication is then administered by a nurse or medical technical assistant. (Kaufman Declaration at 141-142.) In addition, Dr. Kaufman testified that involuntary medication is underutilized at CMC; when inmates refuse medication, involuntary medication is not considered as an option until the inmate has decompensated so severely that emergency involuntary medication is required. (<u>Id</u>.

at 142.) This underutilization has two vices. First, it causes harm to the inmate who is decompensating instead of being treated. Second, it results in the de facto denial of the procedural safeguards to which mentally ill inmates are entitled.

It appears that custody staff can and does play a significant role in recommending the use of involuntary medication. Dr. Petrella cited an example in which a decision was made to involuntarily medicate an inmate based solely on the report of custody staff; medical staff were consulted but apparently did not evaluate the inmate. (Petrella Declaration at 129.) Dr. Meenakshi described an incident at Mule Creek State Prison where an inmate was involuntarily medicated after he assaulted custody staff and then refused medication. (Meenakshi Declaration at 99.) In that case, the involuntary medication was ordered by a medical doctor, but was not authorized by either the Chief Medical Officer or the institutions' contract psychiatrist as is theoretically required by the institution. (Id.)

Custody staff are also allowed to veto clinical decisions concerning the use of involuntary medication. (Meenakshi Declaration at 3.) At California Institution for Women, the warden must approve all orders for involuntary medication, and custody administrators outnumber psychiatric staff two to one on the hearing panel that decides whether to involuntarily medicate an inmate.[41/] (Meenakshi Declaration at 29.) While the

_____

[41/] Dr. Meenakshi also testified that this violates a state court injunction filed in Keyhea v. Rushen (Solano Co. Sup. Ct. No. 67432, filed October 13, 1986) prohibiting an employee of the CDC from

AO 72
(Rev 8/82)

requirement that the warden approve all orders for involuntary medication does not run afoul of the federal constitution, a predominance of custody staff in the decisionmaking process regarding use of involuntary medication, or a system which allows custody staff to unilaterally veto a medical decision that the use of such medication is required, does. See Washington v. Harper, supra.

There is no protocol in place at Pelican Bay State Prison for involuntary administration of medication. (Grassian Declaration at 51.) Sierra Conservation Center does not have a written policy governing use of involuntary medications, although inmates have been involuntarily medicated at that institution. (Meenakshi Declaration at 111.)

In addition, inmates are often involuntarily medicated in inappropriate settings. At CIW inmates are involuntarily medicated in the East Wing of the Support Care Unit. (Id. at 28.) This unit has no provision for emergency medical care. This care is necessary because the inmate may have physical reactions to the involuntary medication that require immediate medical attention. (Id.) Dr. Kaufman opined that administration of involuntary medication at CMC is also done in an inappropriate setting. (Kaufman Declaration at 142.)

Once again, the above-described deficiencies flow in large part from the failure of defendants to have an adequate

serving as a hearing officer in the certification hearing, and that it violates CDC regulations as well. Compliance with state court injunctions is not, of course, before this court.

AO 72
(Rev 8/82)

program in place for screening and identifying mentally ill

inmates.  The deficiencies are also attributable to a lack of

adequate training of custody staff to recognize signs and symptoms

of mental illness.  Finally, the deficiencies are attributable to

policies which permit custody staff to use these measures in the

absence of consultation with, or against the considered advice of,

medical and/or mental health professionals.

This court finds that use of tasers and 37mm guns upon

mentally ill inmates without regard to the impact of such measures

on an underlying mental illness violates the Eighth Amendment.  The

court further finds that defendants present practices concerning

the use of mechanical restraints and involuntary medication violate

the requirements of the federal constitution.[42]

5.  Medical Records

The medical records system within the California

Department of Corrections is extremely deficient.  (Testimony of

James Gomez, RT, March 29, 1993, at 47-48.)  A medical record

should describe the patient, assess the problem, and track the

---

[42]  Section 3364 of Title 15 of the California Code of Regulations
sets forth guidelines for the administration of involuntary
medication.  The regulation contains several requirements, including
a requirement that the decision to involuntarily medicate an inmate
must be made by a physician based on personal examination of the
inmate with a follow-up medical opinion three days later, guidelines
for the location of administering such medication as well as notice
by medical staff to custody staff of such administration, a
requirement of formal consultation where such treatment is continued
beyond ten days, notification to next of kin, and standards for
charting and recording each incident of involuntary medication.  Id.
The regulation does not cover the procedural protections for inmates.
The evidence before the court demonstrated that defendants have not
complied with their own regulation.

61

AO 72
(Rev 8/82)

course of treatment. (Petrella Declaration at 134.) An adequate record is necessary to provide continuity of care, particularly with respect to mental illness. Since mental illness is often recurrent, the prior treatment records help determine future treatment decisions. (Petrella Declaration at 20.) At most of the prisons in the class there are serious deficiencies in medical recordkeeping, including disorganized, untimely and incomplete filing of medical records, insufficient charting, and incomplete or nonexistent treatment plans. To complicate the situation beyond all reason, inmates are typically transferred between prisons without even such medical records as might exist.

Dr. Meenakshi observed that medical records at the California Institution for Women (CIW) were "abysmal." (Meenakshi Declaration at 24.) The records were incomplete, lacked lab reports and complete evaluations of the inmate's mental illness, and were often illegible. (Id.) When inmates were transferred to CIW, their charts did not usually accompany them. Sometimes there would be more than one chart for one patient; sometimes the patient's chart could not be located for the psychiatrist to review prior to evaluation and treatment. Often documents at CIW were misfiled, either within the patient's chart or in another patient's chart. Frequently documents were not filed in chronological order. (Id. at 25.) Prior records were often missing from the patient's file. In addition, patient notes did not reflect that medication had been adjusted to treat the patient's current needs or "to respond to the escalation of psychotic symptoms." (Id.) This

62

precluded the clinician from having benefit of a treatment and diagnostic history, and forced the clinician to rely solely on the information provided by the patient, which was often incomplete or inaccurate. (See id. at 26-27.)

The medical records that did exist at CIW were underutilized by clinicians. Dr. Meenakshi did not find a single reference in any of the records that she reviewed at CIW that the patient's medical chart had been reviewed prior to "making a diagnosis or prescribing treatment." (Id.) The clinicians did not attempt to obtain medical records from a patient's prior hospital stay. In addition, the medical records at CIW did not contain adequate treatment plans. In fact, until last year, CIW did not have treatment plans at all. (Id.)

Similar deficiencies existed at Central California Women's Facility (CCWF). Inmates transferred to CCWF frequently arrived without their medical records. The records were usually incomplete; Dr. Meenakshi found "significant information . . . missing in almost every file" at CCWF. (Meenakshi Declaration at 65.) The medical records at CCWF did not show that physicians and doctors reviewed the patient's chart before treating the patient. Medication sheets were absent from some files at CCWF. The medical charts at CCWF were disorganized and were not promptly updated; signatures on consent forms were obtained late. (Id.)

Record-keeping at Northern California Women's Facility (NCWF) was also deficient. Medical records were often misfiled, either within the patient's own chart or in another patient's

63

chart. Frequently, filing at NCWF was not in chronological order. Important lab reports, medication sheets, consent forms and discharge summaries were often missing. (Meenakshi Declaration at 86-87.) When a patient was admitted to the infirmary at NCWF, a separate medical file was established. Often there was no correlation between the inpatient file and the outpatient file -- no mention in the outpatient file that the patient was going to be hospitalized or that the patient had been discharged and might need follow-up outpatient care. (Id. at 88.)

Charting at NCWF was also insufficient. (Id. at 87.) No reference to a review of the patient's prior medical record was found. Often no diagnosis was recorded. In one set of records, rather than delineate specific information, the physician simply wrote the acronym SOAP[43]/ followed by the prescription issued. (Id.) This offered no insight for the next clinician who reviewed the file. Dr. Meenakshi cited other examples of deviances in treatment that were not explained within the medical record at NCWF. (Id.)

In addition, NCWF did not have adequate treatment plans. An adequate plan "should be based upon a competent psychiatric evaluation . . . [and] should include prescription of appropriate medications and other forms of therapy, as well as a statement of goals for treatment." (Id. at 86.) A doctor at NCWF testified

_____

43/ "The acronym SOAP is a tool to help the clinician remember to record the following information: the patient's subjective description of the problem, the clinician's objective evaluation, his or her assessment of the patient's condition, and a plan for treatment." (Id. at 87.)

AO 72
(Rev 8/82)

that his treatment plan consisted solely of orders for medications
and follow up care.  (Id.)

Dr. Meenakshi described the documentation of psychiatric
care at Mule Creek as "grossly inadequate."  (Meenakshi Declaration
at 100.)  The medical records were disorganized and misfiled, and
many were missing lab reports.  Medical files were mixed in with
psychiatric files.  (Id.)

There was also evidence of insufficient charting at Mule
Creek.  Some files contained no reference to a review of the
patient's prior medical record.  "In some, it [was] impossible even
to determine the source of recommendations for Category J
evaluations, psychotropic medication or psychiatric assessments" at
Mule Creek.  (Id.)

Inmates sent to Mule Creek frequently arrived without
their medical records.  It usually took two weeks for the records
to arrive.  (Id.)

Medical records received at Pelican Bay were often
incomplete and sometimes even failed to contain information on
prior psychiatric hospitalizations.  (Grassian Declaration at 52.)
Sometimes pertinent psychiatric records were misfiled in the
patient's central file.

At Pelican Bay, infirmary records were kept separately
from medical records.  Suicide watch records were made in the
infirmary record, and Psychiatric Services did not receive
infirmary records.  (Id.)  Dr. Grassian also found that clinicians
at Pelican Bay were not reviewing patient records prior to

AO 72
(Rev 8/82)

evaluation and treatment. He observed: "Records are of use only if they are read." (<u>Id</u>.)

Medical records at California Institution for Men (CIM) were disorganized and Dr. Petrella reported that "there [was] no audit or quality assurance program to determine whether records were properly kept." (Petrella Declaration at 86.) Consent forms were sometimes missing from the medical records at CIM.

Inmates often arrived at CIM without their medical records, or with only a description of their medication. This made it difficult to adequately treat suicidal patients. (<u>Id</u>. at 85.)

A review of medical records at CIM revealed insufficient charting. Dr. Petrella testified that "[i]t was not possible to review a record and discern the nature of the inmate's problem, the assessment of the problem, the plan for treating it and the implementation of the plan." (<u>Id</u>. at 86.) Although some entries recommended the inmate be seen in "psych line," there was little evidence that this recommendation was followed.

Medical records at Calipatria were disorganized and incomplete. Progress notes and discharge summaries were missing. (Petrella Declaration at 109-10.) Medical files were not updated in a timely manner. A shortage of medical transcribers contributed to the delay in properly updating files. (<u>Id</u>. at 111.) Infirmary files were kept separately from psychiatric files at Calipatria. This made it difficult to provide continuity of care because the clinician had no easy access to the separate file or did not know it existed. (<u>Id</u>. at 110.)

66

Charting at Calipatria was insufficient as well. Dr. Petrella cited one example where medication was prescribed, but the clinician's notes did not explain why, and another example where the clinician's notes recommended no medications, yet the medications chart showed the patient continued to receive medications. (Id.)

Inmates at Calipatria were sometimes examined without their medical records. Dr. Millan admitted this had a negative impact on the quality of care he was able to provide. (Id.)

Medical files at Wasco were disorganized and incomplete. "Dr. Lewengood stated that he had recently found a stack of unfiled medical records that [were] taller than him." (Petrella Declaration at 135.) Wasco had difficulty with timely transcription of medical records as well. (Id. at 136.) Infirmary files were kept separately from psychiatric files, and updates were not made simultaneously. (Id. at 135.)

There was insufficient charting at Wasco. The mental health staff did not document their patient assessment or treatment. Dr. Petrella called their record-keeping "vague." (Id.) He observed the record of an inmate placed on suicide watch at Wasco in which the record did not show who placed the inmate on suicide watch or why the watch was instituted. (Id.)

He also testified that record-keeping problems were compounded because ninety-five percent of all inmates received at Wasco had no medical or mental health documentation with them when they arrived. (Id. at 136.)

AO 72
(Rev 8/82)

Dr. Petrella found the medical records at California Men's Colony (CMC) generally acceptable. (Petrella Declaration at 71.) Often the files were disorganized and some of the files lacked treatment plans, but most of the files contained the necessary information. (Id.)

Dr. Kaufman found the medical records inadequate at Tehachapi. The files were illegible and incomplete. The charting was insufficient, with no evidence of full psychiatric evaluations, treatment plans, or quality assurance reviews. (Kaufman Declaration at 46.)

Psychiatric records at Avenal were separated behind a divider in the inmate's medical file. Dr. Kaufman found evidence of insufficient charting, including inadequate detail in evaluating inmates and failure to use consent forms. (Kaufman Declaration at 152-53.) Sometimes inmates arrived at Avenal without their medical records. (Id. at 151.)

As a result of the serious deficiencies in the overall medical records system, it is difficult, if not impossible, to provide effective mental health care. (Petrella Declaration at 20.) It is crucial to have a complete and legible record for the next clinician to review before evaluating and treating the inmate. Inmates have often been misdiagnosed based on an absent or incomplete record, which can result in life-threatening situations. (Meenakshi Declaration at 24.)

/////

/////

At trial, defendant Gomez acknowledged the deficiencies in medical recordkeeping. (RT, May 17, 1993, at 47-48.) Defendant Gomez also acknowledged that there is a problem with inmates being transported between prisons and returning to custody without their medical files. (RT, May 17, 1993, at 87.) An essential element of a constitutionally adequate mental health care delivery system in prison is the maintenance of accurate, complete and confidential mental health treatment records. The mental health records in the CDC, such as they are, have none of these qualities. Defendants are in violation of the Eighth Amendment in this regard. Further, those records must be readily available to a clinician at the time an inmate presents for necessary care. Defendants do not have an adequate system for transporting and retrieving inmate mental health records and they are well aware of this deficiency; this, too, constitutes deliberate indifference to serious medical needs in violation of the Eighth Amendment.

### 6. Suicide Prevention

Plaintiffs' experts testified concerning at least twelve suicides at institutions in the class, plus an additional suicide at the San Quentin Reception Center, between 1988 and 1992. (Petrella Declaration at 69-70, 158; Kaufman Declaration at 47, 132-141.) Plaintiffs also provided evidence that suicide attempts were frequent at some institutions in the class. For example, Dr. Petrella testified that there were approximately ten suicide attempts at Calipatria each month; two to three of these occurred in administrative segregation. (Petrella Declaration at 100.) Dr.

AO 72
(Rev 8/82)

Petrella also testified that there were two suicide attempts "or other psychiatric emergencies" each week at Wasco State Prison. (Id. at 145.)

Dr. Meenakshi described four suicide attempts that took place at California Institution for Women between March and October 1992. (Meenakshi Declaration at 36-38.) She described five cases of inmates admitted to the infirmary on suicide watch at Central California Women's Facility during 1992. (Id. at 58-59.) She also described three suicide attempts by women at Northern California Women's Facility during the same year. (Id. at 79-81.) Dr. Meenakshi testified that the staff psychiatrist at California Conservation Center "estimates that she is called to the prison to see an attempted suicide approximately 2-3 times per year." (Id. at 106.)

There was also evidence that suicide attempts are not as frequent at other institutions. (See, e.g., Kaufman Declaration at 151 (Suicide attempts are "infrequent" at Avenal).)

Dr. Louis L. Beermann testified that the suicide rate in the CDC had declined from a high of 77 per 100,000 inmates in 1982 to 14 per 100,000 inmates in 1992.[44/] (Declaration of Dr. Louis L. Beermann, Ph.D., filed February 11, 1993, at 6; see also Beermann Declaration at Attachment 1.) The suicide rate for male inmates in the CDC appears to be lower than that the rate in the general population; in 1992, the suicide rate for male inmates in

_____

[44/] There were 24 suicides in the CDC in 1982; that year the average daily population was 31,142 inmates. (Beermann Declaration at Attachment 1.)

70

the CDC was 14 per 100,000 inmates, while the rate for non-imprisoned males was 20 per 100,000. (Id. at 6.)[45/]

The CDC has a Suicide Prevention Program in place. (Beermann Declaration at 4.) The program was standardized and enhanced in 1990. (Id.) The program consists of three major components: staff education, prevention, and assessment. (Id.) Each prison has a suicide prevention coordinator to implement the suicide prevention program, heighten staff awareness of suicide prevention measures, and report any suicide to the central Mental Health Services Branch within twenty-four hours. (Id. at 3-4.)

As part of staff education, the Department has published a "Suicide Prevention Handbook" prepared by Dr. Beermann for use in in-service training for correctional officers. (Id. at 4.) Approximately 25,000 copies of the Handbook have been distributed to correctional officers and other CDC personnel. (Id.) A suicide prevention videotape is also available and has been shown at in-service training. (Id.) Dr. Beermann testified that 80 to 100 percent of all correctional officers at all institutions have now received suicide prevention training. (Id. at 4-5.) Dr. Beermann also testified that suicide prevention training is now included as part of the curriculum at the Department of Corrections Training Academy and that all new correctional officers are required to participate in the training. (Id.)

/////

---

[45/] The suicide rate for female inmates appears to be relatively low; of the 181 suicides reported in the CDC from 1980 to 1990, 179 were male and 2 were female. (Beermann Declaration at Attachment 1.)

The second component of the program is the prevention component. As described by Dr. Beermann, this part of the program consists of identification of inmates who are potential suicide risks and "suicide watch." (Id. at 5.) Suicide watch is ordered by a clinician and may involve the confinement of an inmate considered seriously suicidal in an observation cell, removal of items from the cell with which the inmate could harm himself or herself, and recording observations every fifteen minutes. (Id.)

The suicide assessment component of the program consists of preparation of a psychological autopsy on each inmate who does commit suicide. (Id.) These autopsies are conducted in order to improve the Suicide Prevention Program. (Id.) Each autopsy includes a description of how the suicide was accomplished, as well as specific recommendations on how to prevent a similar occurrence and time-lines for implementation of the specific recommendations. (Id.) All autopsies are sent to the CDC-Mental Health Services Branch for review and follow-up; the warden of the institution where the suicide occurred is required to submit a signed follow-up memorandum describing the actions taken to implement the recommendations. (Id.)

The presence of a suicide prevention coordinator and in-service training at least some institutions was acknowledged by plaintiffs' experts. (See Meenakshi Declaration at 39 (suicide prevention coordinator and in-service training program at CIW), 82 (suicide prevention protocol claimed to exist at CCWF but doctor at

AO 72
(Rev 9'82)

the prison unable to describe what it entails); Kaufman Declaration at 48 (training implemented at California Correctional Institution at Tehachapi by December 1992).) The presence of either a coordinator or staff training at other institutions was disputed. (See Meenakshi Declaration at 79 (staff at Northern California Women's Facility not properly trained to respond to suicide attempts), 97 (staff at Mule Creek is not trained in suicide prevention), 105-106 (as of April 1992, no training information had been distributed to staff at California Correctional Center and staff doctor did not know of suicide prevention program); Kaufman Declaration at 151 (doctor at Avenal had not received any suicide prevention training, had only received the department manual on the morning of his deposition, and had not trained any staff).) Dr. Meenakshi also questioned the long-term commitment of California Institution for Women to the Suicide Prevention Program, and she testified that the program was halted for a period of time in August 1990 to save money. (Meenakshi Declaration at 39.) Dr. Grassian testified that there has been in-service training and distribution of the pamphlet at Pelican Bay, but that the psychiatric staff at the prison has not provided the custody or the medical staff with formal training in suicide prevention. (Grassian Declaration at 53.) Dr. Grassian also testified to a suggestion that the in-service training has not made a difference in the way staff handles potentially suicidal inmates. (Id.)

Plaintiffs' experts challenged the adequacy of the suicide watch program at several prisons. Dr. Meenakshi testified

73

1 that, at CIW, women known to be high suicide risks were placed in
2 segregation or confined to quarters rather than being properly
3 monitored or observed after suicide attempts, and that charting of
4 the suicide attempts was wholly inadequate. (Meenakshi Declaration
5 at 36-39.) Dr. Meenakshi reported similar inadequacies in the
6 suicide watch program at Central California Women's Facility (id.
7 at 58-59), Northern California Women's Facility (id. at 80-81),
8 Mule Creek State Prison (id. at 96), California Correctional Center
9 (id. at 106), and Sierra Conservation Center (id. at 110).

10        Dr. Petrella testified that the monitoring for suicide
11 risk was inadequate at California Men's Colony. (Petrella
12 Declaration at 69.) Dr. Petrella also testified that some good
13 suicide prevention procedures existed at CMC; he testified that the
14 Locked Observation Unit provided good supervision for inmates on
15 suicide watch. (Id. at 70.) In other instances, the suicide watch
16 program at CMC was, in his opinion, inadequate; use of certain
17 cells in another part of the institution for suicide watch happened
18 and was, he stated, "grossly inappropriate." (Id.) Dr. Petrella
19 found the suicide watch program, including ready access to a
20 psychiatrist, observation, monitoring and charting, at Calipatria
21 to be inadequate. (Id. at 100-103.) Dr. Petrella also testified
22 that at Wasco delays in access to psychological help have resulted
23 in suicide attempts. (Id. at 144.) Finally, he found that
24 charting of inmates on suicide watch was inadequate, as was follow-
25 up monitoring and care after suicide attempts. (Id. at 144-146.)
26 /////

74

This court finds that defendants have designed an adequate suicide prevention program and have taken many of the steps necessary to implement that program. This court also finds that the program has not yet been fully implemented, and that some of the failure to fully implement the program is due to the severe understaffing in mental health care. Accordingly, the court will recommend that the special master recommended below be ordered to report to the court on the adequacy of suicide prevention in the CDC twelve months after the order of the district court.

### C. Deliberate Indifference

The evidence of defendants' deliberate indifference to the deficiencies in mental health care was not seriously contested. Defendants have known of the serious problem with understaffing at least since they undertook the interdepartmental workload study in 1985. That study concluded, inter alia, that the then current workload was "clearly excessive." (Plaintiffs' Exhibit 456 at vi.) Defendants have known that there were thousands of mentally ill inmates incarcerated in the state of California who were not even identified as needing care, let alone being provided necessary care, at least since the publication of the Stirling Report in July, 1989. The inadequacies in the mental health care delivery system were confirmed in 1991 when the Scarlett Carp consultants commenced their study, and they remain today.

Defendants repeatedly acknowledged that they were grossly understaffed in the area of mental health care, that their medical recordkeeping system was woefully outdated and inadequate, and that

AO 72
(Rev 8/82)

they did not have a mechanism in place for screening and identifying mentally ill inmates.

Even without the historical facts found above, the grossly inadequate mental health care provided in the California Department of Corrections, by itself, would be sufficient evidence of deliberate indifference to warrant injunctive relief. <u>Wellman v. Faulkner</u>, 715 F.2d at 272. The fact that defendants have known about these deficiencies for over eight years without taking any significant steps to correct them is additional evidence of deliberate indifference. Injunctive relief is required.

        D.  <u>Remedies</u>

The district court has "broad discretion to fashion remedies once constitutional violations are found." <u>Hoptowit v. Ray</u>, 639 F.2d at 1245 (citing <u>Swann v. Charlotte-Mecklenburg Bd. of Educ.</u>, 402 U.S. 1, 15 (1971)). Indeed, when constitutional violations are found "a federal court must order effective relief." <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1087 (9th Cir. 1986), <u>cert. denied</u>, 481 U.S. 1069 (1989).

The relief "must be no broader than necessary to remedy the constitutional violation." <u>Id</u>. at 1086. "A defendant's history of noncompliance with prior court orders is a relevant factor in determining the necessary scope of an effective remedy." <u>Id</u>. at 1087 (citing <u>Hutto v. Finney</u>, 437 U.S. 678, 687 (1978) (additional citations omitted)).

/////

/////

AO 72
(Rev 8/82)

As described above, this court finds that defendants are in violation of the Eighth Amendment with respect to screening and identification of mentally ill inmates, staffing for mental health care, access to care, use and monitoring of psychotropic medication, placement and retention of mentally ill inmates in administrative segregation and segregated housing units, use of tasers, 37mm guns, mechanical restraints, and involuntary medication, and maintenance of mental health records. This court will recommend that defendants be required to develop and implement forms, protocols, and plans necessary to remedy these violations as set forth below.

E. Appointment of Special Master

The court may appoint a special master in a non-jury case on a showing that "exceptional conditions" require such appointment. Fed. R. Civ. P. 53(b). In the instant case, appointment of a special master will be necessary. This court will recommend to the district court that defendants be ordered to remedy the constitutional violations found in their mental health care delivery. Monitoring compliance with this order will be a significant task. This court will recommend that the district court appoint a special master to monitor defendants' compliance with court ordered injunctive relief with defendants to pay the cost of the master.

F. Mental Retardation

This court has determined that further briefing is required concerning the claims raised on behalf of mentally

77

retarded inmates and has separately issued a further briefing
order.  Accordingly, findings and recommendations on said claims
are deferred at this time.

### RECOMMENDATIONS

In accordance with the above, IT IS HEREBY RECOMMENDED
that the district court order as follows:

1.  The district court appoint a special master for a
term of three years to perform the following duties:

a.  Consult with the court concerning the appointment of
experts to develop the protocols and plans required by the district
court's order;

b.  Monitor compliance with court-ordered injunctive
relief;

c.  Report to the court in twelve months on the adequacy
of suicide prevention at all institutions in the class; and

d.  Perform such additional tasks as the court may deem
necessary.
Defendants shall pay the cost of the special master.

2.  Within thirty (30) days of the order of the district
court, defendants shall develop and use standardized mental health
screening forms and protocols to be used at all institutions in the
class upon the admission, readmission or transfer of any inmate.
Said forms and protocols shall be developed in consultation with an
expert to be designated by the court after consultation with the
special master, with defendants to pay the cost of the expert.
/////

AO 72
(Rev 8/82)

3. Within ninety (90) days of the order of the district court, defendants shall implement a training program to train all medical technical assistants, nurses, correctional officers, and other personnel who work with inmates on a regular basis in the recognition and identification of the signs and symptoms of mental illness. Said training program shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

4. Within thirty (30) days of the order of the district court, defendants shall develop and implement medication protocols to establish an adequate formulary, to ensure timely refilling of prescriptions, to maintain continuity of medication delivery, to require adequate monitoring of the medical condition, including blood levels where appropriate, of inmates receiving psychotropic medications, and to avoid hoarding of medications. Said protocols shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

5. Within ninety (90) days of the order of the district court, defendants shall develop and implement a plan to use transfer notes and to transfer medical records with inmates when they are transferred from one institution to another within the California Department of Corrections. At the same time, defendants shall develop a plan for obtaining medical records from county jails for inmates on their initial admission to the California

Department of Corrections.  Said plan shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

6.  Within ninety (90) days of the order of the district court, defendants shall develop and implement a formula for mental health care staffing ratios at all institutions within the class. Said formula shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

7.  Within (90) days of the order of the district court, defendants shall develop and implement a recruitment program, including but not limited to provision of adequate compensation, for the recruitment of mental health staff at every institution in the class.  Said program shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

8.  Within ninety (90) days of the order of the district court, defendants shall fill those positions presently authorized for the provision of mental health care services.  Within one hundred eighty (180) days of the order of the district court, defendants shall fill those positions determined to be necessary under the formula developed in paragraph 7, supra.

9.  Within ninety (90) days of the order of the district court, defendants shall develop and implement a system for quality assurance and peer review of mental health care services.  Said

80

system shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

10. Within sixty (60) days of the order of the district court, defendants shall develop and implement a protocol, as well as any contractual arrangement that may be necessary, to guarantee prompt access to inpatient psychiatric hospitalization for every class member in need of such hospitalization. Said protocol shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

11. Within ninety (90) days of the order of the district court, defendants shall develop and implement a protocol to govern placement and retention of mentally ill inmates in any administrative segregation or segregated housing unit, and to govern care of any mentally ill inmate who is so housed. Said protocol shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

12. Within ninety (90) days of the order of the district court, defendants shall develop and implement protocols to govern use or non-use of tasers, 37mm guns, mechanical restraints, involuntary medication and other measures on class members. Said protocols shall specifically address coordination and consultation between mental health staff and custody staff and, in the case of involuntary medications, use of federal due process protections.

81

Said protocols shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert.

13. Within ninety (90) days of the order of the district court, defendants shall develop and implement a standardized protocol for completion and maintenance of adequate mental health records at every institution in the class. Said protocol shall be developed in consultation with an expert to be designated by the court after consultation with the special master, with defendants to pay the cost of the expert. Defendants shall also take any and all additional steps necessary to insure that adequate mental health records are kept for all inmates in the class.

14. The preliminary injunction regarding heat plans presently in existence in this action be made permanent to remain in effect for three years.

15. Defendants' motion for judgment pursuant to Federal Rule of Civil Procedure 52(c), made at the close of plaintiffs' case in chief, be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service

AO 72
(Rev 8/82)

of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  June 6, 1994.

UNITED STATES MAGISTRATE JUDGE

JFM:hg:cw
coleman.fin

AO 72
(Rev 8/82)

# APPENDIX

## EXPERTS' BACKGROUNDS[46]/

### Plaintiff's Experts

Stuart Grassian, M.D.

Dr. Stuart Grassian is a board certified psychiatrist. He received his medical degree from New York University Medical School in 1973 and completed his psychiatric residency training at Beth Israel Hospital/Harvard Medical School in Boston, Massachusetts in 1977. He received his Board certification in 1979.

He has been a clinical instructor of psychiatry at the Harvard Medical School since completing his residency, was on the active teaching staff of the Tufts University School of Medicine as an Assistant Clinical Professor of Psychiatry from 1978 to 1981, and has been on the teaching staff at Beth Israel Hospital in Boston continuously since 1977.

Dr. Grassian has published two articles on the subject of the psychological effects of solitary confinement. He has been retained as an expert concerning the psychological effects of imprisonment generally and solitary confinement specifically in class action lawsuits in Massachusetts, New York, Kentucky, and California.

Thomas Greenfield, Ph.D.

Dr. Thomas Greenfield is a psychologist licensed in the State of Washington. Dr. Greenfield was one of the consultants who conducted the prevalence study ultimately published as the Stirling Report. In 1991, he was asked to, and did, reanalyze the prevalence data published in the Stirling Report for use by Scarlett Carp & Associates; these results were used in subsequent reports published by Scarlett Carp & Associates.

Dr. Greenfield obtained his doctoral degree in clinical psychology from the University of Michigan in Ann Arbor in 1977. From 1968 to 1970, he was a predoctoral intern in the department of psychology at Ypsilanti State Hospital in Ypsilanti, Michigan, where he conducted psychological testing and provided psychotherapy to severely disabled patients. He did a second predoctoral internship at the Counseling Center, Bureau of Psychological Services at the University of Michigan from 1970 to 1971.

---

46/ The following information is drawn from the declarations and curriculum vitae of the expert witnesses filed by the parties.

1

He has been a psychological counselor from 1971 to 1986, first at University of Michigan and then at Washington State University. From 1986 to 1988, he was a National Institute of Mental Health postdoctoral fellow at the Department of Psychiatry, University of California, San Francisco, in the Clinical Services Research Program. He worked as a research psychologist in the same department from 1988 to 1989. From 1989 to 1991, he was an Associate Director for Research at the Marin Institute for Prevention of Alcohol and Other Drug Problems.

He is currently Senior Scientist at the Alcohol Research Group, Institute for Epidemiology and Behavioral Medicine, Medical Research Institute of San Francisco, and served as the director of that institute during 1992. He has also provided psychiatric research consultation services to several organizations and has held a number of university appointments. Dr. Greenfield has been involved in several psychometric studies, i.e., studies which measure psychological variables such as depression or client satisfaction, in a given population as well as other prevalence and investigative studies. Many of the studies have been published in journals, presented at professional meetings, or presented to agencies such as the California Department of Corrections.

Craig Haney, J.D., Ph.D.

Craig Haney, J.D., Ph.D., is a Professor of Psychology and Director of the Program in Legal Studies at the University of California at Santa Cruz, where he has taught graduate and undergraduate courses in social psychology, research methodology, psychology and law, forensic psychology, and institutional analysis for fifteen years.

Dr. Haney received his Ph.D. in Social Psychology and his Juris Doctor degree from Stanford University in 1978. He has published over thirty articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on conditions of confinement and the psychological effects of incarceration. He has also served as a consultant to several organizations, including the National Judicial College, the California Legislature, and the United States Justice Department.

For over twenty years, Dr. Haney has studied the effects of living and working in maximum security prisons. During that time he has done numerous interviews with correctional officers, guards and prisoners to assess the impact of prison adjustment, and has analyzed data to examine the effects of overcrowding and other conditions on the quality of prison life and prisoner adjustment. He has toured maximum security state prisons in Alabama, Arkansas, California, Georgia, New Jersey, New Mexico, Ohio, Tennessee, Texas, Washington; maximum security federal prisons at McNeil

2

Island and Marion, Illinois; and prisons in Canada, England, and Mexico. For the last fifteen years, he has also studied the backgrounds and social histories of persons accused and convicted of violent crime and assessed the effects of prior periods of incarceration on such persons.

Dr. Haney has testified as an expert in state and federal courts in California, including the Superior Courts of Lake, Los Angeles, Marin, Orange, Placer, Sacramento, San Diego, San Francisco and Ventura Counties, and the federal courts in the Northern, Southern, and Eastern Districts of California. He has also testified in federal district courts in the Eastern District of Washington and the Southern District of Illinois. His testimony in California has concerned conditions of confinement at several institutions in the California Department of Corrections. He has also evaluated conditions of confinement and the quality of care provided at Atascadero State Hospital for the United States Department of Justice.

Edward Kaufman, M.D.

Dr. Edward Kaufman is a clinical professor in the psychiatry department at the University of California, Irvine. He is Board certified by the American Board of Psychiatry and Neurology and is a Fellow of the American Psychiatric Association. Dr. Kaufman graduated from Jefferson Medical College in 1960, completed his residency in psychiatry in 1964 at the New York State Psychiatric Institute at the Columbia Presbyterian Medical Center, and received his Psychoanalytic Certificate in 1970. He received Board certification in psychiatry in 1971. In 1980, he was made a fellow of the American Psychiatric Association. In 1987 he was certified in Alcohol and Other Drug Dependencies by the American Society of Addiction Medicine.

Dr. Kaufman was Chief of Psychiatric Services at Lewisburg Federal Penitentiary in Pennsylvania from 1964 to 1966. From 1966 to 1967 he was the Senior Research Psychiatrist and Director of An Inpatient Unit at New York State Psychiatric Institute's Washington Heights Community Mental Health Services. From 1967 to 1971 he was Chief of Emergency Psychiatric Services at St. Luke's Hospital Center in New York City. From 1971 to 1973, Dr. Kaufman was the first Director of Psychiatry for Prison Mental Health Services of the City of New York, where he developed regionalized treatment programs at each jail in the city as well as an inpatient unit at Riker's Island Prison. From 1973 to 1977, Dr. Kaufman was the Chief Psychiatrist and Medical Director of the Lower East Side Service Center in New York City, where he directed services for over 1000 narcotics addicts. In 1977, he also served on the Standards and Advisory Panel for Juvenile Justice of the New York State Division of Criminal Justice Services.

AO 72
(Rev 8/82)

In 1977, Dr. Kaufman moved to California. From 1977 to 1978, Dr. Kaufman was a psychiatric consultant to the Orange County Department of Mental Health and to the Metropolitan State Hospital in Norwalk, California. From 1977 to 1979, he was the Medical Director for the Venice Drug Abuse Coalition. From 1978 to 1983, he served as Chief of Clinical Psychiatric Services at the University of California, Irvine (UCI) Department of Psychiatry. From 1979 to the present he has served as Director of Family Therapy Training at UCI Medical Center. From 1986 to 1990, he served as Executive Director of the Family Center in San Bernardino, and from 1988 to 1991, he served as Director of UCI's Chemical Dependency Program at Capistrano-By-The-Sea Hospital. From 1983 to 1991, he was also the Director of Psychiatric Education at UCI Medical Center.

Dr. Kaufman has held several professorships and has worked extensively with individuals with problems with drug abuse and alcoholism. He has written several articles on the subject of mental health care in prisons, including an article entitled "Violation of Psychiatric Standards of Care In Prison," which was reproduced in part by the California Department of Corrections in the 1986 workload study.

V. Meenakshi, M.D.

Dr. V. Meenakshi is a psychiatrist licensed to practice medicine in the State of California. She received her medical degree from the All India Institute of Medical Sciences in February 1963. She completed her residency at the Yale Psychiatric Institute at Yale University in New Haven, Connecticut in 1971. From 1971 to 1974, she was a Senior Fellow and then Assistant Medical Director at the Yale Psychiatric Institute. In 1975, she was an Advanced Fellow in Forensic Psychiatry at the University of Southern California. She has held teaching positions at the University of California campuses at Los Angeles and Davis. She is a Diplomate in Psychiatry of the American Board of Psychiatry and Neurology.

Dr. Meenakshi has been a staff psychiatrist at the Napa State Hospital, the Los Angeles County Crisis and Evaluation Unit stationed at Metropolitan State Hospital in Norwalk, California, the Drug Abuse Program and the Alcohol Program at the Veterans Administration Hospital at Sepulveda, California. From 1979 to 1985, she was in private practice with the Northridge Psychiatric Medical Group in Northridge, California; from 1982 to 1985 she was Co-Chairperson of Adolescent Psychiatry at Northridge Hospital. She has also served as a consultant to the Superior Court of Los Angeles, Atascadero State Hospital, Penny Lane Placement Home for Children, the United States Public Health Service, the Los Angeles Residential Community Clinic, the Criminal Justice Committee for

AO 72
(Rev 8/82)

the State Bar of California, the Burbank Municipal Court, and the Hillsides Children's Home in Pasadena, California. She is currently employed part-time as a psychiatrist at the Sutter-Yuba Mental Health Center and as a private practitioner.

Dr. Meenakshi worked as a psychiatrist at California Medical Facility from 1986 to 1990. During her tenure at CMF, she served as Chief Psychiatrist, Chairperson of the Department of Psychiatry, Chief of Inpatient and Outpatient Psychiatry, and Chief Psychiatrist of the Outpatient Program. From 1990 to 1992, Dr. Meenakshi was Medical Director of Inpatient Psychiatry at the Sacramento County Jail. She also was a member of the Task Force on Mentally Ill Sex Offenders and Mentally Ill Offenders sponsored by the Conference of Mental Health Directors and the California Psychiatric Association.

Russell C. Petrella, Ph.D.

Dr. Russell Petrella is the Director of Mental Health Services for the Virginia Department of Mental Health, Mental Retardation and Substance Abuse Services, a position he has held since 1990. In his present position, he is responsible for planning, developing, directing and monitoring the delivery of mental health services throughout the state of Virginia. He is also responsible for overseeing the provision of inpatient services to female prisoners transferred from the Department of Corrections as well as all male inmates transferred from local jails for inpatient psychiatric hospitalization.

Dr. Petrella received a Ph.D. in Clinical Psychology from Washington University in 1978. In 1975 and 1976, he trained at the Medical Services Division of the Supreme Bench of Baltimore City in Baltimore, Maryland, performing pre-trial and pre-sentencing evaluations of offenders, providing consultation to judges and probation officers, and providing individual psychotherapy to offenders. In 1976, he worked for the Special Offenders Clinic in Baltimore, providing group therapy for violent offenders and sexual offenders. In 1977, he served as a consultant to the Missouri Department of Probation and Parole. From 1977 to 1978, he worked as a Clinical Assistant in the Behavior Therapy Clinic of Washington University Psychological Service Center.

In 1978, Dr. Petrella started his own consultation and clinical practice, which continues to the present. The practice includes, inter alia, evaluation and testing in criminal cases, consultation to mental health and corrections systems, review of service delivery systems and consultations in litigation. In the same year, he also became a staff psychologist in the Department of Psychology for the Center for Forensic Psychiatry in Ann Arbor,

AO 72
(Rev 8/82)

Michigan.  He became Associate Director of the Center's Evaluation
Unit in 1979, and Director/Chairman of the Department of Psychology
in 1991.  He also provided direct services to inmates transferred
from the Michigan Department of Corrections to an inpatient unit.
From 1979 to 1981, he also served as a consultant to the Federal
Correctional Institute in Milan, Michigan, where his work included
conducting treatment groups for inmates.

From 1985 to 1989, Dr. Petrella was Director of Forensic
Services for the Virginia Department of Mental Health.  While in
that position, he participated in the planning, development and
implementation of a mental health system for the Virginia
Department of Corrections.  Prior to the reorganization, inmates in
need of inpatient services had been referred to Department of
Mental Health facilities; the reorganization included development
of a licensed correctional psychiatric hospital run by the Virginia
Department of Corrections.  Dr. Petrella also worked on the
development of legislation concerning mental health transfers from
jails to hospitals; a hospital staffing study; and study of the
clinical and security aspects of forensic inpatient programs.

In 1989, Dr. Petrella was appointed the Chairman of the
Governor's Special Advisory Panel on Forensic Mental Health in
Boston, Massachusetts.  The Panel was established by the
Massachusetts legislature to evaluate and make recommendations
regarding mental health and substance abuse services for men and
women in the criminal justice system, including development of
policy and evaluation of budgetary, resource, or statutory changes
necessary to implement the recommendations.  The Panel ultimately
sent a comprehensive report to the Governor.  In 1991, he served as
Associate Commissioner of Community/Facility Services in the
Virginia Department of Mental Health in addition to his present
position.

Dr. Petrella has held several University appointments,
and has made numerous presentations and written several articles on
the subjects of forensic mental health and mental retardation.  He
has also had extensive prior experience as an expert witness on
mental health legal matters.  He has served as an expert witness in
three cases involving systemic issues regarding mental health care
in jails and/or prisons.

In 1987, he was retained jointly by plaintiffs and
defendants to evaluate the quality of care at Bridgewater State
Hospital, a corrections operated psychiatric facility in
Massachusetts.  He made numerous recommendations regarding program
type and design, staffing numbers and organization,
seclusion/restraint, medical records and other aspects of treatment
programming.  The case resolved by settlement.

AO 72
(Rev 8/82)

In 1988, he was retained by the Pennsylvania Attorney General's office in a case brought by an individual inmate. Dr. Petrella concluded that the inmate did not need to be hospitalized in a mental health hospital and that the correctional programs and services were adequate for the inmate. The federal judge in that case agreed with Dr. Petrella's recommendations and ruled in favor of the Commonwealth of Pennsylvania.

In 1989, Dr. Petrella was retained as an expert for plaintiffs in a lawsuit against New York City regarding the mental health care services in the corrections psychiatric wards at Bellevue Hospital and Elmhurst Hospital. Again, he made several findings regarding problems with the quality of services including poor continuity of care, insufficient staff and delays in treatment. The case resolved by settlement.

AO 72
(Rev 8/82)

## Defendants' Experts

### Louis L. Beermann, Ph.D.

Louis L. Beermann, Ph.D., is the chief psychologist for the California Department of Corrections. He has worked for the CDC since 1990.

Dr. Beermann received his doctoral degree in psychology from the University of Oregon in 1974, and he completed a postdoctoral internship in clinical psychology. He became licensed to practice psychology in California in 1982. From 1974 to 1977, he was the chief of psychological services for the Nevada Division of Mental Hygiene and Mental Retardation. He was the director of the Sierra Developmental Center for the Mentally Retarded from 1977 to 1979.

From 1979 to 1980, Dr. Beermann was a service area director for the California Department of Mental Health (DMH), and from 1980 to 1981 he was the chief of forensic services for the same agency. From 1981 to 1983, he served as a special assistant to the Deputy Director for Clinical Services for DMH. From 1984 to 1989 he served as chief of research for DMH. In that capacity, he designed and implemented a research program to study mental illness in California. The program was replicated by the National Institute of Mental Health and is currently known as the "Public Academic Liaison" research program. During this same period, he also worked as a clinical consultant to the DMH Inpatient Program at California Medical Facility and subsequently as the chief of the Northern California Conditional Release Program.

### Steve Cambra

Steve Cambra is the Regional Administrator of the Central Region of the Institutions Division of the California Department of Corrections. He has been in that position since 1992. He is responsible for nine prisons in the region; he supervises the wardens of those nine prisons, as well as the Classification Services Unit, the Correctional Case Records Unit, the Transportation Unit and the Program Support Unit in the Institutions Division. He has worked for the CDC since 1970 and has extensive experience in line and staff positions. He has worked at several prisons as well as in headquarters.

### Joel Dvoskin, Ph.D.

Dr. Joel Dvoskin is a clinical psychologist employed as the Associate Commissioner for Forensic Services, New York State Office of Mental Health. In this position, he is responsible for inpatient services at three large forensic hospitals and two

8

regional forensic units, including services to civil, forensic, and correctional patients. He is also responsible for all mental health services in New York State Prisons, and he has other community and local jail responsibilities.

In 1991, Dr. Dvoskin was hired as a consultant by Scarlett Carp & Associates. He worked with Henry Steadman, Ph.D. and Dennis Koson, M.D., to develop the mental health delivery system proposed in the Scarlett Carp report. He has acted as a consultant to approximately eighteen jurisdictions regarding the provision of mental health care to incarcerated persons.[47]/

Dennis F. Koson, M.D.

Dennis F. Koson, M.D. is a medical doctor licensed in Florida. He also has inactive medical licenses in Michigan, Pennsylvania and Massachusetts. Dr. Koson received his medical degree from the University of Michigan Medical School in 1972. He completed his residency in psychiatry at the University of Pennsylvania in 1975. In 1974-75, he was a Fellow in Law and Psychiatry at the Center for Studies in Social-Legal Psychiatry at the University of Pennsylvania as well as a registered auditor at the law school there. He is certified by the American Board of Psychiatry and Neurology and by the American Board of Forensic Psychiatry.

Dr. Koson has held several teaching positions, including a consultant position for the National Institute of Corrections, National Academy of Corrections for a course in suicide prevention in jails at the Nova Law Center in Fort Lauderdale, Florida. He has also held positions as a research assistant and as the Director of Research at the State of Michigan Center for Forensic Psychiatry.

From 1973 to 1975, Dr. Koson was a part-time psychiatrist at Haveford State Hospital in Haveford, Pennsylvania. From 1974 to 1975, he was the Co-Director and Director of Training at the Forensic Psychiatry Clinic at the University of Pennsylvania. From 1979 to 1980, he was the Assistant Medical Director at Bridgewater State Hospital in Bridgewater, Massachusetts. From 1979 to 1981, he was also an assistant psychiatrist at the Institute of Psychiatry and Law at McLean Hospital in Belmont, Massachusetts. From 1981 to 1982 he was a senior forensic psychiatrist at South Florida State Hospital in Hollywood, Florida.

---

[47]/ Dr. Dvoskin indicated that his curriculum vitae was appended to his declaration; it was not, so the court is unable to address his qualifications further.

9

AO 72
(Rev 8/82)

Dr. Koson has served as an expert for special masters and on behalf of parties in four class action lawsuits involving mental health services in corrections departments. In connection with a class action law suit in Puerto Rico he assessed the correctional mental health system, created a remedial system, and has since been monitoring compliance with the plan and serving as a consultant to the federal monitor. He is serving the same role in litigation in Florida. He also served as an expert during similar litigation in Texas. Finally, he served as a federal monitor overseeing compliance with a consent decree and providing consultation and technical assistance in a federal class action in New York State involving mental health services to female prisoners in administrative segregation. He has also had extensive experience treating inmate patients in prisons and jails.

AO 72
(Rev 8/82)

United States District Court
for the
Eastern District of California
June 6, 1994

dav
# 2

* * CERTIFICATE OF SERVICE * *

2:90-cv-00520

Coleman

·v.

Reagan

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on June 6, 1994, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

```
        Donald Specter                      CF/JFM
        Prison Law Office
        General Delivery                     SJ/LKK
        San Quentin, CA  94964

        Warren E George Jr
        McCutchen Doyle Brown and Enersen
        Three Embarcadero Center
        Suite 1800
        San Francisco, CA  94111

        Michael W Bien
        Rosen Bien and Asaro
        155 Montgomery Street
        Eighth Floor
        San Francisco, CA  94104

        Sidney Wolinsky
        Disability Rights Advocates
        1999 Harrison Street
        Suite 2020
        Oakland, CA  94612-8644

        Richard L Goff
        Heller Ehrman White and McAuliffe
        333 Bush Street
        Suite 3100
        San Francisco, Ca 94104 - 2878
```

Amelia A Craig
Heller Ehrman White and McAuliffe
333 Bush Street
Suite 3100
San Francisco, CA  94104-2878

Ismael A Castro
Attorney General's Office of the State of California
P O Box 944255
1515 K Street
Suite 511
Sacramento, CA  94244-2550

Karl S Mayer
California State Attorney General
455 Golden Gate Avenue
Suite 6000
San Francisco, CA  94102-2550

Catherine I. Hanson
California Medical Association
221 Main Street
San Francisco, CA  94105


Jack L. Wagner, Clerk

BY: _____

Deputy Clerk